**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, and WILLIAM HUFF, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>COMSCORE, INC., SERGE MATTA, MELVIN WESLEY III, MAGID M. ABRAHAM, KENNETH J. TARPEY, WILLIAM J. HENDERSON, RUSSELL FRADIN, GIAN M. FULGONI, WILLIAM KATZ, RONALD J. KORN, JOAN LEWIS, RENTRAK CORPORATION, DAVID BOYLAN, DAVID I. CHEMEROW, WILLIAM ENGEL, PATRICIA GOTTESMAN, WILLIAM LIVEK, ANNE MACDONALD, MARTIN O'CONNOR, BRENT ROSENTHAL, and RALPH SHAW,<br><br>Defendants. | Case No.: 1:16-cv-01820-JGK<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ........ 1

II. JURISDICTION AND VENUE ........ 8

III. PARTIES TO PLAINTIFFS' CLAIMS UNDER §§ 10(b) AND 20(a) OF THE EXCHANGE ACT ........ 9

A. Plaintiffs ........ 9

B. Defendants ........ 10

IV. OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME ........ 11

A. During the Class Period, the Market Focused on comScore's Reported Revenue Growth and EBITDA ........ 11

B. As comScore Reported Purportedly Strong Revenues and EBITDA, Its Stock Price Nearly Doubled ........ 13

C. Fueled By Defendants' False Statements and an Enormous Stock Buyback Program, comScore's Stock Price Sours, Resulting in Millions of Dollars in Extra Compensation for Matta and Wesley ........ 17

D. The Company's Revenue and EBITDA Growth Were Inflated by Tens of Millions of Dollars in "Nonmonetary" Transactions ........ 19

E. The *Wall Street Journal* Raises Questions About comScore's Accounting for Nonmonetary Revenue ........ 21

F. Defendants Respond to the *Wall Street Journal* Article by Assuring the Market That comScore's Nonmonetary Revenue Is Consistent With GAAP ........ 22

1. Defendants Publicly Assure Analysts and Investors ........ 23

2. Defendants Participate in a Private Conference Call for a Small Group of Institutional Investors ........ 23

G. Defendants Leverage comScore's Inflated Stock Price to Purchase Rentrak in an $827 Million Stock Transaction ........ 27

H. Defendants Continue to Mislead the Market Regarding comScore's Nonmonetary Revenue ........ 29

1. Defendants Announce More "Record" Revenues for the Third Quarter of 2015 ........ 29

2. Defendants Again Deny Wrongdoing in Response to a Comment Letter from the SEC ........ 30

I. On February 17, 2016, comScore Announces "Record Annual GAAP Revenue" ........ 30

V. THE TRUTH IS REVEALED ........ 31

A. comScore Shocks the Market by Disclosing That Its Audit Committee Was Investigating "Potential Accounting Matters" ........ 31

B. conScore Announces that the Audit Committee Investigation Is Being Prolonged and the Company Will Be Unable to Timely File Its Annual Report for 2015 ........ 32

VI. THE AUDIT COMMITTEE INVESTIGATION CONTINUES, AND THE COMPANY EVENTUALLY ADMITS THAT IT HAD BEEN VIOLATING GAAP FOR YEARS ........ 33

A. comScore Repeatedly Delays Filing Its Annual and Quarterly Reports ........ 33

B. comScore's Co-Founder, CEO, and CFO All Leave Their Roles ........ 33

C. comScore Announces That It Must Restate Because Its Financial Statements for the Previous Three Years ........ 34

VII. OVERVIEW OF DEFENDANTS' GAAP VIOLATIONS AND USE OF A RELATED PARTY ........ 36

A. Overview of GAAP ........ 36

B. Defendants Violated GAAP by Using Fair Value Accounting For Nonmonetary Revenue ........ 38

C. Defendants Relied on a Related Party to Generate a Substantial Portion of the Improper Nonmonetary Revenue ........ 43

D. Defendants Manipulated the Revenue and Expenses From Nonmonetary Transactions to Boost EBITDA, comScore's Other "Key Metric" ........ 44

VIII. ADDITIONAL ALLEGATIONS OF SCIENTER ........ 46

A. Defendants Matta, Wesley, Abraham, Tarpey, and Henderson Sold More Than $60 Million Worth Of Artificially Inflated comScore Stock During the Class Period ........ 46

B. comScore's Stock Buybacks ........ 48

C. comScore Inflated Its Stock Price to Facilitate Its Acquisition of Rentrak ........ 49

IX. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..... 50

A. Fourth Quarter and Fiscal Year 2013 ..... 50

1. The February 11, 2014 Press Release ..... 50

2. The February 11, 2014 Conference Call ..... 52

3. The February 18, 2014 Form 10-K ..... 54

B. First Quarter of Fiscal Year 2014 ..... 57

1. The March 10, 2014 Media, Internet and Telecom Conference ..... 57

2. The April 29, 2014 Press Release ..... 57

3. The April 29, 2014 Conference Call ..... 59

4. The May 1, 2014 Form 10-Q ..... 60

C. Second Quarter of Fiscal Year 2014 ..... 62

1. The August 5, 2014 Press Release ..... 62

2. The August 5, 2014 Conference Call ..... 63

3. The August 5, 2014 Form 10-Q ..... 65

D. Third Quarter of Fiscal Year 2014 ..... 66

1. The September 11, 2014 Conference ..... 66

2. The October 28, 2014 Press Release ..... 67

3. The October 28, 2014 Conference Call ..... 69

E. The October 29, 2014 Form 10-Q ..... 70

F. Fourth Quarter and Fiscal Year 2014 ..... 72

1. The December 9, 2014 Global Tech Conference ..... 72

2. The February 12, 2015 Press Release ..... 72

3. The February 12, 2015 Conference Call ..... 74

4. The February 20, 2015 Form 10-K ..... 76

G. First Quarter of Fiscal Year 2015 ..... 77

1. The February 2015 Conference ........ 77

2. March 2015 Meeting with Brean Capital and Investors ........ 78

3. The May 5, 2015 Press Release ........ 78

4. The May 5, 2015 Conference Call ........ 80

5. The May 5, 2015 Form 10-Q ........ 81

H. Second Quarter of Fiscal Year 2015 ........ 83

1. The May 12, 2015 SunTrust Conference ........ 83

2. The August 4, 2015 Press Release ........ 83

3. The August 4, 2015 Conference Call ........ 85

4. The August 7, 2015 Form 10-Q ........ 87

I. Third Quarter of Fiscal Year 2015 ........ 89

1. The August 2015 Communications with Cantor Fitzgerald ........ 89

2. The August 12, 2015 Investor Conference ........ 89

3. The Late August 2015 Meeting with Brean Capital ........ 90

4. The Late August 2015 Statements to SunTrust ........ 91

5. The Response to the August 31, 2015 Wall Street Journal Article ........ 91

a. The September 2015 Meetings with Analysts and Investors ........ 91

b. The September 3, 2015 Private Conference Call ........ 92

6. The September 29, 2015 Conference Call ........ 95

7. The November 5, 2015 Press Release ........ 95

8. The November 5, 2015 Conference Call ........ 97

9. The November 6, 2015 Form 10-Q ........ 99

J. Fourth Quarter and Fiscal Year 2015 ........ 101

1. The December 3, 2015 Response to the SEC's Comment Letter ........ 101

2. The February 17, 2016 Press Release ........ 102

3. The February 17, 2016 Conference Call ..... 104

X. LOSS CAUSATION ..... 106

XI. PRESUMPTION OF RELIANCE ..... 109

XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 110

XIII. CAUSES OF ACTION UNDER §§ 10(b) and 20(a) ..... 111

COUNT I VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (Against Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson) ..... 111

COUNT II VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT (Against Defendants Matta, Wesley, Abraham, Tarpey, and Henderson) ..... 114

XIV. VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND SECTION 11 OF THE SECURITIES ACT ..... 115

A. Additional Parties ..... 115

1. Additional Plaintiff ..... 115

2. Additional Defendants ..... 116

a. comScore Individual Defendants ..... 116

b. Rentrak Defendants ..... 117

B. Background to the Merger ..... 119

1. Pre-Merger Negotiations ..... 119

2. Rentrak's Accountant Reports Serious Concerns Regarding comScore's Nonmonetary Revenue ..... 120

3. The Parties Enter Into the Merger Agreement ..... 121

4. The Joint Proxy Contains Material Misstatements and Fails to Disclose Material Facts ..... 122

C. Post-Merger Revelations ..... 122

1. comScore's Internal Accounting Investigation Forces It to Delay Reporting Its Financial Results ..... 122

D. Materially False and Misleading Proxy Solicitations in Violation of Section 14(a) ..... 123

1. Documents Incorporated by Reference into the Joint Proxy ................. 131

a. 2014 Form 10-K........................................................... 132

b. May 5, 2015 Form 8-K and First Quarter 2015 Form 10-Q ....... 133

c. August 4, 2015 Form 8-K and Second Quarter 15 Form 10-Q .. 135

d. November 5, 2015 Form 8-K and Third Quarter 2015 Form 10-Q.......................................................................... 137

2. Other Proxy Solicitations ........................................................... 139

E. The Registration Statement Contains Untrue Statements of Material Facts and Material Omissions in Violation of Section 11 of the Securities Act................ 143

F. Loss Causation Under Section 14(a) of the Exchange Act............................... 145

COUNT III FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT (Against Defendants Comscore And The Comscore Merger Individual Defendants) ..................................................................................... 147

COUNT IV FOR VIOLATIONS OF § 14(a) OF THE EXCHANGE ACT (Against Defendants Rentrak And The Rentrak Individual Defendants) ......................... 149

COUNT V FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT (Against Defendants comScore and the comScore Merger Individual Defendants) ..................................................................................... 151

XV. CLASS ACTION ALLEGATIONS ............................................................... 152

XVI. PRAYER FOR RELIEF ............................................................................. 154

XVII. JURY DEMAND....................................................................................... 155

Lead Plaintiffs Fresno County Employees' Retirement Association and Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Lead Plaintiffs") and Plaintiff William Huff (together with Lead Plaintiffs, "Plaintiffs") bring this action on behalf of themselves and all persons or entities who purchased or otherwise acquired the securities of Defendant comScore, Inc. ("comScore" or the "Company") during the period from February 11, 2014 through March 7, 2016 (the "Class Period"), as defined in ¶561 below (the Class Definition).

## I. INTRODUCTION

1. This case concerns an egregious accounting fraud perpetrated by comScore and its most senior officers over a period of nearly three years. Founded in 1999, comScore is a media and analytics company that measures online traffic and internet purchasing habits. As discussed below, in connection with a months-long (and still ongoing) internal investigation by its Audit Committee, comScore has admitted that its publicly reported financial statements for a period of more than three years were materially false and misleading, violated Generally Accepted Accounting Principles ("GAAP"), and improperly recognized more than $43 million in fictitious revenues.

2. During the Class Period, Defendants told investors on conference calls and in multiple filings with the Securities and Exchange Commission ("SEC"), filings that comScore was achieving supposedly "record" revenues that grew steadily from $76.9 million in the first quarter of 2014 to $92.4 million by the third quarter of 2015—an increase of more than 20%. These statements were extremely important to investors. As comScore acknowledged in its SEC filings, the Company's revenue and revenue-related metrics (such as earnings before interest, taxes, depreciation, and amortization ("EBITDA")) were "the key financial measures by which our stockholders evaluate our progress."

3. As Defendants knew it would, the market reacted positively to their story of consistent and strong revenue growth. Analysts covering the Company repeatedly raised their price targets while highlighting comScore's "better than expected revenue," "much better than expected" EBITDA, and "strong results" reflecting "growing revenue and EBITDA." This, in turn, caused comScore's stock price to more than double, climbing from approximately $30 per share at the start of the Class Period to a high of more than $64 per share just 18 months later.

4. The insider Defendants took advantage of this sharp increase in the Company's stock price to enrich themselves by more than $60 million in less than two years through insider stock sales and lavish compensation packages. Serge Matta, for example, who became Chief Executive Officer ("CEO") of comScore in March 2014 and was replaced just 18 months later in the midst of the Audit Committee's investigation into the Company's accounting, sold 68 percent of his personal holdings of comScore stock and reaped a staggering $18.1 million for himself.

5. Likewise, after becoming the Company's Chief Financial Officer ("CFO") in August 2014, Melvin Wesley III proceeded to make more than $7.6 million on insider stock transactions in less than two years, selling 88 percent of his holdings. He, too, was replaced in August 2016. During the same short period, Defendant Magid M. Abraham, the Company's co-founder, former CEO, and until recently the Executive Chairman of its Board of Directors, cashed in more than $31 million worth of comScore stock, including an eye-popping 92 percent of his personal holdings as of the start of the Class Period. Abraham stepped down as Executive Chairman in July 2016.

6. Defendants Matta and Wesley were also awarded highly lucrative compensation packages in November 2014. These pay packages—which were approved by Defendant William J. Henderson in his role as the chair of comScore's compensation committee—entitled Matta and

Wesley to significant grants of Restricted Stock Units ("RSUs") when comScore's stock attained predetermined price points ($48, $50, $55, or $60 per share) during any consecutive 30-day period. During the first three quarters after this compensation package was awarded, comScore's stock price soared as a result of Defendants' materially false statements. The stock ultimately achieved each of the predetermined price targets, just squeaking over the final $60 per share threshold in mid-August 2015. In total, Matta and Wesley received nearly $9 million worth of vested stock through these arrangements.

7. There is no dispute that these outsized compensation packages and lucrative insider stock sales occurred at a time when comScore was making materially false and misleading statements that artificially inflated its publicly reported financial results. Nonetheless, as discussed below, these Defendants have walked away with tens of millions of dollars, while investors have suffered hundreds of millions of dollars in losses as a result of Defendants' fraud.

8. The market first raised questions about comScore's accounting in August 2015, shortly after Matta and Wesley received their final award of vested stock. On August 31, 2015, the *Wall Street Journal* published an article noting that a significant and growing portion of comScore's reported revenues were the result of "nonmonetary" transactions. In these transactions, sometimes called "barter transactions," comScore entered into data-sharing agreements whereby comScore would swap data with another company but the companies would not exchange any cash payment. As described in more detail below, because these types of transactions are easily susceptible to abuse (as demonstrated here), there are strict rules under GAAP that dictate when companies are permitted to book revenue from them.

9. During the Class Period, comScore booked tens of millions of dollars in revenue from these nonmonetary transactions. While defendants repeatedly stated that their accounting for

these transactions complied with GAAP, the August 31, 2015 *Wall Street Journal* article commented that the "significance of these nonmonetary revenues to [comScore's] top line warrants scrutiny."

10. In response to the *Wall Street Journal* article, Defendants rushed to reassure the market. In a series of hastily arranged meetings, Defendants met privately with several analysts to assure them that comScore's recognition of nonmonetary revenue fully complied with all applicable accounting rules. Defendants also took the extraordinary step of conducting a conference call in early September 2015 that was limited to a select group of hand-picked institutional investors and analysts.

11. Although comScore has never publicly disclosed a transcript of that call or otherwise made any public mention of it in SEC filings, Plaintiffs obtained an audio recording of the call in the course of their investigation. As discussed in more detail below, this recording captures Matta and Wesley using material nonpublic information (in violation of comScore's obligations of fair disclosure under Regulation FD) to repeatedly assure participants on the call that all nonmonetary revenue was "100% GAAP revenue. . . . [T]he guidelines are very, very strict and <u>we follow them to the t.</u>"

12. Defendants' full-court press to reassure the market was successful. After an initial drop, comScore's stock price stabilized, enabling Defendants to announce in late September 2015 that the Company was going to conduct in an enormous all-stock transaction to purchase Rentrak Corporation, another media-measurement company that focused on television and home video. The Rentrak transaction was valued at $827 million and was funded solely through a stock swap that gave Rentrak shareholders 1.15 shares of comScore stock for every share of Rentrak stock they held.

13. In November 2015, while the market congratulated comScore on yet another quarter of purportedly "record" revenues, the SEC issued a comment letter to comScore (which Defendants did not disclose at the time) asking for additional information regarding the Company's accounting for nonmonetary transactions. In a response filed with the SEC in December 2015 and posted to the SEC's website, Defendants assured the SEC that "all of [comScore's] nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized" and that recording revenue for these transactions was "consistent with [comScore's] accounting policies."

14. Unfortunately for investors, Defendants' repeated assurances regarding comScore's accounting for nonmonetary revenue were false. On February 29, 2016, the Company announced that the Audit Committee of its Board of Directors had "received a message regarding certain potential accounting matters," forcing comScore to hire outside counsel and launch an internal investigation. Although comScore initially stated that the investigation would be completed quickly, in early March 2016 the Company announced that its problems were so severe the Company had "proactively contacted the staff of the Securities and Exchange Commission regarding the Audit Committee's internal review," and would be unable to timely file its annual report for 2015.

15. The *Wall Street Journal* wondered whether comScore's "aggressive accounting practices may have caught up with it," and the market reacted with alarm. There followed an enormous sell-off of comScore common stock, which declined from $27.04 to approximately $13.67 per share, a drop of more than 49 percent.

16. Over the next seven months the investigation dragged on while comScore repeatedly delayed filing its 2015 annual report and missed deadlines for filing its quarterly reports

for the first and second quarters of 2016. In September 2016, the Company finally announced the partial results of its long-running internal investigation. In a Form 8-K filed on September 15, 2016, comScore stated that its Audit Committee had concluded that the Company would have to restate its financial results from 2013 through the first three quarters of 2015. Just as troubling, the Company noted that the investigation was continuing and "there may be additional accounting adjustments" forthcoming and those "adjustments may be material."

17. A restatement is an extraordinarily negative event for a public company. Under GAAP, a "restatement" is a term of art used only where a company's previously issued financial statements were materially false as of the time of issuance and the misstatements were based on "facts that existed at the time the financial statements were prepared." In this case, comScore has announced that it will be issuing a broad restatement because "the Company cannot support the prior accounting for the nonmonetary transactions recorded by the Company during the years ended December 31, 2013, 2014, and 2015." The Company's Audit Committee has determined that comScore's "revenue and expenses associated with all nonmonetary transactions during the periods identified above should be reversed and accounted for at historical cost rather than at fair value." Further, because "there is no historical cost basis associated with the assets that the Company exchanged," comScore admitted that no revenue should have been recognized for those transactions.

18. In other words, comScore admitted that every single penny of more than $43 million in nonmonetary revenue it recorded during the Class Period was included in its financial statements in violation of GAAP. The impact of this on the Company's reported financial statements and supposed revenue growth is enormous. For example, in the second quarter of 2015 alone, comScore improperly recorded $10.8 million of nonmonetary revenue—constituting ***85.7***

***percent*** of the Company's reported revenue growth for that quarter. The impact on comScore's third quarter 2015 results were similar, with the Company improperly recording $9.1 million of nonmonetary revenue, or ***88.3 percent*** of the Company's reported revenue growth for that quarter.

19. Moreover, and suspiciously, much of comScore's improper nonmonetary revenue came from a single counterparty called Acxiom Corporation. During the Class Period, comScore engaged in multiple nonmonetary transactions with Acxiom, repeatedly using the company as a piggy bank to generate phony revenue. Astonishingly, of the $43.2 million in nonmonetary revenue that the Company has so far admitted was improper, $19.1 million—nearly half—came from transactions with Acxiom alone. Indeed, comScore's transactions with Acxiom provided ***two-thirds*** of comScore's nonmonetary revenue in 2014.

20. Defendants used Acxiom to help perpetrate the fraud for a simple reason: it is a related party. Defendant Henderson is not only the chair of comScore's Compensation Committee, he is also a director of Acxiom. And Henderson is no token Board member. As the former Chief Operating Officer of Netflix, Inc., Henderson was intimately familiar with the world of data aggregation and sales. Yet Henderson not only said nothing while these sham transactions occurred, he also approved Matta and Wesley's outsized pay packages. Notably, Henderson himself personally profited from comScore's inflated stock price through $1.7 million in insider stock sales of his own during the Class Period.

21. Defendants' misconduct has destroyed hundreds of millions of dollars' worth of comScore's market capitalization. As of today, many of comScore's senior executives have resigned; the Company has spent millions of dollars in a months-long internal investigation, the results of which are still not final and may yet result in the revelation of additional improprieties; and comScore faces multiple lawsuits.

22. Based on the facts alleged in this Complaint, Plaintiffs assert claims under (i) § 10(b) of the Exchange Act against Defendants comScore, Matta, Wesley, Abraham, Henderson, and Kenneth J. Tarpey, the Company's CFO from April 2009 until August 2014; (ii) § 20(a) of the Exchange Act against Defendants Matta, Wesley, Abraham, Henderson, and Tarpey; (iii) § 14(a) of the Exchange Act against Defendants comScore, Matta, Wesley, Abraham, and Henderson, as well as comScore directors Russell Fradin, Gian M. Fulgoni, William Katz, Ronald J. Korn, and Joan Lewis, Defendant Rentrak, and Rentrak officers and directors David Boylan, David I. Chemerow, William Engel, Patricia Gottesman, William Livek, Anne MacDonald, Martin O'Connor, Brent Rosenthal, and Ralph Shaw; and (iv) Section 11 of the Securities Act against Defendants comScore, Matta, Wesley, Abraham, Henderson, Fradin, Fulgoni, Katz, Korn, and Lewis.

## II. JURISDICTION AND VENUE

23. The claims asserted in this Complaint arise under §§ 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(a), and 78t(a)), SEC Rules 10b-5 (17 C.F.R. §240.10b-5) and 14a-9 (17 C.F.R. §240.14-a9), and § 11 of the Securities Act (15 U.S.C. §77k).

24. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, § 27 of the Exchange Act (15 U.S.C. §78aa), and § 22 of the Securities Act (15 U.S.C. §77v).

25. Venue is proper in this Judicial District under 28 U.S.C. §1391(b), § 27 of the Exchange Act (15 U.S.C. §78aa), and § 22 of the Securities Act (15 U.S.C. §77v). Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this Judicial District. Many of the acts charged in this Complaint, including the dissemination of materially false or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's shares are actively traded within this District.

26. In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES TO PLAINTIFFS' CLAIMS UNDER §§ 10(b) AND 20(a) OF THE EXCHANGE ACT

### A. Plaintiffs

27. Lead Plaintiff Fresno County Employees' Retirement Association ("Fresno") is a California-based pension trust fund established in 1937 that provides retirement benefits for eligible employees of the County of Fresno and for participating agencies. As of June 30, 2015, Fresno managed approximately $4.3 billion in total assets for the benefit of its approximately 17,000 members. As reflected in Fresno's certification on file with the Court (ECF No. 23-2), Fresno purchased shares of comScore stock on the NASDAQ Stock Market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

28. Lead Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Baton Rouge") is a defined benefit pension plan established in 1953 that provides retirement allowances and other benefits to regular employees of the City of Baton Rouge. As of January 1, 2015, Baton Rouge managed approximately $1.1 billion in assets for the benefit of its approximately 6,700 participants. As reflected in Baton Rouge's certification on file with the Court (ECF No. 23-2), Baton Rouge purchased shares of comScore stock on the NASDAQ Stock Market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this Complaint.

**B. Defendants**

29. Defendant comScore is a Delaware corporation with its principal executive offices located at 11950 Democracy Drive, Suite 600, Reston, Virginia 20190.

30. Defendant Serge Matta began working at the Company in 2000 and was, from March 1, 2014 until August 5, 2016, the CEO. According to the Company's Form 8-K dated September 12, 2016, Defendant Matta ended his employment with comScore on October 10, 2016.

31. Defendant Melvin Wesley III was, from August 29, 2014 until August 5, 2016, the Company's CFO. According to the Company's Form 8-K dated September 8, 2016, Defendant Wesley ended his employment with comScore on October 10, 2016.

32. Defendant Magid M. Abraham co-founded comScore and was, from the Company's inception until March 1, 2014, the Company's CEO, and, from March 1, 2014 until July 21, 2016, the Company's Executive Chairman of the Board of Directors.

33. Defendant Kenneth J. Tarpey was, from April 20, 2009 until August 5, 2014, the Company's CFO.

34. Defendant William J. Henderson was throughout the Class Period and continues to be a Director of the Company and the chair of its Compensation Committee, and has been comScore's Lead Independent Director since 2014. Defendant Henderson had previously served as Chief Operations Officer of Netflix, Inc., from January 2006 until February 2007 – a time during which, according to Netflix's Form 10-K for the fiscal year 2007, Netflix focused on the acquisition and use of subscriber data to fuel its growth stragegy.

35. Defendants Matta, Wesley, Abraham, Tarpey, and Henderson, because of their high-ranking positions and direct involvement in the everyday business of the Company, directly participated in the management of the Company and had the power and authority to control the contents of comScore's reports to the SEC, press releases, and presentations to securities analysts,

money and portfolio managers, and institutional investors. These Defendants were directly involved in controlling the content of, and in drafting, reviewing, publishing and disseminating the false and misleading statements and information alleged in this Complaint.

## IV. OVERVIEW OF DEFENDANTS' FRAUDULENT SCHEME

### A. During the Class Period, the Market Focused on comScore's Reported Revenue Growth and EBITDA

36. In 2007, comScore completed an initial public offering, and its shares began trading on the NASDAQ Stock Market under the symbol "SCOR." Since it became a public company, comScore has focused primarily on measuring internet traffic and usage. The Company purports to deliver digital media analytics that aim to help content owners and advertisers understand and value the composition of consumer media audiences, and help marketers understand the performance and effectiveness of advertising targeted at these audiences.

37. The key metrics that investors, analysts and Defendants focused on during the Class Period were comScore's steady and predictable growth in revenue and EBITDA. The Company itself emphasized the importance of its reported revenues and EBITDA in its filings with the SEC during the Class period, stating:

> Key measures used by our management and board of directors to understand and evaluate our core operating performance and trends. We believe that these non-GAAP financial measures [i.e., EBITDA] provide useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of directors.

38. In its Form 14A Annual Proxy filed on June 8, 2015 for example, comScore described revenue and adjusted EBITDA as the "key financial measures by which our stockholders evaluate our progress."

39. Indeed, in each of comScore's press releases announcing its financial results during the Class Period, the very first items mentioned were the Company's revenue, revenue growth,

EBITDA, and EBITDA growth, followed by a prominent statement emphasizing that the revenue for that period was a new "record." And Defendants Abraham, Tarpey, Matta and Wesley spoke about the Company's revenue and revenue growth on each investor conference call held during the Class Period.

40. Analysts also focused on these metrics. For example, in a March 20, 2014 report, Brean Capital LLC ("Brean Capital") noted that "[comScore's] revenue model is relatively predictable" and that the Company should be able to achieve "mid-teens revenue growth." On December 2, 2014, SunTrust Robinson Humphrey ("SunTrust") initiated coverage on comScore with a "Buy" rating, noting:

> The company is on the front-end of a multi-year multi-product cycle that should (at least through 2016) drive strong top-line [*i.e.,* revenue] growth (~16%) and margin expansion (EBITDA growth ~20%) with bottom-line further supported by buybacks . . . .

41. Similarly, on January 28, 2015, Wedbush Securities ("Wedbush") initiated coverage on comScore with an "OUTPERFORM" rating, stating that "we believe comScore is an attractive investment opportunity . . . [w]e view comScore as a base-line mid-teens revenue grower (~16% for 2015/16) with faster EBITDA growth . . . ." In August 4, 2015, an analyst from Cantor Fitzgerald noted that comScore's "*Continued strength in subscription revenue growth*, [and] improving margins," were keeping "us positive on the name."

42. The market consistently reacted to comScore's supposedly "record" revenue and EBITA results by driving comScore's stock price higher after nearly each announcement.

| **Period** | **Announced "Record" Revenue** | **Stock Price Increase** |
|---|---|---|
| FY 2013 | $286.9 million | 5% |
| Q1 2014 | $76.9 million | 10% |
| Q2 2014 | $80.0 million | 0% |
| Q3 2014 | $82.1 million | 7% |

| Period | Announced "Record" Revenue | Stock Price Increase |
|---|---|---|
| FY 2014 | $329.1 million | 25% |
| Q1 2015 | $87.3 million | 15% |
| Q2 2015 | $91.4 million | 14% |
| Q3 2015 | $92.4 million | 5% |
| FY 2015 | $368.8 million | 5% |

**B. As comScore Reported Purportedly Strong Revenues and EBITDA, Its Stock Price Nearly Doubled**

43. During the Class Period, comScore reported significant revenue and EBITDA growth. In response to these seemingly positive disclosures, comScore's stock price increased from approximately $32 per share in February 2014to a Class Period high of over $62 per share by August 2015.

