**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, and WILLIAM HUFF, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiffs,<br><br>                        v.<br><br>COMSCORE, INC., SERGE MATTA, MELVIN WESLEY III, MAGID M. ABRAHAM, KENNETH J. TARPEY, WILLIAM J. HENDERSON, RUSSELL FRADIN, GIAN M. FULGONI, WILLIAM KATZ, RONALD J. KORN, JOAN LEWIS, RENTRAK CORPORATION, DAVID BOYLAN, DAVID I. CHEMEROW, WILLIAM ENGEL, PATRICIA GOTTESMAN, WILLIAM LIVEK, ANNE MACDONALD, MARTIN O'CONNOR, BRENT ROSENTHAL, and RALPH SHAW,<br><br>                                        Defendants. | **CASE NO. 1:16-cv-01820-JGK**<br><br>Oral Argument Requested |

**COMSCORE DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................................1

FACTUAL BACKGROUND ........................................................................................................3

I.     OVERVIEW OF NONMONETARY TRANSACTIONS ...................................................3

        A.     comScore Made Extensive Disclosures Concerning its Nonmonetary
                Transactions Throughout the Class Period ...............................................................4

        B.     The Valuation of Nonmonetary Transactions Pursuant to GAAP..........................5

        C.     comScore's Forthcoming Restatement of its Nonmonetary Transactions ..............6

        D.     Statements Attributed to Individual Defendants Matta, Wesley, Abraham,
                Tarpey, and Henderson During the Class Period.....................................................7

              1.     comScore's Financial Statements and Press Releases.................................8

              2.     Statements Relating to comScore's Compliance with GAAP.....................8

              3.     Statements Premised Upon comScore's Financial Statements ...................9

              4.     Forward-Looking Statements.......................................................................9

        E.     Statements Attributed to comScore Merger Individual Defendants During
                the Class Period......................................................................................................10

              1.     Merger Agreement .....................................................................................10

               2.     Investor Calls and Presentation Decks......................................................11

               3.     Joint Proxy Statement ................................................................................11

               4.     Registration Statement ...............................................................................12

ARGUMENT ..............................................................................................................................12

II.    PLAINTIFFS' SECTION 10(B) CLAIM AGAINST COMSCORE AND THE
       INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO
       STATE A CLAIM ..........................................................................................................12

        A.     Plaintiffs' Section 10(b) Claim is Based on Several Non-Actionable
                Statements...............................................................................................................14

B.   Pleading a Violation of GAAP is Not Sufficient to State a Securities Fraud Claim .................................................................................................16

C.   Pleading a Related Party Transaction is Not Sufficient to State a Securities Fraud Claim ..........................................................................17

D.   The Scheme to Defraud Manufactured by Plaintiffs is Implausible ....................17

E.   Plaintiffs Cannot Adequately Plead Motive ........................................................18

1.   Individual Defendants Stock Sales Do Not Show Motive ........................19

2.   The factual context of each Individual Defendants' stock sales negate any inference of scienter in connection therewith. Individual Defendants' Matta's and Wesley's Compensation Packages Do Not Establish Motive ...........................................................25

3.   comScore's Acquisition of Rentrak Does Not Support Motive ................26

4.   Plaintiffs Do Not Adequately Plead Actual Knowledge or Recklessness ..............................................................................................28

III.   PLAINTIFFS' SECTION 20(A) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAILED TO STATE A SECTION 10(B) CLAIM ...............................................................30

IV.   PLAINTIFFS' SECTION 14(A) CLAIM AGAINST COMSCORE AND THE COMSCORE MERGER INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO ADEQUATELY PLEAD FRAUD ...........................30

A.   Plaintiffs' Section 14(a) Claim Sounds in Fraud ................................................31

B.   Plaintiffs Fail to Adequately Plead Fraud ..........................................................33

C.   Alternatively, Plaintiffs Fail to Plead Negligence ..............................................34

V.   PLAINTIFFS' SECTION 11(B) CLAIM AGAINST COMSCORE AND THE COMSCORE MERGER INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO ADEQUATELY PLEAD FRAUD ...........................34

CONCLUSION ...............................................................................................................35

# TABLE OF AUTHORITIES

**Page**

## Cases

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...........................................................................30

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)..............................................................................26

*In re Advanced Battery Techs., Inc.*,
  781 F.3d 638 (2d Cir. 2015)..........................................................................16

*Albert Fadem Trust v. Citigroup, Inc.*,
  165 F. App'x 928, 930 (2d Cir. 2006) ...........................................................30

*In re Avon Prod., Inc. Sec. Litig.*,
  No. 05 CIV.6803 2009 WL 848017 ...............................................................14

*In re BISYS Sec. Litig.*,
  397  F. Supp. 2d 430 (S.D.N.Y. 2005)...........................................................19

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)............................................................19

*C.D.T.S. v. UBS AG*,
  No. 12 CIV. 4924 KBF, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013),
  *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*,
  604 F. App'x 5 (2d Cir. 2015) ..............................................................13, 28

*In re  Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004),
  *aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc.*,
  165 F. App'x 928 (2d Cir. 2006) ...........................................................17, 26

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)............................................................19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).............................................................16, 17, 26, 28

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...........................................................32

*Harborview Master Fund L.P. v. Lightpath Techs, Inc.*,
  601 F. Supp. 2d 537 (S.D.N.Y. 2009).............................................................16

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................31, 32, 33

iii

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012),
  *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) .............................................................18

*Lipow v. Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144, 160-61 (S.D.N.Y. 2015) ......................................................................26

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014),
  *aff'd*, 604 F. App'x 62 (2d Cir. 2015)..................................................................................19

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  616 F. App'x 442, 445-46 (2d Cir. 2015)........................................................................16, 19

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan &
  Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*,
  No. 15 CIV. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)..............................19

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................3, 13, 16, 18, 29

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)...............................................................17, 25, 27, 29

*Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*,
  645 F. Supp. 2d 210 (S.D.N.Y. 2009)...............................................................................32, 33

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)....................................................................15, 30, 31, 32

*Ross v. Lloyds Banking Grp., PLC*,
  546 F. App'x 5, 9 (2d Cir. 2013) .........................................................................................9

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d at 477 .........................................................................................................13

*Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014),
  *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015)..........................................20

*In re Sotheby's Holdings, Inc.*,
  No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000).............................28

*South Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009).....................................................................................................29

*Teamsters Allied Benefit Funds v. McGraw*,
  09 Civ. 140  2010 WL 882883 (S.D.N.Y. Mar. 11, 2010) ...................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...............................................................................................................13

*In re Travelzoo Inc. Sec. Litig.*,
  No. 11 CIV. 5531 GBD, 2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013)..................................2

*Ross v. Lloyds Banking Grp., PLC*,
   546 F. App'x 5, 9 (2d Cir. 2013) ............................................................................9

*Zech Capital LLC v. Ernst & Young Hua Ming*,
   636 F. App'x 582, 584 (2d Cir. 2016) ................................................................16

### **Statutes**

15 U.S.C. § 77(k) ......................................................................................................34

15 U.S.C. § 78j(b) ....................................................................................................12

15 U.S.C. § 78n(a) ...................................................................................................30

15 U.S.C. § 78t(a) ....................................................................................................30

15 U.S.C. § 78u-4(b)(2) ...........................................................................................13

15 U.S.C. § 78u-5(c)(1)(A)(i) ..................................................................................14

15 U.S.C. § 78u-5(e) ................................................................................................15

15 U.S.C. § 78u-5(i)(1) ............................................................................................14

17 C.F.R. § 240.10b-5 ..............................................................................................13

17 C.F.R. § 240.14a-9(a) ..........................................................................................31

Defendants comScore, Inc. ("comScore" or "Company"), Serge Matta, Magid M. Abraham, Kenneth J. Tarpey, and William J. Henderson ("Individual Defendants" along with Melvin Wesley III), and Russell Fradin, Gian M. Fulgoni, William Katz, Ronald J. Korn, and Joan Lewis (with Matta, Wesley, Abraham, and Henderson, the "comScore Merger Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint for failure to state a claim.