44. On February 11, 2014, the first day of the Class Period, the Company filed with the SEC a Form 8-K and accompanying press release announcing its 2013 financial results. That press release quoted Defendant Abraham as stating that the Company had delivered "record revenue, strong margin expansion and EBITDA growth well above expectations." That same day, Defendants Abraham, Matta, and Tarpey participated in an earnings conference call with investors. During the call, Abraham stated that the Company "generated 16% pro forma revenue growth over 2012, well above our expectations," and Tarpey stated that "[r]evenue in the fourth quarter was $76.5 million, up 15% versus pro forma results in the same quarter last year."

45. Analysts praised the Company's results and were particularly excited by the Company's reported revenue and associated EBITDA. For example, in a report dated February 11, 2014, Cantor Fitzgerald wrote that comScore "reported another strong quarter, with revenue 1% and EBITDA 8% ahead of expectations." In response, comScore's stock price went from $30.97

at the open on February 11, 2014 to close at $32.48 at the end of the week following the filing of the Company's Form 10-K—a nearly 5% increase.

46. On April 29, 2014, Defendants Matta and Tarpey participated in a conference call with investors to announce the Company's first quarter 2014 results. On that call, Matta stated that the Company "continue[d] to build on the tremendous momentum comScore created in the marketplace last year with <u>another quarter of record revenues</u> and strong profitability to kick off 2014." Tarpey added that "[r]evenue in the first quarter was $76.9 million, up 14% versus pro forma results in the same quarter last year."

47. Analysts again reacted positively. An April 29, 2014 report by Cantor Fitzgerald reiterated its "buy" rating on comScore and raised its price target to $36 per share, describing the Company's "strong quarter" that had revenue and EBITDA ahead of expectations. On May 2, 2014, shares of comScore closed the week at $31.83, up 10% from $28.93 at the open on April 29, the day of the earnings announcement.

48. On August 5, 2014, the Company filed its second quarter 2014 Form 10-Q, and Defendants Matta and Tarpey conducted a conference call with investors to discuss its earnings. During the call, Matta stated that:

> comScore <u>delivered another quarter of record revenues</u> and strong profitability demonstrating the continued positive momentum across our business. Second quarter 2014 revenues were $80 million, up 14.5% over last year's results. . . . As you can see, our key operating metrics demonstrate the fundamental strength and continued momentum of our business.

Tarpey added that the Company was "raising our full year 2014 revenue outlook due to the continued momentum of the business."

49. Once again, analysts praised comScore's reported results. In its August 5, 2014 report, Cantor Fitzgerald maintained its buy rating and raised its price target for comScore's shares by 16%, from $36 to $42, writing that comScore "reported another strong quarter, with revenue

and EBITDA . . . ahead of expectations," and predicted "sustained mid-teens revenue growth for several more years."

50. On October 28, 2014, Defendants Matta and Wesley discussed the Company's third quarter 2014 financials in an investor conference call. During the call, Matta described the Company's results as "another quarter of record revenues and strong profitability . . . reflect[ing] continued positive momentum across our business and the strength of our partnerships, which continue to grow in number and impact." Wesley gave "a closer look" at the third quarter 2014 results, stating that "[r]evenue in the quarter was $82.1 million, up 15% versus the same quarter last year."

51. Analysts again reacted well to the Company's reported revenue growth. For example, an October 28, 2014 report by Oppenheimer & Co ("Oppenheimer") noted comScore's "Solid 3Q Results/Guidance" and increased its price target from $38 to $43. In its report that same day, Cantor Fitzgerald maintained its "buy" rating "on the back of strong 3Q results, which were slightly better on revenue and comfortably above on EBITDA."

52. In response to the Company's quarterly earnings announcement, comScore's share price increased from $39.41 at the open on October 28, 2014, to close the week at $42.14 on October 31, 2014—a 7% gain.

53. Heading into 2015, Defendants sought to keep comScore's stock price rising, and on multiple occasions during the first half of 2015, comScore reported seemingly positive results for revenue and EBITDA. On a February 12, 2015 conference call with investors to discuss comScore's fourth quarter and fiscal year 2015 results, Matta stated that "comScore delivered another quarter of record revenues and strong profitability. This reflects continued positive momentum across our business and the strength of our partnerships which continue to grow in

number and impact." Wesley added that management was "pleased with [the Company's] revenue growth," with "[r]evenue in the quarter [of] $89.1 million on a pro forma basis, up 19% versus the same quarter last year."

54. On May 5, 2015, comScore reported its first quarter 2015 results:

> comScore delivered another quarter of strong revenues and strong profitability. This reflects continued positive momentum across our business and the strength of our partnerships, which continue to grow in number and impact. On a pro-forma basis, first-quarter 2015 revenue was $87.1 million, up 15% over last year.

55. On May 12, 2015, a week after comScore reported its first quarter results, Matta spoke at a SunTrust Internet & Digital Media Conference, where he noted that the Company had raised guidance and "when you raise guidance, you have confidence in the estimates of the company." In response to these disclosures, comScore's stock price rose nearly 15% in the two weeks following the earnings announcement, from $48.50 at the close on May 5, 2015 to $55.74 on May 19, 2015.

56. On August 4, 2015, Matta and Wesley participated in an investor conference call to announce comScore's second quarter 2015 results. During the call, Matta stated that "ComScore delivered another quarter of record revenues and strong profitability . . . reflect[ing] continued positive momentum across our business and the strength of our partnerships, which continued to grow in number and impact."

57. Defendant Wesley also elaborated on the Company's revenue growth:

> Revenue in the quarter was $91.3 million on a pro forma basis, up 16% versus the same quarter last year. We are pleased with our revenue growth despite continued foreign currency exchange rate headwinds. If exchange rates against the US dollar remain constant from the same quarter last year, our Q2 pro forma revenue would have been $95.5 million, or a growth of 21%.

58. That month, Defendants met several times with investors and analysts, cementing the analysts' positive views about comScore's revenue growth. For example, Cantor Fitzgerald

wrote in a report dated August 10, 2015 that its meetings with Defendants "keep us positive" on the Company. Likewise, Brean Capital wrote in a report dated August 25, 2015 that comScore management had "highlighted that strength in [the second quarter of 2015] was underpinned by strong Media Metrix net adds and multiplatform upsells, undoubtedly aided by the addition of Kantar's International salesforce, and 50%+ growth in vCE revenues. . . . Management indicated that solid trends continue into 2H15 . . . ." (Media Matrix and vCE are comScore products, and Kantar is a company that formed an international alliance with comScore in February 2015.)

59. From the start of the Class Period on February 11, 2014 to August 17, 2015, comScore's stock price rose approximately 108%, from $30.97 to $64.64.

### C. Fueled By Defendants' False Statements and an Enormous Stock Buyback Program, comScore's Stock Price Sours, Resulting in Millions of Dollars in Extra Compensation for Matta and Wesley

60. As comScore's share price continued to climb in response to its reported "record" revenues and EBITDA, Matta and Wesley profited handsomely under the terms of a unique and lucrative compensation package. As noted above, on November 7, 2014, under the direction of Defendant Henderson in his role as chair of comScore's Compensation Committee, the Company granted Matta and Wesley awards of stock options and RSUs that could be exercised or vested if the average daily closing price of the Company's common stock during any 30 consecutive calendar-day period exceeded the following predetermined price targets: $48.00, $50.00, $55.00, or $60.00.

61. When the awards were granted, the Company's stock was trading at approximately $43 per share. As comScore continued to report record growth in revenue and EBITDA over the next few quarters, comScore's share price increased so that all four blocks of shares granted to Matta and Wesley qualified for vesting or exercising between March and August 2015.

62. Each of the relevant 30-day periods in which comScore's stock reached the required average daily closing price included or closely followed one of comScore's earnings reports that reported strong revenue growth, and the stock reached the thresholds necessary for the compensation awards to vest as a result of the market's positive reaction to those reports, as demonstrated in the following chart from a July 13, 2016 article in the *Wall Street Journal*:




63. Matta and Wesley profited handsomely as a direct result of comScore's increasing share price, collectively receiving shares valued at more than $9 million in less than 6 months:

| Tier | Date Vested | Vested Shares Received by Defendant Matta | Value of Defendant Matta's Vested Shares | Vested Shares Received by Defendant Wesley | Value of Defendant Wesley's Vested Shares |
|---|---|---|---|---|---|
| $48 | 3/1/2015 | 68,401 | $3,283,248 | 15,112 | $725,376 |
| $50 | 3/8/2015 | 13,686 | $684,300 | 3,148 | $157,400 |
| $55 | 6/6/2015 | 31,091 | $1,710,005 | 6,927 | $380,985 |
| $60 | 8/23/2015 | 28,500 | $1,710,000 | 6,297 | $377,820 |
| | | **Total:** | **$7,387,553** | **Total:** | **$1,641,581** |

64. Notably, comScore's stock price was inflated during this time not only by Defendants' admittedly false statements but also by an aggressive stock-repurchase program overseen by Matta and Wesley. As discussed in more detail below, during the Class Period, comScore used $144 million in shareholder money to repurchase over 3.2 million shares of its stock from the market. Of particular relevance is the stock repurchase program put in place by the Company on May 5, 2015, which authorized the Company to spend $150 million repurchasing its shares from the open market.

65. Defendants immediately put that program into place to buy back shares at an unprecedented level. In the second quarter of 2015 (ended on June 30, 2015), comScore spent $56.2 million of Company money to repurchase more than $1 million shares of Company stock from the open market. Similarly, in the third quarter of 2015 (ending on September 30, 2015), comScore spent another $46 million to repurchase another approximately 800,000 shares. Spending $102.2 million on these repurchases in just two quarters was highly unusual and dwarfed comScore's historical practices. For example, for the entire fiscal year 2014, comScore had repurchased only $38.4 million worth of its stock.

66. The average price paid for the shares repurchased by comScore in the second and third quarters of 2015 was $53.77 and $55.78, respectively. Thus, the average price was slightly below the price thresholds for triggering the final two tiers of Defendants Matta and Wesley's RSU compensation packages and helped push the share price into the range where Defendants would receive extra compensation.

**D. The Company's Revenue and EBITDA Growth Were Inflated by Tens of Millions of Dollars in "Nonmonetary" Transactions**

67. Throughout the Class Period, the "record" revenue that comScore reported and announced to investors included not only cash revenue from customers buying its services and

products, but also tens of millions of dollars in revenue the Company recognized from "nonmonetary transactions." These nonmonetary transactions, which are also sometimes referred to as "barter transactions," involved data-sharing agreements with other parties. Under these arrangements, comScore and its counterparties would swap data without exchanging any significant cash or other payment. comScore's counterparties booked no revenue from these data swaps. Nonetheless, comScore booked tens of millions of dollars in revenue from these nonmonetary transactions based on Defendants' determination of the "fair value" of the data exchanged.

68. While Defendants did not highlight comScore's "nonmonetary" revenue when they spoke to investors on conference calls, the Company did state in certain of its SEC filings the amount of revenue attributable to nonmonetary transactions for certain periods. During the Class Period, the portion of comScore's total revenues attributable to nonmonetary transactions was as follows:

| Period | Revenue | Nonmonetary Revenue |
|---|---|---|
| **FY 2013** | **$286.9 million** | **$3.2 million** |
| Q1 2014 | $76.9 million | $2.2 million |
| Q2 2014 | $80.0 million | $1.8 million |
| Q3 2014 | $82.1 million | $4.6 million |
| Q4 2014 | $90.1 million | $7.7 million |
| **FY 2014** | **$329.1 million** | **$16.3 million** |
| Q1 2015 | $87.3 million | $3.8 million |
| Q2 2015 | $91.4 million | $10.8 million |
| Q3 2015 | $92.4 million | $9.1 million |
| | **Total:** | **$43.2 million** |

69. As the above chart shows, comScore's nonmonetary revenue surged during the Class Period. While comScore's nonmonetary revenue grew in absolute amount, it grew even faster as a proportion of comScore's reported growth in revenue:

| Period | Nonmonetary Revenue | Reported Growth From Same Period in Prior Year | Nonmonetary Revenue as Percentage of Growth |
|---|---|---|---|
| **FY 2013** | **$3.2 million** | **$31.7 million** | **10.1%** |
| Q1 2014 | $2.2 million | $8.1 million | 27.2% |
| Q2 2014 | $1.8 million | $10.1 million | 17.8% |
| Q3 2014 | $4.6 million | $10.5 million | 43.8% |
| Q4 2014 | $7.7 million | $13.6 million | 56.6% |
| **FY 2014** | **$16.3 million** | **$42.2 million** | **38.6%** |
| Q1 2015 | $3.8 million | $10.4 million | 36.5% |
| Q2 2015 | $10.8 million | $12.6 million | 85.7% |
| Q3 2015 | $9.1 million | $10.3 million | 88.3% |
| **Total:** | **$43.2 million** | **$107.2 million** | **40.3%** |

70. Throughout the Class Period, Defendants assured investors that comScore's accounting for nonmonetary revenue complied with GAAP.

### E. The *Wall Street Journal* Raises Questions About comScore's Accounting for Nonmonetary Revenue

71. On August 31, 2015, the *Wall Street Journal* published an article entitled "Is comScore's Revenue Growth as Good as it Seems?" The *Wall Street Journal* questioned "what is driving [comScore's] growth," and noted that a significant amount of comScore's revenue consisted of revenue derived from "nonmonetary" transactions: "[comScore] reported second quarter revenue of $91.4 million on Aug. 4, up 14% from a year earlier. A note within its quarterly filing explained, though, that $10.8 million was 'nonmonetary' revenue."

72. As the *Wall Street Journal* noted, comScore's "nonmonetary revenue has ramped up significantly over the past 12 months. It accounted for about 8% of comScore's total revenue over the period, versus only 2% in the previous 12 months. ComScore's stock, meanwhile, reached a 52-week high earlier this month, closing at $64.64 on Aug. 17." The article noted that "the [nonmonetary revenue] gains are based on estimates of the assets' fair value; that is subjective by nature and has been open to question in the past in other industries . . . ."

73. According to the article, if this nonmonetary revenue had been excluded from comScore's income statement, comScore's revenue growth would have been significantly less quarter over quarter and year over year, as shown in the graph below:




74. The article continued: "comScore determines how much revenue to book based on the average historical cash sales of the same product. That seems like an appropriate approach to fair-valuing the asset, but investors don't know much beyond that about the company's method." Noting that "much of the company's reported top-line growth has come from revenue that brings no cash in the door," the August 31 *Wall Street Journal* article concluded by advising that "[i]nvestors cheering comScore's top-line growth should take closer note of where it is coming from."

**F. Defendants Respond to the *Wall Street Journal* Article by Assuring the Market That comScore's Nonmonetary Revenue Is Consistent With GAAP**

75. The market reacted harshly to the August 31, 2015 *Wall Street Journal* article. By the close of September 2, 2015, just two days after the article was first published, comScore's stock price fell by 15%, from \$52.21 to \$44.37. Defendants quickly took steps to reassure the

market, holding meetings with analysts and scheduling a highly unusual private call with a group of select institutional investors and analysts.

**1. Defendants Publicly Assure Analysts and Investors**

76. In the immediate aftermath of the *Wall Street Journal* article, Matta and Wesley arranged for a lunch meeting with Cantor Fitzgerald. Nonmonetary transactions were a primary topic of conversation during that meeting, and Defendants reassured Cantor Fitzgerald that the Company was properly accounting for its nonmonetary revenue. In a September 4, 2015 report, Cantor Fitzgerald wrote that "[w]hile we're not big fans of barter transactions, we believe management has adequately addressed the logic behind pursuing them and their benefits to the business. . . . We remain positive on [comScore] and maintain our BUY rating and $64 [target price]."

77. In addition, in a report dated September 3, 2015, Brean Capital wrote that it had met with comScore's management and discussed the Company's nonmonetary revenue. According to Brean Capital, management stated that it expected the level of revenue recognition from nonmonetary transactions to fall in 2016, which would weigh modestly on overall reported revenue growth, but that comScore would still meet its expected margin expansion. Brean Capital's report reiterated its "buy" rating and $67 price target.

**2. Defendants Participate in a Private Conference Call for a Small Group of Institutional Investors**

78. In addition to defending comScore's nonmonetary revenue in statements to analysts and the general investing public, Matta and Wesley participated on September 3, 2015 in a private conference call arranged by SunTrust for a limited group of institutional investors invited by comScore and SunTrust. Plaintiffs investigation led Plaintiffs to an audio recording of the call.

79. During the call, Matta and Wesley vigorously defended comScore's reasons for entering into nonmonetary transactions and its recognition of nonmonetary revenue from these transactions. Wesley stated that the Company had two reasons for entering into nonmonetary transactions, which he said had "two main benefits."

80. First, Wesley stated that comScore entered into the nonmonetary transactions in order to quickly obtain other companies' valuable consumer databases. According to Wesley, if comScore was willing to provide those other companies with comScore's data in a barter transaction, the deal could be negotiated more quickly:

> The first [reason for nonmonetary transactions] is [that it] allows us to obtain valuable dataset[s] more efficiently. Let me explain that a bit 'cause as you know, many companies are very, very sensitive to providing data especially regarding their user base, you know the demographics to their user base. So, you know, we have to be very intelligent and efficient about how we approach that. So if we approach a customer who has a desire to buy some of our products and we identify that customer as to having a valuable dataset, it's a lot more efficient, it's a lot easier to work that deal through a potential customer if you have an internal champion that has a need for your product . . . So that's the first reason is that it allows us to get these data sets much more efficiently.

81. Second, Wesley stated that comScore entered into nonmonetary transactions because they allowed it to obtain its counterparties' data more cheaply than by paying cash:

> Then the second [reason] is that it's just an issue of value. We deem these data sets quite frankly more valuable than just the cash value of what we would obtain if we just did a straight cash deal. I mean, it's just that simple. . . .
>
> [D]oing straight deals where you just sign an agreement to pay them "x" amount of dollars for "x" period for the data sets . . . can be more difficult to negotiate because a lot of times they don't understand how valuable this data is.

82. Similarly, in response to an investor's questions about comScore's accounting for the nonmonetary transactions, Wesley insisted that comScore acquired its barter counterparties' data more cheaply in the nonmonetary deals than it would by paying cash, and he added that the data comScore received in the barter deals was more valuable than the data it delivered. This raised

questions in the investor's mind about comScore's accounting, but Wesley promptly reassured the investor:

> **[Investor:]** If you believe the value of what you are giving up is greater than the cash value would have been, I'm assuming the party on the other side seems and feels similarly. That would suggest your expenses and revenues even though they net zero, are both inflated relative to what you would do in a cash [indecipherable] with all these nonmonetary transactions were indeed cash. Is that what I heard or no?
>
> **[Wesley:]** I think that it implies that actually the revenue would be less than the cost—maybe the cost would be inflated because we believe if he had to directly to them to get this data that we would actually pay more for it. So I think it is a fair statement to say that the cost is not inflated on our book that actually we would have a greater cost had we not gone nonmonetary to get that data.
>
> Ultimately we believe that it is financially beneficial. . . . The cash we believe that the value of that data set are greater than the straight cash value that would have received had we done a straight cash deal.
>
> **[Unidentified Investor:]** On your end.
>
> **[Wesley:]** Correct.
>
> **[Unidentified Investor:]** So what you are giving back, you're getting more than you would have on a cash deal. But you're buying stuff in the barter transaction that's less than you would have paid if it were a cash deal.
>
> **[Wesley:]** Yes.

83. Defendant Wesley claimed that the Company properly accounted for its nonmonetary transactions based on comparable cash sales by comScore of the same data it delivered in the barter deals: "So the way that you value these is basically the same way you would value and allocate revenue in a cash transaction. And that is you look at your historic cash sales and that's the basis for the fair value of what you're delivering." According to Wesley:

> It's important to know that <u>if you don't have historic cash transactions for the products or services that you are selling in a nonmonetary transaction, you cannot under the guidance recognize revenue in connection with that transaction</u>. Obviously they don't want people to be assigning arbitrary values in these deals and inflating what they are reporting. So there are very strict guidelines around that.

84. Similarly, in response to a question about the effect on the Company's growth rates if its nonmonetary revenue were removed from its financial results, Wesley insisted that its counterparties in the barter deals were also cash customers for comScore data:

> I mean that's kind of the fundamental issue, right, is whether or not you perceive these as legitimate true transactions or if you view these as a separate bucket of transactions that would never result in a cash deal. If you take the position that, look, these are legitimate transactions with customers of the company that do cash transactions that would have been cash transactions had the company not decide[d] they wanted to do a nonmonetary transaction and that benefitted them from the standpoint of adding future value to the products, then it would absolutely not be appropriate to pull those out.

85. Wesley explained that "these [counterparty] companies that are cash customers, these are companies that are credible companies that have very, very valuable data asset and as a percentage of our total customer base, they are very, very small."

86. When an institutional investor on the September 3, 2015 call suggested that comScore's accounting for nonmonetary transactions could possibly "overstate your revenue and understate your expense," Defendants Wesley and Matta insisted that the nonmonetary revenue was not overstated, was based on comparable cash sales, complied with GAAP, and Defendants followed the accounting rules to the "t":

> [Defendant Wesley:] Well, no. I think. No. I'm not sure how you are arriving at the fact that it over states your revenue. If we believe that we're basically getting more value because again, remember, the value is based on our historic sales. The value that we record in revenue is consistent with our historic sales for the same products.
>
> [Defendant Matta:] Let's just be very clear, the revenue that we are taking on here is based on revenues that we have sold before of similar transaction for cash. The revenue is calculated based on fair value. It is fully audited by our accounting firm E&Y, and it follows GAAP revenue. It is 100% GAAP revenue. It is audited by E&Y. . . .[A]gain, if there is something that we have provided in these transactions that we have not ever sold for cash previously, we would not be able to take any revenue for that. So the guidelines are very, very strict and we follow them to the "t."

87. Nonetheless, Matta promised that the Company would avoid doing future barter deals and would improve its disclosures concerning the ones it had already recorded:

> The bottom line is on a going forward basis, we are going to work to avoid these transactions wherever possible. . . .
>
> You know we've been very transparent already but we plan on being even more. We are going to be for the runouts of these existing transactions, we will make sure in every earnings call, we provide a presentation. We absolutely will have a slide that shows this and we will make sure that it is included in the script, like we've done before, but we did not put it in a slide before, we will going forward. We will make sure it is asked time and time again. Again we are 100% committed to full transparency.

88. In response to Defendants' false reassurances, analysts remained positive about comScore and wrote reports stating that comScore's accounting complied with GAAP despite the concerns raised in the August 31, 2015 *Wall Street Journal* article. For example, on September 3, 2015, Brean Capital wrote that "comScore's recognition of these deals was in line with generally accepted accounting practices." This, in turn, halted the slide in comScore's stock price that had been driven by concerns over its accounting for nonmonetary revenue.

**G. Defendants Leverage comScore's Inflated Stock Price to Purchase Rentrak in an $827 Million Stock Transaction**

89. Having reassured the market that comScore's nonmonetary revenues complied with GAAP, Defendants publicly announced an enormous proposed merger. Throughout the summer of 2015, comScore had been in private merger discussions with Rentrak. Rentrak engaged in similar services as comScore in that it attempted to measure and analyze consumer media consumption, but Rentrak focused on television and video rather than the Internet.

90. According to a publicly filed complaint in a case pending in the Circuit Court of the State of Oregon, captioned *In re Rentrak Corp. Shareholders Litig.*, 15-cv-27429, Rentrak retained Grant Thornton LLP ("Grant Thornton") to perform financial due diligence on comScore. According to the complaint in that case, Grant Thornton provided the Rentrak Board of Directors

with a report raising several red flags regarding comScore's recognition of nonmonetary revenue, including the following key findings:

- comScore's use of nonmonetary, i.e., "barter," transactions for the sharing of data or exchange of services that comScore had accounted for as revenue "may have provided opportunities for [comScore] Management to 'manage' revenues to meet targets."
- ComScore's use of nonmonetary transactions "may not be fully understood by analysts and investors. It was unclear how much comScore's stock price may be impacted if comScore's nonmonetary transactions are better understood."
- "It is unclear how much analysts have incorporated [nonmonetary transactions] in their forecasts and understand the arrangement's impact on revenue and earnings."
- "a consensus revenue for virtually all periods would not have been achievable without [nonmonetary transactions]."

91. Nonetheless, the companies continued their discussions and, on September 29, 2015, announced that they had entered into a merger agreement, under which comScore would acquire Rentrak in an all-stock transaction valuing Rentrak at $827 million. Under the merger agreement, Rentrak shareholders were to receive 1.15 shares of comScore stock for each Rentrak share held—a deal made possible by the rising tide of revenue growth lifting the Company's share price.

92. That same day, Defendants Matta and Wesley participated in an investor conference call along with Rentrak CEO Livek and Rentrak COO Chemerow to discuss the merger agreement. None of these individuals, however, discussed the Grant Thornton report or comScore's nonmonetary revenue. Matta did stress, however, the combined companies' financials, including revenue:

> [T]he combination of our companies delivers enhanced scale with a combined pro forma of $2.4 billion market cap, $457 million in revenue, and $100 million in adjusted EBITDA in the 12 months ending June 30, 2015. Both companies have strong recent revenue growth, 17% for comScore and 33% for Rentrak for the latest 12 months ending June 30, 2015, compared to the prior period. Together, we also

have strong profitability, with a 22% pro forma adjusted EBITDA, and prospects for further margin expansion.

93. The deal would ultimately be approved by shareholders. On January 28, 2016, comScore and Rentrak shareholders voted to approve the Merger, and Rentrak became a wholly owned subsidiary of comScore the following day.

### H. Defendants Continue to Mislead the Market Regarding comScore's Nonmonetary Revenue

94. Having largely assuaged the market regarding the issues raised by the *Wall Street Journal*, Defendants continued to aggressively mislead investors regarding the Company's financial results.

#### 1. Defendants Announce More "Record" Revenues for the Third Quarter of 2015

95. On November 5, 2015, comScore held an investor conference call to discuss its financial results for the third quarter 2015. During that call, Matta stated that the Company "ended the third quarter of 2015 with <u>record results</u> and strong momentum. . . . comScore delivered <u>another quarter of record revenues</u> and strong profitability. This reflects continued positive momentum across our business."

96. Defendant Wesley specifically addressed the Company's nonmonetary revenue: "Revenue from nonmonetary transactions in the quarter was $9 million, down $2 million sequentially and up $4 million versus the same quarter last year. . . . We expect both nonmonetary revenue and expense to decline year-over-year in the coming quarters. . . ."

97. Despite Defendants' insistence that comScore's nonmonetary transactions served legitimate business purposes and that the nonmonetary revenue was properly recognized, Matta told investors that comScore would reduce its nonmonetary revenue in future periods.

98. The Company's third quarter 2015 results and commentary reassured the market. Cantor Fitzgerald wrote in a November 5, 2015 report that it "believe[d nonmonetary revenue] concerns should now be put to rest," and it adjusted its price target up from $60 to $64 and "maintain[ed] a BUY rating on SCOR after virtually in-line 3Q:15 results, which show that organic growth remains very healthy even as nonmonetary revenue (a hot topic throughout the quarter) drops below 10% of total revenue."

99. On November 6, 2015, comScore's stock price increased more than 5 percent, from $44.31 to $46.57.

**2. Defendants Again Deny Wrongdoing in Response to a Comment Letter from the SEC**

100. On November 25, 2015, the SEC issued a comment letter to comScore asking several questions of the Company's management. In a response that was published on the SEC's website on or about December 3, 2015, comScore stated "the Company supplementally advises the Staff that all of its monetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized." The response further stated: "The Company concluded that such transactions were consistent with its accounting policies and with the terms of similar transactions with other ordinary course transactions but for the nonmonetary element."

101. The Company's response to the SEC's comment letter was signed by Wesley and a "cc" copy was sent to Matta.

**I. On February 17, 2016, comScore Announces "Record Annual GAAP Revenue"**

102. On February 17, 2016, comScore filed with the SEC a Form 8-K and accompanying press release to preannounce its annual results for 2016. That press release stated that "comScore

achieved record annual GAAP revenue of $368.8 million, an increase of 12% compared to 2014." The Company also announced a new, $125 million stock-buyback program.

103. On that same day, Matta and Wesley participated in a conference call with investors where Matta stated that "comScore delivered another quarter and year of record revenues and strong profitability." Wesley spoke about the Company's nonmonetary transactions:

> [R]evenue from non-monetary transactions in the quarter was $5 million, down $4 million sequentially and down $2 million versus the same quarter last year. Expense from non-monetary transactions in the quarter was $6.5 million, up $1.5 million sequentially and down $3 million versus the same quarter last year.

104. Analysts, including Oppenheimer, SunTrust, and Cantor Fitzgerald, uniformly described comScore's results as "solid." By the end of the week of the Company's announcement, shares of comScore rose 5%, from $37.34 to $39.29, and continued climbing to reach $42.95 on February 26, 2016.