## PRELIMINARY STATEMENT

All of Plaintiffs' allegations in their 155 page complaint [1] against comScore, the Individual Defendants, and the comScore Merger Individual Defendants are derived from comScore's accounting for nonmonetary transactions under Generally Accepted Accounting Principles ("GAAP") during the class period, and comScore's subsequent decision to restate its accounting for these transactions.  The most compelling explanation for the Company's decision to restate, based on a review of Plaintiffs' factual allegations, is that comScore misapplied a complex and subjective provision of GAAP.  Upon further review, comScore decided to restate its 2013, 2014, and 2015 financials to value the nonmonetary transactions at historical cost rather than fair value.  Plaintiffs reject this explanation because the Second Circuit has *repeatedly* held that accounting which is not in conformity with GAAP, standing alone, does not constitute securities fraud.  In an attempt to create liability, Plaintiffs manufacture a widespread scheme to defraud that it as convoluted as it is implausible.

Plaintiffs' theory has to be that at the beginning of the class period (February 11, 2014), comScore's then-CEO Abraham and/or then-CFO Tarpey hatched a plan to intentionally

---

[1]  For the purpose of this motion to dismiss, the moving Defendants recount the "facts" as alleged by Plaintiffs, but in so doing, make no concessions as to the truth of Plaintiffs' allegations.

misapply GAAP for comScore's revenues from nonmonetary transactions going back in time to 2013. Plaintiffs speculate that Abraham and/or Tarpey were motivated to inflate comScore's share price as owners of comScore stock. Of course, as explained below, Tarpey sold no stock for profit outside of a 10b5-1 plan while CFO of comScore, and Abraham sold only a small fraction of his total shares in for-profit sales outside of a plan over the entire 2-plus year class period. Plaintiffs allege *no* other motivations personal to Abraham or Tarpey. Instead, Plaintiffs contend that comScore was motivated to inflate stock prices to facilitate an all-stock acquisition of Rentrak Corporation ("Rentrak"). However, it is not at all clear from Plaintiffs' allegations that an all-stock transaction with Rentrak was even contemplated at the beginning of the class period (comScore and Rentrak did not merge until 2 years later). Either way, the acquisition of Rentrak would not confer a personal benefit upon Abraham or Tarpey, rendering it insufficient motivation under the law.

From there, Plaintiffs' theory must be that Abraham and Tarpey turned over the supposed fraud to incoming CEO Matta and incoming CFO Wesley in 2014. Plaintiffs do not attempt to explain why Abraham or Tarpey would initiate a fraudulent scheme only to risk detection when resigning from their management positions within weeks (for Abraham) or months (for Tarpey). Under Plaintiffs' theory, incoming CEO Matta and incoming CFO Wesley picked up the alleged fraud where Abraham and Tarpey left off, supposedly motivated to inflate comScore's stock price as holders of comScore stock and to increase their executive compensation. But like Abraham, Matta and Wesley also sold approximately $2 million or fewer in shares for-profit outside of a 10b5-1 plan over the entire 2-plus year class period. Moreover, Second Circuit law is clear that increased compensation is not a sufficient motive to commit fraud because if it were, then motive could be adequately plead for every executive in every case claiming securities

fraud.  It is not clear how Director Henderson fits into Plaintiffs' theory of fraud, if at all.
Plaintiffs *only* pertinent allegations relating to Henderson are that he sold less than $2 million in
shares for-profit outside of a plan during the class period, was chair of comScore's compensation
committee and served on the Board of a company with whom comScore entered into a fully
disclosed related party transaction.

Based on these allegations, Plaintiffs bring a Section 10(b) securities fraud claim against
comScore and the Individual Defendants.  In order for Plaintiffs' Section 10(b) claim to survive
this motion to dismiss, Plaintiffs' allegations that comScore and the Individual Defendants acted
with scienter must be *at least as compelling as any opposing inference of nonfraudulent intent.*
Far from compelling, Plaintiffs' version of events is not plausible.  The Court should therefore
dismiss Plaintiffs' Section 10(b) claim.  Because Plaintiffs' Section 20(a) control person liability
claim is predicated on the Section 10(b) claim, the Court should also dismiss that claim.

Plaintiffs bring additional Section 14(a) and Section 11 claims against comScore and the
comScore Merger Individual Defendants.  The comScore Merger Individual Defendants include
current and former comScore Directors Fradin, Fulgoni, Katz, Korn, and Lewis (in addition to
Individual Defendants Matta, Wesley, Abraham, and Henderson).  Because Plaintiffs' Section
14(a) and Section 11 claims sound in fraud, Plaintiffs must plead a strong inference of scienter to
sustain both.  Plaintiffs' allegations that the comScore Directors signed certain SEC filings in
connection with the Rentrak merger are not sufficient to establish scienter.  Plaintiffs fail to
allege scienter with respect to Matta, Wesley, Abraham, or Henderson as well.  The Court should
dismiss Plaintiffs' Section 14(a) and Section 11 claims for failure to adequately plead scienter.

**FACTUAL BACKGROUND**

**I.      OVERVIEW OF NONMONETARY TRANSACTIONS**

The gravamen of Plaintiffs' securities claims against comScore, the Individual Defendants, and the comScore Merger Individual Defendants is the allegation that comScore violated GAAP in its accounting for nonmonetary transactions in 2013, 2014, and 2015.  *See, e.g.*, Dkt. 83, ¶¶ 1, 16, 18.  As a cross media platform measurement company that measures audience and consumer behavior, *see id.*, ¶¶ 1, 36, comScore entered into nonmonetary transactions with other companies to facilitate the reciprocal exchange of data.  *Id.*, ¶¶ 8, 67.  Such transactions constitute data-for-data barters and are therefore "nonmonetary" in nature.  *Id.*  "Under GAAP, a nonmonetary transaction will ordinarily have no effect on a company's operating income, because the Company will recognize matching revenue *and* expense from the exchange.  In other words, any revenue will be cancelled out by the matching expense" over time.  *Id.*, ¶ 150.

A.     **comScore Made Extensive Disclosures Concerning its Nonmonetary Transactions Throughout the Class Period**

comScore recognized revenue and expense from nonmonetary transactions in years 2013, 2014, and 2015 by accounting for the transactions at fair value.  Dkt. 83, ¶ 130.  comScore disclosed that it was accounting for nonmonetary transactions at fair value in its 2013 Form 10-K, first, second, and third quarter 2014 Form 10-Qs, 2014 Form 10-K, and first, second, and third quarter 2015 Form 10-Qs:

> The Company accounts for nonmonetary transactions under ASC 845, Nonmonetary Transactions.  *Nonmonetary transactions with commercial substance are recorded at the estimated fair value* of assets surrendered including cash, if cash is less than 25% of the fair value of the overall exchange, unless the fair value of the assets received is more clearly evident, in which case the fair value of the asset received is used.

*Id.*, ¶¶ 130, 190, 215, 237, 262, 286, 313, 339, 386 (emphasis added).

In addition to disclosing its recognition of nonmonetary transactions at fair value, comScore also disclosed the amount of revenue attributable to nonmonetary transactions for each

period.  *Id.*, ¶¶ 68, 192, 216, 239, 264, 288, 315, 340-41, 387.  comScore further disclosed that "due to timing differences in the delivery and receipt of [] nonmonetary assets exchanged," offsetting revenues and expenses may not be recorded in the same quarter, resulting in the accelerated recognition of revenue or expense from nonmonetary transactions quarter to quarter. *See id.*, ¶¶ 152, 192.  For example, comScore stated in its 2013 Form 10-K that:

> During the year ended December 31, 2013, we recognized $3.2 million in revenue related to nonmonetary transactions of which $1.8 million is attributable to this related party transaction.  Due to timing differences in the delivery and receipt of the respective nonmonetary assets exchanged, the expense recognized in each period is different from the amount of revenue recognized.  As a result, during the year ended December 31, 2013, we recognized $1.8 million in expense related to nonmonetary transactions, though no expense was recognized for this related party transaction since data assets have not yet been received.

*Id.*, ¶ 192.

comScore also repeatedly disclosed that it entered into nonmonetary transactions with a related party (Acxiom Corporation).  *Id.*, ¶¶ 191, 215, 238, 263, 287, 314, 341, 387.  For example, comScore stated in its 2013 Form 10-K that:

> In the fourth quarter of 2013, we entered into an agreement to exchange certain data assets with a corporation.  A member of our Board of Directors also serves as a member of the Board of Directors of that corporation and therefore, we have considered the corporation to be a related party . . . We [] considered the guidance in ASC 850, Related Party Disclosures.

*Id.*, ¶ 191 (emphasis added).  comScore further disclosed the amount of revenue attributable to related party nonmonetary transactions.  *Id.*, ¶¶ 192, 216, 239, 264, 288, 315, 341, 387.