## V. THE TRUTH IS REVEALED

### A. comScore Shocks the Market by Disclosing That Its Audit Committee Was Investigating "Potential Accounting Matters"

105. On February 29, 2016, just days after announcing "record annual GAAP revenue" for 2015, the Company filed a Form 12b-25 Notification of Late Filing, disclosing that it would be unable to file its 2015 Form 10-K on time because its Audit Committee had received an alert regarding potential accounting errors. The February 29, 2016 announcement stated:

> On February 19, 2016, the Audit Committee of the Company's Board of Directors (the "Audit Committee") received a message regarding certain potential accounting matters. In response, "the Audit Committee immediately commenced a review of the matters with the assistance of independent counsel and advisors. As a result, the Company has not finalized its financial statements pending completion of the review, and the Company is not in a position to file its Form 10-K until after the completion of the Audit Committee's review. The Company expects to file the Form 10-K by March 15, 2016, which is within the permitted 15-day extension of the prescribed due date of February 29, 2016.

106. The market was rattled: shares of comScore fell $1.15 per share, or 2.8%, to close at $40.00 on March 1, 2016. However, some analysts, including Susquehanna International Group, advised investors not to overreact, noting that the Company still expected to file its Form 10-K by March 15, 2016.

**B. conScore Announces that the Audit Committee Investigation Is Being Prolonged and the Company Will Be Unable to Timely File Its Annual Report for 2015**

107. On March 7, 2016, the Company dashed any hope of a quick resolution when it announced that:

> The Audit Committee continues to work vigorously with its independent counsel and advisors to complete its internal review as soon as possible. On March 5, 2016, however, the Audit Committee advised the Company's Board of Directors that it did not expect to finalize its review before March 15, 2016.

108. Moreover, the Company disclosed that the problems were so severe that the Company had "proactively contacted the staff of the Securities and Exchange Commission regarding the Audit Committee's internal review." The Company also disclosed that as a result of its inability to file its 2014 Form 10-K, it was postponing an "Investor Day" that it had previously scheduled for March 16, 2016 (which was never rescheduled), and that it was suspending the $125 million stock-buyback program it had announced just three weeks earlier.

109. The market was stunned. The *Wall Street Journal* wondered whether "comScore pushed the envelope with its accounting . . . too far." William Blair's analyst called the further delay "obviously disappointing," and by the end of the day, shares of comScore had fallen $13.67, or 33.5%, to close at $27.04, wiping out millions of dollars in investor value.

## VI. THE AUDIT COMMITTEE INVESTIGATION CONTINUES, AND THE COMPANY EVENTUALLY ADMITS THAT IT HAD BEEN VIOLATING GAAP FOR YEARS

### A. comScore Repeatedly Delays Filing Its Annual and Quarterly Reports

110. After the March 7, 2016 announcement that comScore was unable to file its Form 10-K by the extended deadline, the market waited for an update from Defendants. On March 18, 2016, the Company announced that it had received a NASDAQ notice of noncompliance with NASDAQ Listing Rule 5250(c)(1), which requires current periodic reports. Though the Company stated that it expected to submit a plan to regain compliance or file its Form 10-K within the 60-calendar-day timeline prescribed by NASDAQ, it did not provide any updates as to the status or subject matter of the Audit Committee's investigation.

111. On May 11, 2016, the Company filed another notification of late filing to announce that it would not be able to file timely its Form 10-Q for the first quarter of 2016 due to the Audit Committee's continuing investigation, adding only that it expected to provide an update by June 27, 2016.

112. Unfortunately, the promised update on June 27, 2016 was without any substance. That day, the Company filed a Form 8-K stating that, while "the independent counsel and other advisers to the Audit Committee have completed a substantial amount of their factual inquiries to address the Audit Committee's review," further time was required to reach final conclusions.

### B. comScore's Co-Founder, CEO, and CFO All Leave Their Roles

113. On July 22, 2016, comScore announced that Defendant Abraham – the Company's co-founder – had stepped down as Executive Chairman of the Board. Though he would remain a director, the Company's press release signaled a diminished role for Abraham at the Company he had cofounded and worked at since 1999, stating that he would instead focus on his work as Executive Chairman of APX Labs and as a visiting scholar at Stanford University.

114. On August 10, 2016, in another notification that it was unable to meet its filing deadline due to the Audit Committee's investigation, comScore finally disclosed significant new information:

> The internal investigation is substantially complete, and the Audit Committee has identified certain areas of potential concern, including with respect to certain accounting and disclosure practices and controls that the Company, with input from its consultants and counsel, is further analyzing. The accounting transactions at issue mainly relate to certain non-monetary transactions**.** The Company has not yet concluded whether any of these or other transactions of concern were incorrectly recorded at the time of the transactions.

115. That same day, the Company announced that Defendants Matta and Wesley would no longer serve as CEO and CFO, respectively. Instead, Matta would serve as Executive Vice Chairman and Advisor to the new CEO (the Company's other cofounder, § 14(a) Defendant Gian Fulgoni, while Wesley would assist with the transition of the Company's new CFO, Defendant David Chemerow, who had served as the Company's Chief Revenue Officer since January 2016 and was formerly the CFO of Rentrak. Both Matta and Wesley ultimately resigned from the Company altogether as of October 10, 2016.

116. On August 18, 2016, the Company announced that NASDAQ had given comScore until August 29, 2016 to regain compliance with NASDAQ's listing requirement that the Company have filed current financial statements.

117. The Company did not meet that deadline and on September 2, 2016 announced that it had received a notice of delisting from NASDAQ. The Company stated, however, that it intended to appeal and seek a stay of suspension, buying it some additional time before actual delisting.

### C. comScore Announces That It Must Restate Because Its Financial Statements for the Previous Three Years

118. On September 15, 2016, the Company filed a Form 8-K finally announcing the partial results of its long-running Audit Committee investigation: comScore's Audit Committee

had concluded that the Company would have to restate its financial results for the years ended December 31, 2014 and 2013 and for the quarters ended September 30, 2015, June 30, 2015, and March 31, 2015, as well as its preliminary financial statements for the quarter and year ended December 31, 2015 announced in its February 17, 2016 press release.

119. The Company also stated that, in order to correct the "errors" in its accounting for nonmonetary transactions, the Company would wipe out *all* of the previously recognized nonmonetary revenue:

> [T]he Company has concluded that revenue and expenses associated with all nonmonetary transactions during the periods identified above should be reversed and accounted for at historical cost rather than at fair value. There is no historical cost basis associated with the assets that the Company exchanged and therefore there should be no revenue recognized or expenses incurred for those transactions.

120. The Company's preliminary estimate of the impact of these errors delivered a blow to the Company's previously reported revenue and income.

| *($ in thousands)* | **Revenue** | | **(Loss) Income From Operations** | |
|---|---|---|---|---|
| **Period** | **Previously Reported** | **As Adjusted** | **Previously Reported** | **As Adjusted** |
| FY 2013 | $286,860 | $283,615 | $3,093 | $1,644 |
| FY 2014 | $329,151 | $312,900 | ($14,780) | ($14,768) |
| Q1 2015 | $87,329 | $83,532 | ($9,190) | ($8,816) |
| Q2 2015 | $91,414 | $80,649 | ($2,818) | ($8,593) |
| Q3 2015 | $92,405 | $83,310 | $2,243 | ($1,722) |
| Q4 2015 | $97,669 | $92,362 | $7,115 | $8,332 |
| FY 2015 | $368,817 | $339,853 | ($2,650) | ($10,799) |

121. For example, as shown above, comScore's revenue actually *declined* 3.5% from $83.5 million to $80.6 million over the second quarter of 2015, right as Defendants Matta and Wesley received millions of dollars' worth of vested shares as a result of comScore's stock-price increases in response to its originally reported revenue *growth*.

122. Moreover, the adjustments reveal that comScore's real, non-inflated revenues in 2015 were so stagnant that its third quarter revenue was lower than its first quarter revenue.

## VII. OVERVIEW OF DEFENDANTS' GAAP VIOLATIONS AND USE OF A RELATED PARTY

123. By improperly recognizing over $43 million in revenue during the Class Period, comScore misstated many of its critical financial metrics. Each of the financial metrics that comScore misstated in its financial statements, for each reporting period during the Class Period, is alleged in detail below. As comScore has admitted, its financial statements violated basic GAAP provisions during the Class Period and should no longer be relied upon.

### A. Overview of GAAP

124. GAAP include those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. The Financial Accounting Standards Board ("FASB"), the entity that holds the authority to promulgate GAAP, has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for financial reporting for all public filers. In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"s), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the underlying basis and framework for the promulgation of accounting standards.

125. Financial statements (including footnote disclosures), like those filed on Forms 10-Q and 10-K with the SEC, are a central feature of financial reporting. One of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an

entity's financial performance during the period being presented. FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), which, as its title provides, represents, along with a number of other FASCONs, the framework for financial accounting, states that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." FASCON 8, ¶ OB2.

126. This framework also states that "[d]ecisions by existing and potential investors about buying, selling, or holding equity and debt instruments depend on the returns that they expect from an investment in those instruments," and that "[i]nvestors', lenders', and other creditors' expectations about returns depend on their assessment of the amount, timing, and uncertainty of (the prospects for) future net cash inflows to the entity." FASCON 8, ¶ OB3.

127. FASCON 8 also states that, in order to assess an entity's prospects for future net cash inflows, "existing and potential investors, lenders and other creditors need information about the resources of the entity, [and] claims against the entity." FASCON 8, ¶ OB4. It also states that investors and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources." FASCON 8, ¶ OB4.

128. Because investors, lenders, and other creditors generally cannot require reporting entities to provide information directly to them and must rely on financial reports for much of the financial information they need to make rational decisions regarding the entity, they are considered to be the primary users to whom general purpose financial reports are directed. FASCON 8, ¶ OB5.

129. A primary quality that renders financial information useful to investors, creditors, and other users in their decision-making is faithful representation. For an entity to faithfully

represent what it purports to represent, including its financial position and the results of its operations for selected periods of time, information must be complete, neutral, and free from error. FASCON 8, ¶ QC12. To be complete, the financial information must include all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. FASCON 8, ¶ QC13. To be neutral, the financial information must be without bias in the selection or presentation of such information. FASCON 8, ¶ QC14. The standard describes a neutral depiction of financial information in more detail as follows:

> A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users. Neutral information does not mean information with no purpose or no influence on behavior. On the contrary, relevant financial information is, by definition, capable of making a difference in users' decisions.

FASCON 8, ¶ QC14.

### B. Defendants Violated GAAP by Using Fair Value Accounting For Nonmonetary Revenue

130. comScore stated in its 2013 Form 10-K, first, second, and third quarter 2014 Form 10-Qs, 2014 Form 10-K, and first, second, and third quarter 2015 Form 10-Qs that it based its recorded revenues from nonmonetary transactions on the "fair value" of either the assets surrendered or the assets received in these barter deals in accordance with ASC 845:

> The Company accounts for nonmonetary transactions under ASC 845, Nonmonetary Transactions. Nonmonetary transactions with commercial substance are recorded at the estimated fair value of assets surrendered including cash, if cash is less than 25% of the fair value of the overall exchange, unless the fair value of the assets received is more clearly evident, in which case the fair value of the asset received is used.

131. *Nonmonetary Transactions* ("ASC 845") is a provision of GAAP that applies where there is no payment of cash or other monetary assets or liabilities for goods or services. These nonmonetary transactions involve either of the following:

> a) An exchange with another entity (reciprocal transfer) that involves principally nonmonetary assets or liabilities
>
> b) A transfer of nonmonetary assets for which no assets are received or relinquished in exchange (nonreciprocal transfer).

ASC 845-10-05-2.

132. The fundamental principle when accounting for nonmonetary transactions is that measurement of the goods or services exchanged should be based on the fair values of assets (or services) involved, which is the same basis as that used in monetary transactions. ASC 845-10-30-1. The standard also states the following with respect to how exchanges of nonmonetary assets should be accounted for:

> Thus, the cost of a **nonmonetary asset** acquired in **exchange** for another nonmonetary asset is the fair value of the asset surrendered to obtain it, and a gain or loss shall be recognized on the exchange. The fair value of the asset received shall be used to measure the cost if it is more clearly evident than the fair value of the asset surrendered.

ASC 845-10-30-1.

133. While fair value is ordinarily used to measure a nonmonetary transaction, ASC 845 lists three conditions in which the recorded amounts, otherwise referred to as "historical costs," of assets exchanged should be used in measuring nonmonetary transactions in place of fair value:

> A nonmonetary exchange shall be measured based on the recorded amount . . . of the nonmonetary asset(s) relinquished, and not on the fair values of the exchanged assets, if any of the following conditions apply:
>
> a. The fair value of neither the asset(s) received nor the asset(s) relinquished is determinable within reasonable limits.
>
> b. The transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange.
>
> c. The transaction lacks commercial substance.

ASC 845-10-30-3; *see also* ASC 845-10-30-4 (defining "commercial substance" to mean "the entity's future cash flows are expected to significantly change as a result of the exchange").

134. As noted above, on September 15, 2016, comScore admitted that it had to restate its financial statements because it had improperly recognized the revenue and related expenses associated with nonmonetary transactions. Defendants admitted that its nonmonetary transactions should have been "accounted for at historical cost rather than at fair value," as well as that "[t]here is no historical cost basis associated with the assets that the Company exchanged and therefore there should be no revenue recognized or expenses incurred for those transactions."

135. The Company's conclusion that the decision to record its nonmonetary transactions at fair value was in error, and that, instead, these transactions should have been recorded using the recorded amount, means that at the time the financial statements were prepared it was apparent that one (or more) of the three conditions listed in ¶133 above applied. This is because, under GAAP, a "restatement" is a term of art, reserved only for those situations in which a company's previously issued financial statements were materially false because of facts that existed as of the time of issuance. GAAP defines a "restatement" as:

> The process of revising previously issued financial statements to reflect the correction of . . . [a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared.

ASC 250-10-20; *see also* ASC 250-10-45-17 (distinguishing that a mere "change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods").

136. The Audit Committee's conclusion that facts existed at the time showing that fair value accounting was improper demonstrates that Defendants intentionally or recklessly

misapplied GAAP, because Defendants' own statements contradict each of the conditions listed in ASC 845-10-30-3.

137. As for the first condition—"The fair value of neither the asset(s) received nor the asset(s) relinquished is determinable within reasonable limits"—Defendants repeatedly claimed that comScore's accounting for nonmonetary transactions was based on comparable cash sales, a reliable methodology to determine fair value.

138. For example, in the private conference call for institutional investors on September 3, 2015, Matta stated:

> [Defendant Wesley:] So the way that you value these is basically the same way you would value and allocate revenue in a cash transaction. And that is you look at your historic cash sales and that's the basis for the fair value of what you're delivering. . . .
>
> Let's just be very clear, the revenue that we are taking on here is based on revenues that we have sold before of similar transaction for cash. . . Then again [if] it is something that we have provided in these transactions that we have not ever sold for cash previously, we would not be able to take any revenue for that.
>
> Let me reiterate that the accounting for the NMT is defined by GAAP and the revenue was recognized because we sell similar products and services at comparable prices making this evaluations and dictating that these transactions are treated as revenue.

139. comScore's response to questions from the SEC staff likewise asserted that "in these types of nonmonetary transactions, the Company provides subscription products and solutions that it typically sells on a cash basis to data source providers in exchange for additional consumer demographics and segmentation data that improves the accuracy and granularity of the Company's products and services, particularly the Company's panel and census data."

140. If the Company has now concluded that, at the time it accounted for these transactions, fair value was not readily determinable, then there were no comparable cash sales

and Defendants necessarily knew or should have known that the above statements were false at the time they were made.

141. As for the second condition—"The transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange"—Defendants stated precisely the opposite during the September 3, 2015 call: that these sales did *not* involve products that the counterparties sold in their ordinary course of business. According to Defendant Wesley, "my understanding of their [the counterparties'] business model is that they do not sell these in the normal course of business … clearly these are not things they sell in the normal course of business," and "it is important to note that we are not obtaining data sets from people that typically sell these in the normal course." Defendant Matta likewise stated on that call that "[i]n a lot of cases, they actually don't sell that data to other clients. It is data that they provide to us, in some cases, on an exclusive basis. . . ."

142. If the Company has now concluded that, at the time it accounted for these transactions, the purpose of these transactions was to facilitate sales of these datasets in the ordinary course of business, Defendants necessarily knew or should have known that the above statements necessarily were false at the time they were made.

143. As to the third condition—"The transaction lacks commercial substance"—Defendants likewise knowingly or recklessly misled the market when they repeatedly trumpeted the commercial substance of these transactions, including the value and use these datasets had for comScore in its own products. For example, during the September 3, 2015 private conference call, Defendant Wesley stated the transactions were in part motivated because

> We deem these data sets quite frankly more valuable than just the cash value of what we would obtain if we just did a straight cash deal. . . . [T]hey don't understand

how valuable this data is. . . . We believe that the value to us and the value to our products and the return on that investment in terms of what our customer gets out of the products in terms of futures deliverables based on those data sets far outweighs the value of the cash that we would receive if we just did a straight cash deal.

144. Likewise, Wesley later stated during a November 5, 2015 conference call that the Company's nonmonetary transactions were "driven by the release of new products in the last year that required acquisition of scarce data sets."

145. If the Company has now concluded that, at the time it accounted for these transactions, the transactions lacked commercial substance, Defendants necessarily knew or should have known that the above statements necessarily were false at the time they were made.

**C. Defendants Relied on a Related Party to Generate a Substantial Portion of the Improper Nonmonetary Revenue**

146. During the Class Period, much of comScore's nonmonetary revenue—and therefore a substantial percentage of the Company's reported growth—came from a single counterparty that had close ties to comScore. This related party was Acxiom, with which comScore shares Defendant Henderson as a director. Henderson is, and was throughout the Class Period, the chair of comScore's Compensation Committee.

147. Defendants first entered into a nonmonetary transaction agreement with Acxiom in the fourth quarter of 2013, and then "modified the existing agreement" in the fourth quarter of 2014. As the below chart indicates, comScore's transactions with Acxiom ***provided over half*** of the Company's nonmonetary transaction revenue in 2013, and ***two-thirds*** of the nonmonetary revenue in 2014. For each period, transactions with Acxiom provided an enormous percentage of comScores total related party revenue.

| Period | Nonmonetary Revenue | Related-Party Nonmonetary Revenue | Related-Party Percentage of Nonmonetary Revenue |
|---|---|---|---|
| **FY 2013** | **$3.2 million** | **$1.8 million** | **56%** |
| Q1 2014 | $2.2 million | $1.7 million | 77% |
| Q2 2014 | $1.8 million | $1.5 million | 83% |
| Q3 2014 | $4.6 million | $1.5 million | 33% |
| Q4 2014 | $7.7 million | $6 million | 77% |
| **FY 2014** | **$16.3 million** | **$10.7 million** | **66%** |
| Q1 2015 | $3.8 million | $2.1 million | 55% |
| Q2 2015 | $10.8 million | $2.2 million | 20% |
| Q3 2015 | $9.1 million | $2.3 million | 25% |
| **Total:** | **$43.2 million** | **$19.1 million** | **44.2%** |

148. The fact that so much of comScore's nonmonetary revenue came from one related party is highly suspicious.

**D. Defendants Manipulated the Revenue and Expenses From Nonmonetary Transactions to Boost EBITDA, comScore's Other "Key Metric"**

149. In addition to their use of nonmonetary transactions to boost fraudulently comScore's total revenues, Defendants also manipulated the Company's recognition of the expenses from these nonmonetary transactions so as to boost comScore's other "key metric," EBITDA, further inflating comScore's stock price.

150. Under GAAP, a nonmonetary transaction will ordinarily have no effect on a company's operating income, because the Company will recognize matching revenue *and* expense from the exchange. In other words, any revenue will be cancelled out by the matching expense. However, when the Company announced in its September 15, 2016 Form 8-K that it cannot support the prior accounting for its nonmonetary transactions—including *both* the revenues and expenses—it acknowledged that its timing of nonmonetary revenue recognized relative to the related expense "may have had an effect" on operating income and cash flow.

151. In fact, comScore had reported varying amounts of revenue and expense from its nonmonetary transactions from quarter to quarter, creating an asymmetry which did affect comScore's operating income on a quarterly basis and thus also affected EBITDA, which included operating income.

152. The Company's filings throughout the Class Period explained this asymmetry as "due to timing differences in the delivery and receipt of the respective nonmonetary assets exchanged," and, when confronted about these "timing differences" during their September 3, 2015 private call with institutional investors, Matta and Wesley both stressed that the nonmonetary transactions would eventually "net to zero."

153. In reality, Defendants were using these "timing differences" to hide sagging revenues, artificially inflate comScore's stock price and hit their compensation targets. This is particularly true for the critical period in the second and third quarters of 2015.

154. In the second quarter of 2015, comScore reported adjusted EBITDA of $22.9 million, purportedly up 30% versus the second quarter 2014. As discussed, within weeks, comScore's stock hit a record high, and Matta and Wesley received the final tier of their compensation target. Part of the reason that reported EBITDA was so high was because purported "timing differences" in the second quarter of 2015 meant that comScore recognized $10.8 million in nonmonetary revenue but only $5 million in nonmonetary expense—providing comScore's operating income (and thus EBITDA) with a net boost of $5.8 million. Without this boost, the Company's adjusted EBITDA in the second quarter of 2015 would have been only $17.1 million, against $17.5 million in the second quarter of 2014.

155. In other words, if Defendants had not staggered the revenues and expenses, comScore would have reported negative growth in one of its "key metrics," adjusted EBITDA.

156. Likewise, in the third quarter of 2015, comScore reported $9.1 million in nonmonetary revenues but only $5.1 million in nonmonetary expenses, a net gain of $4 million to its operating income and EBITDA. Without the net gain provided by these "timing differences," comScore's adjusted EBITDA in that quarter would have been $19.3 million, as opposed to $20.2 million for the third quarter 2014—again, negative growth in adjusted EBITDA.

157. The profound effect of these opportunistic "timing differences" on one of comScore's "key metric"—timing differences the Company's announced adjustments will also wipe clean—is also highly suspicious.

## VIII. ADDITIONAL ALLEGATIONS OF SCIENTER

158. In addition to the facts alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or should have known that their

### A. Defendants Matta, Wesley, Abraham, Tarpey, and Henderson Sold More Than $60 Million Worth Of Artificially Inflated comScore Stock During the Class Period

159. Defendants Matta, Wesley, Abraham, Tarpey and Henderson made more than ***$60 million*** in insider stock sales during the Class Period, all of these sales accord at a time when it is undisputed that Defendants were making materially false and misleading statements that artificially inflated comScore's publicly-reported financial results and stock price.

160. The dollar amounts of these sales were enormous and involved massive dispositions of significant percentages of each Defendant's shares held as of the start of the Class Period. The following chart details these Defendants' insider sales:

| | Percent of Shares Sold | Dollar Value of Shares Sold |
|---|---|---|
| | 92% (direct) | |

| | | |
|---|---|---|
| Abraham | 57% (indirect) | $31.5 million[1] |
| Henderson | 54% | $1.7 million |
| Matta | 68% | $18.1 million |
| Tarpey | 22% | $1.8 million |
| Wesley | 83% | $7.6 million |
| **TOTAL:** | | **$60.1 Million** |

161. The highly unusual nature of these sales is further confirmed by their suspicious timing. For example, Matta cashed in $6.7 million worth of stock between March and August 2015, when the Company's recognition of revenue from nonmonetary transactions was pushing comScore stock prices to record heights. Matta also sold $1.1 million of comScore stock on February 18, 2016. This sale occurred one day after Defendants falsely announced supposedly "record annual GAAP revenues" (¶¶102-03), and one day before Defendants claimed the comScore's Audit Committee had received the information about potential accounting irregularities, which triggered the internal investigation. Similarly, Defendant Wesley cashed in nearly $5.1 million worth of stock during the second quarter of 2015, as the Company's recognition of more nonmonetary revenue than ever before pushed comScore stock prices to record heights.

162. Finally, Defendants made the vast bulk of their sales either not pursuant to any Rule 10b5-1 trading plans or pursuant to trading plans that were entered into at times when the Company has admitted its reported financial results were artificially inflated through the dissemination of false and misleading statements to the market.

163. **Matta**. During the Class Period, $10.9 million of Matta's $18.1 million in insider sales were made *not* pursuant to any Rule 10b5-1 trading plan. The remaining $7.2 million in sales

[1] This number includes both $27.9 million worth of comScore stock directly held by Abraham, and $3.5 million of comScore stock Abraham held indirectly on behalf of related parties, including his wife and children.

were made pursuant to trading plans that were entered into in May 2013 ($800,000), June 2014 ($2.2 million), and May 2015 ($4.2 million).

164. **Wesley**. During the Class Period, *none* of Wesley's $7.6 million in insider sales were made pursuant to a Rule 10b5-1 trading plan.

165. **Abraham**. During the Class Period, $13.1 million of Abraham's $31.5 million in insider sales were made *not* pursuant to any Rule 10b5-1 trading plan. The remaining $18.4 million in sales were made pursuant to trading plans that were entered into in May 2013 ($11.5 million) and December 2014 ($6.9 million).

166. **Tarpey**. During the Class Period, $1.2 million of Tarpey's $1.8 million in insider sales were made *not* pursuant to any Rule 10b5-1 trading plan. The remaining $600,000 in insider sales were made pursuant to a trading plan entered into in October 2013.

167. **Henderson**. During the Class Period, *none* of Henderson's $1.7 million in insider sales were made pursuant to a Rule 10b5-1 trading plan.

### B. comScore's Stock Buybacks

168. As part of their fraudulent scheme, Defendants caused the Company to repurchase over 3.2 million of its shares with $144 million in shareholder money during the Class Period. These shares were purchased at prices that were inflated by what the Company has now admitted were materially false and misleading statements regarding comScore's revenues and other key financial metrics. By using shareholder money to engage in these buy-backs, Defendants further inflated the price of comScore's stock in an effort to trigger their own lavish compensation packages.

169. On August 5, 2014, Defendant Matta stated in a conference call that the Board had approved a new $50 million stock repurchase program. Then, on May 5, 2015, Matta stated in a conference call that the Board had approved a new $150 million stock buyback program.

170. Though comScore was already in the midst of a stock repurchase program when the Class Period began, the Company's repurchases during 2015 went to unprecedented levels: comScore's repurchase of its shares exploded in the second and third quarters of 2015, reaching levels in each quarter beyond comScore's prior repurchases for for either the entire year in 2013 or 2014:

| | FY 2013 | FY 2014 | 1Q 2015 | 2Q 2015 | 3Q 2015 |
|---|---|---|---|---|---|
| **Number of Shares** | 483,437 | 1,296,678 | 80,661 | 1,045,100 | 823,779 |
| **Amount Spent** | $13.1 million | $38.4 million | $3.8 million | $56.2 million | $46 million |
| **Average Price** | $24.27 | $32.95 | $46.56 | $53.77 | $55.78 |

171. The unprecedented level of the Company's stock repurchases coincided with the equally unprecedented rise in the Company's nonmonetary revenue described above.

172. It appears Defendants would still be using this scheme but for the exposure of their fraud. On February 17, 2016, when the Company issued its press release announcing its inflated "Record Annual GAAP Revenue" for 2015, the Company also announced that it was initiating a new $125 million stock repurchase program. However, on March 5, 2016, after the Audit Committee began its investigation into Defendants' fraudulent scheme, comScore announced that its Board of Directors had determined to suspend the announced repurchase program.

### C. comScore Inflated Its Stock Price to Facilitate Its Acquisition of Rentrak

173. Defendants began negotiating to acquire Rentrak in about late 2013, several months before the start of the Class Period, and the negotiations became more active in April 2015 before culminating in a formal Merger Agreement in September 2015. As a company with a history of net losses, comScore intended throughout the negotiations to use its stock, rather than cash, to pay for the acquisition of Rentrak, providing additional motivation for comScore and its senior

management, including Matta and Wesley, to overstate comScore's revenues during the Class Period so as to artificially inflate its stock price, which would make Rentrak more likely to agree to be acquired by comScore and would also reduce the number of shares comScore would have to issue to pay for the acquisition.

## IX. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

174. In addition to the materially false and misleading statements and omissions alleged above, Defendants made the following materially false and misleading statements and omissions during the Class Period.