## B.    The Valuation of Nonmonetary Transactions Pursuant to GAAP

Plaintiffs acknowledge that "fair value is ordinarily used to measure a nonmonetary transaction" pursuant to ASC 845 of GAAP.  Dkt. 83, ¶ 133.  Although nonmonetary transactions are typically accounted for at fair value, ASC 845 provides that such transactions

should be valued at historical cost—and not fair value—if any of the following three conditions apply:

> a.  The fair value of neither the asset(s) received nor the asset(s) relinquished is determinable within reasonable limits.
>
> b.  The transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange.
>
> c.  The transaction lacks commercial substance.

*Id*.  The conditions set forth in ASC 845 are both complex and subjective.  For example, the fair value of data and by extension whether the fair value of data is determinable within reasonable limits "is subjective by nature . . ."  *See id.*, ¶ 72.  Similarly, a transaction has commercial substance pursuant to ASC 845 when "the entity's future cash flows are *expected* to significantly change as a result of the exchange."  *Id.*, ¶ 133 (emphasis added).  Such an expectation is inherently subjective.

### C.    comScore's Forthcoming Restatement of its Nonmonetary Transactions

On February 19, 2016, comScore's Audit Committee commenced an internal review of comScore's accounting for nonmonetary transactions.  Dkt. 83, ¶ 105.  On August 10, 2016—nearly six months into its review—comScore filed a Form 8-K announcing that the internal investigation was "substantially complete" and that the "accounting transactions at issue mainly relate to certain non-monetary transactions."  *Id.*, ¶ 114.  At that time, comScore "ha[d] not yet concluded" whether the nonmonetary transactions had been "incorrectly recorded at the time of the transactions."  *Id*.

Ultimately, comScore filed a Form 8-K on September 15, 2016 stating that comScore would restate its financial statements for the years ended 2013 and 2014, the first, second, and third quarters of 2015, as well as its preliminary financial statements for fourth quarter 2015 and

the year ended 2015.  *Id*., ¶ 118.  comScore concluded that "revenue and expenses associated with all nonmonetary transactions during the periods identified [] should be reversed and accounted for at historical cost rather than at fair value."  *Id*., ¶ 119.  According to GAAP, a restatement may be required to correct "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, *mistakes in the application of generally accepted accounting principles (GAAP)*, or oversight or misuse of facts that existed at the time the financial statements were prepared."  *Id*., ¶ 135 (emphasis added).

> **D.    Statements Attributed to Individual Defendants Matta, Wesley, Abraham, Tarpey, and Henderson During the Class Period**

To support their Section 10(b) claim, Plaintiffs allege that Defendant comScore and the Individual Defendants[2] made false statements during the class period.  At the time that the class period began on February 11, 2014, Individual Defendant Abraham was comScore's CEO, Dkt. 83, ¶ 32, and Individual Defendant Tarpey was comScore's CFO.  *Id.*, ¶ 33.  Individual Defendant Matta replaced Abraham as CEO on March 1, 2014, and Abraham became Executive Director of the Board.  *Id*., ¶¶ 30, 32.  Individual Defendant Wesley replaced Tarpey as CFO in August 2014.  *Id*., ¶¶ 31, 33.  Individual Defendant Henderson was a comScore Board member throughout the class period.  *Id*., ¶ 34.

The alleged statements attributed to comScore and the Individual Defendants and placed at issue in this litigation include: (1) Company financial statements and press releases; (2) Company and Individual Defendants' statements relating to comScore's compliance with GAAP;

---

[2]  Importantly, Plaintiffs do not allege that Individual Defendant Henderson made any of the allegedly false statements (apart from having signed certain comScore financial statements).  *See* Dkt. 83.

(3) Individual Defendants' statements premised upon comScore's financial statements; and (4) projected financial performance.

### 1.    comScore's Financial Statements and Press Releases

Plaintiffs allege that comScore's financial statements for 2013, 2014, and 2015[3] and corresponding company press releases contained misstatements arising from comScore's accounting of nonmonetary transactions at fair value.  Dkt. 83, ¶¶ 175, 177, 187-96, 200, 202, 212-19, 221-22, 224, 234-242, 246, 248, 259-267, 271, 273, 283-91, 298, 300, 310-19, 323, 325, 335-345, 369, 371, 383-391, 397, 399.  Specifically, Plaintiffs allege that comScore misstated its revenues from nonmonetary transactions and financial metrics derived from revenue, including EBITDA and income.  *Id.*, ¶¶ 178, 197, 203, 220, 225, 243, 249, 268, 274, 292, 301, 320, 326, 346, 372, 392, 400.  Plaintiffs also allege that the following representations in comScore's financial statements are somehow actionable: (1) that the financial statements were prepared in accordance with GAAP; (2) that comScore's disclosure and internal controls were effective; and (3) that comScore's financials were accurate and complete.  *Id.*, ¶¶ 193-96, 217-19, 240-42, 265-67, 289-291, 316-19, 342-45, 388-391.

### 2.    Statements Relating to comScore's Compliance with GAAP

Plaintiffs allege that comScore and Individual Defendants Matta and Wesley made incorrect statements during the class period representing that comScore's accounting for

---

[3]  comScore's 2013 Form 10-K was signed by Abraham, Tarpey, and Henderson, and its 2014 Form 10-K was signed by Matta, Wesley, Abraham, and Henderson.  Dkt. 83, ¶¶ 187, 283. comScore's 2014 first and second quarter Form 10-Qs were signed by Matta and Tarpey.  *Id.*, ¶¶ 212, 234.  Its 2014 third quarter Form 10-Q and 2015 first, second, and third quarter Form 10-Qs were signed by Matta and Wesley.  *Id.*, ¶¶ 259, 310, 335, 383.

nonmonetary transactions was consistent with GAAP.  *See* Dkt. 83, ¶¶ 394-95 (statements attributed to comScore); ¶¶ 359, 365, 141 (statements attributed to Individual Defendant Matta); ¶¶ 359, 362-65, 141 (statements attributed to Individual Defendant Wesley); ¶¶ 354, 358 (statements not attributed)[4].

### 3.    Statements Premised Upon comScore's Financial Statements

Plaintiffs allege that Individual Defendants Abraham, Matta, Wesley, and Tarpey made false statements during the class period premised upon comScore's financial statements.  Dkt. 83, ¶¶ 176, 182 (statements attributed to Individual Defendant Abraham); ¶¶ 201, 207, 223, 229, 247, 253, 269, 272, 278, 299, 305, 321, 324, 330, 367, 370, 375, 398, 403 (statements attributed to Individual Defendant Matta); ¶¶ 254, 279, 294, 306, 331, 349, 376, 377, 404 (statements attributed to Individual Defendant Wesley); ¶¶ 183, 208, 230 (statements attributed to Individual Defendant Tarpey); ¶ 296, 347, 351 (statements not attributed).   In each of these alleged statements, Individual Defendants merely relay information as set forth in comScore's financial statements to investors or analysts.  *See id.*

### 4.    Forward-Looking Statements

Plaintiffs additionally allege that comScore and Individual Defendants Matta, Wesley and Tarpey made projections during the class period concerning comScore's future financial performance.  Dkt. 83, ¶¶ 179, 204, 226, 250, 275, 302, 327, 373, 401 (statements attributed to comScore); ¶¶ 244, 256, 269, 321 (statements attributed to Individual Defendant Matta); ¶¶ 257, 281, 308, 333, 349, 379, 381, 406, 408 (statements attributed to Individual Defendant Wesley);

---

[4]  All statements not attributed to a speaker are deficient.  *Ross v. Lloyds Banking Grp., PLC,* 546 F. App'x 5, 9 (2d Cir. 2013) (reasoning that statements attributed to "Defendants" are deficient— "Rule 9(b) requires complaint to identify speaker").

¶¶ 185, 198, 210, 232 (statements attributed to Individual Defendant Tarpey).  With respect to each statement, Plaintiffs allege that Defendants "lacked any reasonable basis for the projected nonmonetary revenue" and "knew that recognizing the nonmonetary revenue would violate GAAP." *Id.*, ¶¶ 180, 186, 199, 205, 211, 227, 233, 245, 251, 258, 270, 276, 282, 297, 303, 309, 322, 328, 334, 348, 350, 374, 380, 402, 407.