### A. Fourth Quarter and Fiscal Year 2013

#### 1. The February 11, 2014 Press Release

175. The Class Period began on February 11, 2014. On that day, comScore issued a press release entitled "comScore, Inc. Reports Fourth Quarter and Full Year 2013 Results." In the press release, the Company stated:

> comScore achieved record quarterly revenue of $76.5 million; GAAP income before income taxes of $0.3 million; and GAAP net income of $0.2 million, or $0.00 per basic and diluted share. Fourth quarter and full year 2013 metrics compared to pro forma results for the fourth quarter and full year 2012 were as follows:
>
> - Fourth quarter revenue of $76.5 million, up 15% from a year ago.
> - Fourth quarter Adjusted EBITDA of $17.1 million, up 47% from a year ago.
> - Fourth quarter Adjusted EBITDA margin was 22% of revenue, up from 18% from a year ago.
> - Annual revenue of $285.5 million, up 16% from a year ago.
> - Annual Adjusted EBITDA of $60.1 million, up 40% from a year ago.

176. The press release quoted Defendant Abraham: "Our strong fourth quarter and full-year performance reflected the significant momentum comScore generated throughout 2013 with

our leading digital measurement products and multi-platform capabilities. We delivered meaningful market share gains, record revenue, strong margin expansion and EBITDA growth well above expectations."

177. The Company also stated in the press release its reported revenues and income (loss) from operations for the quarter and year ended December 31, 2013:

| **($ in thousands)** | **Three Months Ended December 31, 2013** | **Twelve Months Ended December 31, 2013** |
|---|---|---|
| Revenues | $76,495 | $286,860 |
| Income from operations | $577 | $3,093 |
| Adjusted EBITDA | $17,122 | $60,071 |

178. Defendants comScore and Abraham's statements quoted in ¶¶175-77 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, they overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income from operations) through the recognition of $3.2 million of nonmonetary revenue in fiscal year 2013 in violation of GAAP.

179. The Company also stated in the press release its "Financial Outlook":

| **First Quarter 2014** | |
|---|---|
| GAAP revenue | $74.8 million to $76.7 million |
| GAAP (loss) income before income taxes | ($4.8) million to ($3.1) million |
| Adjusted EBITDA | $12.0 million to $13.7 million |

| **Fiscal Year 2014** | |
|---|---|
| GAAP revenue | $316.5 million to $327.5 million |
| GAAP (loss) income before income taxes | ($2.8) million to $6.7 million |
| Adjusted EBITDA | $58.8 million to $67.5 million |

180. Defendant comScore's statements quoted in ¶179 were materially false and misleading because the revenue, income, and EBITDA projections relied upon recognition of nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 2. The February 11, 2014 Conference Call

181. On February 11, 2014, Defendants Abraham, Matta, and Tarpey participated in a conference call with analysts and investors to discuss the Company's financial results.

182. During this call, Defendant Abraham stated:

> [comScore] generated 16% pro forma revenue growth over 2012, well above our expectations. . . . Our margin performance was strong with adjusted EBITDA margin at 22% for the quarter and 21% for the year, well above our expectations and the overall 2012 results.
>
> Finally, we are exiting the year with no gap between bookings growth and revenue growth rate.

183. During the call, Defendant Tarpey stated:

> [R]evenue in the fourth quarter was $76.5 million, up 15% versus pro forma results in the same quarter last year. . . .
>
> [I]n 2013 we closed the gap between bookings and revenue growth. We began disclosing bookings for contract value in 2012 as a number of new products were gaining traction and generating CV growth substantially greater than revenue growth. . . .
>
> Non-GAAP net income for the fourth quarter of 2013 was $11.4 million. . .
>
> In the fourth quarter, adjusted EBITDA was $17.1 million, representing an EBITDA margin of 22%. Looking for the full year, our reported revenue was $286.9 million, up 12.4% from 2012. . . .
>
> On a pro forma basis, revenue was $285.5 million, or up 16% over 2012. GAAP pretax income was $2.1 million. And GAAP net loss was $2.3 million, or $0.07 per basic and diluted share loss.

> Non-GAAP net income was $40.3 million, or $1.12 per diluted share. Adjusted EBITDA was $60.1 million, or 21% EBITDA margin, as we produced solid adjusted EBITDA margins throughout 2013.

184. Defendants Abraham and Tarpey's statements quoted in ¶¶181-83 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income from operations) through the recognition of $3.2 million of nonmonetary revenue in fiscal year 2013 in violation of GAAP.

185. On the February 11, 2014 call, Defendant Tarpey also stated:

> We expect [bookings and revenue growth] to ride similar growth rates going forward, with some minor quarter-to-quarter fluctuation, and thus expect bookings and revenue growth rates to align, making it unnecessary to separately disclose CV. . . .
>
> For the first quarter of 2014, we anticipate revenues in the range of $74.8 million to $76.7 million. . . .
>
> We anticipate adjusted EBITDA for the first quarter of 2014 to be in the range of $12 million to $13.7 million, which represents an adjusted EBITDA margin of approximately 16% to 18%, or 17% at the midpoint of our revenue and adjusted EBITDA guidance ranges. . . .
>
> We expect a full-year 2014 GAAP revenue range of $316.5 million to $327.5 million. On this basis, the 2014 pro forma revenue growth rate is 11% to 15%, or 13% at the midpoint.
>
> We anticipate full-year GAAP income or loss before income taxes to be in the range of a $2.8 million loss to pretax income of $6.7 million. . .
>
> We anticipate adjusted EBITDA to be between $58.8 million and $67.5 million in 2014, representing an adjusted EBITDA margin range of 19% to 21%, or 20% at the midpoint of our revenue and adjusted EBITDA guidance ranges.

186. Defendant Tarpey's statements quoted in ¶185 were materially false and misleading because the revenue, EBITDA, and income projections relied upon recognition of revenue from nonmonetary transactions, when Defendants (a) lacked any reasonable basis for the projected

nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 3. The February 18, 2014 Form 10-K

187. On February 18, 2014, the Company filed its annual report on Form 10-K for 2013, which was signed by Defendants Abraham, Tarpey, and Henderson. In the annual report, the Company reported its "Key Metrics" for 2013:

| **($ in thousands)** | **Year Ended December 31, 2013** |
|---|---|
| Revenue | $286,860 |
| Adjusted EBITDA | $60,071 |
| Adjusted EBITDA Margin | 21% |

188. The Company also reported its revenues and income from operations for the first, second, third, and fourth quarters of 2013 and the full year:

| **($ in thousands)** | **1Q 2013** | **2Q 2013** | **3Q 2013** | **4Q 2013** | **FY 2013** |
|---|---|---|---|---|---|
| Revenues | $68,848 | $69,911 | $71,606 | $76,495 | $286,860 |
| Income from Operations | $660 | $993 | $863 | $577 | $3,093 |

189. The Company attributed its revenue growth "to increased sales to our existing customer base and continued growth of our customer base during the period."

190. The Company described its accounting for nonmonetary transactions as follows:

> The Company accounts for nonmonetary transactions under ASC 845, Nonmonetary Transactions. Nonmonetary transactions with commercial substance are recorded at the estimated fair value of assets surrendered including cash, if cash is less than 25% of the fair value of the overall exchange, unless the fair value of the assets received is more clearly evident, in which case the fair value of the asset received is used.

191. The Company described its related-party nonmonetary transaction as follows:

> In the fourth quarter of 2013, we entered into an agreement to exchange certain data assets with a corporation. A member of our Board of Directors also serves as a member of the Board of Directors of that corporation and therefore, we have considered the corporation to be a related party. The transaction was considered to have commercial substance under the guidance in ASC 845 and we estimated the fair value of the services delivered based on similar monetary transactions with

third parties. No cash was exchanged in this transaction. We also considered the guidance in ASC 850, Related Party Disclosures.

192. The Company described its nonmonetary transactions:

During the year ended December 31, 2013, we recognized $3.2 million in revenue related to nonmonetary transactions of which $1.8 million is attributable to this related party transaction. Due to timing differences in the delivery and receipt of the respective nonmonetary assets exchanged, the expense recognized in each period is different from the amount of revenue recognized. As a result, during the year ended December 31, 2013, we recognized $1.8 million in expense related to nonmonetary transactions, though no expense was recognized for this related party transaction since data assets have not yet been received.

193. The Company further stated in the 2013 Form 10-K that its consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

194. The 2013 Form 10-K further disclosed as follows with respect to comScore's disclosure controls and procedures and internal control over financial reporting:

**Evaluation of Disclosure Controls and Procedures**

Our Chief Executive Officer and our Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Securities Exchange Act of 1934 (the "Exchange Act") Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this report (the "Evaluation Date"), have concluded that as of the Evaluation Date, our disclosure controls and procedures are effective, in all material respects, to ensure that information required to be disclosed in the reports that we file and submit under the Exchange Act (i) is recorded, processed, summarized and reported as and when required and (ii) is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

* * *

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the guidelines established in Internal Control — Integrated Framework issued by the Committee of Sponsoring

> Organizations of the Treadway Commission (1992 Framework) (COSO). Our internal control over financial reporting includes policies and procedures that provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. Based on that evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2013.

195. In Exhibits 31.1 and 31.2 of the 2013 Form 10-K, Defendants Abraham and Tarpey certified under § 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") that the annual report was accurate and complete:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report . . . .
>
> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

196. In Exhibit 32.1 and 32.2 of the 2013 Form 10-K, Defendants Abraham and Tarpey further certified under § 906 of Sarbanes-Oxley: "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

197. Defendants comScore, Abraham, Tarpey, and Henderson's statements quoted in ¶¶187-196 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income from operations) through the recognition of $3.2 million of nonmonetary revenue in fiscal year 2013 in violation of GAAP.

### B. First Quarter of Fiscal Year 2014

#### 1. The March 10, 2014 Media, Internet and Telecom Conference

198. On March 10, 2014, Defendants Matta and Tarpey participated in the Deutsche Bank Media, Internet and Telecom Conference, during which Defendant Tarpey discussed the Company's 2014 revenue guidance.

> [Question:] [I]f you look at your revenue guidance for '14, it does show, you know, a little bit of growth deceleration despite all these new products. . . .
>
> [Tarpey:] . . . I mean the 13% growth rate at the midpoint, yes, a little bit lower versus last year. It's 15% actual. But we feel like we're in a good place, you know, as we proceed through the year.

199. Defendant Tarpey's statements in ¶198 above were materially false and misleading because comScore's projected revenue growth rates included nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

#### 2. The April 29, 2014 Press Release

200. On April 29, 2014, comScore issued a press release entitled "comScore, Inc. Reports First Quarter 2014 Results." In the press release, the Company stated:

> comScore achieved record quarterly revenue of $76.9 million; GAAP loss before income taxes of $0.7 million; and GAAP net loss of $0.8 million, or $(0.02) per basic and diluted share.
>
> First quarter 2014 metrics compared to pro forma results for the first quarter 2013 were as follows:
>
> - First quarter revenue of $76.9 million, up 14% from a year ago.
> - First quarter Adjusted EBITDA of $15.4 million, up 22% from a year ago.
> - First quarter Adjusted EBITDA margin was 20% of revenue, up from 19% from a year ago.

201. The press release also quoted Defendant Matta: "I am proud of the strong growth we drove in revenue and adjusted EBITDA."

202. The Company also included in the press release its reported revenues and (loss) income from operations for the three months ended March 31, 2014 and 2013:

| **($ in thousands)** | **Three Months Ended March 31, 2014** | **Three Months Ended March 31, 2013** |
|---|---|---|
| Revenues | $76,899 | $68,848 |
| (Loss) income from operations | ($304) | $660 |

203. Defendants comScore and Matta's statements quoted in ¶¶200-02 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) income from operations) through the recognition of $2.2 million of nonmonetary revenue in first quarter 2014 in violation of GAAP.

204. The press release also stated comScore's "Financial Outlook":

| | **Second Quarter 2014** | **Fiscal Year 2014** |
|---|---|---|
| GAAP revenue | $77.3 million to $79.7 million | $317.2 million to $328.2 million |
| GAAP (loss) income before income taxes | ($2.0) million to ($0.3) million | ($2.4) million to $5.2 million |
| Adjusted EBITDA | $14.3 million to $16.0 million | $59.9 million to $68.5 million |

205. Defendant comScore's statements quoted in ¶204 were materially false and misleading and omitted to disclose material facts because the revenue, loss or income before income taxes, and EBITDA projections relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 3. The April 29, 2014 Conference Call

206. On April 29, 2014, Defendants Matta and Tarpey participated in a conference call with analysts and investors to discuss the first quarter 2014 Company's financial results.

207. During this call, Defendant Matta stated:

> [W]e continue to build on the tremendous momentum comScore created in the marketplace last year with another quarter of record revenues and strong profitability to kick off 2014. First-quarter 2014 revenues were $76.9 million, up 14% over last year's pro forma results.
>
> Adjusted EBITDA was $15.4 million. This equates to a 20% EBITDA margin, which reflects operating leverage in the business and continued disciplined expense management. . . .

208. Also on the call, Defendant Tarpey stated:

> Revenue in the first quarter was $76.9 million, up 14% versus pro forma results in the same quarter last year. Subscription revenue in the first quarter was $69.1 million, up 18% versus pro forma results in Q1 2013. . . .
>
> GAAP net tax loss, pretax loss for Q1 2014, was $660,000 compared to a GAAP pretax income of $156,000 in the same quarter last year. . . .
>
> In the first quarter GAAP net loss was $782,000, or $0.02 per basic and fully diluted share based on a basic and diluted share count of 33.8 million shares. Non-GAAP net income for the first quarter of 2014 was $10.7 million, or $0.30 per diluted share, excluding stock-based compensation, amortization of intangibles, acquisition-related expenses and other nonrecurring items. . .
>
> First-quarter adjusted EBITDA was $15.4 million and represented an adjusted EBITDA margin of 20%.

209. Defendants Matta and Tarpey's statements quoted in ¶¶206-08 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income from operations) through the recognition of $2.2 million of nonmonetary revenue in first quarter 2014 in violation of GAAP.

210. Defendant Tarpey also stated:

> We anticipate an adjusted EBITDA for the second quarter of 2014 to be in a range of $14.3 million to $16.0 million, which represents an adjusted EBITDA margin of approximately 18% to 20%, or 19% at the midpoint of our revenue and adjusted EBITDA guidance. . . . For the full year of 2014 we now anticipate revenues in the range of $317.2 million to $328.2 million.
>
> We anticipate 2014 GAAP loss before income taxes in the range of a $2.4 million loss to a $5.2 million of income. We anticipate adjusted EBITDA for 2014 to be in the range of $59.9 million to $68.5 million, which represents an adjusted EBITDA margin of approximately 19% to 21%, or 20% at the midpoint of our revenue and adjusted EBITDA guidance ranges.

211. Defendant Tarpey's statements quoted in ¶210 were materially false and misleading because the projections of EBITDA, revenue, and loss before income taxes relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

#### 4. The May 1, 2014 Form 10-Q

212. On May 1, 2014, the Company filed its quarterly report on Form 10-Q for the quarter ended March 31, 2014, which was signed by Defendants Matta and Tarpey. In the quarterly report, the Company stated its "Key Metrics," its revenue (including certain adjustments), adjusted EBITDA, and adjusted EBITDA margin:

| ($ in thousands) | Three Months Ended March 31, 2014 | Three Months Ended March 31, 2013 |
|---|---|---|
| Revenue | $76,899 | $67,518 |
| Adjusted EBITDA | $15,435 | $12,634 |
| Adjusted EBITDA Margin | 20% | 19% |

213. The Company reported its revenues and (loss) income from operations for the three months ended March 31, 2014 and 2013 as follows:

| ($ in thousands) | Three Months Ended March 31, 2014 | Three Months Ended March 31, 2013 |
|---|---|---|
| Revenues | $76,899 | $68,848 |
| (Loss) income from operations | ($304) | $660 |

214. The Company attributed its revenue growth "primarily to increased sales to our existing customer base."

215. The Company also discussed its accounting for nonmonetary transactions in substantially the same form as quoted in ¶190. The Company described its nonmonetary transaction with a related party in substantially the same form as quoted in ¶191.

216. The Company stated that, during the three months ended March 31, 2014, it recognized $2.2 million of nonmonetary revenue, of which $1.7 million was attributable to the related-party transaction, and $1.2 million in expense related to nonmonetary transactions, of which $0.8 million was attributable to the related-party transaction.

217. The Company further stated in the Form 10-Q that its consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

218. The Form 10-Q included substantially the same statement about Defendant Matta and Tarpey's evaluation of the effectiveness of comScore's Disclosure Controls and Procedures as quoted in ¶194.

219. Defendants Matta and Tarpey made the same certifications under §§ 302 and 906 of Sarbanes-Oxley as quoted in ¶¶195-96.

220. Defendants comScore, Matta, and Tarpey's statements quoted in ¶¶212-19 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) income from operations) through the recognition of $2.2 million of nonmonetary revenue in first quarter 2014 in violation of GAAP.

### C. Second Quarter of Fiscal Year 2014

#### 1. The August 5, 2014 Press Release

221. On August 5, 2014, comScore issued a press release entitled "comScore, Inc. Reports Second Quarter 2014 Results." In the press release, the Company stated:

> comScore achieved record quarterly revenue of $80.0 million. GAAP loss before income taxes was $2.7 million; and GAAP net loss was $3.2 million, or $(0.09) per basic and diluted share . . . .
>
> Second quarter and year to date 2014 metrics compared to results for the second quarter and year to date in the prior year were as follows:
>
> - Second quarter revenues of $80.0 million, up 14% from a year ago.
> - Second quarter adjusted EBITDA of $16.7 million, up 20% from a year ago.
> - Second quarter adjusted EBITDA margin was 21% of revenue, as compared to 20% in the same quarter of 2013.
> - Year to date revenues of $156.9 million, up 13% from the same period in 2013 and up 14% on a pro forma basis.
> - Year to date adjusted EBITDA of $32.1 million, up 20% from the same period in 2013 and up 21% from a year ago on a pro forma basis.

222. The Company's press release also reported "[y]ear to date revenues of $156.9 million, up 13% from the same period in 2013."

223. The press release also quoted Defendant Matta: "Our strong performance in the second quarter reflects continued sharp execution on comScore's key strategic priorities and positive momentum across our business."

224. The Company also stated in the press release its reported revenues and (loss) income from operations for the three and six months ended June 30, 2014 and 2013:

| **($ in thousands)** | **Three Months Ended June 30, 2014** | **Three Months Ended June 30, 2013** | **Six Months Ended June 30, 2014** | **Six Months Ended June 30, 2013** |
|---|---|---|---|---|
| Revenues | $80,013 | $69,911 | $156,912 | $138,759 |
| (Loss) income from operations | ($2,251) | $993 | ($2,555) | $1,653 |

225. Defendants comScore and Matta's statements quoted in ¶¶221-24 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) income from operations) through the recognition of $1.8 million of nonmonetary revenue in second quarter 2014 in violation of GAAP.

226. The press release also stated comScore's "Financial Outlook":

| | **Third Quarter 2014** | **Fiscal Year 2014** |
|---|---|---|
| GAAP revenue | $80.6 million to $82.7 million | $320.5 million to $329.5 million |
| GAAP (loss) before income taxes | ($1.1) million to $0.7 million | ($3.9) million to $0.2 million |
| Adjusted EBITDA | $15.7 million to $17.4 million | $62.5 million to $69.5 million |

227. Defendant comScore's statements quoted in ¶226 were materially false and misleading because the revenue, loss, and EBITDA projections relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

**2. The August 5, 2014 Conference Call**

228. On August 5, 2014, Defendants Matta and Tarpey participated in a conference call with analysts and investors to discuss the Company's second quarter financial results.

229. During the call, Defendant Matta stated:

> comScore delivered another quarter of record revenues and strong profitability demonstrating the continued positive momentum across our business. Second quarter 2014 revenues were $80 million, up 14.5% over last year's results. Adjusted EBITDA was $16.7 million, a 20% year-over-year increase at a 21% EBITDA margin, reflecting continued operating leverage in the business, and disciplined expense management. . .
>
> As you can see, our key operating metrics demonstrate the fundamental strength and continued momentum of our business.

230. During the call, Defendant Tarpey stated:

> Revenue in the second quarter was $80 million, up 14.5% versus results in the same quarter last year. . . .
>
> Non-GAAP net income for the quarter was $11.3 million, or $0.33 per diluted share, excluding stock-based compensation, amortization of intangibles, acquisition-related expenses, and other non-recurring items. . . . The second quarter adjusted EBITDA was $16.7 million, or 20% increase over the prior year, representing an adjusted EBITDA margin of 21%. The Q2 EBITDA increase can mostly be attributed to the higher revenues and the resulting gross margins which I previously mentioned.

231. Defendants Matta and Tarpey's statements quoted in ¶¶228-230 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income from operations) through the recognition of $1.8 million of nonmonetary revenue in second quarter 2014 in violation of GAAP.

232. During the call, Defendant Tarpey also stated:

> For the third quarter of 2014 we anticipate revenues in the range of $80.6 million to $82.7 million. We anticipate third quarter GAAP income loss before income taxes in the range of a $1.1 million pretax loss, to pretax income of $700,000. We anticipate adjusted EBITDA for the third quarter of 2014 to be in the range of $15.7 million to $17.4 million, which represented an adjusted EBITDA margin of approximately 19% to 21%, or 20% at the midpoint of our revenue and adjusted EBITDA guidance ranges. . . .
>
> We're now raising our full year 2014 revenue outlook due to the continued momentum of the business. For 2014, we now anticipate revenues in the range of $320.5 million to $329.5 million. We anticipate 2014 GAAP income loss before income taxes in the range of a $3.9 million pretax loss to pretax income of $200,000. We anticipate adjusted EBITDA for 2014 to be in the range of $62.5 million to $69.5 million, which represents an adjusted EBITDA margin of approximately 19% to 21%, or 20% at the midpoint of our revenue and adjusted EBITDA guidance ranges.

233. Defendant Tarpey's statements quoted in ¶232 were materially false and misleading because the revenue, income, loss, and EBITDA projections relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

**3. The August 5, 2014 Form 10-Q**

234. Also on August 5, 2014, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2014, signed by Defendants Matta and Tarpey. In the quarterly report, the Company reported its "Key Metrics," its revenue (including certain adjustments), adjusted EBITDA, and adjusted EBITDA:

| ($ in thousands) | Three Months Ended June 30, 2014 | Three Months Ended June 30, 2013 | Six Months Ended June 30, 2014 | Six Months Ended June 30, 2013 |
|---|---|---|---|---|
| Revenue | $80,013 | $69,911 | $156,912 | $137,429 |
| Adjusted EBITDA | $16,709 | $13,979 | $32,144 | $26,598 |
| Adjusted EBITDA Margin | 21% | 20% | 20% | 19% |

235. The Company also reported its revenues and (loss) income from operations for the three and six months ended June 30, 2014 and 2013:

| ($ in thousands) | Three Months Ended June 30, 2014 | Three Months Ended June 30, 2013 | Six Months Ended June 30, 2014 | Six Months Ended June 30, 2013 |
|---|---|---|---|---|
| Revenues | $80,013 | $69,911 | $156,912 | $138,759 |
| (Loss) income from operations | ($2,251) | $993 | ($2,555) | $1,653 |

236. The Company attributed the growth in revenue "primarily to increased sales to our existing customer base."

237. The Company described its accounting for nonmonetary transactions in substantially the same form as quoted in ¶190.

238. The Company described its nonmonetary transaction with a related party in substantially the same form as quoted in ¶191.

239. The Company stated that, during the three and six months ended June 30, 2014, the Company recognized $1.8 million and $4.0 million in nonmonetary revenue, respectively, of which $1.5 million and $3.2 million were attributable to the related-party transaction.

240. The Company further stated in the Form 10-Q that the Company's consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

241. The Form 10-Q included substantially the same statement about Defendant Matta and Tarpey's evaluation of the effectiveness of comScore's Disclosure Controls and Procedures as quoted in ¶194.

242. Defendants Matta and Tarpey made the same certifications under §§ 302 and 906 of Sarbanes-Oxley as quoted in ¶¶195-96.

243. Defendants comScore, Matta, and Tarpey's statements quoted in ¶¶234-242 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income from operations) through the recognition of $1.8 million of nonmonetary revenue in second quarter 2014 in violation of GAAP.

## D. Third Quarter of Fiscal Year 2014

### 1. The September 11, 2014 Conference

244. On September 11, 2014, Defendants Matta and Wesley participated in the Deutsche Bank Technology Conference, where Matta emphasized comScore's prospects for revenue growth:

> We still think organically, we can grow year over year 50% without Google and Yahoo!. Just with our just sales force selling vCE outside of double-click and outside of Yahoo!.

> With Google and with Yahoo!, it could grow even more. It just—what is more? That's the question. . . .
>
> [W]e feel like with the continued increase in revenue growth, this is a company that can easily grow one basis point a year in EBITDA margin. This is a company that should be in the next three to five years in the mid-20%s in terms of EBITDA margin. . . .
>
> [B]ased on the revenue growth and the flow through to the bottom line, we feel like over the next three to five years, this should be a mid-20%s EBITDA margin.

245. Defendant Matta's statements in ¶244 above were materially false and misleading because the projected revenue and EBITDA margin growth rates depended on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 2. The October 28, 2014 Press Release

246. On October 28, 2014, comScore issued a press release entitled "comScore, Inc. Reports Third Quarter 2014 Results," which stated:

> comScore achieved record quarterly revenue of $82.1 million. GAAP loss before income taxes was $5.8 million; and GAAP net loss was $3.3 million, or $(0.10) per basic and diluted share, which primarily reflects an impairment charge of $6.9 million related to our mobile operator analytics division. Excluding the impairment charge, pro forma income before income taxes would have been $1.1 million.
>
> Third quarter and year to date 2014 metrics compared to results for the third quarter and year to date in the prior year were as follows:
>
> - Third quarter revenues of $82.1 million, up 15% from a year ago.
> - Third quarter adjusted EBITDA of $19.1 million, up 17% from a year ago.
> - Third quarter adjusted EBITDA margin was 23% of revenue, unchanged from a year ago.
> - Year to date revenues of $239.0 million, up 14% from the same period in 2013 on both a GAAP and pro forma basis.
> - Year to date adjusted EBITDA of $51.3 million, up 19% from the same period in 2013 on a pro forma basis.

247. The press release also quoted Defendant Matta as stating that "comScore delivered continued strong performance in the third quarter both on revenue and EBITDA."

248. The Company also reported in the press release its revenues and income (loss) from operations for the three and six months ended September 30, 2014 and 2013:

| ($ in thousands) | Three Months Ended September 30, 2014 | Three Months Ended September 30, 2013 | Nine Months Ended September 30, 2014 | Nine Months Ended September 30, 2013 |
|---|---|---|---|---|
| Revenues | $82,136 | $71,606 | $239,048 | $210,365 |
| (Loss) income from operations | ($6,004) | $863 | ($8,559) | $2,516 |

249. Defendants comScore and Matta's statements quoted in ¶¶246-48 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) income from operations) through the recognition of $4.6 million of nonmonetary revenue in third quarter 2014 in violation of GAAP.

250. The press release also stated comScore's "Financial Outlook":

| | Fourth Quarter 2014 | Fiscal Year 2014 |
|---|---|---|
| GAAP revenue from continuing operations | $83.0 million to $88.5 million | $319.0 million to $324.5 million |
| GAAP income before income taxes from continuing operations | $0.4 million to $3.4 million | $3.4 million to $6.4 million |
| Adjusted EBITDA | $17.5 million to $20.5 million | $72.2 million to $75.2 million |

251. Defendant comScore's statements quoted in ¶250 were materially false and misleading because the projections of revenue from continuing operations, income before income taxes from continuing operations, and EBITDA relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 3. The October 28, 2014 Conference Call

252. On October 28, 2014, Defendants Matta and Wesley participated in a conference call with analysts and investors to discuss the Company's third quarter 2014 financial results.

253. During the call, Defendant Matta stated:

> ComScore delivered another quarter of record revenues and strong profitability. This reflects continued positive momentum across our business and the strength of our partnerships, which continue to grow in number and impact.
>
> Third quarter 2014 revenues were $82.1 million, up 15% over last year. Adjusted EBITDA was $19.1 million, a 17% year-over-year increase and a 23% EBITDA margin, reflecting the significant operating leverage we have in the business and our focus on managing expenses. . . .
>
> To sum up, we had another record quarter for revenue.

254. Defendant Wesley also gave "a closer look" at the third quarter 2014 results:

> Revenue in the quarter was $82.1 million, up 15% versus the same quarter last year. Subscription revenue in the quarter was $74.1 million, up 19% versus the same quarter last year. Subscription and project revenue represented 90% and 10% of total revenue respectively. The ongoing success and customer adoption of vCE continues to drive our subscription revenue mix higher. . . .
>
> GAAP pretax loss for the quarter was $5.8 million, compared to GAAP pretax income of $707,000 in the same quarter last year. The decrease was primarily the result of a $6.9 million impairment charge during the quarter related to our mobile operator division. Excluding the impairment charge, we would have achieved pretax income for the quarter of $1.1 million. . . .
>
> Third quarter adjusted EBITDA was $19.1 million or a 17% increase over the prior year representing an adjusted EBITDA margin of 23%.