### E. Statements Attributed to comScore Merger Individual Defendants During the Class Period

In support of their Section 14(a) and Section 11 claims, Plaintiffs allege that the comScore Merger Individual Defendants made or signed false statements in connection with the merger between comScore and Rentrak Corporation.  An all-stock merger transaction between comScore and Rentrak was announced on September 29, 2015.  Dkt. 83, ¶ 467.  comScore and Rentrak shareholders voted to approve the merger on January 28, 2016, and Rentrak became a wholly owned subsidiary of comScore on January 29, 2016.  *Id.*, ¶ 472.

The statements attributed to comScore and the Merger Individual Defendants and placed at issue in Counts III and/or V include alleged statements made in (1) the Merger Agreement; (2) the September 29 and November 30 investor calls and presentation decks; (3) the Joint Proxy statement; and (4) the Registration Statement.  Plaintiffs allege that representations by comScore and the Merger Individual Defendants  were false because comScore's accounting for nonmonetary transactions violated GAAP.

#### 1. Merger Agreement

Statements in the Merger Agreement are attributed to comScore.  Dkt. 83, ¶ 475.  Plaintiffs copy and paste a 2 page block quote without specifying which statements are allegedly false.  *Id.*  The Agreement contains statements to the effect that comScore's financial statements

were prepared in accordance with GAAP; that comScore's internal controls were effective; and that comScore's financials were accurate and complete.  *Id.*

### 2.      Investor Calls and Presentation Decks

The statements made on the September 29, 2015 and November 6 investor calls and included in the presentation decks are attributed to comScore and Merger Individual Defendants Matta and Wesley.  Plaintiffs allege that the slide deck presented comScore's financials and related revenue metrics and that Matta and Wesley restated the same on the investor calls.  Dkt. 83, ¶¶ 479-480, 506-509.

### 3.      Joint Proxy Statement

The Merger Individual Defendants signed comScore's and Rentrak's Joint Proxy statement.  The Joint Proxy stated that:

> On September 8, 2015, the Rentrak Board met to review the status of the discussions with comScore, with a focus on results of the due diligence process. Mr. Chemerow reviewed materials that had been prepared by Grant Thornton regarding the results of Grant Thornton's accounting due diligence.

Dkt. 83, ¶ 485.  Plaintiffs allege that "Defendants were at least negligent in failing to disclose" Grant Thornton's conclusions with respect to comScore's nonmonetary transactions.  *Id.*, ¶ 486; *see also id.*, ¶ 512.  Importantly, Plaintiffs do not allege that comScore or the comScore Merger Individual Defendants were aware of Grant Thornton's conclusions.  *See* Dkt. 83.  Grant Thornton was retained by Rentrak.  *Id.*, ¶ 90.

Plaintiffs further allege that the Joint Proxy included comScore's historical financial data for 2013, 2014, and 2015, *Id.*, ¶¶ 487-88,  and incorporated by reference comScore's 2014 Form 10-K and amendment thereto; comScore's Form 10-Qs for the first, second, and third quarters of 2015; and comScore's 2015 Form 8-Ks.  *Id.*, ¶ 491.  Plaintiffs contend that comScore's historical financial data misstated its revenues from nonmonetary transactions and financial metrics

11

derived from revenue.  *Id.*, ¶¶ 489, 493, 497, 501, 504.  Plaintiffs also object to representations in comScore's financial statements stating that the financial statements were prepared in accordance with GAAP; that comScore's disclosure and internal controls were effective; and that comScore's financials were accurate and complete.  *Id.*

### 4.    Registration Statement

The Merger Individual Defendants signed comScore's and Rentrak's Registration Statement.  Dkt. 83, ¶ 513.  Like the Joint Proxy, the Registration Statement also incorporated by reference comScore's historical financial data.  *Id.*  Plaintiffs also allege that comScore's Registration Statement failed to disclose the Grant Thornton report—again, without alleging that comScore or the comScore Merger Individual Defendants were aware of Grant Thornton's conclusions.  *Id.*, ¶ 514.

For the reasons set forth below, Plaintiffs' complaint against comScore, Individual Defendants Matta, Wesley, Abraham, Tarpey, and Henderson, and the comScore Merger Individual Defendants should be dismissed.

## **ARGUMENT**

## II.    PLAINTIFFS' SECTION 10(B) CLAIM AGAINST COMSCORE AND THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Section 10(b) of the Securities Exchange Act prohibits the "use or employ . . . [of] any manipulative or deceptive device or contrivance" contrary to the SEC's implementing regulations.  15 U.S.C. § 78j(b).  SEC Rule 10b-5 declares it unlawful to (a) "employ any device, scheme, or artifice to defraud"; (b) "make any untrue statement of a material fact or to omit to state a material fact . . ." or (c) "engage in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person" in connection with the sale of securities.  17 C.F.R. § 240.10b-5.

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotations and citations omitted). Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Plaintiffs must also satisfy the heightened pleading standards of Rule 9(b), and "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Tellabs, Inc.*, 551 U.S. at 314 (emphasis added). The court "must consider plausible, nonculpable explanations for the defendant's conduct." *Id.* at 323-24.

"The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307(internal quotations and citations omitted). However, "combining [a] handful of fruitless propositions" does not give rise to a strong inference of fraudulent intent. *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d at 477. Importantly, "[s]cienter must be separately plead and individually supportable as to each defendant; scienter is not amenable to group pleading." *C.D.T.S. v. UBS AG*, No. 12 CIV. 4924 KBF, 2013 WL 6576031, at *5-6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604

F. App'x 5 (2d Cir. 2015).  Because Plaintiffs have failed to adequately plead scienter, the Court should dismiss Count I.

### A.    Plaintiffs' Section 10(b) Claim is Based on Several Non-Actionable Statements

As a preliminary matter, Plaintiffs allege a number of statements that are non-actionable as a matter of law.  These statements fall into two categories: (1) forward-looking statements and/or (2) immaterial puffery and corporate optimism.

First, the PSLRA's safe harbor immunizes forward-looking statements from liability.  A statement "identified as a forward-looking" and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" qualify for safe harbor protection.  15 U.S.C. § 78u-5(c)(1)(A)(i).[5]  "Meaningful" does not mean clairvoyant: a Company need not describe every possible risk or even "mention the particular factor that ultimately causes the forward-looking statement not to come true."  *In re Avon Prod., Inc. Sec. Litig.*, No. 05 CIV.6803 LAK MHD, 2009 WL 848017, at *17 (S.D.N.Y. Feb. 23, 2009).  Forward-looking statements include "a statement containing a projection of revenues, income . . . earnings [] per share . . . or other financial items," "a statement of future economic performance," and any statement of assumptions underlying or relating to such projections.  15 U.S.C. § 78u-5(i)(1).  Plaintiffs characterize all of the statements identified in Section I.D.4 as projections (Dkt. 83, ¶¶ 180, 199, 205, 211, 227, 233, 245, 251, 258, 270, 276, 282, 297, 303,

---

[5]  The oral forward-looking statements identified by Plaintiffs—Dkt. 83, ¶¶ 185, 198, 210, 232, 244, 256-57, 269, 281, 308, 321, 333, 349, 379, 381, 406, 408—also qualify for safe harbor, given the availability of cautionary language in accompanying "readily available written document[s]."  *In re Avon Prod., Inc. Sec. Litig.*, 2009 WL 848017, at *18.

14

309, 322, 328, 348, 350, 380, 402, 407) and thus concede that such statements are forward-looking.

At least the following statements in Section I.D.4 were accompanied by a disclosure substantively similar to the following:

> This [document] contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, including, without limitation . . . expectations as to the company's . . . growth in revenue and margin expansion . . . expectations and forecasts of future financial performance, including related growth rates and components thereof; and assumptions related to growth . . .  These statements involve risks and uncertainties that could cause our actual results to differ materially, including, but not limited to: comScore's ability to generate strong revenue and margin growth in future periods . . . and the volatility of quarterly results and expectations.
>
> For a detailed discussion of these and other risk factors, please refer to comScore's Annual Report on Form 10-K . . . our Quarterly Report on Form 10-Q . . . and other filings we make from time to time with the Securities and Exchange Commission (the "SEC"), which are available on the SEC's Web site (http://www.sec.gov ).
>
> Stockholders of comScore are cautioned not to place undue reliance on our forward-looking statements, which speak only as of the date such statements are made.  comScore does not undertake any obligation to publicly update any forward-looking statements to reflect events, circumstances or new information after the date of this press release, or to reflect the occurrence of unanticipated events.

Dkt. 83, ¶¶ 179, 185, 204, 210, 226, 232, 250, 256-57, 275, 281, 302, 308, 327, 333, 373, 379, 381, 401, 406, 408; Decl., Ex. K.[6]  This disclosure is sufficiently meaningful to trigger the protections of the safe harbor.