255. Defendants Matta and Wesley's statements quoted in ¶¶252-54 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, EBITDA growth rates, and pro forma pretax income) through the recognition of $4.6 million of nonmonetary revenue in third quarter 2014 in violation of GAAP.

256. Defendant Matta also stated that "As far as EBITDA expansion . . . I have always said that you should expect at least 1 margin point increase year over year."

257. Defendant Wesley also stated:

> It is important to note that the following guidance ranges exclude the financial impact of the mobile operator division as we expect to complete the sale of this division during Q4. Factoring in this adjustment, we are increasing the midpoint of the annual revenue guidance by $1.4 million which implies 15% year-over-year growth at the midpoint. . . . For the fourth quarter of 2014 we anticipate revenue in the range of $83 million to $88.5 million.

258. Defendants Matta and Wesley's statements quoted in ¶¶256-57 were materially false and misleading because the projections of EBITDA and revenue relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

**E. The October 29, 2014 Form 10-Q**

259. On October 29, 2014, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2014, signed by Defendants Matta and Wesley. In the quarterly report, the Company reported its "Key Metrics," its revenue (including certain adjustments), adjusted EBITDA, and adjusted EBITDA margin:

| ($ in thousands) | Three Months Ended September 30, 2014 | Three Months Ended September 30, 2013 | Nine Months Ended September 30, 2014 | Nine Months Ended September 30, 2013 |
|---|---|---|---|---|
| Revenue | $82,136 | $71,606 | $239,048 | $209,035 |
| Adjusted EBITDA | $19,118 | $16,355 | $51,262 | $42,953 |
| Adjusted EBITDA Margin | 23% | 23% | 21% | 21% |

260. The Company reported its revenues and income (loss) from operations for the three and nine months ended September 30, 2014 and 2013:

| ($ in thousands) | Three Months Ended September 30, 2014 | Three Months Ended September 30, 2013 | Nine Months Ended September 30, 2014 | Nine Months Ended September 30, 2013 |
|---|---|---|---|---|
| Revenues | $82,136 | $71,606 | $239,048 | $210,365 |
| (Loss) income from operations | ($6,004) | $863 | ($8,559) | $2,516 |

261. The Company attributed the growth in revenue "primarily to increased sales to our existing customer base."

262. The Company described its accounting for nonmonetary transactions in substantially the same form as quoted in ¶190.

263. The Company described its nonmonetary transaction with a related party in substantially the same form quoted in as ¶191.

264. The Company stated that, during the three and nine months ended September 30, 2014, the Company recognized $4.6 million and $8.6 million in nonmonetary revenue, respectively, of which $1.5 million and $4.7 million was attributable to the related-party transaction.

265. The Company further stated in the Form 10-Q that its consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

266. The Form 10-Q included substantially the same statement about Defendant Matta and Wesley's evaluation of the effectiveness of comScore's Disclosure Controls and Procedures as quoted in ¶194.

267. Defendants Matta and Wesley made the same certifications under §§ 302 and 906 of Sarbanes-Oxley as quoted in ¶¶195-96.

268. Defendants comScore, Matta, and Wesley's statements quoted in ¶¶259-267 were materially false and misleading because, as the Company has admitted in its September 15, 2016

Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income from operations) through the recognition of $4.6 million of nonmonetary revenue in third quarter 2014 in violation of GAAP.

### F. Fourth Quarter and Fiscal Year 2014

#### 1. The December 9, 2014 Global Tech Conference

269. On December 9, 2014, Defendants Matta and Wesley participated in the Barclays Global Tech Conference, during which Defendant Matta described the Company's revenue:

> [I]n terms of revenue growth and how does it all play, . . . I think the underappreciated part of the business is we have a business that 60% of our business is growing at 12% to 15% with very good margins. We have margins of 23% to 25% EBITDA margins.

270. Defendant Matta's statement in ¶269 was materially false and misleading because the Company's historic revenue growth and EBITDA margins reflected the recognition of nonmonetary revenue that the Company has admitted in its September 15, 2016 Form 8-K were in violation of GAAP, and its projected revenue growth relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

#### 2. The February 12, 2015 Press Release

271. On February 12, 2015, comScore issued a press release entitled "comScore, Inc. Reports Fourth Quarter And Full Year 2014 Results." In the press release, the Company stated:

> comScore achieved record quarterly revenue of $90.1 million, an increase of 18% compared to the fourth quarter of 2013. GAAP loss before income taxes was $6.0 million, which reflects an impairment charge of $2.8 million related to our Mobile Operator Analytics Division and other non-cash expenses. GAAP net loss was $2.7 million, or $0.08 per basic and diluted share.
>
> Fourth quarter 2014 results and metrics compared to 2013 on a proforma basis were as follows:
>
> - Revenue of $89.1 million, up 19% from a year ago.

- Adjusted EBITDA of $21.1 million, up 16% from a year ago.
- Adjusted EBITDA margin was 24% of revenue, unchanged from a year ago.

Full year 2014 results and metrics compared to 2013 on a proforma basis were as follows:

- Revenue of $325.2 million, up 18% from a year ago.
- Adjusted EBITDA of $75.9 million, up 24% from a year ago.
- Adjusted EBITDA margin was 23% of revenue, up 105 basis points from a year ago.

272. The press release also quoted Defendant Matta: "We had a great year. comScore's strong performance continued through the fourth quarter, and our record revenue and adjusted EBITDA achievements for fiscal year 2014 speak for themselves."

273. The Company also stated in the press release its reported revenues and income (loss) from operations for the three and twelve months ended December 31, 2014 and 2013:

| **($ in thousands)** | **Three Months Ended December 31, 2014** | **Three Months Ended December 31, 2013** | **Twelve Months Ended December 31, 2014** | **Twelve Months Ended December 31, 2013** |
|---|---|---|---|---|
| Revenues | $90,103 | $76,495 | $329,151 | $286,860 |
| Income (loss) from operations | ($6,221) | $577 | ($14,780) | $3,093 |

274. Defendants comScore and Matta's statements quoted in ¶¶271-73 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income (loss) from operations) through the recognition of $7.7 million of nonmonetary revenue in fourth quarter 2014 and $16.3 million for fiscal year 2014 in violation of GAAP.

275. The press release also stated comScore's "Financial Outlook":

| | First Quarter 2015 | Fiscal Year 2015 |
|---|---|---|
| GAAP revenue | $84.0 million to $88.0 million | $366.0 million to $379.0 million |
| GAAP income (loss) before income taxes | ($15.3) million to ($10.0) million | ($10.9) million to $4.5 million |
| Adjusted EBITDA | $17.5 million to $20.3 million | $82.5 million to $93.5 million |

276. Defendant comScore's statements quoted in ¶275 were materially false and misleading because the projections of revenue, income or loss before income taxes, and EBITDA relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

**3. The February 12, 2015 Conference Call**

277. On February 12, 2015, Defendants Matta and Wesley participated in a conference call with analysts and investors to discuss the Company's fourth-quarter 2014 financial results.

278. During the call, Defendant Matta stated:

> comScore delivered another quarter of record revenues and strong profitability. This reflects continued positive momentum across our business and the strength of our partnerships which continue to grow in number and impact. On a pro forma basis, fourth-quarter 2014 revenue was $89.1 million, up 19% over last year. Adjusted EBITDA was $21.1 million, a 16% year-over-year increase and a 24% adjusted EBITDA margin, reflecting the significant operating leverage we have in the business and our focus on managing expenses.

279. Also during the call, Defendant Wesley stated:

> Revenue in the quarter was $89.1 million on a pro forma basis, up 19% versus the same quarter last year. We are pleased with our revenue growth, despite foreign currency exchange rate headwinds. If exchange rates against the US dollar remain constant from the same quarter last year, our Q4 pro forma revenue would have been $1.5 million, or 2% higher. . . .
>
> GAAP pre-tax loss for the quarter was $6 million compared to GAAP pre-tax income of $312,000 in the same quarter last year. . .
>
> During the quarter, GAAP net loss was $2.7 million. . . . Non-GAAP net income for the quarter was $15.7 million. . . .

> Fourth-quarter, adjusted EBITDA was $21.1 million, or a 16% increase over the prior year, representing an adjusted EBITDA margin of 24%.

280. Defendants Matta and Wesley's statements quoted in ¶¶277-79 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income (loss) from operations) through the recognition of $7.7 million of nonmonetary revenue in fourth quarter 2014 in violation of GAAP.

281. Defendant Wesley also stated:

> For the first quarter of 2015, we anticipate revenue on a pro forma basis in the range of $84 million to $88 million.
>
> We anticipate GAAP loss, before income taxes, on a pro forma basis in the range of $15.3 million to $10 million. The guidance range is driven by $13.1 million of expense associated with the previously discussed market-based, stock grant.
>
> We anticipate adjusted EBITDA to be in the range of $17.5 million to $20.3 million, which represents an adjusted EBITDA margin range of approximately 21% to 23%, or 22% at the midpoint of our revenue and adjusted EBITDA guidance ranges. For . . . the full year of 2015, we anticipate revenue on a pro forma basis in the range of $366 million to $379 million.
>
> We anticipate GAAP income, before income taxes, on a pro forma basis in the range of a $10.9 million loss-to-income of $4.5 million. The guidance range is driven by $18.2 million of expense associated with the previously discussed market-based, stock grant.
>
> We anticipate adjusted EBITDA to be in the range of $82.5 million to $93.5 million, which represents an adjusted EBITDA margin range of approximately 23% to 25%, or 24% at the midpoint of our revenue and adjusted EBITDA guidance ranges.

282. Defendant Wesley's statements quoted in ¶281 were materially false and misleading because the projections of revenue, income or loss before income taxes, and EBITDA relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 4. The February 20, 2015 Form 10-K

283. On February 20, 2015, the Company filed its annual report on Form 10-K for the year ended December 31, 2014, signed by Defendants Matta, Wesley, Abraham, and Henderson. The annual report reported comScore's "Key Metrics," its revenue (including certain adjustments), adjusted EBITDA, and adjusted EBITDA margin:

| ($ in thousands) | Year Ended December 31, 2014 | Year Ended December 31, 2013 |
|---|---|---|
| Revenue | $325,150 | $274,922 |
| Adjusted EBITDA | $75,858 | $61,252 |
| Adjusted EBITDA Margin | 23% | 22% |

284. The Company reported its revenues and income (loss) from operations for 2014 and 2013:

| ($ in thousands) | FY 2013 | 1Q 2014 | 2Q 2014 | 3Q 2014 | 4Q 2014 | FY 2014 |
|---|---|---|---|---|---|---|
| Revenues | $286,860 | $76,899 | $80,013 | $82,136 | $90,103 | $329,151 |
| Income (loss) from operations | $3,093 | ($304) | ($2,251) | ($6,004) | ($6,221) | ($14,780) |

285. The Company attributed its revenue growth to "increased sales to our existing customer base and continued growth of our customer base during the period."

286. The Company described its accounting for nonmonetary transactions in substantially the same form as quoted in ¶190.

287. The Company described its nonmonetary transaction with a related party in substantially the same form as quoted in ¶191 and added that "[i]n Q4 2014, the Company and the corporation modified the existing agreement, where the parties will provide additional data assets."

288. The Company stated that, during the years ended December 31, 2014 and 2013, it recognized $16.3 million and $3.2 million, respectively, of nonmonetary revenue, of which $10.7 million and $1.8 million, respectively, was attributable to the related-party transaction.

289. The Company further stated in the 2014 Form 10-K that its consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

290. The Form 10-K included substantially the same statement about Defendant Matta and Wesley's evaluation of the effectiveness of comScore's Disclosure Controls and Procedures as quoted in ¶194.

291. Defendants Matta and Wesley made the same certifications under §§ 302 and 906 of Sarbanes-Oxley Act as quoted in ¶¶195-96.

292. Defendants comScore, Matta, Wesley, Abraham, and Henderson's statements quoted in ¶¶283-291 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and income (loss) from operations) through the recognition of $7.7 million of nonmonetary revenue in fourth quarter 2014 and $16.3 million for fiscal year 2014 in violation of GAAP.

## G. First Quarter of Fiscal Year 2015

### 1. The February 2015 Conference

293. On February 24, 2015, Defendant Wesley spoke to investors at an Internet Conference hosted by Cantor Fitzgerald.

294. At the conference, Defendant Wesley was asked about "business trends at core" and the reasons for "reaccelerating growth in the last several quarters." In response, Wesley stated:

> Yes. So, the products—when people talk about our core, they're generally talking about media metrics.
>
> That constitutes about 60% of our revenues. . . . The second area is basically our pricing power. . . .
>
> And then the third area of growth in that business, the lesser of the three, is international expansion. We do get new logos. Most of those new logos do come

> from international expansion. But, overall, that core area is growing low to mid teens in terms of revenue growth year over year.
>
> So, for the core, that's a very nice—provides a very nice tailwind, and nice incremental margins.

295. Defendant Wesley's statements quoted in ¶293-94 were materially false and misleading because he did not state that close to 40% of the Company's growth in 2014 came from improperly recognized revenue from nonmonetary transactions.

### 2. March 2015 Meeting with Brean Capital and Investors

296. On or about March 12, 2015, members of comScore management met with Brean Capital and investors and made false statements about comScore's revenue and earnings projections. Brean Capital reported on March 12, 2015: "After visiting investors with management and discussing the company's prospects in greater detail, we have revised our out year estimates and are raising our out year non-GAAP EPS estimates."

297. Defendants' statements during this meeting were materially false and misleading because comScore's projected revenue and earnings growth relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 3. The May 5, 2015 Press Release

298. On May 5, 2015, comScore issued a press release entitled "comScore, Inc. Reports First Quarter 2015 Results." In the press release, the Company stated:

> comScore achieved record first quarter revenue of $87.3 million, an increase of 14% compared to the first quarter of 2014. GAAP loss before income taxes was $9.7 million. GAAP net loss was $7.3 million, or $0.22 per basic and diluted share.
>
> First quarter 2015 results and metrics compared to first quarter 2014 on a proforma basis were as follows:
>
> - Revenue of $87.1 million, up 15% from a year ago.
> - Adjusted EBITDA of $21.3 million, up 25% from a year ago.

- Adjusted EBITDA margin was 24% of revenue, up 200 basis points from a year ago.

299. The press release also quoted Defendant Matta as stating, "I'm pleased that comScore delivered another quarter of strong revenues and financial performance."

300. The Company also stated in the press release its reported revenues and (loss) from operations for the three months ended March 31, 2015 and 2014:

| ($ in thousands) | Three Months Ended March 31, 2014 | Three Months Ended March 31, 2014 |
|---|---|---|
| Revenues | $87,329 | $76,899 |
| (Loss) from operations | ($9,190) | ($304) |

301. Defendants comScore and Matta's statements quoted in ¶¶298-300 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $3.8 million of nonmonetary revenue in first quarter 2015 in violation of GAAP.

302. The press release also stated comScore's "Financial Outlook":

| | Second Quarter 2015 | Fiscal Year 2015 |
|---|---|---|
| GAAP revenue | $86.8 million to $92.2 million | $368.0 million to $381.0 million |
| GAAP income (loss) before income taxes | ($5.6) million to ($2.2) million | ($9.2) million to $5.4 million |
| Adjusted EBITDA | $18.5 million to $21.5 million | $85.5 million to $94.5 million |

303. Defendant comScore's statements quoted in ¶302 were materially false and misleading because the projections of revenue, income (loss) before income taxes, and EBITDA relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

**4. The May 5, 2015 Conference Call**

304. On May 5, 2015, Defendants Matta and Wesley participated in a conference call with analysts and investors to discuss the Company's second quarter 2015 financial results.

305. During the call, Defendant Matta stated that:

> comScore delivered another quarter of strong revenues and strong profitability. This reflects continued positive momentum across our business and the strength of our partnerships, which continue to grow in number and impact. On a pro-forma basis, first-quarter 2015 revenue was $87.1 million, up 15% over last year.
>
> We had a strong revenue growth despite the negative effects of foreign currency. For example, on a constant currency basis, our pro-forma revenue would have grown 19% over last year, an additional $3.5 million. Adjusted EBITDA was $21.3 million, a 25% year-over-year increase, and a 24% adjusted EBITDA margin, reflecting the significant operating leverage we have in the business and our focus on managing expenses. Adjusted EBITDA margin for the same quarter last year was 22%.

306. Also during the call, Defendant Wesley stated:

> Revenue in the quarter was $87.1 million on a pro-forma basis, up 15% versus the same quarter last year. We are pleased with our revenue growth despite foreign currency exchange rate headwind. If exchange rates against the US dollar remained constant from the same quarter last year, our Q1 pro-forma revenue would have been $3.5 million higher, generating a growth rate of 19%.
>
> GAAP pre-tax loss for the quarter was $9.7 million compared to GAAP pre-tax loss of $660,000 for the same quarter last year.
>
> During the quarter, GAAP net loss was $7.3 million, or $0.22 per basic and diluted share, based on a basic and diluted share count of 33.8 million shares. Non-GAAP net income for the quarter was $18.7 million, or $0.54 per diluted share, excluding stock-based compensation, amortization of intangibles, acquisition-related expenses, and other non-recurring items. Our non-GAAP EPS calculation is based on a fully diluted share count of 34.9 million shares.
>
> First-quarter adjusted EBITDA was $21.3 million, a 25% increase over the prior year, representing an adjusted EBITDA margin of 24%.

307. Defendants Matta and Wesley's statements quoted in ¶¶304-06 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including

revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $3.8 million of nonmonetary revenue in first quarter 2015 in violation of GAAP.

308. Defendant Wesley also stated:

> For the second quarter of 2015, we anticipate revenue on a pro-forma basis in the range of $86.8 million to $92.2 million. We anticipate GAAP loss before income taxes on a pro-forma basis in the range of $5.6 million to $2.2 million.
>
> We anticipate adjusted EBITDA to be in the range of $18.5 million to $21.5 million, which represents an adjusted EBITDA margin range of approximately 21% to 23%, or 22% at the midpoint of our revenue and adjusted EBITDA guidance ranges. . .
>
> We're raising our full-year revenue and profitability guidance. For the full year of 2015, we anticipate revenue on a pro-forma basis in the range of $368 million to $381 million. We anticipate GAAP income before income taxes on a pro-forma basis in the range of $9.2 million loss to income of $5.4 million. . . .
>
> We anticipate adjusted EBITDA to be in the range of $85.5 million to $94.5 million, which represents an adjusted EBITDA margin range of approximately 23% to 25%, or 24% at the midpoint of our revenue and adjusted EBITDA guidance ranges.

309. Defendant Wesley's statements quoted in ¶308 were materially false and misleading because the projections of revenue, income and loss before income taxes, and EBITDA relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 5. The May 5, 2015 Form 10-Q

310. Also on May 5, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended March 31, 2015, signed by Defendants Matta and Wesley. In the quarterly report, the Company reported its "Key Metrics," its revenue (including certain adjustments), adjusted EBITDA, and adjusted EBITDA margin:

| **($ in thousands)** | **Three Months Ended March 31, 2015** | **Three Months Ended March 31, 2014** |
|---|---|---|
| Revenue | $87,084 | $75,971 |
| Adjusted EBITDA | $21,295 | $17,030 |

| ($ in thousands) | Three Months Ended March 31, 2015 | Three Months Ended March 31, 2014 |
|---|---|---|
| Adjusted EBITDA Margin | 24% | 22% |

311. The Company reported its revenues and loss income from operations for the three months ended March 31, 2015 and 2014:

| ($ in thousands) | Three Months Ended March 31, 2015 | Three Months Ended March 31, 2014 |
|---|---|---|
| Revenues | $87,329 | $76,899 |
| Loss from operations | ($9,190) | $(304) |

312. The Company attributed the growth in revenue "primarily to increased sales to our existing customer base."

313. The Company described its accounting for nonmonetary transactions in substantially the same form as quoted in ¶190.

314. The Company described its nonmonetary transaction with a related party in substantially the same form as quoted in ¶¶191, 287.

315. The Company stated that during the three months ended March 31, 2015 and 2014, it recognized $3.8 million and $2.2 million, respectively, of nonmonetary revenue, of which $2.1 million and $1.7 million, respectively, was attributable to the related-party transaction.

316. The Company further stated in the Form 10-Q that its consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

317. The Form 10-Q included substantially the same statement about Defendant Matta and Wesley's evaluation of the effectiveness of comScore's Disclosure Controls and Procedures as quoted in ¶194.

318. Defendants Matta and Wesley made the same certifications under §§ 302 and 906 of Sarbanes-Oxley as quoted in ¶¶195-96.

319. The first quarter 2015 Form 10-Q further included substantially the same statement about Matta and Wesley's evaluation of the effectiveness of comScore's disclosure controls and procedures as quoted in ¶194.

320. Defendants comScore, Matta, and Wesley's statements quoted in ¶¶310-19 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $3.8 million of nonmonetary revenue in first quarter 2015 in violation of GAAP.

### H. Second Quarter of Fiscal Year 2015

#### 1. The May 12, 2015 SunTrust Conference

321. On May 12, 2015, Defendant Matta participated in a conference hosted by SunTrust. Discussing the Company's first quarter 2015 financial results, Matta stated that "we raised guidance. Like when you raise guidance, you have confidence in the estimates of the company."

322. Defendant Matta's statement quoted in ¶321 was materially false and misleading because the Company's guidance included nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

#### 2. The August 4, 2015 Press Release

323. On August 4, 2015, comScore issued a press release entitled "comScore, Inc. Reports Second Quarter 2015 Results." In the press release, the Company stated:

> comScore achieved record second quarter GAAP revenue of $91.4 million, an increase of 14% compared to the second quarter of 2014. GAAP loss before income taxes was $2.7 million. GAAP net loss was $4.8 million, or $0.12 per basic and diluted share.

Second quarter 2015 results and metrics compared to second quarter 2014 on a proforma basis were as follows:

- Revenue of $91.3 million, up 16%.
- Adjusted EBITDA of $22.9 million, up 30%.
- Adjusted EBITDA margin was 25% of revenue, up 300 basis points.

Year to date 2015 results and metrics compared to the six months ended June 30, 2014 on a proforma basis were as follows:

- Revenue of $178.3 million, up 15%.
- Adjusted EBITDA of $44.2 million, up 28%.
- Adjusted EBITDA margin was 25% of revenue, up 300 basis points.

324. The press release also quoted Defendant Matta as stating, "I'm pleased to share that comScore delivered a quarter of record revenues and strong profitability."

325. The Company also stated in the press release its reported revenues and (loss) from operations for the three and six months ended June 30, 2015 and 2014:

| **($ in thousands)** | **Three Months Ended June 30, 2015** | **Three Months Ended June 30, 2014** | **Six Months Ended June 30, 2015** | **Six Months Ended June 30, 2014** |
|---|---|---|---|---|
| Revenues | $91,414 | $80,013 | $178,743 | $156,912 |
| (Loss) from operations | ($2,818) | ($2,251) | ($12,008) | ($2,555) |

326. Defendants comScore and Matta's statements quoted in ¶¶323-25 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $10.8 million of nonmonetary revenue in second quarter 2015 in violation of GAAP.

327. The Company press release also stated comScore's "Financial Outlook":

| | Third Quarter 2015 | Fiscal Year 2015 |
|---|---|---|
| GAAP revenue | $90.8 million to $95.4 million | $369.5 million to $382.5 million |
| GAAP (loss) income before income taxes | ($1.4) million to $4.1 million | ($5.9) million to $10.1 million |
| Adjusted EBITDA | $19.5 million to $23.6 million | $86.5 million to $97.5 million |

328. Defendant comScore's statements quoted in ¶327 were materially false and misleading because the projections of revenue, loss or income, and EBITDA relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 3. The August 4, 2015 Conference Call

329. On August 4, 2015, Defendants Matta and Wesley participated in a conference call with analysts and investors to discuss the Company's second quarter 2015 financial results.

330. During the call, Defendant Matta stated that:

> ComScore delivered another quarter of record revenues and strong profitability. This reflects continued positive momentum across our business and the strength of our partnerships, which continued to grow in number and impact. On a pro forma basis, second-quarter 2015 revenue was $91.3 million, up 16% over second quarter last year. We have strong revenue growth despite the negative effects of foreign currency adjustments. On a constant currency basis, our pro forma revenue grew 21% over last year, representing an additional $4.2 million, and as such, we achieved record pro forma constant currency revenue of $95.5 million. Adjusted EBITDA was $22.9 million, a 30% year-over-year increase, and a 25% adjusted EBITDA margin. Reflecting the significant operating leverage we have in the business and our focus on managing expenses. Adjusted EBITDA margins for the same quarter last year was 22%.

331. Defendant Wesley added that:

> Revenue in the quarter was $91.3 million on a pro forma basis, up 16% versus the same quarter last year. We are pleased with our revenue growth despite continued foreign currency exchange rate headwinds. If exchange rates against the US dollar remain constant from the same quarter last year, our Q2 pro forma revenue would have been $95.5 million, or a growth of 21%. . . .

> GAAP pre-tax loss for the quarter was $2.7 million, which includes a $5.2 million loss on disposition of the mobile operator division. The Q2 loss of $2.7 million was equivalent to the GAAP pre-tax loss for the same quarter last year. . . . During the quarter, GAAP net loss was $4.8 million, or $0.12 per basic and diluted share, based on the basic and diluted share count of 40.1 million shares.
>
> Non-GAAP net income for the quarter was $15 million, or $0.37 per diluted share, excluding stock based compensation, amortization of intangibles, acquisition related expenses, and other nonrecurring items. Our non-GAAP EPS calculation is based on a fully diluted share count of 40.9 million shares. Second quarter adjusted EBITDA was $22.9 million, a 30% increase over the prior year, representing an adjusted EBITDA margin of 25%.

332. Defendants Matta and Wesley's statements quoted in ¶¶329-331 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $10.8 million of nonmonetary revenue in second quarter 2015 in violation of GAAP.

333. Defendant Wesley also stated:

> For the third quarter of 2015, we anticipate revenue on a pro forma basis in the range of $90.8 million to $95.4 million. We anticipate GAAP income before income taxes on a pro forma basis in the range of a $1.4 million loss to income of $4.1 million. We anticipate adjusted EBITDA to be in the range of $19.5 million to $23.6 million, which represents an adjusted EBITDA margin range of approximately 21% to 25%, or 23% at the midpoint of our revenue and adjusted EBITDA guidance ranges. . . .
>
> We are raising our full year revenue and profitability guidance. For the full year of 2015, we anticipate revenue on a pro forma basis in the range of $369.5 million to $382.5 million. We anticipate GAAP income before income taxes on a pro forma basis in the range of a $5.9 million loss to income of $10.1 million. We anticipate adjusted EBITDA to be in the range of $86.5 million to $97.5 million, which represents an adjusted EBITDA margin range of approximately 23% to 25%, or 24% at the midpoint of our revenue and adjusted EBITDA guidance ranges.

334. Defendant Wesley's statements quoted in ¶333 were materially false and misleading because the projections of revenue, income before income taxes, and EBITDA relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected

nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

**4. The August 7, 2015 Form 10-Q**

335. On August 7, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2015, signed by Defendants Matta and Wesley. In the quarterly report, the Company announced that its revenue had increased 14% over the second quarter of the prior year to $91.3 million, including nonmonetary revenue of $10.8 million, nearly three times the amount of nonmonetary revenue in the immediately preceding quarter and five times more than in the corresponding quarter of the prior year.

336. The Company reported as its "Key Metrics," its revenue (including certain adjustments), adjusted EBITDA, and adjusted EBITDA margin:

| ($ in thousands) | Three Months Ended June 30, 2015 | Three Months Ended June 30, 2014 | Six Months Ended June 30, 2015 | Six Months Ended June 30, 2014 |
|---|---|---|---|---|
| Revenue | $91,258 | $78,804 | $178,342 | $154,775 |
| Adjusted EBITDA | $22,875 | $17,585 | $44,170 | $34,615 |
| Adjusted EBITDA Margin | 25% | 22% | 25% | 22% |

337. The Company reported its revenue and (loss) from operations for the three and six months ended June 30, 2015 and 2014:

| ($ in thousands) | Three Months Ended June 30, 2015 | Three Months Ended June 30, 2014 | Six Months Ended June 30, 2015 | Six Months Ended June 30, 2014 |
|---|---|---|---|---|
| Revenue | $91,414 | $80,013 | $178,743 | $156,912 |
| (Loss) from operations | ($2,818) | ($2,251) | ($12,008) | ($2,555) |

338. The Company attributed the growth in revenue to "a combination of increased sales to our existing customer base and increased sales to new customers."