---

[6] "On any motion to dismiss based upon [the safe harbor], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e).

Second, it is well settled that "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004). Plaintiffs attempt to base their claims on several of these types of vague expressions. For example, many of the alleged statements Plaintiffs attribute to Matta are generalized expressions as to the "strength" of the Company's growth. *See, e.g.*, Dkt. 83, ¶ 201 ("I am proud of the strong growth we drove in revenue and adjusted EBITDA."); ¶ 223 ("Our strong performance in the second quarter reflects continued sharp execution on comScore's key strategic priorities and positive momentum across our business."); ¶ 247 ("comScore delivered continued strong performance in the third quarter both on revenue and EBITDA"); ¶ 299 ("I'm pleased that comScore delivered another quarter of strong revenues and financial performance."). Such statements are not actionable. *Harborview Master Fund L.P. v. Lightpath Techs, Inc.*, 601 F.Supp.2d 537, 549 (S.D.N.Y. 2009) ("[S]tatements expressing optimism about current . . . economic growth are too non-specific to be actionable.").

## B.    Pleading a Violation of GAAP is Not Sufficient to State a Securities Fraud Claim

Plaintiffs' allegations that comScore violated GAAP in its accounting for nonmonetary transactions and that Defendants made material misstatements and omissions relating to its accounting for nonmonetary transactions under GAAP are not sufficient to state a claim for securities fraud. "Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent, might they be sufficient." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (internal quotations and citations). Without more, the statements identified by Plaintiffs are not actionable under Section 10(b) or Rule 10b-5. *Zech Capital LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 584 (2d Cir. 2016), *as amended* (Jan. 28, 2016);

*In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 445–46 (2d Cir. 2015); *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

### C.    Pleading a Related Party Transaction is Not Sufficient to State a Securities Fraud Claim

Nor is it sufficient to plead that comScore entered into nonmonetary transactions with a related party—particularly where the related party was disclosed.  *See* Dkt. 83, ¶ 20.  Although Plaintiffs characterize comScore's nonmonetary transactions with Acxiom as "highly suspicious," Dkt. 83, ¶ 148, Plaintiffs do not allege that comScore violated any applicable accounting guidance in connection with the related party transactions.  *See* Dkt. 83.  The Second Circuit has held that even a violation of related party disclosures is not enough to show scienter.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 199-200.  Where as here, no such violation is alleged and the related party transaction was disclosed, there is no evidence of scienter.

### D.    The Scheme to Defraud Manufactured by Plaintiffs is Implausible

Because neither an accounting restatement nor a disclosed related party transaction can support a claim for securities fraud standing alone, Plaintiffs' complaint manufactures the scheme to defraud investors recounted above.  Given the turnover in the management of the Company within the first six months of the class period, such a scheme is implausible on its face, particularly absent any facts supporting the theory.  *See Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 358 (S.D.N.Y. 2012) (reasoning that "the high turnover among the Executive Defendants further underscores the implausibility of Plaintiff's

17

theory," where both the CEO and CFO had stepped down and were replaced during the course of the alleged scheme). The scheme is made further implausible because comScore disclosed that it was engaging in nonmonetary transactions, disclosed the amount of revenue attributable to such transactions in each period, disclosed that timing differences could create divergences between the recognition of revenue and expense, and disclosed that it was engaging in a related-party transaction. *See* Section I.A. Such disclosures "negate[] an inference of scienter." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) ("It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures. If [] executives sought to shield investors from 'learning the truth of' its business, they needed to be measurably more opaque."). Far more compelling is the inference of non-fraudulent intent—such as comScore simply made a mistake in its application of GAAP to nonmonetary transactions in years 2013, 2014, and 2015. Plaintiffs' theory of a fraudulent scheme is insufficient to plead scienter.

### E.    Plaintiffs Cannot Adequately Plead Motive

Where, as here, the alleged wrongdoing in and of itself does not give rise to a strong inference of scienter, Plaintiffs must establish such an inference by alleging facts showing that defendants had both opportunity *and* motive to commit fraud. *Novak*, 216 F.3d at 307. Endeavoring to establish that comScore and the Individual Defendants acted with scienter, Plaintiffs assert that (1) Individual Defendants were motivated to artificially inflate comScore's stock price to sell their own stock at higher prices; (2) Individual Defendants Matta and Wesley were motivated to inflate comScore's stock price to increase their compensation; and (3) Defendants were motivated to inflate comScore's stock price to facilitate the acquisition of Rentrak. These allegations fail to establish the requisite opportunity and motive.

18

### 1.   Individual Defendants Stock Sales Do Not Show Motive

Plaintiffs allege that stock sales made by Individual Defendants during the class period give rise to a strong inference of scienter, based on (1) the dollar value of stock sold; (2) the percentage of stock sold; (3) the percentage of stock sold outside of a Rule 10b5-1 plan; or (4) the timing of sales.  However, "stock sales are insufficient by themselves to demonstrate motive and opportunity to commit fraud."  *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x at 445, n.2 (plaintiff must plead that the sales are "unusual").  Plaintiffs' allegations are rife with inaccuracies, mischaracterizations, and the selective presentation of "facts."

As detailed below, Plaintiffs repeatedly overstate the dollar value and percentage of shares sold by the Individual Defendants by counting both sales transactions *and* in-kind transactions.  Only for-profits sales are relevant to scienter.  *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) ("Courts in this District have held that the exercise of expiring stock appreciation rights and the disposition of shares to pay taxes do not demonstrate a defendant's motive to defraud."); *see also Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 241-42 (S.D.N.Y. 2012); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

Plaintiffs also inflate the dollar value and percentage of shares sold by the Individual Defendants by counting shares sold pursuant to Rule 10b5-1 plans.  "Trades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter" and should therefore be excluded from the analysis.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  After backing out in-kind transactions and shares sold pursuant to a 10b5-1 plan, Plaintiffs do not allege that a single Defendant sold more than approximately $2 million in for-profit sales outside of a Rule 10b5-1 plan within the entire 2 year

class period that Plaintiffs themselves define.  $2 million in for-profit sales outside of a plan and over a two year period is not an unusually high dollar value supporting a strong inference of scienter.  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005) ("Plaintiffs' allegation that the insider sales resulted in more than $60 million in gross proceeds does not save the day.  The significance of insider transactions in the *scienter* analysis is what, if anything, they suggest about the likely intent of the insiders.  The gross proceeds, standing alone, tell us very little.").

Finally, Plaintiffs fail to allege any trading activity during the class period that is inconsistent with any Individual Defendants' prior practices.  *See In re Travelzoo Inc. Sec. Litig.*, No. 11 CIV. 5531 GBD, 2013 WL 1287342, at *9–10 (S.D.N.Y. Mar. 29, 2013) (finding an absence of scienter where a defendant sold 95% of her stock, because "Plaintiffs fail[ed] to adequately plead that her sale was inconsistent with her prior trading practices.").  As explained in detail below, Individual Defendants' stock sales do not support a strong inference of scienter.

### a.    Matta's Stock Sales[7]

Plaintiffs allege that within the class period, Serge Matta sold 68% of his shares for a total of $18.1 million, Dkt. 83, ¶ 160; that $10.9 million in Matta's sales "were made *not* pursuant to any Rule 10b5-1 trading plan," *Id.*, ¶ 163; and that the timing of Matta's sales were suspicious, *Id.*, ¶ 161.  First, only $9.2 million of Matta's shares were sold for-profit.  Ex A.  The remaining

---

[7]  Decl., Ex. B.  *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015) ("[T]he Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.").

$8.7 million shares were deducted to cover tax withholding obligations associated with the vesting of restricted stock awards.  Decl., Exs. A, B.  Second, of Matta's $9.2 million in sales transactions (which are the only transactions that would have been conducted pursuant to a trading plan), $7.2 million in shares were sold pursuant to a Rule 10b5-1 plan.  Decl., Ex. A.  Plaintiffs' allegation that Matta sold $10.9 million in shares outside of a Rule 10b5-1 plan improperly counts all of Matta's in-kind dispositions which would not be made pursuant to such plans.  Decl., Ex. A.  Third, Matta's percentage of stock sales did not significantly increase during the class period relative to before the class period.  Between March 2012 and January 2014, Matta sold 37% of his stock in sales transactions.  During the class period, Matta sold 39% of his stock in sales transactions.[8]  Finally, between February 27, 2015 and August 21, 2015, Matta vested a total of over 980,000 options, none of which he ever exercised and sold.  Decl., Exs. B, C.