339. The Company described its accounting for nonmonetary transactions in substantially the same form as quoted in ¶190.

340. The Company stated its revenue and expenses from nonmonetary transactions for the three and six months ended June 30, 2014 described in ¶239 above, and stated that during the three and six months ended June 30, 2015, the Company recognized $10.8 million and $14.6 million of nonmonetary revenue, respectively.

341. In addition to describing its nonmonetary transaction with a related party in substantially the same form as quoted in ¶¶191, 287, the Company stated its revenue and expenses from the related-party nonmonetary transaction described in ¶239 above, and stated that during the three and six months ended June 30, 2015, it recognized $2.2 million and $4.3 million of related-party nonmonetary revenue, respectively.

342. The Company further stated in the Form 10-Q that the Company's consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

343. The Form 10-Q included substantially the same statement about Defendant Matta and Wesley's evaluation of the effectiveness of comScore's Disclosure Controls and Procedures as quoted in ¶194.

344. Defendants Matta and Wesley made the same certifications under §§ 302 and 906 of Sarbanes-Oxley as quoted in ¶¶195-96.

345. The second quarter 2015 Form 10-Q further included substantially the same statement about Matta and Wesley's evaluation of the effectiveness of comScore's disclosure controls and procedures as quoted in ¶194.

346. Defendants comScore, Matta, and Wesley's statements quoted in ¶¶335-345 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $10.8 million of nonmonetary revenue in second quarter 2015 in violation of GAAP.

### I. Third Quarter of Fiscal Year 2015

#### 1. The August 2015 Communications with Cantor Fitzgerald

347. In or about the week of August 3, 2015, senior management of comScore met with Cantor Fitzgerald. In Cantor Fitzgerald's August 10, 2015 report, it stated that its "key take-aways" from the meeting "include [that] demand for the company's core products, including MMP XP, remains robust enough to support double-digit growth Y/Y for the next couple of years."

348. The statement attributable to Defendant comScore quoted in ¶347 was materially false and misleading because the Company's growth projections relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

#### 2. The August 12, 2015 Investor Conference

349. On August 12, 2015, Defendant Wesley participated in a Technology, Internet and Communications conference hosted by Oppenheimer. During the conference, he was asked to "break down [comScore's] revenue by product, whether the most recent quarter or last year," and to "give us a sense of how fast is each of the different product or segments growing." Defendant Wesley responded:

> So the different segments that we have, there's three major segments and then there's a segment that's kind of a customary that I'll talk about. The largest one and the first one, and probably the one people know the best, is the audience segment and that contributes about 60% of our overall revenue. That grows low to mid-teens depending on quarter. . . . The next biggest piece is the advertising piece. So if you

> think about audience, the 60%, as kind of the planning your campaigns, the advertising piece is kind of verifying that your campaigns are actually hitting your target demo or your target audience. And that generates about 20% of the Company's revenues. . . . The 20% advertising piece has grown in the 40% range. . . The third piece is what we call digital analytics. That contributes about 10% of the revenue; as of last year, that is. . . . And then the final piece of the business is what we refer to as project and/or custom. . . . [T]hat's a little less than 10% of the whole pie. And that's flattish to kind of 1%–2% growth this year.

350. Defendant Wesley's statements quoted in ¶349 were materially false and misleading and omitted to disclose material facts because he did not state that over 85% of the Company's growth in the second quarter 2015 came from improperly recognized revenue from nonmonetary transactions and because the Company's growth projections relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 3. The Late August 2015 Meeting with Brean Capital

351. On or about August 25, 2015, members of comScore's senior management met with Brean Capital. According to Brean Capital's August 25, 2015 report, comScore management "highlighted that strength in [the second quarter of 2015] was underpinned by strong Media Metrix net adds and multiplatform upsells, undoubtedly aided by the addition of Kantar's International salesforce, and 50%+ growth in vCE revenues. . . . Management indicated that solid trends continue into 2H15 . . . ."

352. The statements attributed to Defendant comScore and quoted in ¶351 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $10.8 million of nonmonetary revenue in second quarter 2015 in violation of GAAP.

#### 4. The Late August 2015 Statements to SunTrust

353. On or around August 28, 2015, members of comScore's senior management met with SunTrust to discuss market concerns over the Company's nonmonetary revenue.

354. As described in SunTrust's report, dated August 28, 2015, comScore management responded as follows to concerns about the nonmonetary revenue:

> SCOR's response (SCOR has met with this investor): They could just as easily have sold their services to these providers for cash (normal transaction) and entered into rev share agreements or paid upfront cash (amortized) for the data feeds. The economics around Xmedia data shares were well known when they issued initial 2Q guidance and 3Q and full-year guidance fully contemplates a return to normal run-rates in nonmonetary revenue and expense. Note: SCOR's auditor, Ernst & Young, has scrutinized and accepted these nonmonetary arrangements.

355. The statements attributed to Defendant comScore and quoted in ¶¶353-54 were materially false and misleading and because, as the Company has admitted in its September 15, 2016 Form 8-K, comScore did not comply with GAAP and its stated accounting policies in accounting for those transactions.

#### 5. The Response to the August 31, 2015 *Wall Street Journal* Article

356. As discussed in ¶¶71-74 above, on August 31, 2015, the *Wall Street Journal* published an article questioning the Company's nonmonetary revenue.

357. Following the publication of the August 31, 2015 *Wall Street Journal* article, Defendants comScore, Matta, and Wesley falsely reassured analysts and investors by making further materially false and misleading statements concerning that revenue.

##### a. The September 2015 Meetings with Analysts and Investors

358. On or around September 3, 2015, members of comScore's senior management met with Brean Capital and stated, as Brean Capital informed investors in a September 3, 2015 report, that comScore expected the level of revenue recognition from nonmonetary transactions to fall in

2016, which would weigh on overall reported revenue growth modestly, but that it would still meet its expected margin expansion. Brean Capital also reassured investors after meeting with management that comScore's accounting complied with GAAP.

359. On or around September 4, 2015, Matta and Wesley participated in a lunch with investors hosted by Cantor Fitzgerald. During the lunch, Cantor Fitzgerald reported in a September 4, 2015 report, "management . . . addressed the logic behind pursuing [the nonmonetary transactions] and their benefits to the business." After meeting with management, Cantor Fitzgerald also reassured investors that the nonmonetary revenue complied with GAAP.

360. The statements attributable to Defendants comScore, Matta, and Wesley and quoted in ¶¶358-59 were materially false and misleading because comScore's recognition of nonmonetary revenue was a violation of GAAP, as the Company has admitted in its September 15, 2016 Form 8-K.

**b. The September 3, 2015 Private Conference Call**

361. On September 3, 2015, Defendants Matta and Wesley participated in a private conference call only for institutional investors, arranged by SunTrust.

362. During this call, Defendant Wesley purported to explain why the Company did nonmonetary transactions:

> [I]t's just an issue of value. We deem these data sets quite frankly more valuable than just the cash value of what we would obtain if we just did a straight cash deal. I mean, it's that simple. . . . [D]oing straight deals where you just sign an agreement to pay them "x" amount of dollars for "x" period for the data sets . . . can be more difficult to negotiate because a lot of times they don't understand how valuable this data is. Of course, they try to get data points on, "well, gee, how badly do you want this data, how much are you making off of it," but you can get those done, but it's more time consuming and it's not quite as efficient. . . .

363. Defendant Wesley offered an explanation for how the Company accounted for these transactions:

> So the way that you value these is basically the same way you would value and allocate revenue in a cash transaction. And that is, you look at your historic cash sales and that's the basis for the fair value of what you're delivering. It's important to know that if you don't have historic cash transactions for the products or services that you are selling in a nonmonetary transaction, you cannot under the guidance recognize revenue in connection with that transaction because obviously they don't want people to be assigning arbitrary values in these deals and inflating what they are reporting. So there are very strict guidelines around that. This is a very narrow area of the guidance and most companies don't qualify for this treatment because, think about our business. . . .

364. Asked about the effect on the Company's growth rates if these transactions were removed, Defendant Wesley stated:

> I mean that's kind of the fundamental issue, right, is whether or not you perceive these as legitimate true transactions or if you view these as a separate bucket of transactions that would never result in a cash deal. If you take the position that, look, these are legitimate transactions with customers of the company that do cash transactions that would have been cash transactions had the company not decided they wanted to do a nonmonetary transaction and that benefitted them from the standpoint of adding future value to the products, then it would absolutely not be appropriate to pull those out. That's what we're saying, is that clearly these companies that are cash customers, these are companies that are credible companies that have very, very valuable data asset and as a percentage of our total customer base, they are very, very small. Again we have six of these deals tracking right now in the system that we are under active contract on that are reflected in our runouts and our guidance. So we do not feel it's appropriate to pull those out because at any given quarter you can take a specific deal and say, hey, well, had that deal not closed, your financial performance would have been "x," and to us this is no different than any other deal from the standpoint of it is a customer who has come to us and requested products and we are tracking that deal and trying to get that deal closed just like any other deal in the pipeline.

365. In response to a challenge by a participant as to Defendants' explanation for the accounting, Defendants Wesley and Matta stated the following:

> [Investor:] If you believe the value of what you are giving up is greater than the cash value would have been, I'm assuming the party on the other side seems and feels similarly. That would suggest your expenses and revenues even though they net zero, are both inflated relative to what you would do in a cash deal if all these nonmonetary transactions were indeed cash. Is that what I heard or no?
>
> [Defendant Wesley:] I think that it implies that actually the revenue would be less than the cost – maybe the cost would be inflated because we believe if he had to go directly to them to get this data that we would actually pay more for it. So I think it

is a fair statement to say that the costs are not inflated on our books, that actually we would have a greater cost had we not gone nonmonetary to get that data.

Ultimately we believe that it is financially beneficial. I am happy to review that again. The cash, we believe that the value of that data set are greater than the straight cash value that would have received had we done a straight cash deal.

[Investor:] On your end.

[Defendant Wesley:] Correct.

[Investor:] So what you are giving up, you think you're getting more than you would have on a cash deal. But you're buying stuff in the barter transaction that's less than you would have paid in it were a cash deal.

[Defendant Wesley:] Yes.

[Investor:] Okay. So economically it's very good for the company but it does tend to overstate your revenue and understate your expenses. That's what you just told me.

[Defendant Wesley:] Well, no. I think. No. I'm not sure how you are arriving at the fact that it overstates our revenue. If we believe that we're basically getting more value because again remember the value is based on our historic sales. The value that we record as revenue is consistent with our historic sales of the same products.

[Defendant Matta:] Let's just be very clear, the revenue that we are taking on here is based on revenues that we have sold before of similar transaction for cash. The revenue is calculated based on fair value. It is fully audited by our accounting firm E&Y, and it follows GAAP revenue. It is 100% GAAP revenue. It is audited by E&Y. It is [undecipherable] revenue that, and again, if there is something that we have provided in these transactions that we have not ever sold for cash previously, we would not be able to take any revenue for that. So the guidelines are very, very strict and we follow them to the "t." E&Y blesses it, and it is 100% GAAP revenue. It is no overstating of revenue or understating. It is what it is in terms of revenue and how it is calculated.

366. Defendants Matta and Wesley's statements quoted in ¶¶361-65 above were materially false and misleading because comScore's recognition of nonmonetary revenue was a violation of GAAP, as the Company has admitted in its September 15, 2016 Form 8-K.

#### 6. The September 29, 2015 Conference Call

367. On September 29, 2015, Defendants Matta and Wesley participated in a conference call alongside Rentrak CEO Livek and Rentrak COO Chemerow to discuss the Merger agreement between comScore and Rentrak. During the call, Defendant Matta stated:

> [T]he combination of our companies delivers enhanced scale with a combined pro forma of $2.4 billion market cap, $457 million in revenue, and $100 million in adjusted EBITDA in the 12 months ending June 30, 2015. Both companies have strong recent revenue growth, 17% for comScore and 33% for Rentrak for the latest 12 months ending June 30, 2015, compared to the prior period. Together, we also have strong profitability, with a 22% pro forma adjusted EBITDA, and prospects for further margin expansion.

368. Defendant Matta's statement in ¶367 above was materially false and misleading because it overstated comScore's revenue, EBITDA, and revenue growth by including $16.9 million of nonmonetary revenue for the twelve months ended June 30, 2015 in what the Company later admitted was a violation of GAAP.

#### 7. The November 5, 2015 Press Release

369. On November 5, 2015, comScore issued a press release entitled "comScore, Inc. Reports Third Quarter 2015 Results." In the press release, the Company stated:

> comScore achieved record third quarter GAAP revenue of $92.4 million, an increase of 13% compared to the third quarter of 2014. GAAP income before income taxes was $0.9 million. GAAP net income was $1.0 million, or $0.02 per basic and diluted share.
>
> Third quarter 2015 results and metrics compared to third quarter 2014 on a proforma basis were as follows:
>
> - Revenue of $92.4 million, up 14%.
> - Adjusted EBITDA of $23.4 million, up 16%.
> - Adjusted EBITDA margin was 25% of revenue, up 50 basis points.
>
> Year to date 2015 results and metrics compared to the nine months ended September 30, 2014 on a proforma basis were as follows:
>
> - Revenue of $270.7 million, up 15%.
> - Adjusted EBITDA of $67.6 million, up 23%.

- Adjusted EBITDA margin was 25% of revenue, up 200 basis points.

370. The press release also quoted Defendant Matta as stating, "I'm very pleased to announce that comScore delivered a solid quarter of record revenues, strong profitability and net income from operations."

371. The Company also stated in the press release its reported revenue and income (loss) from operations for the three and nine months ended September 30, 2015 and 2014:

| **($ in thousands)** | **Three Months Ended September 30, 2015** | **Three Months Ended September 30, 2014** | **Nine Months Ended September 30, 2015** | **Nine Months Ended September 30, 2014** |
|---|---|---|---|---|
| Revenue | $92,405 | $82,136 | $271,148 | $239,048 |
| Income (loss) from operations | $2,243 | ($6,004) | ($9,765) | ($8,559) |

372. Defendants comScore and Matta's statements quoted in ¶¶369-371 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $9.1 million of nonmonetary revenue in third quarter 2015 in violation of GAAP.

373. The press release also stated comScore's "Financial Outlook":

| | **Fourth Quarter 2015** | **Fiscal Year 2015** |
|---|---|---|
| GAAP revenue | $95 million to $103 million | $365.7 million to $373.7 million |
| GAAP (loss) income before income taxes | ($5.3) million to $4.3 million | ($9.9) million to ($0.3) million |
| Adjusted EBITDA | $20.5 million to $27.0 million | $88.1 million to $94.6 million |

374. Defendant comScore's statements quoted in ¶373 were materially false and misleading because the projections of revenue, loss or income before income taxes, and EBITDA relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected

nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

**8. The November 5, 2015 Conference Call**

375. Also on November 5, 2015, Defendants Matta and Wesley participated in a conference call to discuss the Company's third quarter 2015 results. During the call, Matta stated:

> We ended the third quarter of 2015 with record results and strong momentum. . . . comScore delivered another quarter of record revenues and strong profitability. This reflects continued positive momentum across our business. On a pro forma basis, third quarter 2015 revenue was $92.4 million. Up 14% over second quarter last year. We had strong revenue growth despite the continued negative effect of foreign currency adjustments. On a constant currency basis our pro forma revenue grew 19% over last year, representing an additional $4 million and as such we achieved record pro forma constant currency revenue of $96.4 million. . . .
>
> Adjusted EBITDA was $23.4 million, a 16% year-over-year increase and a 25% adjusted EBITDA margin, reflecting the significant operating leverage we have in the business and our focus on managing expenses. This adjusted EBITDA margin remained constant from the same quarter last year. I'm especially pleased that our pre-tax income for the quarter was $900,000. Which includes $3.3 million of Rentrak-related transaction fees. Excluding these transaction fees, pre-tax income for the quarter would have been $4.2 million.

376. Defendant Wesley further stated:

> We're pleased with our revenue growth, despite softness from our Digital Analytix division and continued foreign currency exchange rate headwinds. If exchange rates against the US dollar remain constant from the same quarter last year, our Q3 pro forma revenue would've been $96.4 million, or a growth of 19%.
>
> Revenue from nonmonetary transactions in the quarter was $9 million, down $2 million sequentially and up $4 million versus the same quarter last year.. . . .
>
> GAAP pre-tax income for the quarter was $900,000. Which includes $3.3 million of fees associated with the proposed acquisition of Rentrak. The loss for the same quarter last year was $5.8 million, which included an impairment charge of $6.9 million. . . .
>
> During the quarter, GAAP net income was $1 million, or $0.02 per diluted share based on a diluted share count of 39.8 million shares. Non-GAAP net income for the quarter was $17 million.

> Third quarter adjusted EBITDA was $23.4 million. A 16% increase over the prior year. Representing an adjusted EBITDA margin of 25%. We are pleased by the continued adjusted EBITDA margin expansion.

377. In addition, Defendant Wesley responded to an analyst's question about growth rates discounting nonmonetary transaction revenue:

> [Oppenheimer analyst:] I just want to lay out what we calculated we think was the year-over-year organic growth if you strip out currency and nonmonetary revenue. So, Mel [Wesley], correct me if I'm wrong, the second quarter would have been about 12% growth year-over-year. Third quarter at 15%, and then the guidance, assuming about $2.5 million of currency headwind, would imply about 22%. And so, I don't know if that foots with your numbers.
>
> [Defendant Wesley:] On the growth rates that you outlined, I think we're within like 1% 1.5% on all the ones you quoted. I think we're fine there.

378. Defendants Matta and Wesley's statements quoted in ¶¶375-77 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $9.1 million of nonmonetary revenue in third quarter 2015 in violation of GAAP.

379. Defendant Wesley also stated:

> For the fourth quarter of 2015, we anticipate revenue on a pro forma basis in the range of $95 million to $103 million. We anticipate GAAP income before income taxes on a pro forma basis in the range of a 5.3 million loss to income of $4.3 million. We anticipate adjusted EBITDA to be in the range of $20.5 million to $27 million, which represents an adjusted EBITDA margin range of approximately 22% to 26%. Or 24% at the mid-point of our revenue and adjusted EBITDA guidance ranges. . . .

380. Defendant Wesley's statements quoted in ¶379 were materially false and misleading because the projections of revenue, income before income taxes, and EBITDA relied upon nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

381. Defendant Wesley also stated:

> For the fourth quarter of 2015 we anticipate nonmonetary revenue of $5.5 million and nonmonetary expense of $6 million. For Q4 of last year, nonmonetary revenue was $7.6 million, and nonmonetary expense was $9.2 million. We expect both nonmonetary revenue and expense to decline year-over-year in the coming quarters. The expected decline is driven by the release of new products in the last year that required acquisition of scarce data sets. And the fact that we don't believe a similar need exists based on anticipated product launches in the coming quarters.

382. Defendant Wesley's statements quoted in ¶381 were false and misleading because the data comScore acquired in the nonmonetary transactions was not valuable or "need[ed]" for the development of comScore's new products, and because Defendants were promising to stop doing more data-barter transactions because they feared that analysts and investors would discover comScore's improper accounting for the transactions.

**9. The November 6, 2015 Form 10-Q**

383. On November 6, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2015, signed by Defendants Matta and Wesley. In the quarterly report, the Company reported as its "Key Metrics," its revenue (including certain adjustments),

| ($ in thousands) | Three Months Ended September 30, 2015 | Three Months Ended September 30, 2014 | Nine Months Ended September 30, 2015 | Nine Months Ended September 30, 2014 |
|---|---|---|---|---|
| Revenue | $92,405 | $81,260 | $270,747 | $236,034 |
| Adjusted EBITDA | $23,381 | $20,166 | $67,551 | $54,781 |
| Adjusted EBITDA Margin | 25% | 25% | 25% | 23% |

adjusted EBITDA, and adjusted EBITDA margin:

384. The Company reported its revenues and income (loss) from operations for the three and nine months ended September 30, 2015 and 2014:

| ($ in thousands) | Three Months Ended | Three Months Ended | Nine Months Ended | Nine Months Ended |
|---|---|---|---|---|

| | **September 30, 2015** | **September 30, 2014** | **September 30, 2015** | **September 30, 2014** |
|---|---|---|---|---|
| Revenues | $92,405 | $82,136 | $271,148 | $239,048 |
| Income (loss) from operations | $2,243 | ($6,004) | ($9,765) | ($8,559) |

385. The Company attributed the growth in revenue to "a combination of increased sales to our existing customer base and increased sales to new customers."

386. The Company described its accounting for nonmonetary transactions in substantially the same form as quoted in ¶190.

387. The Company stated its revenues and expenses from the three and nine months ended September 30, 2014 described in ¶264 above, and also that during the three and nine months ended September 30, 2015, the Company recognized $9.1 million and $23.7 million of revenue related to nonmonetary transactions, respectively, and $5.1 million and $14.3 million, respectively, in expense related to nonmonetary transactions, respectively. In addition to describing its nonmonetary transaction with a Related Party in substantially the same form as ¶¶191, 287, the Company stated its revenues and expenses from the related party nonmonetary transaction for the three and nine months ended September 30, 2014 described in ¶264, and also that during the three and nine months ended September 30, 2015, the Company recognized $2.3 million and $6.6 million of revenue and expense of $2.0 million and $6.1 million, respectively, for this nonmonetary transaction.

388. The Company further stated in the Form 10-Q that the Company's consolidated financial statements had "been prepared in accordance with U.S. generally accepted accounting principles."

389. The Form 10-Q included substantially the same statement about Defendant Matta and Wesley's evaluation of the effectiveness of comScore's Disclosure Controls and Procedures as quoted in ¶194.

390. Defendants Matta and Wesley made the same certifications under §§ 302 and 906 of Sarbanes-Oxley as quoted in ¶¶195-96.

391. The third quarter 2015 Form 10-Q further included substantially the same statement about Matta and Wesley's evaluation of the effectiveness of comScore's disclosure controls and procedures as quoted in ¶194.

392. Defendants comScore, Matta, and Wesley's statements quoted in ¶¶383-391 were materially false and misleading and omitted to disclose material facts because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $9.1 million of nonmonetary revenue in third quarter 2015 in violation of GAAP.

## J. Fourth Quarter and Fiscal Year 2015

### 1. The December 3, 2015 Response to the SEC's Comment Letter

393. In response to the Company's disclosures in its 2014 Form 10-K and third quarter 2015 Form 10-Q concerning its nonmonetary transactions, the SEC issued a comment letter to the Company, dated November 25, 2015, asking what consideration the Company gave to breaking out the impact of nonmonetary transactions in its presentation of results of operations for the periods presented.

394. In its response that was publicly posted on the SEC's website on or around December 3, 2015, comScore stated:

> The Company supplementally advises the Staff that all of its nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized. Accordingly, the Company determined that the disclosure in the Results of Operations regarding trends generally otherwise captured the material factors contributing to the changes in the Company's results of operations for the periods presented in the 2014 Form 10-K.

395. In addition, in response to a question from the SEC as to the nature of the data exchanges that were being accounted for as nonmonetary transactions and whether these transactions were similar to typical revenue transactions, comScore stated:

> All of the Company's nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized. As an example, in these types of nonmonetary transactions, the Company provides subscription products and solutions that it typically sells on a cash basis to data source providers in exchange for additional consumer demographics and segmentation data that improves the accuracy and granularity of the Company's products and services, particularly the Company's panel and census data. The Company concluded that such transactions were consistent with its accounting policies and with the terms of similar transactions with other ordinary course transactions but for the nonmonetary element.

396. Defendant comScore's statements quoted in ¶¶393-95 above were materially false and misleading because the Company's recognition of revenue from those agreements violated GAAP, as the Company subsequently admitted in its September 15, 2016 Form 8-K.

### 2. The February 17, 2016 Press Release

397. On February 17, 2016, comScore issued a press release entitled "comScore, Inc. Reports Fourth Quarter And Fiscal Year 2015 Results." In the press release, the Company stated:

> comScore achieved record fourth quarter GAAP revenue of $97.7 million, an increase of 8% compared to the fourth quarter of 2014. GAAP income before income taxes was $6.5 million. GAAP net income was $4.4 million, or $0.11 per diluted share. Free cash flow for the fourth quarter was $10.7 million, up 68% from the same quarter last year.
>
> Fourth quarter 2015 results and metrics compared to fourth quarter 2014 on a proforma basis were as follows:

- Revenue of $97.7 million, up 10%.
- Adjusted EBITDA of $27.4 million, up 30%.
- Adjusted EBITDA margin was 28.1% of revenue, up 440 basis points.
- Non-GAAP net income was $18.9 million, up 19%.

comScore achieved record annual GAAP revenue of 368.8 million, an increase of 12% compared to 2014. GAAP loss before income taxes was ($5.0) million, GAAP net loss was $(6.8) million or $(0.18) per basic and diluted share. Free cash flow for the year ended December 31, 2015 was $55.3 million, up 32%.

Full year to date 2015 results and metrics compared to the twelve months ended December 31, 2014 on a proforma basis were as follows:

- Revenue of $368.4 million, up 13%.
- Adjusted EBITDA of $95.0 million, up 25%.
- Adjusted EBITDA margin was 25.8% of revenue, up 250 basis points.
- Non-GAAP net income was $69.6 million, up 27%.

398. The press release also quoted Defendant Matta as stating, "I'm very pleased to announce that comScore delivered record revenues, record Adjusted EBITDA and strong net income from operations."

399. The Company also stated in the press release its reported revenues and income (loss) from operations for the three and twelve months ended December 31, 2015 and 2014:

| **($ in thousands)** | **Three Months Ended December 31, 2015** | **Three Months Ended December 31, 2014** | **Twelve Months Ended December 31, 2015** | **Twelve Months Ended December 31, 2014** |
|---|---|---|---|---|
| Revenues | $97,669 | $90,103 | $368,817 | $329,151 |
| Income (loss) from operations | $7,115 | ($6,221) | ($2,650) | ($14,780) |

400. Defendants comScore and Matta's statements quoted in ¶¶397-99 were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $5 million

of nonmonetary revenue in fourth quarter 2015 and $28.7 million of nonmonetary revenue in fiscal year 2015 in violation of GAAP.

401. The press release also stated comScore's "Financial Outlook":

| | **First Quarter 2016** | **Fiscal Year 2016** |
|---|---|---|
| GAAP revenue | $105 million to $111 million | $508.0 million to $532.0 million |
| GAAP (loss) income before income taxes | ($1.9) million to $6.5 million | ($26.9) million to ($3.5) million |
| Adjusted EBITDA | $19.0 million to $23.5 million | $116.0 million to $132.0 million |

402. Defendant comScore's statements quoted in ¶401 were materially false and misleading because the projections of revenue, loss or income before income taxes, and EBITDA relied on nonmonetary revenue when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

### 3. The February 17, 2016 Conference Call

403. On February 17, 2016, Defendants Matta and Wesley participated in a conference call with investors to announce the Company's 2015 financial results. Defendant Matta stated:

> comScore delivered another quarter and year of record revenues and strong profitability. We closed out 2015 with positive momentum across our business, setting us up well for a game-changing 2016. Fourth-quarter 2015 pro forma revenue was $97.7 million, up 10% over fourth quarter of last year. We have strong revenue growth despite the continued negative effects of foreign currency adjustments. On a constant currency basis, our pro forma revenue grew 13% over last year and we achieved record pro forma constant currency revenue of $100.9 million.
>
> Adjusted EBITDA was $27 million, a 30% year-over-year increase and a 28% adjusted EBITDA margin reflecting the significant operating leverage we have in the business. This adjusted EBITDA margin increased more than 400 basis points from the same quarter last year.
>
> I'm especially pleased that our pretax income for the quarter was $6.5 million.

404. Defendant Wesley stated:

> Revenue in the quarter was $97.7 million on a pro forma basis, up 10% versus the same quarter last year. We are pleased with our revenue growth despite lower sales of our DAx solution after announcing the divestiture of that business in early November.
>
> [R]evenue from nonmonetary transactions in the quarter was $5 million, down $4 million sequentially and down $2 million versus the same quarter last year. Expense from nonmonetary transactions in the quarter was $6.5 million, up $1.5 million sequentially and down $3 million versus the same quarter last year. . .
>
> GAAP pretax income for the quarter was $6.5 million. For the same quarter last year, there was a pretax loss of $6 million. The increase in pretax income was largely due to a reduction in stock-based compensation of $7.5 million and a $2.8 million impairment charge recorded in Q4 of last year related to intangible assets of the mobile operator business that was subsequently divested. . .
>
> Non-GAAP net income for the quarter was $18.9 million or $0.48 per diluted share, excluding stock-based compensation, amortization of intangibles, acquisition-related expenses, deferred tax benefit and other nonrecurring items. Fourth-quarter adjusted EBITDA was $27.4 million, a 30% increase over the prior year, representing an adjusted EBITDA margin of 28%.