Plaintiffs' suspicion as to the timing of Matta's transactions is unwarranted.  Plaintiffs allege that Matta sold $6.7 million worth of stock "between March and August 2015, when the Company's recognition of revenue from nonmonetary transactions was pushing comScore stock prices to record heights."  Dkt. 83, ¶ 161.  However, Plaintiffs omit that nearly 70% of the sales during that period were pursuant to a 10b5-1 plan; all sales after May 2015 were under a plan; and Matta forwent profits of up to $19 million during this period when he could have exercised and sold options.  Decl., Exs. A, C.  Plaintiffs also allege that Matta sold $1.1 million in

---

[8]  Decl., Ex. B shows that Matta sold 49,272 of 133,778 shares of common stock held between March 2012 and January 2014.  It shows during the class period that Matta sold 181,375 of 461,079 shares of common stock held.  Shares "held" during these periods include any shares held at the start of the period and those earned through awards and vesting during the period.

comScore stock on February 18, 2016—"one day after Defendants falsely announced supposedly 'record annual GAAP revenues'" and one day before the comScore Audit Committee "received the information about potential accounting irregularities."  Dkt. 83, ¶ 161.  However, Matta's transaction on February 18, 2016 was an in-kind transaction to cover his tax liability on restricted stock units that had vested on February 18.  Decl., Exs. A, B.  In fact, shares vest under comScore's 2007 Equity Incentive Plan on February 18 of *every* year.  Decl., Ex. B.[9]  As a consequence, Matta entered into a substantively identical in-kind transaction to cover tax liability on February 18, 2015 as well.  Decl., Exs. A, B.

### b.      Wesley's Stock Sales[10]

Plaintiffs allege that within the class period, Mel Wesley sold 83% of his shares for a total of $7.6 million, Dkt. 83, ¶ 160; that none of Wesley's sales were made pursuant to a Rule 10b5-1 plan, *Id.*, ¶ 164; and that Wesley suspiciously sold $5.1 million in shares during the second quarter of 2015.  *Id.*, ¶ 161.

Plaintiffs significantly overstate the dollar value of Wesley's stock sales by apparently failing to recognize that 3 of Wesley's 2015 transactions—conducted on May 11, May 12, and May 13—involved the sale of stock *options*.  Decl., Ex. D.  If the purchase price of these options is properly deducted from Wesley's sale figures, the total value of the shares he disposed of during the class period is actually $3.4 million—$4.2 million less than Plaintiffs allege.  Of

---

[9]  Noting that February 18 shares are "[g]ranted pursuant to the terms of comScore, Inc. 2007 Equity Incentive Plan.  One third (1/3) to vest each year beginning on February 18, 2014 and annually thereafter on future anniversaries of the Vesting Commencement Date . . . ."

[10]  Decl., Ex. D.

Wesley's $3.4 million worth of stock dispositions, only $2 million represents sale transactions.  The remaining $1.4 million constitute in-kind dispositions.  Decl., Exs. A, D.

Finally, the timing of Wesley's sales do not support an inference of scienter.  While Plaintiffs attempt to manufacture an inference of fraud out of Wesley's concentrated sales during the second quarter of 2015, because of restrictions on stock awards, these shares were among the first that became available for Wesley to sell.  With the exception of in-kind transactions, Wesley retained all of the shares he received from comScore after an initial 9-month period and through the end of the class period, which is not consistent with a strong inference of scienter.  Decl., Exs. A; D.

### c.      Abraham's Stock Sales[11]

Plaintiffs allege that within the class period, Magid Abraham sold 92% of his directly-held shares (57% of his indirectly-held shares) for a total of $31.5 million.  Dkt. 83, ¶ 160.  Plaintiffs further allege that $13.1 million of that total represent sales made outside of a Rule 10b5-1 trading plan.  *Id.*, ¶ 161.  However, all but 2 of the dispositions allegedly made outside of a trading plan were in-kind transactions, which are not relevant to the motive-and-opportunity analysis.  Decl., Exs. A, F.   Thus, Plaintiffs' scienter theory regarding Abraham comes down to 2 transactions that amounted to only $1.8 million—less than 6% of the total transactions during the period and far from "unusual."  Decl., Ex. A.  Nor have Plaintiffs alleged Abraham's class-period trades diverged from his pre-class-period trades.  Plaintiffs are only able to manufacture the allegation that he traded 92% of his shares by disregarding all of the shares he held, and sold, before the class period.  *Travelzoo*, 2013 WL 1287342, at *10 & n.9.  As comScore's co-founder, Abraham has a long history of receiving and selling a substantial amount of comScore shares.

---

[11]  Decl., Ex. F.

For example, in an eight-day period in September 2013, Abraham liquidated 30% of his holdings for nearly $10 million.  Decl., Ex. G.  The fact that a co-founder of a technology company sold his shares during the two-year class period is not unusual.

### d.  Tarpey's Stock Sales[12]

Plaintiffs allege that within the class period, Ken Tarpey sold 22% of his shares for a total of $1.8 million.  Dkt. 83, ¶ 160.  They also allege that $1.2 million of that figure represented sales made not pursuant to a Rule 10b5-1 plan.  *Id.*, ¶ 166.  Plaintiffs again fail to note the fact that only $600,000 of Tarpey's stock transactions were for-profit; the other $1.2 million were in-kind transactions.  Decl., Ex. A.  Additionally, *all* of Tarpey's sale transactions while he was CFO were conducted pursuant to a Rule 10b5-1 plan.  Decl., Exs. A, H.  In fact, the trading plan Tarpey used to sell shares was entered into in October 2013, prior to the start of the proposed class period and Plaintiffs' allegations.  Decl., Ex. H.

### e.  Henderson's Stock Sales[13]

Plaintiffs allege that within the class period, William Henderson sold 54% of his shares for a total of $1.7 million.  Dkt. 83, ¶ 160.  They also allege that all of Henderson's sales were made outside of a Rule 10b5-1 trading plan.  *Id.*, ¶ 167.  However, the SEC records Plaintiffs rely on show that Henderson has never used a Rule 10b5-1 plan in connection with a stock sale.  Decl., Exs. I,  J.  Additionally, none of Henderson's sales were made after March 6, 2015.  Decl., Exs. A.,  H.  As a consequence, Henderson held his shares through the end of the class period— negating any inference of intent.

---

[12]  Decl., Ex. H.

[13]  Decl., Ex. I.

2.    **The factual context of each Individual Defendants' stock sales negate any inference of scienter in connection therewith.  Individual Defendants' Matta's and Wesley's Compensation Packages Do Not Establish Motive**

Next, Plaintiffs allege that Individual Defendants Matta and Wesley "artificially inflate[d] comScore's stock price [to] hit their compensation targets."  Dkt. 83, ¶ 153.  Matta and Wesley were granted Restricted Stock Units and options under their compensation packages "when comScore's stock attained predetermined price points."  *Id.*, ¶ 6.  Matta and Wesley purportedly attempted to inflate comScore's stock price to increase their compensation through (1) their public statements and (2) a share repurchase program.  Neither of these theories make sense.

First, Matta and Wesley were not offered the compensation packages at issue until November 2014—*after* the supposed fraudulent accounting for nonmonetary transactions had already begun.  Dkt. 83, ¶ 6.  It is not plausible that Individual Defendants Abraham and Tarpey instituted a fraud in February 2014, so that when Matta and Wesley *subsequently* became CEO and CFO respectively, and were *subsequently* offered a compensation package tied to comScore's stock price, Matta and Wesley would be positioned to increase their compensation by continuing a fraud that pre-dated their appointments as CEO and CFO.  "[A] theory in which fraudulent conduct predates motive is not plausible."  *Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 874 F. Supp. 2d at 358.

Second, Plaintiffs claim that Matta and Wesley "us[ed] shareholder money to engage in [stock] buybacks [to] further inflate[] the price of comScore's stock in an effort to trigger their own lavish compensation packages."  Dkt. 83, ¶ 168.  Plaintiffs complain that comScore's repurchase of 1.8 million shares for $102.2 million in the second and third quarters of 2015 "was highly unusual" and "unprecedented."  *Id.*, ¶¶ 65, 170.  But Plaintiffs also allege that comScore's Board of Directors approved the stock buyback program—*not Matta or Wesley*.  *Id.*, ¶ 169.