405. Defendants Matta and Wesley's statements quoted in ¶¶403-04 were materially false and misleading because , as the Company has admitted in its September 15, 2016 Form 8-K, these statements overstated comScore's revenue (and all metrics derived therefrom, including revenue growth rates, EBITDA, and (loss) from operations) through the recognition of $5 million of nonmonetary revenue in fourth quarter 2015 and $28.7 million of nonmonetary revenue in fiscal year 2015 in violation of GAAP.

406. Defendant Wesley also stated:

> During 2016, we expect nonmonetary revenue of $20 million, or less than 4% of pro forma revenue at the midpoint of our guidance and nonmonetary expense of $28 million.
>
> For the first quarter of 2016, we anticipate revenue on a pro forma basis in the range of $105 million to $111 million. We anticipate GAAP income before income taxes on a pro forma basis in the range of a $1.9 million loss to income of $6.5 million. We anticipate adjusted EBITDA to be in the range of $19 million to $23.5 million, which represents an adjusted EBITDA margin range of approximately 18% to 21%, or 20% at the midpoint of our revenue and adjusted EBITDA guidance ranges. . .

> For the full year of 2016, we anticipate revenue on a pro forma basis in the range of $508 million to $532 million. We anticipate GAAP loss before income taxes on a pro forma basis in the range of $26.9 million to $3.5 million. We anticipate adjusted EBITDA to be in the range of $116 million to $132 million, which represents an adjusted EBITDA margin range of approximately 23% to 25%, or 24% at the midpoint of our revenue and adjusted EBITDA guidance range. . . . Our 2016 pro forma revenue guidance represents 17% growth over pro forma revenue generated by both companies in 2015. Our adjusted EBITDA guidance represents 28% growth over adjusted EBITDA generated by both companies in 2015. . .
>
> Look, we do continue to expect expansion in adjusted EBITDA moving forward out of 2016.

407. Defendant Wesley's statements quoted in ¶406 were materially false and misleading because the projections of revenue, income and loss before income taxes, and EBITDA, relied on revenue from nonmonetary transactions when Defendants (a) lacked any reasonable basis for the projected nonmonetary revenue, and (b) knew that recognizing the nonmonetary revenue would violate GAAP.

408. Defendant Wesley also stated:

> The expected decline in nonmonetary revenue during 2016 as compared to 2015 is driven by the release of new products that required scarce data sets and our view that similar needs do not exist based on anticipated product launches in 2016. We do not expect any new nonmonetary transactions during 2016. . . .

409. Defendant Wesley's statements quoted in ¶408 were false and misleading because the data comScore acquired in the nonmonetary transactions was not valuable or "need[ed]" for the development of comScore's new products, and because Defendants were promising to stop doing more data-barter transactions because they feared that analysts and investors would discover comScore's improper accounting for the transactions.

## X. LOSS CAUSATION

410. Defendants' wrongful conduct, as alleged in this Complaint, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

411. During the Class Period, Plaintiffs and the Class purchased or otherwise acquired comScore's securities at artificially inflated prices and were damaged thereby. That artificial inflation in comScore's stock price was removed when Defendants' misrepresentations and omissions made to the market, and the effects thereof, were revealed, causing investors' losses.

412. A partial disclosure on August 31, 2015, partly revealed Defendants' fraudulent scheme and the artificial inflation in comScore's stock to the market, when the *Wall Street Journal* published an article entitled "Is comScore's Revenue as Good as it Seems?" The article advised that comScore investors should "dig into" what was driving comScore's growth, calling attention to comScore's growing amounts of nonmonetary transaction revenue.

413. In response to this partial corrective disclosure, the following day shares of comScore fell $4.06 per share, or 7.7%, to close at $48.15, on unusually heavy trading volume.

414. Another partial corrective disclosure on February 29, 2016, partly revealed Defendants' fraudulent scheme and the artificial inflation in comScore's stock to the market, when the Company filed a Notification of Late Filing on Focus 12b-25 with the SEC, disclosing that the Company would be unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 on time because the Company "require[d] additional time to prepare its financial statements and complete the external audit of those statements included in the Form 10-K." Elaborating, the Company disclosed that on February 19, 2016, "the Audit Committee of the Company's Board of Directors (the "Audit Committee") received a message regarding certain potential accounting matters" and that, in response, "the Audit Committee immediately commenced a review of the matters with the assistance of independent counsel and advisors." comScore also announced that the Company would not file its Form 10-K until after the

completion of the Audit Committee's review, and that comScore expected to file the 10-K by March 15, 2016.

415. On this news, shares of comScore fell $1.15 per share, or 2.8%, to close at $40.00 on March 1, 2016, on unusually heavy trading volume.

416. The final corrective disclosure on March 7, 2016, the end of the class period, revealed Defendants' fraudulent scheme and the artificial inflation in comScore's stock price to the market when the Company filed an amendment to the Notice of Late Filing previously filed on February 29, 2016. In the amendment, the Company disclosed that on March 5, 2016, the Audit Committee advised the Company's Board of Directors that it did not expect to finalize its review before March 15, 2016. The Company also disclosed that, as a result, "the Company is not in a position to file its Form 10-K until after the Audit Committee completes its review and the Company's independent public accountants assess the conclusions of the Audit Committee in connection with their audit of the Company's annual financial statements included in the Form 10-K." The Company also stated that it did not expect to make further comment regarding the Audit Committee's review until its conclusion. Finally, in a press release issued the same day, the Company announced that it was suspending the Company's previously announced share repurchase program."

417. On this news, shares of comScore fell $13.67 per share, or 33.5%, to close at $27.04 on March 7, 2016, on unusually heavy trading volume.

418. As a result of their purchases of comScore securities during the Class Period and the corrections removing the artificial inflation in the prices paid for those securities, Lead Plaintiffs and the Class suffered economic harm under the federal securities laws.

## XI. PRESUMPTION OF RELIANCE

419. The market for comScore's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and failures to disclose, comScore's securities traded at artificially inflated prices during the Class Period. On August 17, 2015, the Company's stock closed at a Class Period high of $64.64 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of comScore's securities and market information relating to comScore, and have been damaged thereby.

420. During the Class Period, the artificial inflation of comScore's stock was caused by the material misrepresentations and omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about comScore's business, prospects, and operations. These material misstatements and omissions created an unrealistically positive assessment of comScore and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

421. At all relevant times, the market for comScore's securities was an efficient market for the following reasons, among others:

(a) comScore stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a registered issuer, comScore filed periodic public reports with the SEC and the NASDAQ;

(c) comScore regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) comScore was followed by securities analysts employed by at least five brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

422. As a result of the foregoing, the market for comScore's securities promptly digested current information regarding comScore from all publicly available sources and reflected the information in comScore's stock price. Under these circumstances, all purchasers of comScore's securities during the Class Period suffered similar injury through their purchase of comScore's securities at artificially inflated prices, and a presumption of reliance applies.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

423. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the statements alleged to be false and misleading in this Complaint relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that some of the alleged false statements are forward-looking, Defendants are liable

for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of comScore who knew that the statement was false when made.

## XIII. CAUSES OF ACTION UNDER §§ 10(b) AND 20(a)

### COUNT I
### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### (Against Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson)

424. Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

425. During the Class Period, Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did (i) deceive the investing public, including Plaintiffs and other Class members; and (ii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire comScore's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions alleged in this Complaint.

426. Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the acquirers of the Company's securities in an effort to maintain artificially high market prices for comScore's securities in violation of § 10(b) of the Exchange Act and Rule 10b-5.

427. Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of

interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about comScore's financial wellbeing and prospects.

428. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged in this Complaint in an effort to assure investors of comScore's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about comScore and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as alleged more particularly in this Complaint, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the acquirers of the Company's securities during the Class Period.

429. Each of these Defendants' primary liability arises from the following facts: (i) these Defendants were high-level executives or directors of the Company during the Class Period and members of the Company's management team or had control of the Company; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

430. Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson had actual knowledge of the misrepresentations and omissions of material facts alleged in this Complaint, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose these facts, even though these facts were available to them. These Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing comScore's financial condition and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by these Defendants' overstatements or misstatements of the Company's business, operations, financial wellbeing, and prospects throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain that knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

431. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as alleged above, the market price of comScore's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and in the absence of material adverse information that was known to or recklessly disregarded by these Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired comScore's securities during the Class Period at artificially high prices and were damaged thereby.

432. At the time of Defendants' misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs

and the other members of the Class and the marketplace known the truth regarding the misrepresentations and omissions, which was not disclosed by Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their comScore securities, or, if they had acquired those securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

433. By virtue of the foregoing, Defendants comScore, Matta, Wesley, Abraham, Tarpey, and Henderson have violated § 10(b) of the Exchange Act and Rule 10b-5.

434. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period.

**COUNT II**
**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Matta, Wesley, Abraham, Tarpey, and Henderson)**

435. Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count.

436. Defendants Matta, Wesley, Abraham, Tarpey, and Henderson acted as controlling persons of comScore within the meaning of § 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the statements that Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs

to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

437. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged in this Complaint, and exercised that power.

438. As alleged above, comScore violated § 10(b) and Rule 10b-5 by its acts and omissions. By virtue of their positions as controlling persons, Defendants Matta, Wesley, Abraham, Tarpey, and Henderson are liable under § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's securities during the Class Period.

## XIV. VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT AND SECTION 11 OF THE SECURITIES ACT

### A. Additional Parties

#### 1. Additional Plaintiff

439. Plaintiff William Huff is an individual who resides in Fort Myers, Florida. As stated in his certification attached to this Complaint, Huff held shares of Rentrak common stock as of January 28, 2016 and was eligible to vote on the M of comScore and Rentrak. In exchange for his Rentrak shares, Huff received 34,943 shares of comScore common stock at an artificially inflated price upon consummation of the Merger and has been damaged thereby.

### 2. Additional Defendants

#### a. comScore Individual Defendants

440. In addition to Defendants Abraham, Henderson, Matta, and Wesley, the following Individual Defendants are named in Plaintiffs' claims under § 14(a) of the Exchange Act and § 11 of the Securities Act.

441. Defendant Russell Fradin served as a director of comScore since July 2014. Fradin signed comScore's SEC filings, made public representations in, and permitted his name to be used in solicitations contained in the following documents that were materially false and misleading and omitted material facts: (i) comScore's 2014 Form 10-K; (ii) comScore's Registration Statement on Form S-4 filed with the SEC on October 30, 2015, as amended by comScore's Form S-4/A filed with the SEC on December 7, 2015 and declared effective by the SEC on December 23, 2015 (the "Registration Statement"); (iii) and comScore's Joint Proxy Statement/Prospectus filed with the SEC on Form 424B3 on December 23, 2015 and mailed to comScore and Rentrak shareholders on December 28, 2015 (the "Joint Proxy").

442. Defendant Gian M. Fulgoni co-founded comScore and served as Chairman Emeritus and a director of comScore at all relevant times. Effective August 5, 2016, Fugloni became the CEO of comScore. Fugloni signed comScore's SEC filings, made public representations in, and permitted his name to be used in solicitations contained in comScore's 2014 Form 10-K, the Registration Statement, and the Joint Proxy, which were materially false and misleading and omitted material facts.

443. Defendant William Katz served as a director of comScore at all relevant times. In September 2016, Katz resigned from the comScore Board. Katz signed comScore's SEC filings, made public representations in, and permitted his name to be used in solicitations contained in

comScore's 2014 Form 10-K, the Registration Statement, and the Joint Proxy, which were materially false and misleading.

444. Defendant Ronald J. Korn served as a director of comScore at all relevant times. Korn signed comScore's SEC filings, made public representations in, and permitted his name to be used in solicitations contained in comScore's 2014 Form 10-K, the Registration Statement, and the Joint Proxy, which were materially false and misleading and omitted material facts.

445. Defendant Joan Lewis served as a director of comScore at all relevant times. Lewis signed comScore's SEC filings, made public representations in, and permitted his name to be used in solicitations contained in comScore's 2014 Form 10-K, the Registration Statement, and the Joint Proxy, which were materially false and misleading and omitted material facts.

446. Defendants Abraham, Fradin, Fulgoni, Henderson, Katz, Korn, Lewis, Matta, and Wesley are collectively referred to as the "comScore Merger Individual Defendants."

**b. Rentrak Defendants**

447. Defendant Rentrak was, at all relevant times before the Merger, a global media-measurement and advanced consumer-targeting company serving the entertainment, television, video, and advertising industries. Before merging with comScore, Rentrak provided its clients, such as content producers, distributors, advertisers and advertising agencies, with multiscreen viewership and product-preference information to enable its clients to more effectively program and market their networks and more precisely target and sell their advertising inventory. Rentrak issued the Joint Proxy and solicited Rentrak shareholders to vote in favor of the Merger.

448. Defendant David Boylan served as a director of Rentrak at all relevant times through the consummation of the Merger. Boylan solicited Rentrak shareholders to vote in favor of the Merger.

449. Defendant David I. Chemerow served as Rentrak's Chief Operating Officer, CFO, and Secretary at all relevant times through the consummation of the Merger. The Joint Proxy included a cover letter dated December 23, 2015 signed by Chemerow giving notice to Rentrak shareholders of their eligibility to vote on the proposed Merger at the Rentrak Special Meeting to be held on January 28, 2016 and informing them of the Rentrak Board's recommendation to vote in favor of the Merger. Effective August 5, 2016, Chemerow became the CFO of comScore.

450. Defendant William Engel served as a director of Rentrak at all relevant times through the consummation of the Merger. Following the Merger, Engel has continued to serve as a director of comScore. Engel solicited Rentrak shareholders to vote in favor of the Merger.

451. Defendant Patricia Gottesman served as a director of Rentrak at all relevant times through the consummation of the Merger. Following the Merger, Gottesman has continued to serve as a director of comScore. Gottesman solicited Rentrak shareholders to vote in favor of the Merger.

452. Defendant William Livek served as a director of Rentrak and Rentrak's CEO at all relevant times through the consummation of the Merger. Following the Merger, Livek became a director of comScore. In August 2016, Livek became the Executive Vice Chairman and President of comScore. Livek solicited Rentrak shareholders to vote in favor of the Merger.

453. Defendant Anne MacDonald served as a director of Rentrak at all relevant times through the consummation of the Merger and solicited Rentrak shareholders to vote in favor of the Merger.

454. Defendant Martin O'Connor served as a director of Rentrak at all relevant times through the consummation of the Merger and solicited Rentrak shareholders to vote in favor of the Merger.

455. Defendant Brent Rosenthal served as a director of Rentrak at all relevant times through the consummation of the Merger. Following the Merger, Rosenthal has continued to serve as a director of comScore. Rosenthal solicited Rentrak shareholders to vote in favor of the Merger.

456. Defendant Ralph Shaw served as a director of Rentrak at all relevant times through the consummation of the Merger and solicited Rentrak shareholders to vote in favor of the Merger.

457. Defendants Boylan, Chemerow, Engel, Gottesman, Livek, MacDonald, O'Connor, Rosenthal, and Shaw are collectively referred to as the "Rentrak Individual Defendants."

## B. Background to the Merger

### 1. Pre-Merger Negotiations

458. Since about late 2013, comScore and Rentrak were considering some form of strategic combination.

459. The companies' merger discussions became more involved in April 2015, when Matta and Livek met and discussed combining the companies.

460. Throughout the summer of 2015, comScore and Rentrak continued their discussions regarding a potential merger, exchanged financial information, and prepared projections for each company, as well as the combined entity.

461. As part of the merger process, Rentrak hired Grant Thornton LLP to perform financial due diligence on comScore.

462. Merger discussions between the companies were rocky. At various times, the companies ceased discussions and cut off access to each other's financial data. Indeed, the companies' talks broke down entirely in early September 2015 following publication of the Wall Street Journal article discussed in ¶¶71-74.

463. Following publication of the August 31, 2015 *Wall Street Journal* article, comScore addressed investors and analysts' concerns about its nonmonetary transactions. For example, as

described in ¶¶75-88, in early September 2015, members of comScore's senior management met with Brean Capital, and Defendants Matta and Wesley participated in a private conference call only for institutional investors hosted by SunTrust and a lunch with investors hosted by Cantor Fitzgerald.

464. Based on Defendants' reassurances, analysts remained bullish on comScore despite the concerns raised in the August 31, 2015 *Wall Street Journal* article, as discussed in ¶88.

### 2. Rentrak's Accountant Reports Serious Concerns Regarding comScore's Nonmonetary Revenue

465. Meanwhile, in the course of Rentrak's due diligence for the Merger, Rentrak's accountant, Grant Thornton, delivered a formal report on September 4, 2015 to the Rentrak Board that raised several red flags regarding comScore's recognition of nonmonetary revenue. The Grant Thornton Report and its contents, which were never disclosed to Rentrak's shareholders before the merger vote, included the following key findings:

- comScore's use of nonmonetary, i.e., barter, transactions for the sharing of data or exchange of services that comScore had accounted for as revenue "may have provided opportunities for [comScore] Management to 'manage' revenues to meet targets."
- ComScore's use of nonmonetary transactions might not be fully understood by analysts and investors. It was unclear how much comScore's stock price would be impacted if comScore's nonmonetary transactions were better understood by investors.
- It was unclear how much analysts had incorporated non-monetary transactions into their forecasts for comScore. And it was unclear if analysts understood how non-monetary transactions affected revenue and earnings.
- ComScore's consensus revenue for virtually all periods would not have been achievable without the non-monetary revenue.

466. None of these findings was disclosed in the Joint Proxy. Instead, the Proxy merely disclosed to Rentrak's shareholders that Grant Thornton had delivered an accounting due diligence report to Rentrak's Board.

### 3. The Parties Enter Into the Merger Agreement

467. Despite being alerted to red flags concerning comScore's nonmonetary revenue recognition practices, Rentrak continued to engage in merger discussions with comScore throughout September 2015, culminating in the announcement in comScore's Form 8-K filed with the SEC on September 29, 2015 that the parties had entered into an Agreement and Plan of Merger and Reorganization (the "Merger Agreement"). The Merger Agreement was attached as an exhibit to the September 29, 2015 Form 8-K. Under the Merger Agreement, which was attached as an exhibit to comScore's September 29, 2015 Form 8-K, the Merger would be an all-stock transaction, with Rentrak shareholders entitled to receive 1.15 shares of comScore stock for each Rentrak share held.

468. In addition to announcing the Merger Agreement in the September 29, 2015 Form 8-K, the companies held a conference call later that same day to discuss the proposed Merger. Critically, the issues raised by Grant Thornton with respect to comScore's nonmonetary transactions were not discussed in either the September 29, 2015 Form 8-K or on the September 29, 2015 conference call.

469. Analysts following comScore reported positively on the announced Merger, predicting that the combined entity would be well-positioned to compete with the market leader, Nielsen.

470. As discussed in ¶¶95-99, comScore met analysts' expectations for the third quarter of 2015 and announced a $2 million reduction of nonmonetary revenue, and analysts responded with recommendations to buy comScore stock.

#### 4. The Joint Proxy Contains Material Misstatements and Fails to Disclose Material Facts

471. Following their announcement of the Merger Agreement on September 29, 2015, comScore and Rentrak solicited their respective shareholders to vote in favor of the proposed Merger. On December 23, 2015, the companies filed their Joint Proxy Statement/Prospectus with the SEC under Rule 424(b)(3) (the "Joint Proxy," discussed in more detail below) announcing a shareholder vote on January 28, 2016. The Joint Proxy stated the historical and pro forma projected financial information for Rentrak and comScore, disclosed some of the details regarding the proposed Merger, and announced that the comScore and Rentrak Boards both recommended that shareholders vote in favor of the proposed Merger. Notably, the Joint Proxy made no mention of Grant Thornton's findings that comScore's nonmonetary transactions presented the risks that (a) comScore's management could manipulate earnings; and (b) analysts and investors did not fully understand how comScore's nonmonetary transactions affected revenue, earnings, and ultimately comScore's share price.

472. Without this critical information, comScore and Rentrak shareholders voted to approve the Merger on January 28, 2016. The next day, Rentrak became a wholly owned subsidiary of comScore, and Rentrak shareholders received 1.15 shares of comScore in exchange for each of their Rentrak shares.

### C. Post-Merger Revelations

#### 1. comScore's Internal Accounting Investigation Forces It to Delay Reporting Its Financial Results

473. Just a month after the Merger closed, on February 29, 2016, comScore disclosed that it was going to delay filing its 2015 annual report on Form 10-K, as discussed in ¶105. During the following weeks and months, comScore repeatedly further delayed filing the Form 10-K, failed to file its first and second quarter Form 10-Qs, and admitted that the Audit Committee's

investigation primarily concerned comScore's accounting for nonmonetary transactions, as discussed in ¶¶107-117. On September 15, 2016, comScore filed with the SEC a current report on Form 8-K announcing that as a result of the issues identified to date in the Audit Committee's investigation, the Audit Committee had concluded that its previously issued financial statements for 2013, 2014, and the first three quarters of 2015 should no longer be relied upon and would have to be restated because they erroneously recognized nonmonetary revenue that should never have been recognized, as discussed in ¶¶118-122.

### D. Materially False and Misleading Proxy Solicitations in Violation of Section 14(a)

474. As part of the merger process between comScore and Rentrak, on September 29, 2015, the companies issued a joint press release officially announcing that the parties had entered into the Merger Agreement, under which the companies would combine in a stock-for-stock transaction, Rentrak would merge into a wholly owned subsidiary of comScore, and Rentrak shareholders would receive 1.15 shares of comScore common stock in exchange for each share of Rentrak common stock that they held (the "Exchange Ratio"). Both the September 29, 2015 press release and the Merger Agreement were attached as exhibits to comScore's September 29 Form 8-K.

475. In the Merger Agreement, comScore represented and warranted in pertinent part as follows:

> 4.7 <u>SEC Reports</u>
>
> comScore has filed and made available to Rentrak (including via the SEC's EDGAR system) all forms, reports, schedules, statements and other documents, including any exhibits thereto, required to be filed by comScore with the SEC since December 31, 2010 (collectively, the " comScore SEC Reports "). The comScore SEC Reports, including all forms, reports and documents filed by comScore with the SEC after the date hereof and prior to the Effective Time, (i) were and, in the case of the comScore SEC Reports filed after the date hereof, will be, prepared in accordance with the applicable requirements of the Securities Act, the Exchange

Act and the Sarbanes-Oxley Act, as the case may be, and the rules and regulations thereunder, and (ii) did not at the time they were filed (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing), and in the case of such forms, reports and documents filed by comScore with the SEC after the date of this Agreement, will not as of the time they are filed, contain any untrue statement of a material fact or omit to state a material fact required to be stated in such comScore SEC Reports or necessary in order to make the statements in such comScore SEC Reports, in light of the circumstances under which they were and will be made, not misleading. None of the Subsidiaries of comScore is required to file any forms, reports, schedules, statements or other documents with the SEC. comScore is eligible to incorporate by reference into the Registration Statement regarding comScore pursuant to Part B of Form S-4.

4.8 Financial Statements and Internal Controls.

(a) Each of the consolidated financial statements (including, in each case, any related notes and schedules), contained in the comScore SEC Reports, including any comScore SEC Reports filed after the date of this Agreement, complied or will comply, as of its respective date, in all material respects with all applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, was or will be prepared in accordance with GAAP (except as may be indicated in the notes thereto) applied on a consistent basis throughout the periods involved and fairly presented in all material respects or will fairly present in all material respects the consolidated financial position of comScore and its Subsidiaries as of the respective dates thereof and the consolidated results of its operations and cash flows for the periods indicated, except that any unaudited interim financial statements are subject to normal and recurring year-end adjustments which have not been and are not expected to be material in amount, individually or in the aggregate.

(b) The chief executive officer and chief financial officer of comScore have made all certifications required by Sections 302 and 906 of the Sarbanes-Oxley Act, and the statements contained in any such certifications are complete and correct, and comScore is otherwise in compliance in all material respects with all applicable effective provisions of the Sarbanes-Oxley Act and the applicable listing and corporate governance rules of the Nasdaq Stock Market.

(c) comScore and each of its Subsidiaries has established and maintains, adheres to and enforces a system of internal accounting controls which are effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP, including policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the material transactions and dispositions of the assets of comScore and its Subsidiaries, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of comScore and its Subsidiaries are being made only in accordance with

> authorizations of management and the comScore board of directors and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of comScore and its Subsidiaries that could have a material effect on the financial statements.
>
> (d) To the knowledge of comScore, since December 31, 2010, neither comScore nor its independent auditors have identified (i) any significant deficiency or material weakness in the system of internal accounting controls utilized by comScore and its Subsidiaries, (ii) any fraud, whether or not material, that involves comScore's management or other employees who have a role in the preparation of financial statements or the internal accounting controls utilized by comScore and its Subsidiaries or (iii) any claim or allegation regarding any of the foregoing.
>
> * * *
>
> (f) Neither comScore nor any of its Subsidiaries nor, to the knowledge of comScore, any director, officer, auditor, accountant, consultant or representative of comScore or any of its Subsidiaries has, since December 31, 2010, received or otherwise had or obtained knowledge of any substantive complaint, allegation, assertion or claim, whether written or oral, that comScore or any of its Subsidiaries has engaged in questionable accounting or auditing practices. No current or former attorney representing comScore or any of its Subsidiaries has reported evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by comScore or any of its officers, directors, employees or agents to the current the comScore board of directors or any committee thereof or to any current director or executive officer of comScore.

476. The foregoing representations in the Merger Agreement were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had

misstated its revenue and (loss) income from operations for 2013 and 2014, including the interim periods within those years, and the first three quarters of 2015, as discussed in ¶¶118-122. Indeed, comScore's recognition of nonmonetary revenue allowed the Company to report higher revenue growth for each of these periods, including in the periods when Defendants Matta and Wesley's options and RSUs vested, as depicted in the following graph:




477. Also on September 29, 2015, comScore and Rentrak held a conference call with analysts and investors to discuss the proposed Merger, as discussed in ¶92.

478. On September 30, 2015, comScore filed with the SEC on Form 425 the investor presentation used in the September 29 conference call ("September 29 Investor Presentation").

479. The September 29 Investor Presentation included a slide with a side-by-side presentation of comScore's and Rentrak's financials for the last twelve months ("LTM") ended June 30, 2015, including $349 million and $457 million in revenue for comScore and the combined entity, respectively, for that period. The September 29 Investor Presentation further represented on the same slide: "Enhanced scale ($457 mm revenue and $100 mm adjusted EBITDA" and "Strong revenue growth momentum (17% for comScore, 33% for Rentrak LTM 6/30/15)."

480. Commenting on the foregoing slide from the September 29 Investor Presentation during the September 29, 2015 conference call, Defendant Matta reiterated: "[T]he combination of our companies delivers enhanced scale with a combined pro forma of $2.4 billion market cap, $457 million in revenue, and $100 million in adjusted EBITDA in the 12 months ending June 30, 2015. Both companies have strong recent revenue growth, 17% for comScore and 33% for Rentrak for the latest 12 months ending June 30, 2015, compared to the prior period."

481. The foregoing statements in the September 29 Investor Presentation and on the September 29, 2015 conference call quoted in ¶¶92, 479-480 were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue for 2014, including the interim periods within those years, and the first and second quarters of 2015, as follows:

| *$ (in thousands)* | **Revenue** | |
|---|---|---|
| **Period** | **Previously Reported** | **As Adjusted** |
| FY14 | 329,151 | 312,900 |
| 1Q15 | 87,329 | 83,532 |
| 2Q15 | 91,414 | 80,649 |

482. Indeed, comScore's recognition of nonmonetary revenue for each of these periods enabled the Company to report higher revenue growth over the prior year, including in the periods when Defendants Matta and Wesley's options and RSUs vested, as reflected in the following graph:




483. On October 30, 2015, comScore filed a preliminary version of the joint proxy statement/prospectus with the SEC on Form S-4, and later filed an amendment on Form S-4/A on December 7, 2015. On December 23, 2016, comScore and Rentrak filed the definitive Joint Proxy on Form 424B3 with the SEC, which was mailed to comScore and Rentrak shareholders on December 28, 2015. The Joint Proxy included, among other information, (i) cover letters signed by Defendants Matta, Livek, and Chemerow notifying comScore and Rentrak shareholders of their right to vote on the proposed Merger at their respective special meetings to be held on January 28, 2016; (ii) the recommendation of comScore's Board that comScore shareholders vote to approve the issuance of shares of comScore common stock in the Merger; (iii) the recommendation of Rentrak's Board that Rentrak shareholders vote to adopt the Merger Agreement and approve the

Merger at the special shareholder meeting to be held on January 28, 2016; and (iv) a copy of the Merger Agreement.