Plaintiffs do not allege that comScore's Board had any ulterior motives to approve the program. *See* Dkt. 83. Plaintiffs also fail to disclose that in the May 5, 2015 earnings call Matta stated that "the board recently authorized a total share buyback program of $150 million, with the primary purpose of offsetting dilution on the WPP transaction." Decl., Ex. E. These facts refute any inference that the plan was done to trigger compensation and are consistent with a good faith belief that the Company's investment in its own stock was a good investment and good for shareholders.

Even setting aside the implausibility of Plaintiffs' theories, the Second Circuit has repeatedly held that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (reasoning that "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *see also ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 201 (2d Cir. 2009) ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.") (internal quotation and citation omitted); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 382 (internal citation omitted) ("Plaintiff's argument that [] scienter can be inferred from [defendant's] motive to receive higher annual compensation . . . must be rejected because it is the type of motive expressly held by the Second Circuit to be too generalized to satisfy the pleading requirements for scienter."); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 160-61 (S.D.N.Y. 2015). For this reason, Plaintiffs reliance on compensation to show motive is insufficient as a matter of law.

### 3. comScore's Acquisition of Rentrak Does Not Support Motive

Finally, Plaintiffs speculate that "comScore inflated its stock price to facilitate its acquisition of Rentrak." Dkt. 83 at ¶ 173. According to Plaintiffs, comScore was motivated to

inflate its stock price to "reduce the number of shares comScore would have to issue to pay for the acquisition" of Rentrak. *Id.* However, the timing of the alleged fraud and the acquisition of Rentrak does not add up. According to Plaintiffs, Matta and then-Rentrak CEO William Livek met in April 2015 to "discuss[] combining the companies." *Id.*, ¶ 459. Plaintiffs allege that negotiations between comScore and Rentrak "became more active" after that meeting, *Id.*, ¶ 173, and were ongoing "[t]hroughout the summer of 2015." *Id.*, ¶¶ 89, 91. Plaintiffs' claim that the alleged fraudulent scheme was developed in February 2014 for the purpose of facilitating the acquisition of Rentrak, when negotiations with Rentrak did not become "active" until April 2015, and the merger was not completed until January 29, 2016, is not plausible. It bears repeating that "a theory in which fraudulent conduct predates motive is not plausible." *Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 874 F. Supp. 2d at 358.

Apparently recognizing this fatal flaw, Plaintiffs vaguely allege that "[s]ince *about* late 2013, comScore and Rentrak were considering *some form of strategic combination*." Dkt. 83, ¶ 459 (emphasis added). Plaintiffs offer no support for that allegation. But even assuming that comScore was motivated to acquire Rentrak *before* the alleged scheme began, comScore must have intended to acquire Rentrak in an all-stock transaction *before the fraud* for Plaintiffs' theory to make sense (the motive to increase comScore's stock price only applies to a stock-based transaction). As a result, Plaintiffs speculate that "[a]s a company with a history of net losses, comScore intended throughout the negotiations to use its stock, rather than cash, to pay for the acquisition of Rentrak." *Id.*, ¶ 173. Plaintiffs' speculation that comScore always intended to acquire Rentrak in an all-stock transaction is without basis.

Even setting aside the fact that merger discussions began in earnest *after* the purported fraud began—and therefore could not have motivated the fraud—Plaintiffs' claims are also

legally deficient because there is no connection between comScore's purported misstatements and its acquisition of Rentrak.   The Second Circuit has rejected such claims in similar circumstances:

> [I]n alleging that [defendant] inflated its stock price in order to reduce the cost of acquiring [target], Plaintiffs failed to allege a connection between the [purported fraud] and the acquisition . . . [T]he fact that the alleged misstatements began eight years before the acquisition and ended years afterward renders any connection between the events dubious at best.   At most, Plaintiffs allege a generalized desire to achieve a lucrative acquisition proposal.   Such generalized desires fail to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired, or to acquire another.

*ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d 187 at 201 (internal quotations and citations omitted).   For these reasons, Plaintiffs' complaint fails to adequately plead motive.

### 4.      Plaintiffs Do Not Adequately Plead Actual Knowledge or Recklessness

In the absence of motive, the only way to plead scienter is "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307 (internal quotations and citations omitted).   Plaintiffs' conclusory allegation that comScore and Individual Defendants "had actual knowledge of the misrepresentations and omissions of material facts alleged in this Complaint, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose these facts," Dkt. 83, ¶ 430, is insufficient to satisfy the strong inference pleading requirement as to both actual knowledge and recklessness.

As an initial matter, Plaintiffs do not plead conscious misbehavior or recklessness separately for each individual Defendant, as required.   *See C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *5-6 ("scienter is not amenable to group pleading"); *see also Teamsters Allied Benefit Funds v. McGraw*, 09 Civ. 140 (PGG), 2010 WL 882883, at *11, n.6 (S.D.N.Y. Mar. 11, 2010).   As it pertains to actual knowledge, it is insufficient as a matter of law to plead that each Individual Defendant must have had knowledge by virtue "of his responsibilities and activities as

a senior officer or director of the Company," as Plaintiffs do here.  Dkt. 83, ¶ 429.  "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."  *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).  If anything, Plaintiffs' allegations that comScore and Individual Defendants Matta and Wesley represented that comScore was in compliance with GAAP during the class period are consistent with a good faith belief that comScore was in fact properly accounting for nonmonetary transactions.  An unknown mistake in accounting treatment is at least as plausible an explanation for their statements as is Plaintiffs' conclusion that Defendants knew their statements were allegedly false.

Plaintiffs have also failed to plead recklessness.  Recklessness is not "*merely a heightened form of negligence*," rather, the standard is "conscious recklessness—*i.e.*, a state of mind *approximating actual intent*."  *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  Plaintiff must show "at the least . . . [conduct which] is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it*."  *Id.* (internal quotations and citations omitted).  Plaintiffs may show recklessness by pleading that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  However, to demonstrate either, "Plaintiff must identify specific contradictory information that was available to the [] Defendants at the time they made their misleading statements."  *Pennsylvania Pub. Sch. Employees' Ret. Sys.*, 874 F. Supp. 2d at 358-59 (S.D.N.Y. 2012).  "Additionally, a plaintiff must specifically identify the

reports or statements containing this information."  *Id*.  Plaintiffs have not done so here.  *See* Dkt.

83.  Because Plaintiffs have not plead scienter, the Court must dismiss the Section 10(b) claim.

### III.    PLAINTIFFS' SECTION 20(A) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAILED TO STATE A SECTION 10(B) CLAIM

Plaintiffs also bring claims against the Individual Defendants for violation of Section

20(a) of the Exchange Act, which provides for control person liability.  Section 20(a) states that

"[e]very person who, directly or indirectly, controls any person liable under any provision of this

chapter . . . shall also be liable jointly and severally with and to the same extent as such

controlled person."  15 U.S.C. § 78t(a).  To state a claim for control person liability, a plaintiff

must show "(1) a primary violation by the controlled person, (2) control of the primary violator

by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable

participant in the controlled person's fraud."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 108 (2d Cir. 2007).  Plaintiffs' Section 20(a) claim is premised upon an underlying violation

of Section 10(b).  Dkt. 83, ¶ 438.  Because Plaintiffs have failed to state a violation of Section

10(b), the Court must dismiss Plaintiffs' Section 20(a) claim.  *Albert Fadem Trust v. Citigroup,*

*Inc.*, 165 F. App'x 928, 930 (2d Cir. 2006) ("Section 20(a) claims are necessarily predicated on a

primary violation of securities law.  If no primary violation of the securities laws has been

shown, the Individual Defendants cannot be held liable under Section 20(a) control person

liability as a matter of law.") (internal citations omitted); *Rombach*, 355 F.3d 164, 177-78 (2d

Cir. 2004).  Moreover, Plaintiffs have failed to show any culpability on the party of Individual

Defendants, for the reasons set forth above.

### IV.    PLAINTIFFS' SECTION 14(A) CLAIM AGAINST COMSCORE AND THE COMSCORE MERGER INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO ADEQUATELY PLEAD FRAUD

Section 14(a) of the Securities Exchange Act requires that proxy solicitations comply with the SEC's implementing regulations.  15 U.S.C. § 78n(a).  SEC Rule 14a-9(a) states that "no solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact . . . " 17 C.F.R. § 240.14a-9(a).