484. The Joint Proxy explained the terms of the Merger to shareholders, informed shareholders about the background of the Merger, and stated the reasons why the comScore and Rentrak Boards recommended that shareholders vote in favor of the Merger. The Joint Proxy further instructed that shareholders "should rely only on the information contained in this joint proxy statement/prospectus and in the documents that comScore and Rentrak have incorporated by reference . . . ."

485. In a summary of the parties' negotiations leading to the Merger Agreement, the Joint Proxy stated in pertinent part:

> On September 8, 2015, the Rentrak Board met to review the status of the discussions with comScore, with a focus on results of the due diligence process. Mr. Chemerow reviewed materials that had been prepared by Grant Thornton regarding the results of Grant Thornton's accounting due diligence.

486. The statements quoted in ¶485 describing Rentrak's discussions regarding the Grant Thornton Report were materially misleading because they failed to disclose the issues raised in the Grant Thornton Report with respect to comScore's accounting for nonmonetary transactions, which had provided opportunities for comScore's management to manipulate its reported revenue in order to meet market consensus estimates and artificially inflate comScore's common stock price. Defendants were at least negligent in failing to disclose these material facts before the shareholder vote.

487. The Joint Proxy also provided a summary of comScore's selected historical consolidated financial data, which included comScore's reported revenues and (loss) income from operations for 2014 and 2013, and for the six months ended June 30, 2015, and June 30, 2014, as summarized in the following table:

| ($ in thousands) | FY14 | FY13 | Six Months Ended June 30, 2015 | Six Months Ended June 30, 2014 |
|---|---|---|---|---|
| Revenue | $329,151 | $286,860 | $178,743 | $156,912 |
| (Loss) income from operations | ($14,780) | $3,093 | ($12,008) | ($2,555) |

488. In addition, the Joint Proxy included pro forma condensed combined financial information for both companies to illustrate the effect of the Merger as if it occurred on June 30, 2015. With respect to comScore and Rentrak's combined revenue and loss from operations for 2014, the Joint Proxy reported as follows:

| ($ in thousands) | Six Months Ended June 30, 2015 | FY14 |
|---|---|---|
| Revenue | $234,735 | $425,168 |
| Loss from operations | ($25,384) | ($49,820) |

489. The statements quoted in ¶¶487-488 were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue and (loss) income from operations for 2013 and 2014, including the interim periods within those years, and the first and second quarters of 2015, as follows:

| *$ (in thousands)* | **Revenue** | | **(Loss) Income from Operations** | |
|---|---|---|---|---|
| **Period** | **Previously Reported** | **As Adjusted** | **Previously Reported** | **As Adjusted** |
| FY13 | 286,860 | 283,615 | 3,093 | 1,644 |
| FY14 | 329,151 | 312,900 | (14,780) | (14,768) |
| 1Q15 | 87,329 | 83,532 | (9,190) | (8,816) |
| 2Q15 | 91,414 | 80,649 | (2,818) | (8,593) |

490. Indeed, comScore's recognition of nonmonetary revenue for each of these periods enabled the Company to report higher revenue growth over the prior year, including during the periods when Defendants Matta's and Wesley's options and restricted shares vested, as reflected in the following graph:




**1. Documents Incorporated by Reference into the Joint Proxy**

491. The Joint Proxy also incorporated by reference the following documents, among others: (i) 2014 Form 10-K; (ii) comScore's amendment no. 1 to its 2014 Form 10-K filed with the SEC on April 24, 2015; (iii) comScore's quarterly reports on Form 10-Q for the first, second, and third quarters of 2015; and (iv) comScore's current reports on Form 8-K filed with the SEC on May 5, 2015, August 7, 2015, September 29, 2015, and November 6, 2015.

**a. 2014 Form 10-K**

492. The 2014 Form 10-K was signed by Defendants Matta, Wesley, Abraham, Fulgoni, Fradin, Henderson, Katz, Korn, and Lewis. As discussed in ¶¶283-291, the 2014 Form 10-K included certifications signed by Defendants Matta and Wesley under §§ 302 and 906 of Sarbanes-Oxley, statements about these Defendants' evaluation of disclosure controls and procedures, management's report on internal control over financial reporting, a statement that comScore's financial statements complied with GAAP, and statements about the Company's revenue, nonmonetary revenue, reasons for revenue growth, income or loss from operations, and nonmonetary-transaction accounting policies.

493. The foregoing statements were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue and (loss) income from operations for 2013 and 2014, including the interim periods within those years, as follows:

| *$ (in thousands)* | **Revenue** | **(Loss) Income from Operations** |
|---|---|---|

| Period | Previously Reported | As Adjusted | Previously Reported | As Adjusted |
|---|---|---|---|---|
| FY13 | 286,860 | 283,615 | 3,093 | 1,644 |
| FY14 | 329,151 | 312,900 | (14,780) | (14,768) |

494. Indeed, comScore's recognition of nonmonetary revenue allowed the Company to report higher revenue growth for each of these periods, as depicted in the following graph:




**b. May 5, 2015 Form 8-K and First Quarter 2015 Form 10-Q**

495. comScore's press release dated May 5, 2015 announcing comScore's financial results for the first quarter of 2015 was attached as an exhibit to the May 5 Form 8-K. As discussed in ¶¶298-302, the May 5 press release included statements about comScore's revenue, revenue growth, income or loss from operations, and revenue projections.

496. As discussed in ¶¶310-19, the first quarter 2015 Form 10-Q was signed by Defendant Wesley and included certifications signed by Defendants Matta and Welsey under §§ 302 and 906 of Sarbanes-Oxley, statements about comScore's disclosure controls and procedures, a statement that the Company's financial statements complied with GAAP, and

statements about the Company's revenue, nonmonetary revenue, reasons for revenue growth, loss from operations, and nonmonetary-transaction accounting policies.

497. The foregoing statements were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue and (loss) from operations for the first quarter of 2015 and fiscal year 2014, including the interim periods within that year, as follows:

| *$ (in thousands)* | **Revenue** | | **(Loss) from Operations** | |
|---|---|---|---|---|
| **Period** | **Previously Reported** | **As Adjusted** | **Previously Reported** | **As Adjusted** |
| FY14 | 329,151 | 312,900 | (14,780) | (14,768) |
| 1Q15 | 87,329 | 83,532 | (9,190) | (8,816) |

498. Indeed, comScore's recognition of nonmonetary revenue allowed the Company to report higher revenue growth for each of these periods, as depicted in the following graph:




**c. August 4, 2015 Form 8-K and Second Quarter 15 Form 10-Q**

499. comScore's press release dated August 4, 2015 announcing comScore's financial results for the second quarter of 2015 was attached as an exhibit to the August 4 Form 8-K. The August 4 press release contained statements about comScore's revenue, revenue growth, revenue projections, and loss from operations, as discussed in ¶¶323-27.

500. The second quarter 2015 Form 10-Q was signed by Defendant Wesley. As discussed in ¶¶335-345, it included certifications signed by Defendants Matta and Welsey under §§ 302 and 906 of Sarbanes-Oxley, statements about these Defendants' evaluation of the effectiveness of comScore's disclosure controls and procedures, a statement that the Company's consolidated financial statements complied with GAAP, and statements about comScore's revenue, revenue growth, nonmonetary revenue, reasons for revenue growth, loss or income from operations, and nonmonetary transaction accounting policies.

501. The foregoing statements were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions

violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue and (loss) from operations for the first and second quarters of 2015 and fiscal year 2014, including the interim periods within that year, as follows:

| *$ (in thousands)* | **Revenue** | | **(Loss) from Operations** | |
|---|---|---|---|---|
| **Period** | **Previously Reported** | **As Adjusted** | **Previously Reported** | **As Adjusted** |
| FY14 | 329,151 | 312,900 | (14,780) | (14,768) |
| 1Q15 | 87,329 | 83,532 | (9,190) | (8,816) |
| 2Q15 | 91,414 | 80,649 | (2,818) | (8,593) |

502. Indeed, comScore's recognition of nonmonetary revenue allowed the Company to report higher revenue growth for each of these periods, as depicted in the following graph:




**d. November 5, 2015 Form 8-K and Third Quarter 2015 Form 10-Q**

503. comScore's press release dated November 5, 2015 announcing its financial results for the third quarter of 2015 was attached as an exhibit to the November 5 Form 8-K. As discussed in ¶¶369-373, the November 5 press release contained statements about comScore's revenue, revenue growth, and income or loss from operations. The third quarter 2015 Form 10-Q was signed by Defendant Wesley. As discussed in ¶¶383-391, the third quarter 2015 Form 10-Q included certifications signed by Defendants Matta and Welsey under §§ 302 and 906 of Sarbanes-Oxley, statements about these Defendants' evaluation of the effectiveness of comScore's disclosure controls and procedures, and statements about comScore's revenue, revenue growth, reasons for revenue growth, loss or income from operations, and nonmonetary-transaction accounting policies.

504. The foregoing statements were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it

surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue and (loss) income from operations for the first, second, and third quarters of 2015 and fiscal year 2014, including the interim periods within that year, as follows:

| *$ (in thousands)* | **Revenue** | | **(Loss) Income from Operations** | |
|---|---|---|---|---|
| **Period** | **Previously Reported** | **As Adjusted** | **Previously Reported** | **As Adjusted** |
| FY14 | 329,151 | 312,900 | (14,780) | (14,768) |
| 1Q15 | 87,329 | 83,532 | (9,190) | (8,816) |
| 2Q15 | 91,414 | 80,649 | (2,818) | (8,593) |
| 3Q15 | 92,405 | 83,310 | 2,243 | (1,722) |

505. Indeed, comScore's recognition of nonmonetary revenue allowed the Company to report higher revenue growth for each of these periods, as depicted in the following graph:




### 2. Other Proxy Solicitations

506. On November 6, 2015 comScore filed with the SEC on Form 425 a partial transcript of its third quarter 2015 earnings call held on November 5, 2015. Defendants Wesley and Matta were identified in the transcript as participants on the call. During the call, Defendant Matta stated:

> ***comScore delivered another quarter of record revenues*** and strong profitability. This reflects continued positive momentum across our business. On a pro forma basis, ***third quarter 2015 revenue was $92.4 million. Up 14% over second quarter last year. We had strong revenue growth*** despite the continued negative effect of foreign currency adjustments. On a constant currency basis our ***pro forma revenue grew 19% over last year, representing an additional $4 million and as such we achieved record pro forma constant currency revenue of $96.4 million.***

507. Providing further details regarding comScore's third quarter 2015 results and guidance on its results for the fourth fiscal quarter of 2015, Defendant Wesley stated:

> ***Revenue in the quarter was $92.4 million on a pro forma basis, up 14% versus the same quarter last year. We're pleased with our revenue growth***, despite softness from our Digital Analytix division and continued foreign currency exchange rate headwinds. If exchange rates against the US dollar remain constant from the same quarter last year, ***our Q3 pro forma revenue would've been $96.4 million, or a growth of 19%.***

* * *

> ***Revenue from non-monetary transactions in the quarter was $9 million***, down $2 million sequentially and ***up $4 million versus the same quarter last year***.
>
> * * *
>
> For the fourth quarter of 2015, ***we anticipate revenue on a pro forma basis in the range of $95 million to $103 million***. . . .
>
> For the fourth quarter of 2015 ***we anticipate non-monetary revenue of $5.5 million***.

508. In connection with the third quarter 2015 Earnings Call, comScore prepared an investor presentation, which was filed on Form 425 with the SEC on November 5, 2015 (the "November 5 Investor Presentation"). The November 5 Investor Presentation similarly disclosed for 3Q15 "[p]ro forma revenue $92.4M; up 14% from 3Q14" and "***$96.M [pro foma revenue on] constant currency basis; up 19% from 3Q14***" (emphasis in original).

509. The November 5 Investor Presentation also addressed comScore's "Non-Monetary Transaction Trends," as summarized in the following slide:

# Non-Monetary Transaction Trends

| All amounts in millions | Q215 Actual | Q315 Actual | Seq Change | Q314 Actual | YoY Change | Q414 Actual | Q415 Projected | Proj YoY Change |
|---|---|---|---|---|---|---|---|---|
| Non-monetary Revenue | $ 10.77 | $ 9.09 | $ (1.67) | $ 4.66 | $ 4.43 | $ 7.62 | $ 5.52 | $ (2.10) |
| Non-monetary Expense | $ 4.99 | $ 5.13 | $ 0.14 | $ 2.93 | $ 2.20 | $ 9.24 | $ 6.06 | $ (3.18) |
| Net Revenue (Expense) | $ 5.77 | $ 3.96 | $ (1.81) | $ 1.73 | $ 2.23 | $ (1.62) | $ (0.54) | $ 1.08 |

## Key Non-Monetary Revenue Trends

- Sequential decline of $2M
- Expected Q4 2015 YOY decline of $2M
- No New Non-Monetary Transactions expected in Q4 2015 guidance

510. The foregoing statements were materially false or misleading because comScore subsequently admitted in the September 15, 2016 Form 8-K that, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable

than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue and (loss) income from operations for the first three quarters of 2015 and fiscal year 2014, including the interim periods within that year, as follows:

| *$ (in thousands)* | **Revenue** | | **(Loss) Income from Operations** | |
|---|---|---|---|---|
| **Period** | **Previously Reported** | **As Adjusted** | **Previously Reported** | **As Adjusted** |
| FY13 | 286,860 | 283,615 | 3,093 | 1,644 |
| FY14 | 329,151 | 312,900 | (14,780) | (14,768) |
| 1Q15 | 87,329 | 83,532 | (9,190) | (8,816) |
| 2Q15 | 91,414 | 80,649 | (2,818) | (8,593) |
| 3Q15 | 92,405 | 83,310 | 2,243 | (1,722) |

511. Indeed, comScore's recognition of nonmonetary revenue allowed the Company to report higher revenue growth for each of these periods, as depicted in the following graph:




512. In addition to the foregoing false statements contained or incorporated by reference in the Joint Proxy, the Joint Proxy further omitted the material risks relating to comScore's accounting for nonmonetary revenue. In particular, Defendants had an affirmative duty to disclose

in the Joint Proxy that comScore's recognition of nonmonetary revenue from barter transactions, in which no cash was exchanged, provided opportunities for comScore's management to manipulate its reported revenue in order to meet market consensus estimates and artificially inflate comScore's common stock price. Indeed, as discussed above, the Grant Thornton report alerted Defendants to these issues before the announcement of the Merger, yet at no time prior to the shareholder vote did Defendants disclose these material facts to investors.

### E. The Registration Statement Contains Untrue Statements of Material Facts and Material Omissions in Violation of Section 11 of the Securities Act

513. On October 30, 2015, comScore filed a preliminary version of the registration statement with the SEC on Form S-4, and later filed an amendment on Form S-4/A on December 7, 2015 (the "Registration Statement"). The Registration Statement, as amended, was declared effective by the SEC on December 23, 2015. The Registration Statement included a preliminary prospectus and related materials to register the shares of comScore common stock to be issued in the Merger, a preliminary joint proxy statement/prospectus of comScore and Rentrak used to solicit votes from stockholders necessary to complete the Merger, and other documents concerning the proposed Merger, including a copy of the Merger Agreement. The Registration Statement was signed by the comScore Merger Individual Defendants. The Registration Statement repeated or incorporated by reference the same statements contained or incorporated by reference in the Joint Proxy identified above in ¶¶491-92, 495-96, 499-500, 503. These statements were materially untrue for the reasons alleged in ¶¶493-94, 497-98, 501-02, 504-05.

514. The Registration Statement also failed to comply with Item 503, which requires the registrant to disclose, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Here, one of the most significant factors that made comScore's issuance of shares necessary to complete the Merger speculative or risky was its accounting

practices with respect to nonmonetary transactions, which Grant Thornton had identified as an area of concern because comScore's recognition of non-monetary revenue from barter transactions, in which no cash was exchanged, provided opportunities for comScore's management to manipulate its reported revenue in order to meet market consensus estimates and artificially inflate comScore's common stock price.

515. Indeed, within weeks of comScore's shareholders voting to approve comScore's issuance of shares necessary to complete the Merger, the Company disclosed that its Audit Committee had commenced an investigation into "certain potential accounting matters," and, as a result, it would be unable to file its FY15 Form 10-K. As the Company subsequently admitted in the September 15 Form 8-K, due to internal control deficiencies and errors in judgment, the Company's accounting for nonmonetary transactions violated GAAP. comScore did not have a reliable basis to determine the fair value of the assets it surrendered in the nonmonetary transactions because it had not made comparable cash sales; comScore did not have a reliable basis to determine the fair value of the assets it acquired in the nonmonetary transactions because the counterparties did not make comparable cash sales; the transactions lacked commercial substance because the data comScore acquired was less valuable than it represented to investors; and comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions. As a result, the Company had misstated its revenue and (loss) income from operations for the first, second, and third quarters of 2015 and fiscal years 2013 and 2014, including the interim periods within those years. However, nowhere in the Registration Statement did comScore disclose to its shareholders that the significant risks arising from its accounting practices with respect to nonmonetary transactions and related internal control deficiencies could, among other things, (i) provide opportunities for management to "'manage' revenues to meet targets"; (ii)

significantly delay the Company's filing of its financial results while its Audit Committee investigated such practices to determine their impact on the Company's prior financial statements; and (iii) result in GAAP violations and the restatement of comScore's prior financial results.

516. Accordingly, disclosure of these material facts was required under Item 503.

**F. Loss Causation Under Section 14(a) of the Exchange Act**

517. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff Huff and the Class of Rentrak shareholders entitled to vote on the merger who acquired comScore shares in exchange for their Rentrak shares.

518. At the consummation of the merger between comScore and Rentrak, Plaintiff Huff and the Class of Rentrak shareholders entitled to vote on the merger acquired comScore's common stock at an artificially inflated price and were damaged thereby. The artificial inflation in comScore's stock price was removed when Defendants' misrepresentations and omissions made in the Joint Proxy were revealed, causing Plaintiff's losses.

519. A partial disclosure on February 29, 2016 partly revealed Defendants' false statements and omissions in the Joint Proxy and the artificial inflation in comScore's stock to the market, when the Company filed a Notification of Late Filing on Focus 12b-25 with the SEC, disclosing that the Company would be unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 on time because the Company "require[d] additional time to prepare its financial statements and complete the external audit of those statements included in the Form 10-K." Elaborating, the Company disclosed that on February 19, 2016, "the Audit Committee of the Company's Board of Directors (the "Audit Committee") received a message regarding certain potential accounting matters" and that, in response, "the Audit Committee immediately commenced a review of the matters with the assistance of independent counsel and advisors." comScore also announced that the Company would not file its Form 10-K until after the

completion of the Audit Committee's review, and that comScore expected to file the 10-K by March 15, 2016.

520. On this news, shares of comScore fell $1.15 per share, or 2.8%, to close at $40.00 on March 1, 2016, on unusually heavy trading volume.

521. The final corrective disclosure on March 7, 2016, the end of the class period, revealed Defendants' misstatements and omissions in the Joint Proxy and the artificial inflation in comScore's stock price to the market when the Company filed an amendment to the Notice of Late Filing previously filed on February 29, 2016. In the amendment, the Company disclosed that on March 5, 2016, the Audit Committee advised the Company's Board of Directors that it did not expect to finalize its review before March 15, 2016. The Company also disclosed that, as a result, "the Company is not in a position to file its Form 10-K until after the Audit Committee completes its review and the Company's independent public accountants assess the conclusions of the Audit Committee in connection with their audit of the Company's annual financial statements included in the Form 10-K." The Company also stated that it did not expect to make further comment regarding the Audit Committee's review until its conclusion. Finally, in a press release issued the same day, the Company announced that it was suspending the Company's previously announced share repurchase program."

522. On this news, shares of comScore fell $13.67 per share, or 33.5%, to close at $27.04 on March 7, 2016, on unusually heavy trading volume.

523. As a result of their acquisition of comScore common stock in the Merger in exchange for their Rentrak common stock, at an artificially inflated price, and the corrections removing the artificial inflation in the price of those comScore shares, Plaintiff Huff and the Class suffered economic harm under Section 14(a) of the Exchange Act. Alternatively, Plaintiff Huff

and the Class of Rentrak shareholders entitled to vote on the merger who received comScore shares are entitled to a rescissory measure of damages sufficient to put them back in the economic position they were prior to the consummation of the Merger.

**COUNT III**
**FOR VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT**
**(Against Defendants Comscore And The Comscore Merger Individual Defendants)**

524. Plaintiff Huff repeats and realleges the allegations in ¶¶439-523 as if alleged fully in this Count. For purposes of this Count, Plaintiff Huff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This Count is based solely on negligence.

525. The Joint Proxy, the documents attached to the Joint Proxy or incorporated by reference in it, and other solicitations described above omitted material facts required to be stated in order to make the statements contained in those documents not misleading.

526. Defendants named in this count failed to update the Joint Proxy or its other solicitations when material information arose between the dissemination of these documents or statements and the January 28, 2016 shareholder vote.

527. Defendants named in this count, jointly and severally, solicited, and permitted the use of their names in solicitations contained in the Joint Proxy.

528. comScore was an issuer of the Joint Proxy. comScore also permitted the use of its name in the Joint Proxy by allowing the Joint Proxy to represent, among other things, its operating results and financial condition.

529. Defendant Matta signed the Registration Statement and its subsequent amendment, signed the cover letter for the Joint Proxy, permitted the use of his name in connection with the

Joint Proxy, and otherwise solicited the votes of shareholders in comScore's press releases, investor presentations, and conference calls described above.

530. Defendant Wesley signed the Registration Statement and its subsequent amendment, permitted the use of his name in connection with the Joint Proxy, and otherwise solicited the votes of shareholders in comScore's press releases, investor presentations, and conference calls described above.

531. Defendants Abraham, Fulgoni, Fradin, Henderson, Katz, Korn, and Lewis signed the Registration Statement and its subsequent amendment, and permitted the use of their names in the Joint Proxy by, among other things, allowing the Joint Proxy to represent that they recommended a vote in favor of the issuance of shares of comScore common stock in the Merger.

532. By means of the Joint Proxy, the documents attached to or incorporated by reference in it, and other solicitations alleged above, Defendants sought to secure the approval of the Merger from Lead Plaintiff and other Class members, and solicited proxies from Lead Plaintiff and other Class members.

533. Each Defendant named in this count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated in order to make the statements contained in their solicitations not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the January 28 shareholder vote.

534. The solicitations described in this Count were essential links in the accomplishment of the Merger. As a result of these solicitations, comScore and Rentrak shareholders approved the Merger.

535. Plaintiff Huff and the Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger as a result, and were damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

536. This claim is brought within the applicable statute of limitations.

537. By reason of the foregoing, these Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 79n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9.

**COUNT IV**
**FOR VIOLATIONS OF § 14(a) OF THE EXCHANGE ACT**
**(Against Defendants Rentrak And The Rentrak Individual Defendants)**

538. Plaintiff Huff repeats and realleges the allegations in ¶¶439-537 as if alleged fully in this Count. For purposes of this Count, Plaintiff Huff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

539. The Joint Proxy, the documents attached to the Joint Proxy or incorporated by reference in it, and other solicitations described above omitted material facts required to be stated in order to make the statements contained in those documents not misleading.

540. Defendants named in this count failed to update the Joint Proxy or its other solicitations when material information arose between the dissemination of these documents or statements and the January 28, 2016 shareholder vote.

541. Defendants named in this count, jointly and severally, solicited and permitted the use of their names in solicitations contained in the Joint Proxy.

542. Rentrak was an issuer of the Joint Proxy. Rentrak also permitted the use of its name in the Joint Proxy by allowing the Joint Proxy to represent, among other things, the operating results and financial condition of comScore and the results of Rentrak's due diligence efforts.

543. Defendants Livek and Chemerow signed the cover letters for the Joint Proxy, and permitted the use of their names in connection with the Joint Proxy.

544. Defendants Rosenthal, Boylan, Engel, Gottesman, MacDonald, O'Connor, and Shaw permitted the use of their names in the Joint Proxy by, among other things, allowing the Joint Proxy to represent that they recommended a vote to adopt the Merger Agreement and approve the Merger.

545. By means of the Joint Proxy, and the documents attached to it or incorporated by reference in it, Defendants sought to secure the approval of the Merger from Plaintiff Huff and other Class members, and solicited proxies from Plaintiff Huff and other Class members.

546. Each Defendant named in this count acted negligently in making false or misleading statements of material fact, omitting material facts required to be stated in order to make the statements contained in their solicitations not misleading, and failing to update statements that were rendered misleading by material information that arose after the dissemination of these statements and before the January 28 shareholder vote.

547. The solicitations described in this Count were essential links in the accomplishment of the Merger. As a result of these solicitations, comScore and Rentrak shareholders approved the Merger.

548. Plaintiff Huff and the Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger as a result, and were damaged as a direct and proximate result of the materially false or misleading statements and omissions as alleged in this Count.

549. This claim is brought within the applicable statute of limitations.

550. By reason of the foregoing, these Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. §79n(a), and Rule 14a-9, 17 C.F.R. §240.14a-9.

**COUNT V**
**FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT**
**(Against Defendants comScore and the comScore Merger Individual Defendants)**

551. Plaintiff Huff repeats and realleges the allegations above at ¶¶439-516, 524-550 as if fully alleged in this Count. For purposes of this claim, Plaintiff Huff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence or strict liability.

552. This claim is brought against comScore and the comScore Merger Individual Defendants under § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiff Huff and all other Class members who were eligible to receive shares of comScore common stock registered by the Registration Statement that comScore filed in connection with the Merger in exchange for their shares of Rentrak common stock.

553. The Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading, as alleged more fully above in ¶¶513-16.

554. comScore was the issuer of the common stock registered by the Registration Statement. As the issuer of the common stock, comScore is strictly liable to the members of the Class who received comScore common stock in exchange for their shares of Rentrak common stock pursuant to the Registration Statement, which contained the untrue statements and omissions of material fact alleged in this Count.

555. The comScore Merger Individual Defendants signed the Registration Statement. The comScore Merger Individual Defendants acted negligently and are therefore liable to the

members of the Class who received shares of comScore common stock in exchange for their shares of Rentrak common stock pursuant to the Registration Statement.

556. Plaintiff Huff and other members of the Class received comScore common stock issued pursuant to the Registration Statement, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

557. Plaintiff Huff and the other members of the Class who received shares comScore common stock pursuant to the Registration Statement suffered damages as a result of the untrue statements and omissions of material fact in the Registration Statement, which had caused the price of such shares to be artificially inflated at the time of their issuance.

558. The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

559. This claim is brought within the applicable statute of limitations because less than one year has elapsed from the time that Plaintiff Huff and the other members of the Class discovered or reasonably could have discovered the facts upon which this Count is based. Less than three years have elapsed from the time that Plaintiff and other Class members received the shares of comScore common stock in exchange for their Rentrak shares pursuant to the Registration Statement.

560. By reason of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act.

## XV. CLASS ACTION ALLEGATIONS

561. With respect to all Counts alleged in this Complaint, Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) bring this action on

behalf of themselves and all persons or entities who (i) purchased or otherwise acquired the securities of Defendant comScore, Inc. ("comScore" or the "Company") during the period from February 11, 2014 through March 7, 2016 (the "Class Period"); (ii) held the common stock of Defendant Rentrak Corporation ("Rentrak") as of December 10, 2015 and were entitled to vote on the merger between comScore and Rentrak consummated on January 29, 2016 (the "Merger"); or (iii) acquired shares of comScore common stock issued pursuant to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission ("SEC") on October 30, 2015 and subsequently amended (the "Registration Statement"), and were damaged thereby.

562. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

563. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, comScore's securities were actively traded on the NASDAQ Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of comScore shares were traded publicly during the Class Period on the NASDAQ. As of May 4, 2015, comScore had 40,483,660 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by comScore or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

564. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

565. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

566. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and misrepresented material facts about the business, operations, and prospects of comScore; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

567. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 17, 2016

/s/ *John C. Browne*
John C. Browne
Jai K. Chandrasekhar
Jesse L. Jensen
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
jai@blbglaw.com
jesse.jensen@blbglaw.com

- and -

Blair A. Nicholas
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
12481 High Bluff Drive
Suite 300
San Diego, CA 92130 Avenue of the Americas
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
Blair@blbglaw.com

*Counsel for Lead Plaintiffs the Fresno County Employees' Retirement Association and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge and Proposed Lead Counsel for the Class*

Sharan Nirmul
Daniel J. Mulveny
Meredith Lambert
KESSLER TOPAZ MELTZER
& CHECK LLP
280 King of Prussia Road
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Radnor, PA 19087
snirmul@ktmc.com
dmulveny@ktmc.com
mlambert@ktmc.com
*Counsel for Named Plaintiff William Huff*

Douglas McKeige
The McKeige Law Firm
1337 Flagler Drive
Mamaroneck, NY 10543
*Additional Plaintiffs' Counsel*