To state a claim pursuant to Section 14(a), "Plaintiffs must allege that defendants acted at least with negligence in making the misrepresentations or omissions" alleged.  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005).  However, the Second Circuit held in *Rombach* that:

> [T]he heightened pleading standard of Rule 9(b) applies to Section 11 . . . claims insofar as the claims are premised on allegations of fraud . . . Fraud is not an element or a requisite to a claim under Section 11 . . .; at the same time, claims under those sections may be—and often are—predicated on fraud. The same course of conduct that would support a Rule 10b–5 claim may as well support a Section 11 claim . . .  So while a plaintiff need allege no more than negligence to proceed under Section 11 . . . claims that do rely upon averments of fraud are subject to the test of Rule 9(b).

355 F.3d 164, 171 (2d Cir. 2004).  This same reasoning applies to Section 14(a): "When plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, even if they disclaim reliance on a fraud theory."  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 595 (internal citations omitted).  A Section 14(a) claim premised on fraud requires that plaintiffs "plead a strong inference of scienter in connection with a material misrepresentation or omission."  *Id.* at 636; *see also Police & Fire Ret. Sys.*, 645 F. Supp. 2d at 240.  Plaintiffs have failed to meet this standard for the reasons identified in Section II.

**A.     Plaintiffs' Section 14(a) Claim Sounds in Fraud**

Plaintiffs' Section 14(a) claim unmistakably sounds in fraud.  Plaintiffs' Section 14(a) claim is brought against many of the same Defendants and is based on the same purportedly false statements that are at issue in Plaintiffs' Section 10(b) fraud claim.  In fact, Plaintiffs incorporate dozens of Section 10(b) allegations into its Section 14(a) claim.[14]  Plaintiffs even incorporate allegations sounding in fraud—for example, Plaintiffs incorporate by reference numerous paragraphs alleging that "Defendants comScore and Matta's statements . . . were materially false and misleading."   Plaintiffs likewise use the "materially false and misleading" language throughout the factual allegations underlying their Section 14(a) claim.  This precise language is "classically associated with fraud."   *Rombach*, 355 F.3d 164 at 172.   Further, Plaintiffs completely fail to plead facts showing that comScore and the comScore Merger Individual Defendants acted negligently.   "Plaintiffs' attempt to fall into the lower pleading standard for negligence actions is unavailing [where] [t]he basis for Plaintiffs' claims is that [] officers and directors failed to properly disclose . . . using improper revenue-recognition accounting methods, and that they did so to enrich themselves by inflating [] stock prices.  This is essentially a fraud claim, and Plaintiffs will not be allowed to reclassify their claims to avoid the pleading standards of Rule 9(b)."   *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d 210 at 238.

Plaintiffs' disclaimer of a basis in fraud is of no consequence.  Dkt. 83, ¶ 524 (Plaintiffs "expressly exclude[] and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct" and claim Count III "is based solely on

---

[14]  Dkt. 84, ¶¶ 462 (incorporating ¶¶ 71-74); 462 (incorporating ¶¶ 75-88); 470 (incorporating ¶¶ 95-99); 473 (incorporating ¶ 105, 107-122); 477 (incorporating ¶ 92); 492 (incorporating ¶¶ 283-291); 495 (incorporating ¶¶ 298-302); 496 (incorporating ¶¶ 310-19); 499 (incorporating ¶¶ 323-27); 500 (incorporating ¶¶ 335-345); 503 (incorporating ¶¶ 369-373, 383-391).

negligence."). Such disclaimers are not entitled to any weight. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 at 635 ("Plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness."); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 393 (E.D.N.Y. 2013) ("[E]ven though the Plaintiff does separate out the factual allegations supporting the fraud claims and negligence claims, the complaint contains a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the Securities Act claims; the allegations largely parrot the fraud allegations; and the complaint does not show any basis for the claims that is non-fraudulent. For these reasons, the Court finds that the Section 11 claim sounds in fraud.").

### B.    Plaintiffs Fail to Adequately Plead Fraud

For the reasons set forth in Section II, Plaintiffs have failed to plead a strong inference of scienter to state a Section 14(a) claim premised on fraud against comScore and Merger Individual Defendants Matta, Wesley, Abraham, and Henderson. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 636 (dismissing Section 14(a) claim for failure to plead a strong inference of scienter based on the same reasoning requiring dismissal of Section 10(b) claim).

Plaintiffs have also failed to plead a strong inference of scienter with respect to the remaining comScore Merger Individual Defendants Fradin, Fulgoni, Katz, Korn, and Lewis, all of whom served on comScore's Board of Directors. Plaintiffs make no individualized allegations of scienter relating to these Defendants. *See* Dkt. 83. Plaintiffs' only allegations concerning these Defendants—that Fradin, Fulgoni, Katz, Korn, and Lewis signed the Registration Statement and Joint Proxy—are legally insufficient under Rule 9(b). "Plaintiffs fail to meet [Rule 9(b)'s] standard by simply alleging that the Corporate Director Defendants had the requisite state of mind because they signed certain documents or because of their positions,

rather than alleging with more specificity their knowledge of the allegedly fraudulent []
accounting." *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 239-40.

### C. Alternatively, Plaintiffs Fail to Plead Negligence

Even if Rule 9(b) did not apply to Plaintiffs' Section 14(a) claim (which it does), the
Court must still dismiss the claim because Plaintiffs' allegations of negligence are completely
conclusory.  Plaintiffs proclaim that "[e]ach Defendant named in this count acted negligently."
Dkt. 83, ¶ 533.   Plaintiffs allege *no* facts in support of that conclusion, much less plead
negligence with respect to each individual defendant.  *See* Dkt. 83.  Entirely absent from the 155
page complaint is any theory of negligence.  By way of example, the only duty alleged in the
Complaint is a purported duty to disclose the conclusions of the Grant Thornton report in the
Joint Proxy Statement.  *Id.*, ¶ 512.  However, there is no corresponding allegation that comScore
or the comScore Merger Individual Defendants were even aware of the conclusions of the Grant
Thornton report.  *See* Dkt. 83. Defendants cannot have a duty to disclose information of which
they are not aware.  Nor is the legal basis for such duty plead.  *See id.*  And no other duty is even
alleged.  *See id.*

Because Plaintiffs' theory is one of fraud, and Plaintiffs have not plead the requisite
mental state to show fraud, Plaintiffs' Section 14(a) claim must be dismissed.

### V. PLAINTIFFS' SECTION 11(B) CLAIM AGAINST COMSCORE AND THE COMSCORE MERGER INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO ADEQUATELY PLEAD FRAUD

Section 11 of the Securities Act provides that the signer of a Registration Statement is
liable where the Registration Statement "contained an untrue statement of a material fact or
omitted to state a material fact . . ."  15 U.S.C. § 77(k).  Because substantively identical facts and
law apply to Plaintiffs' Section 14(a) and Section 11 claims, comScore and the comScore Merger
Individual Defendants move to dismiss the Section 11 claim on the same basis as the Section

14(a) claim—(A) Plaintiffs' Section 11 Claim is Subject to Rule 9(b)[15]; (B) Plaintiffs Fail to Adequately Plead Fraud; and (C) Alternatively, Plaintiffs Fail to Plead Negligence[16]—and incorporate by reference their arguments therein.

## CONCLUSION

For the foregoing reasons, the Court should grant the comScore Defendants' motion to dismiss for Plaintiffs' failure to state a claim in the Consolidated Amended Class Action Complaint.

Dated:  December 9, 2016               Respectfully submitted,


                                       */s/ Stephen A. Swedlow*
                                       **Stephen Swedlow** (admitted *pro hac vice*)
                                       stephenswedlow@quinnemanuel.com
                                       **Michelle Schmit** (admitted *pro hac vice*)
                                       michelleschmit@quinnemanuel.com
                                       **John Robinson** (admitted *pro hac vice*)
                                       johnrobinson@quinnemanuel.com
                                       QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP

                                       *Counsel for comScore, Inc., Serge Matta, Magid M. Abraham, Kenneth J. Tarpey, William J. Henderson, Russell Fradin, Gian M. Fulgoni, William Katz, Ronald J. Korn, and Joan Lewis*

---

[15]  The Court of Appeals held in *Rombach* that "the heightened pleading standard of Rule 9(b) applies to Section 11 . . . claims insofar as the claims are premised on allegations of fraud."  355 F.3d at 171.

[16]  *Rombach*, 355 F.3d 164, 171 (2d Cir. 2004) (plaintiff must allege negligence to proceed under Section 11 if complaint does not sound in fraud); *see also Scott v. Gen. Motors Co.*, 605 F. App'x 52, 54 (2d Cir. 2015).