**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION, EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, and WILLIAM HUFF, Individually and on Behalf of All Others Similarly Situated, | Case No.: 1:16-cv-01820-JGK |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| COMSCORE, INC., SERGE MATTA, MELVIN WESLEY III, MAGID M. ABRAHAM, KENNETH J. TARPEY, WILLIAM J. HENDERSON, RUSSELL FRADIN, GIAN M. FULGONI, WILLIAM KATZ, RONALD J. KORN, JOAN LEWIS, RENTRAK CORPORATION, DAVID BOYLAN, DAVID I. CHEMEROW, WILLIAM ENGEL, PATRICIA GOTTESMAN, WILLIAM LIVEK, ANNE MACDONALD, MARTIN O'CONNOR, BRENT ROSENTHAL, and RALPH SHAW, | |
| Defendants. | |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE COMSCORE DEFENDANTS, TARPEY, AND WESLEY**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   FACTUAL BACKGROUND ................................................................. 7

    A.    The Fictitious-Revenue Fraud ................................................. 7

    B.    Defendants' Fraud Is Gradually Revealed ........................................... 12

    C.    Defendants' Materially False and Misleading Statements About comScore's Revenue, EBITDA, GAAP Compliance, and Internal Controls ....... 17

        1.    Statements of Historical and Present Fact ................................ 17

        2.    Statements of Projected Results ................................................ 20

    D.    Defendants' Knowing or Reckless Misconduct ................................... 20

        1.    The Company's Admissions of "Misconduct" ......................... 20

        2.    The Suspicious Resignations of Abraham, Matta, and Wesley ............... 21

        3.    The Officer Defendants' Frequent Comments About comScore's Revenue and Aggressive Defense of Its Accounting ............................. 22

        4.    The Officer Defendants' Personal Profiting from comScore's Artificially Inflated Stock Price ................................................. 22

        5.    The Rentrak Acquisition ............................................................ 25

        6.    comScore's Extraordinary Delay in Finalizing Its Still Unissued Restatement ................................................................................ 25

    E.    The comScore and Rentrak Merger ................................................. 26

III.  ARGUMENT ........................................................................................ 28

    A.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER EXCHANGE ACT §§ 10(b) and 20(a) .................................................. 28

        1.    The Complaint Alleges Actionable Misstatements and Omissions. .......... 28

            a.    comScore Has Admitted to Dozens of Misstatements and Omissions by the §10(b) Defendants. ............................. 28

|  | b. | The "Safe Harbor" Provides No Shelter, and the §10(b) Defendants' False Statements Regarding comScore's "Key Financial Measures" Is Not "Corporate Optimism" | 30 |

|  | c. | Wesley's Disagreement with comScore's Decision to Restate Provides No Basis to Dismiss the Complaint | 32 |

|  | d. | The Complaint Adequately Alleges that Tarpey Made Material Misstatements and Omissions | 37 |

| 2. | The Complaint Adequately Pleads Scienter | 40 |

|  | a. | The §10(b) Defendants Had Motive and Opportunity to Commit Fraud | 42 |

|  |  | i. | The Market Agreed that comScore's Revenue and EBITDA Were the Company's "Key Financial Measures" | 42 |

|  |  | ii. | The §10(b) Defendants Sold Nearly $60 Million in Stock | 43 |

|  |  | iii. | Matta and Wesley's Compensation Packages Uniquely Incentivized and Rewarded the Fraud | 50 |

|  |  | iv. | Rentrak Transaction | 53 |

|  | b. | The Complaint Alleges Strong Circumstantial Evidence of Conscious Misbehavior by the §10(b) Defendants | 55 |

| 3. | The Complaint Adequately Alleges Control-Person Liability Against the Executive Defendants Under §20(a) | 67 |

B. THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER EXCHANGE ACT §14(a) AND SECURITIES ACT §11 AGAINST THE COMSCORE MERGER INDIVIDUAL DEFENDANTS ... 68

| 1. | Plaintiffs' §14(a) Claim Does Not Sound in Fraud | 68 |

| 2. | Plaintiff Has Adequately Pleaded a Section 14(a) Claim | 71 |

| 3. | Plaintiffs Adequately Plead a §11 Claim Against the comScore 14(A) Defendants | 72 |

| 4. | Plaintiffs State Section 14(A) and Section 11 Claims Against Wesley | 72 |

IV. CONCLUSION | 73

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*
47 F.3d 47 (2d Cir. 1995)................................................................................................51

*Acticon AG v. China N.E. Petroleum Holdings Ltd.,*
615 F. App'x 44, 46 (2d Cir. 2015) ..............................................................................58

*In re Ancor Comm'n, Inc.,*
22 F. Supp. 2d 999 (D. Minn. 1998).............................................................................60

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................5, 29

*In re Baan Co. Sec. Litig.,*
103 F. Supp. 2d 1 (D.D.C. 2000)..................................................................................60

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act
(ERISA) Litig.,*
757 F. Supp. 2d 260 (S.D.N.Y. 2010).............................................................69, 70, 71

*Beck v. Dobrowski,*
559 F.3d 680 (7th Cir. 2009) ..................................................................................71, 72

*Bell v. Fore Sys., Inc.,*
17 F. Supp. 2d 433 (W.D. Pa. 1998).............................................................................60

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,*
866 F. Supp. 2d 223 (S.D.N.Y. 2012).....................................................................68, 69

*Burstyn v. Worldwide Xceed Grp., Inc.,*
2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)............................................................55

*Carley Capital Grp. v. Deloitte & Touche,*
27 F. Supp. 2d 1324 (N.D. Ga. 1998)...........................................................................62

*In re Cardinal Health Inc. Sec. Litig.,* 426 F. Supp. 2d 688, (S.D. Ohio 2006) ..........................47

*Chalverus v. Pegasystems, Inc.,*
59 F. Supp. 2d 226 (D. Mass. 1999).............................................................................60

*In re Citigroup, Inc. Sec. Litig.,*
330 F. Supp. 2d 367 ................................................................................................51, 52

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010)........................................................................69

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395, (S.D.N.Y. 2011)........................................................43, 45, 70

*Clark v. TRO Learning, Inc.*,
  1998 WL 292382 (N.D. Ill. May 20, 1998) ..............................................................33

*In re Complete Mgmt. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001)........................................................................55

*Cunha v. Hansen Natural Corp.*,
  2011 WL 8993148 (C.D. Cal. May 12, 2011) ...........................................................42

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ...................................................................................36

*Darquea v. Jarden Corp.*,
  2007 WL 1610146 (S.D.N.Y. May 31, 2007) ...........................................................51

*Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 241–42 (S.D.N.Y. 2012) ......................46

*ECA, Local 134 IBEW Joint Pension Trust of Chicago*,
  553 F.3d 187 (2d Cir. 2009).................................................................46, 51, 52, 54

*In re Electrobras Sec. Litig.*,
  2017 WL 1157138 (S.D.N.Y. March 25, 2017) ...............................................38, 39, 58, 64

*In re Enron Corp. Sec. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 686 (S.D.
  Tex. 2002) ..................................................................................................................48

*In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y.
  2006) ..........................................................................................................................31

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105, 110 (2d. Cir. 2011)...................................................................35, 36

*Fla. State Bd. Of Admin. V. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .....................................................................................52

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).....................71

*In re GE Sec. Litig.*,
  856 F. Supp. 2d 645 (S.D.N.Y. 2012).......................................................................36

*George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8,
  2012) ..........................................................................................................................46

*In re GeoPharma, Inc. Sec. Litig.*,
    399 F.Supp.2d 432 (S.D.N.Y. 2005)................................................................45

*Gerstle v. Gamble-Skogmo, Inc.*,
    478 F.2d 1281 (2d Cir. 1973)...........................................................72, 73

*In re Global Crossing, Ltd. Sec. Litig.*
    322 F. Supp. 2d 319 (S.D.N.Y. 2004)................................................36

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)................................................40

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)................................................35

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)........................................................................74

*Int'l Assoc. of Heat & Frost Insulators & Asbestos Workers Local #6 Pension
    Fund v. Int'l Bus. Machines Corp.*,
    2016 WL 4688862 (S.D.N.Y. Sept. 7, 2016)................................59

*Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y.
    2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed.
    Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) ................63

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011)................................................28

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144, 160-61 (S.D.N.Y. 2015) ................................52

*In re Lululemon Securities Litigation*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)........44

*Marksman Partners v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal.1996) ................................................60

*McCurdy v. SEC*,
    396 F.3d 1258 (D.C. Cir. 2005)........................................................67

*Mendell v. Greenberg*,
    927 F.2d 667 (2d Cir. 1990)............................................................72

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)............................................................28

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................................36, 48, 61, 62

*New Orleans Employees Retirement System v. Celestica, Inc.*,
   455 F. App'x. 10 (2d Cir. 2011) ...........................................................................................42

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC*
   *Partners Inc.*,
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)......................................................................37

*In re Nortel Network Sec. Litig.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003)...................................................................................29

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000).................................................................................................41

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015).................................................................................................33, 37

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012)................................................................52, 53, 65, 66

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012).................................................................................................73

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015).............................................................................38, 40

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015).............................................................40, 41, 59, 65

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin.*
   *Holdings Ltd.*,
   886 F. Supp. 2d 328 (S.D.N.Y. 2012)...................................................................................39

*In re Raytheon Sec. Litig.*,
   157 F. Supp. 2d 131 (D. Mass. 2001) ..............................................................................34, 62

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)...................................................................................70

*Ret. Sys. of Govt. of Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015).................................................................................................44

*Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) .......................................................................................68

*Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................43, 45, 71

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
  207 F. Supp. 2d 292 (S.D.N.Y. 2002)..................................................55

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................5, 31, 69

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000)..................................................................53

*In re Salix Pharma., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ........30, 42,61, 64

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir.2001)..............................................................43, 46

*SEC v. China Northeast Petroleum Holdings Ltd.*,
  27 F. Supp. 3d 379 (S.D.N.Y. 2014)....................................................67

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996)..............................................................68

*In re SLM Corp. Securities Litigation*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010)........................................46, 51, 55

*Tellabs, Inc. v. Makor Issues & Rights*,
  551 U.S. 308 (2007)......................................................................40, 41

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
  672 F. Supp. 2d 596 (S.D.N.Y. 2009)..................................................40

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)........................................28, 33, 55

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)..................................................70

*Wilson v. Great Am. Indus., Inc.*,
  855 F.2d 987 (2d Cir. 1988)..........................................................72, 73

**Statutes and Rules**

Fed. R. Civ. P. 8 ......................................................................69, 70, 71

Fed. R. Civ. P. 9(b) ..........................................................28, 69, 70, 71

Fed. R. Civ. P. 12(b)(6)......................................................................46

Fed. R. Civ. P. § 20(a) ......................................................................68

Private Securities Litigation Reform Act of 1995 ...............................................................5, 28, 30

**Administrative and Executive Materials**

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45, 152.......................................................40

**Other Authorities**

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011).....................20, 56

Plaintiffs respectfully submit this memorandum of law in opposition to the Motions to Dismiss Plaintiffs' Second Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") (DE 172) filed by Defendants comScore, Inc. ("comScore" or the "Company"), Serge Matta, Magid M. Abraham, William J. Henderson, Russell Fradin, Gian Fulgoni, William Katz, Ronald J. Korn, and Joan Lewis (together with comScore, the "comScore Defendants") (DE 199), Defendant Kenneth J. Tarpey (DE 188), and Defendant Melvin Wesley, III (DE 191).[1]

## I.    PRELIMINARY STATEMENT

This case arises from an egregious fraud perpetrated by comScore and certain of its senior executives. Prompted by a nearly year-long investigation conducted by its Audit Committee, comScore has *admitted* that its publicly filed financial statements for more than three years were materially false and misleading, violated Generally Accepted Accounting Principles ("GAAP"), improperly recognized more than $43 million in fictitious revenues, and need to be formally restated.

The Company so far has spent more than $39 million on the Audit Committee's investigation, which also identified "internal control deficiencies" and "concerns about tone at the top," as well as explicitly attributing the revenue overstatements in part to "instances of *misconduct.*" Exhibit 1 to the Declaration of John C. Browne in Support of Lead Plaintiffs'

---

[1]   Lead Plaintiffs oppose the Rentrak Defendants' Motion to Dismiss (DE 185) in a separate memorandum of law. All capitalized terms have the meanings set forth in the Complaint (cited as "¶__"). All emphasis in quotations is added unless otherwise noted.

Opposition to the Motions to Dismiss of the comScore Defendants, Tarpey, and Wesley, April 13, 2017 ("Browne Decl."), at p.3; Browne Decl. Ex. 2, at Ex. 99.9 p.7; *see also* ¶¶130-36.

The fallout from this misconduct has been catastrophic for comScore's investors. The Company has not filed its Annual Report on Form 10-K for the year ended December 31, 2015 or any financial statements for any subsequent period—a delay of more than one year. On February 8, 2017, comScore was suspended from NASDAQ. Brown Decl. Ex. 3., at p.3. Its common stock now trades on the OTC Market. On March 14, 2017, comScore disclosed that it "is targeting the Summer of 2017 to complete the financial restatement and to be current with all of its SEC filings" but warned "there can be no assurance that the process will be completed by that time." *Id*. The Audit Committee's investigation also has led to the "resignations" of the Company's CEO (Defendant Serge Matta), co-founder and Executive Chairman of the Board (Defendant Magid Abraham), and CFO (Defendant Melvin Wesley). When comScore's fraud was revealed to the market, the Company's stock price declined from a Class Period high of $64 per share to just $28 per share, wiping out hundreds of millions of dollars in shareholder value.

The reality of comScore's financial performance during the Class Period stands in stark contrast to how Defendants portrayed it. Defendants told investors that the Company was achieving supposedly "record" revenues that grew steadily from $76.9 million in the first quarter of 2014 to $92.4 million by the third quarter of 2015. Defendants touted these supposedly positive revenue results in multiple conference calls and SEC filings, repeatedly highlighting "another quarter of record revenues" and "EBITDA growth well above expectations." ¶¶43, 48-50, 52, 54, 57. These statements were important to investors. As comScore itself acknowledged, revenue and related metrics (including EBITDA) were "the key financial measures by which our stockholders evaluate our progress." ¶¶3, 42.

Fueled by Defendants' false statements, the Company's stock price soared from approximately $30 per share at the start of the Class Period to more than $64 per share just 18 months later. ¶¶47-63. Defendants leveraged the sharp increase in comScore's stock price to enrich themselves by nearly *$60 million* in less than two years through massive insider selling and highly unusual compensation packages. Defendant Matta, the Company's CEO, sold 68 percent of his comScore holdings for more than $18.1 million. Defendant Abraham, the Company's co-founder, sold an eye-popping *92 percent* of his holdings, worth over $31 million. Defendant Wesley sold 88 percent of his holdings for more than $7.6 million. ¶¶175-82.

The market first began to question comScore's accounting in August 2015 when the *Wall Street Journal* published an article highlighting comScore's reliance on revenues derived from "nonmonetary" transactions. ¶¶75-78. In response, Defendants scrambled to reassure the market and prevent any major declines in comScore's stock price. Defendants met with analysts to falsely tell them that comScore properly accounted for nonmonetary revenue. ¶¶80-81. Defendants also convened a private conference call with a select group of hand-picked investors and analysts, where Matta and Wesley stated that all nonmonetary revenue was "100% GAAP revenue . . . [T]he guidelines are very, very strict and *we follow them to the t.*" ¶¶82-92.

With comScore's stock price stabilized, Defendants announced in late September 2015 that the Company was going to conduct an enormous all-stock transaction to purchase Rentrak Corporation. ¶¶93-97. The Rentrak transaction was valued at $827 million and was funded solely through a stock swap that gave Rentrak shareholders 1.15 shares of comScore stock for every share of Rentrak stock they held. *Id.*

Defendants continued to mislead the market throughout the remainder of 2015. ¶¶98-103. Indeed, Defendants went so far as to submit a false response to a November 25, 2015 comment

letter from the SEC that asked several questions about comScore's nonmonetary revenue accounting. ¶¶104-05. In a December 3, 2015 response that was publicly filed and signed by Defendant Wesley, with copy to Defendant Matta, comScore assured the SEC and the public that its accounting for nonmonetary revenue was proper and accurate. ¶477.

Unfortunately for investors, Defendants' repeated and emphatic assurances were false. On February 29, 2016, the Company announced that its Audit Committee was conducting an internal investigation and that the Company would be unable to timely file its annual report for 2015. ¶¶109-10. The investigation dragged on over the next seven months while comScore repeatedly delayed filing its 2015 annual report and missed deadlines for filing its quarterly reports for the first and second quarters of 2016. ¶¶111-21. In September 2016, the Company finally announced that it would have to restate its financial results from 2013 through the first three quarters of 2015—wiping out more than $43 million in nonmonetary revenue. ¶¶122-29.

The full truth was revealed on November 23, 2016, when comScore filed a Form 8-K disclosing that its Audit Committee's investigation had concluded. ¶130. The Form 8-K affirmed that comScore's accounting for nonmonetary revenue had been false and that comScore would have to restate its financials for three years. ¶131. It also made several additional (and alarming) disclosures, including that "accounting for certain *monetary* transactions will need to be adjusted." ¶132. The Form 8-K further announced that "[t]he Audit Committee's investigation concluded that, as a result of ***certain instances of misconduct*** and errors in accounting determinations, adjustments to the Company's accounting for certain nonmonetary and monetary transactions were required." Browne Decl. Ex 1, at p.3. Finally, the Form 8-K identified concerns regarding "internal control deficiencies," the "tone at the top," "information not having been provided to . . . external auditors," and "the sufficiency of public disclosures made by the Company." *Id.*; ¶¶130-36.

In response to these well-pled allegations, Defendants raise a number of arguments that ignore the specific facts pleaded in the Complaint and ask the Court to draw highly improbable inferences in *their* favor at the pleading stage. None of Defendants' arguments has merit.

First, Defendants argue that certain of the alleged false statements are non-actionable "puffery" or forward-looking statements. comScore Br. at 12-16. But even Defendants cannot deny that comScore has admitted making repeated false statements regarding its compliance with GAAP, its internal controls, and the existence of over $43 million in fictitious nonmonetary revenue reported during the Class Period. These are indisputably statements of present or historical fact regarding the Company's "key financial measures," which are neither "puffery" nor protected by the Private Securities Litigation Reform Act's ("PSLRA") safe harbor for forward-looking statements. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) (holding that the "fact that financial results were restated is sufficient basis for pleading that those statements were false when made").

As for the subset of alleged false statements that Defendants characterize as projections, Defendants' reliance on boilerplate risk disclosures (comScore Br. at 14) does not insulate these statements from liability under the PSLRA. Imprecise and conditional "risk factors" such as those cited by Defendants—stating that "interpretations of accounting rules . . . *could* result in unfavorable accounting charges," or that comScore's "stock price *may be* adversely affected *if* our internal control over financial reporting is found … not to be adequate" (*id.*)—will not shield Defendants from liability where, as here, it is alleged that Defendants knew that their statements were false. This is particularly true given Defendants' many express and emphatic reassurances during the Class Period that comScore's accounting for nonmonetary revenue was accurate. *See*

*Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (holding that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired")

Defendant Wesley (and only Defendant Wesley) argues that the dozens of factual representations he made to investors about comScore's revenue were merely "opinions." Wesley Br. at 10-15. This argument fares no better. Wesley repeatedly made statements of hard fact not just regarding comScore's revenue, but also regarding the reasons why comScore's accounting for that nonmonetary revenue supposedly complied with GAAP. He variously stated, for example, that the nonmonetary transactions "would have been cash transactions had the company not decided [otherwise]," and "the value we record in revenue is consistent with our historic sales for the same products." ¶¶88, 90. He also said that GAAP had "very, very strict" guidelines and comScore follow[ed] them to the t."

During the Class Period, Wesley spoke emphatically, repeatedly, and forcefully about comScore's nonmonetary revenue. He did not present his statements as "opinions" or qualify them in any way. His belated attempt to do so now should be rejected. In any event, as discussed below, even if these statements are held to be opinions the Complaint adequately alleges they were false when made. At bottom, the absurdity of Wesley's argument is demonstrated by his contention that "Mr. Wesley still has no reason to believe his opinion was wrong." Wesley Br. at 13. Whatever Mr. Wesley's "beliefs" may be, it is obvious that his disagreement with the findings of comScore's own Audit Committee (after a nearly year-long investigation and $39 million spent) provides no basis to dismiss this case at the pleading stage.

Second, Defendants' arguments regarding scienter ask the Court to review each of the Complaint's many allegations of scienter in isolation, and argue that each of them *standing alone* is not sufficient. This is improper. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308,

322-23 (2007) (holding that "the inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" (emphasis in original)).

The Complaint's detailed allegations easily raise a strong inference of scienter on both a motive-and-opportunity theory and a circumstantial-evidence-of-recklessness theory. These facts include, among many others, that (i) revenue was a "key financial measure" for comScore and Defendants repeatedly made statements about revenue during the Class Period (¶¶40-46); (ii) Defendants made nearly $60 million in insider sales (¶¶175-82); (iii) Matta and Wesley had unique and lavish compensation packages that rewarded their fraud with millions of dollars as a result of repeatedly hitting stock-price targets by reporting fictitious revenue (¶¶64-70); (iv) comScore used its artificially inflated stock to purchase Rentrak (¶188); (v) the Audit Committee investigation expressly attributed comScore's false statements to "misconduct"; (vi) the fraud was perpetrate with the aid of a related party (¶¶162-64); (vi) all Defendants still at the Company were forced to "resign" from their positions in top management as a result of the Audit Committee investigation (¶¶189-96); and (vii) comScore's extraordinary delay in completing its restatement (¶¶197-99). As discussed below, when viewed holistically, these allegations are more than sufficient to plead Defendants' scienter.

Finally, Defendants' arguments that Plaintiffs' Securities act claims should be dismissed are meritless. *See* Sections III.B.4 and III.B.5.

## II.    FACTUAL BACKGROUND

### A.    The Fictitious-Revenue Fraud

This case concerns an accounting fraud perpetrated by Defendant comScore and its most senior officers—Defendants Matta, Wesley, Abraham, and Tarpey—over a period of nearly three years. As discussed below, in connection with a nearly year-long internal investigation by its Audit

Committee, comScore has *admitted* that its publicly reported financial statements for a period of more than three years were materially false and misleading, violated GAAP, and improperly recognized more than $43 million in fictitious nonmonetary revenues. ¶¶1, 122-24.

During the Class Period (February 11, 2014 through November 23, 2016), comScore and its senior executives told investors on conference calls and in multiple filings with the SEC that comScore was achieving supposedly "record" revenues that grew steadily from $76.9 million in the first quarter of 2014 to $92.4 million by the third quarter of 2015—an increase of more than 20%. ¶¶2, 43, 48, 50, 52, 54, 57, 60, 99. These statements were extremely important to investors. ¶¶2, 41-45. As comScore acknowledged in its SEC filings, the Company's revenue and revenue-related metrics (such as earnings before interest, taxes, depreciation, and amortization ("EBITDA")) were "the key financial measures by which our stockholders evaluate our progress." ¶¶2, 42.

As comScore and its senior executives knew it would, the market reacted positively to their story of consistent and strong revenue growth. ¶¶3, 46. Analysts covering the Company repeatedly raised their price targets while highlighting comScore's "better than expected revenue," "much better than expected" EBITDA, and "strong results" reflecting "growing revenue and EBITDA." ¶3. This, in turn, caused comScore's stock price to more than double, climbing from approximately $30 per share at the start of the Class Period to a high of more than $64 per share just 18 months later. ¶¶3, 63. Indeed, throughout the Class Period, the market consistently reacted favorably to comScore's announcements of "record" revenue by driving comScore's stock price up—to pick just a few examples, the stock price rose 10% following the first-quarter 2014 disclosures, 15% following the first-quarter 2015 disclosures, and up 14% following the third-quarter 2015 disclosures. ¶46.

The Defendant comScore senior executives took advantage of this sharp increase in the Company's stock price to enrich themselves by nearly *$60 million in less than two years* through insider stock sales and lavish compensation packages. ¶¶4, 175. Defendant Serge Matta joined comScore shortly after its inception in 1999, became its President in June 2013, and became its CEO in March 2014. He was unceremoniously replaced as CEO just 18 months later in the midst of the Audit Committee's investigation, and ultimately left the Company's Board of Directors in December 2016 just after the Audit Committee completed its investigation. During the Class Period, he sold *68%* of his personal holdings of comScore stock and reaped a staggering $18.1 million for himself. ¶¶4, 176-79.

During the same short period, Defendant Magid M. Abraham—who was the Company's co-founder, was its CEO from its inception in 1999 until Defendant Matta became CEO in March 2014, and was the Executive Chairman of its Board of Directors until stepping down in July 2016—cashed in more than *$31 million* worth of comScore stock, including an eye-popping *92%* of his personal holdings as of the start of the Class Period. ¶¶5, 176. In July 2016—in the midst of the Audit Committee's investigation—Abraham unexpectedly stepped down as Executive Chairman, though the Company stated that Abraham would remain a Director until 2018. ¶¶5, 117. But then in December 2016, shortly after the Audit Committee concluded its investigation—which uncovered telltale concerns about "misconduct" and the "tone at the top"—Abraham resigned from the Board altogether, leaving the company in which he had played a prominent role since its founding in 1999. ¶5; Browne Decl. Ex. 1, at p.3.

Likewise, after becoming the Company's Chief Financial Officer ("CFO") in August 2014, Defendant Melvin Wesley III proceeded to sell more than $7.6 million in insider stock transactions

in less than two years, selling 88% of his holdings. ¶¶6, 176-78. Like Defendant Matta, he too was replaced in August 2016 during the internal investigation. ¶¶6, 119.

Defendants Matta and Wesley were also awarded highly lucrative compensation packages in November 2014. ¶7. These pay packages entitled Matta and Wesley to significant grants of Restricted Stock Units ("RSUs") when comScore's stock attained predetermined price points ($48, $50, $55, or $60 per share) during any consecutive 30-day period. ¶¶7, 64. During the first three quarters after this compensation package was awarded, comScore's stock price soared as a result of comScore and its senior executives' materially false statements. ¶¶7, 65. The stock ultimately achieved each of the predetermined price targets shortly after quarterly earnings announcements that were juiced by the phony nonmonetary revenue, just squeaking over the final $60 per share threshold in mid-August 2015. ¶¶7, 57-60, 63, 66. In total, Matta and Wesley received nearly $9 million worth of vested stock through these arrangements. ¶¶7, 67.

There is no dispute, given comScore's admission that its Class Period financial statements materially overstated its revenues, that these outsized compensation packages and lucrative insider stock sales occurred at a time when comScore was making materially false and misleading statements that artificially inflated its publicly reported financial results. ¶¶8, 122-26. Nonetheless, these insider Defendants have walked away with tens of millions of dollars, while investors have suffered hundreds of millions of dollars in losses as a result of these Defendants' fraud. ¶8.

The market first raised questions about comScore's accounting in August 2015, shortly after Matta and Wesley received their final award of vested stock. ¶9. On August 31, 2015, the *Wall Street Journal* published an article noting that a significant and growing portion of comScore's reported revenues resulted from "nonmonetary" transactions. ¶¶9, 75. In these transactions, sometimes called "barter transactions," comScore entered into data-sharing

agreements whereby comScore would swap data with another company but the companies would not exchange any cash payment. ¶¶9, 71. Because these types of transactions are easily susceptible to abuse (as demonstrated here), there are strict rules under GAAP that dictate when companies are permitted to book revenue from them. ¶¶9, 144-47.

During the Class Period, comScore booked $43.2 million dollars in revenue from these nonmonetary transactions. ¶72. While comScore and its senior executives repeatedly stated that their accounting for these transactions complied with GAAP, the August 31, 2015 *Wall Street Journal* article commented that the "significance of these nonmonetary revenues to [comScore's] top line warrants scrutiny." ¶10; *see also* ¶78.

In response to the *Wall Street Journal* article, comScore and its senior executives rushed to reassure the market. In a series of hastily arranged meetings, comScore's senior executives met privately with several analysts to assure them that comScore's recognition of nonmonetary revenue fully complied with all applicable accounting rules. ¶¶11, 79-81. These Defendants also took the extraordinary step of conducting a conference call in early September 2015 that was limited to a select group of hand-picked institutional investors and analysts. ¶¶11, 82.

Although comScore has never publicly disclosed a transcript of that call or otherwise made any public mention of it in SEC filings, Plaintiffs obtained an audio recording of the call in the course of their investigation. ¶12. This recording captures Matta and Wesley using material nonpublic information (in violation of comScore's obligations of fair disclosure under Regulation FD) to repeatedly assure participants on the call that all nonmonetary revenue was "100% GAAP revenue. . . . [T]he guidelines are very, very strict and ***we follow them to the t***." ¶¶12, 90; *see generally* ¶¶82-92.

comScore and its senior executives' full-court press to reassure the market was successful. After an initial drop, comScore's stock price stabilized (¶¶13, 92), enabling these Defendants to announce in late September 2015 that the Company was going to conduct an enormous all-stock transaction to purchase Rentrak Corporation, another media-measurement company that focused on television and home video (¶¶13, 93). The Rentrak transaction was valued at $827 million and was funded solely through a stock swap that gave Rentrak shareholders 1.15 shares of comScore stock for every share of Rentrak stock they held. ¶¶13, 95.

In November 2015, while the market congratulated comScore on yet another quarter of purportedly "record" revenues, the SEC issued a comment letter to comScore (which comScore did not disclose at the time) asking for additional information regarding the Company's accounting for nonmonetary transactions. ¶¶14, 104. In a response filed with the SEC in December 2015 and posted to the SEC's website, comScore assured the SEC that "all of [comScore's] nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized" and that recording revenue for these transactions was "consistent with [comScore's] accounting policies." *Id.*

### B. Defendants' Fraud Is Gradually Revealed

Unfortunately for investors, comScore and its senior executives' repeated assurances regarding comScore's accounting for nonmonetary revenue were false. On February 29, 2016, the Company announced that its Audit Committee had "received a message regarding certain potential accounting matters," forcing comScore to hire outside counsel and launch an internal investigation. ¶¶15, 109. Although comScore initially stated that the investigation would be completed quickly, in early March 2016 the Company announced that its problems were so severe that it had "proactively contacted the staff of the Securities and Exchange Commission regarding the Audit

12

Committee's internal review," and would be unable to timely file its annual report for 2015 even within the permitted extension period. ¶¶15, 112.

The *Wall Street Journal* suggested that comScore's "aggressive accounting practices may have caught up with it," and the market reacted with alarm. ¶16; *see also* ¶113. There followed an enormous sell-off of comScore common stock, which declined to $27.04 after falling approximately $13.67 per share, a drop of more than 33%. ¶113.

Over the next seven months, the investigation dragged on while comScore repeatedly delayed filing its 2015 annual report and missed deadlines for filing its quarterly reports for the first and second quarters of 2016. ¶¶17, 115, 118. In September 2016, the Company finally announced the partial results of its long-running internal investigation. In a Form 8-K filed on September 15, 2016, comScore stated that its Audit Committee had concluded that the Company would have to restate its financial results from 2013 through the first three quarters of 2015, as well as its preliminary financial results for the full year 2015. ¶¶17, 122. Just as troubling, the Company noted that the investigation was continuing, "there may be additional accounting adjustments" forthcoming, and those "adjustments may be material." ¶17.

A restatement is an extraordinarily negative event for a public company. Under GAAP, "restatement" is a term of art used only where a company's previously issued financial statements were materially false as of the time of issuance and the misstatements were based on "facts that existed at the time the financial statements were prepared." ¶¶18, 149. In this case, comScore has announced that it will be issuing a broad restatement because "the Company *cannot support the prior accounting for the nonmonetary transactions recorded by the Company during the years ended December 31, 2013, 2014, and 2015*." ¶18. The Company's Audit Committee has determined that comScore's "revenue and expenses associated with all nonmonetary transactions

during the periods identified above should be reversed and accounted for at historical cost rather than at fair value." ¶¶18, 123, 148. Further, because "there is no historical cost basis associated with the assets that the Company exchanged," comScore has admitted that no revenue should have been recognized for those transactions. *Id.*

In other words, comScore has admitted that ***every single penny*** of more than $43 million in nonmonetary revenue it recorded during the Class Period was included in its financial statements in violation of GAAP. The impact of this on the Company's reported financial statements and supposed revenue growth is enormous. For example, in the second quarter of 2015 alone, comScore improperly recorded $10.8 million of nonmonetary revenue—constituting ***85.7%*** of the Company's reported revenue growth for that quarter. ¶¶19, 73. The impact on comScore's third quarter 2015 results was similar, as the Company improperly recorded $9.1 million of nonmonetary revenue, or ***88.3%*** of its reported revenue growth for that quarter. *Id.*

Moreover, and suspiciously, much of comScore's improper nonmonetary revenue came from a single counterparty called Acxiom Corporation. ¶¶20, 162. During the Class Period, comScore engaged in multiple nonmonetary transactions with Acxiom, repeatedly using that company as a piggy bank to generate phony revenue. ¶¶20, 163. Astonishingly, of the $43.2 million in nonmonetary revenue that the Company has so far admitted was improper, $19.1 million—nearly half—came from transactions with Acxiom alone. *Id.* Indeed, comScore's transactions with Acxiom provided ***two-thirds*** of comScore's nonmonetary revenue in 2014. *Id.*

comScore and its senior executives used Acxiom to help perpetrate the fraud for a simple reason: it is a related party. Section 14(a) Defendant William J. Henderson is not only the chair of comScore's Compensation Committee but also a director of Acxiom. ¶¶21, 162. And Henderson is no token Board member. As the former Chief Operating Officer of Netflix, Inc., Henderson was

intimately familiar with the world of data aggregation and sales. ¶21. Yet Henderson not only said nothing while these sham transactions occurred but also approved Matta and Wesley's outsized pay packages. ¶¶21, 64. Moreover, although comScore disclosed that it engaged in nonmonetary transactions with a related party, it never identified the related party as Acxiom in its periodic reports, press releases, or conference calls during the Class Period. ¶21.

Yet despite the enormity of its revelations up to September 15, 2016, comScore had still more misconduct to disclose. On November 23, 2016—in what the *Wall Street Journal* described as giving "its investors a pre-Thanksgiving turkey . . . [i]n a filing buried after the market closed ahead of the holiday"—comScore summarized the disturbing findings of its finally concluded Audit Committee investigation and indisputably confirmed that comScore's accounting for its nonmonetary transactions did not result from an error in judgment, but instead from conscious misbehavior, including "instances where additional arrangements were entered into and not properly disclosed to the Company's accounting group and instances where there did not appear to be a clear need for all of the data that was being exchanged." ¶¶22, 130-31. The Company further admitted that its improper accounting was the result not only of "errors" but also of "misconduct": "The Audit Committee's investigation concluded that, as a result of certain instances of misconduct and errors in accounting determinations, adjustments to the Company's accounting for certain nonmonetary and monetary transactions were required." Browne Decl. Ex. 1, at p.3.

The Company also disclosed another shocking revelation: that comScore would also be adjusting *monetary* transactions. ¶¶23, 132. As the *Wall Street Journal* noted, this revelation "may be ***even worse for investors*** because . . . monetary revenue flowed to the bottom line. ***Restating it should cut into reported profits***." ¶23.

15

Finally, comScore's "pre-Thanksgiving turkey" also exposed the enormous scale of comScore and its senior executives' fraudulent conduct by revealing that the Audit Committee had uncovered "internal control deficiencies," including "concerns about tone at the top" and "the failure to provide information to the Company's accounting group and its external auditors." ¶¶24, 133. Further distressing beleaguered investors, the Company also disclosed the Audit Committee's concern about "the sufficiency of public disclosures made by the Company . . . ." ¶¶24, 134. Not coincidentally, the Company also disclosed alongside these "internal control deficiencies" that two Directors—its Chair and the head of its Governance Committee—had resigned. ¶24.

On November 25, 2016, the first trading day after comScore's latest admission of its improprieties, the market reacted harshly to comScore's newest admissions, which still left investors in the dark as to the final impact of the hit to the Company's revenue or profits, or even when the Company would file its restatement for the period from 2013 to 2015 or its long-overdue 2015 and first- to third-quarter 2016 financial statements. ¶25. comScore's share price, which had just started to recover from news of the Company's restatement, fell over 5% from $30.50 to $28.94. ¶¶25, 505.

comScore and its senior executives' misconduct has destroyed hundreds of millions of dollars' worth of comScore's market capitalization. As of today, many of comScore's senior executives have resigned (¶¶26, 117, 119); the Company has spent millions of dollars in an almost year-long internal investigation, whose impact is still not final (¶¶26, 136);[2] even with the

---

[2]   comScore spent $39 million on the internal investigation, restatement, re-audit, and related litigation in 2016 alone. *See* comScore Form 8-K, Feb. 24, 2017, Ex. 99.1 at 7, *available at* www.sec.gov/Archives/edgar/data/1158172/000119312517054995/d352226dex991.htm.

investigation now completed, the Company has cautioned that there may still be additional accounting adjustments coming, which may yet result in the revelation of additional improprieties (¶¶26, 135); and comScore faces multiple lawsuits. The market has recognized that the comScore debacle resulted from false statements by the Company. For example, Jefferies LLC wrote in an analyst report on November 25, 2016 that "[comScore] will face challenges in . . . re-building trust/credibility, which we expect will likely take several quarters." ¶26.

### C.   Defendants' Materially False and Misleading Statements About comScore's Revenue, EBITDA, GAAP Compliance, and Internal Controls

#### 1.   Statements of Historical and Present Fact

As discussed above, investors and analysts focused on comScore's steady and predictable growth in revenue and EBITDA when valuing the Company during the Class Period. The Company itself emphasized the importance of its reported revenues and EBITDA in multiple SEC filings during the Class Period, describing them as "key measures used by our management and board of directors to understand and evaluate our core operating performance and trends," and "key financial measures by which our stockholders evaluate our progress." ¶¶41-42. Analysts likewise focused on these metrics in their published reports during the Class Period. ¶¶44-46.

Indeed, in each of comScore's press releases announcing its financial results during the Class Period, the very first items mentioned were the Company's revenue and EBITDA, followed by a prominent statement emphasizing that the revenue for that period was a new "record." ¶¶43, 201-02, 234, 262, 294, 326-27, 360, 391-92, 446-47, 479-80. For example, the Company's fourth-quarter 2014 earnings release quoted Defendant Matta: "We had a great year. comScore's strong performance continued through the fourth quarter, and *our record revenue and adjusted EBITDA achievements for fiscal year 2014 speak for themselves*." ¶327. Defendants Abraham, Tarpey, Matta, and Wesley also spoke about the Company's reported revenue and revenue growth on each

investor conference call held during the Class Period, as well as in meetings with analysts. ¶¶209-11, 242-44, 271-73, 302-04, 323, 334-36, 354-55, 368-70, 399-401, 423, 426, 443, 454-56, 487-88. For example, Matta said on the Company's first-quarter 2014 conference call that "we continue to build on the tremendous momentum comScore created in the marketplace last year with *another quarter of record revenues and strong profitability to kick off 2014*." ¶243. These SEC filings, conference calls, and presentations to analysts also discussed other revenue-related metrics, including revenue growth rates and income from operations. E.g., ¶¶203, 210-11.

All of these statements were materially false and misleading because, as the Company has admitted in its September 15, 2016 Form 8-K, they overstated comScore's revenue (and all metrics derived from revenue) through the improper recognition of nonmonetary revenue in each reporting period in violation of GAAP. E.g., ¶¶122-26, 204. The statements with respect to fiscal year 2013 (¶¶201-02, 210-11) also overstated comScore's revenue (and all metrics derived from revenue) because, as comScore has admitted in its November 23, 2016 Form 8-K, they overstated monetary revenue in that fiscal year by an as-yet undisclosed amount. E.g., ¶¶132, 205.

comScore's Form 10-Ks and 10-Qs filed during the Class Period included both the false historical financial statements discussed above and additional false statements and certifications by the Officer Defendants that comScore had adequate internal controls and that its financial statements were accurate. E.g., ¶¶217-27, 250-58. These statements were materially false and misleading because the financial statements violated GAAP and comScore had serious internal-control deficiencies, including "misconduct" and "tone at the top." ¶¶122-26, 130-33; comScore Form 8-K, Nov. 23, 2016 (Brown Decl. Ex. 1, at p.3 of 5).

The § 10(b) Defendants also made false statements specifically about comScore's nonmonetary data-swapping transactions and its accounting for revenue from those transactions.

For example, SunTrust reported on August 28, 2015 that comScore said that "[t]hey could just as easily have sold their services to these providers for cash (normal transaction) and entered rev share agreements or paid upfront cash (amortized) for the data feeds." ¶430. Defendant Wesley said on the September 3, 2015 private conference call for institutional investors that "the revenue that we are taking on here is based on revenues that we have sold before of similar transaction for cash." ¶153. Similarly, the Company wrote in its December 3, 2015 response to the SEC's comment letter that "in these types of nonmonetary transactions, the Company provides subscription products and solutions that it typically sells on a cash basis to data source providers in exchange for additional consumer demographics and segmentation data that improves the accuracy and granularity of the Company's products and services . . . ." ¶477.

These statements about the data comScore delivered in the barter transactions were false because, as the Company admitted in its September 15, 2016 Form 8-K, the transactions could not properly be accounted for at "fair value," and "[t]here [wa]s no historical cost basis associated with the assets that the Company exchanged." ¶123. This admission means that—contrary to Defendants' repeated statements to investors and the SEC that the nonmonetary revenue was based on comparable cash sales—there were no comparable cash sales. ¶154.

With respect to the data that comScore acquired in the barter deals, Wesley said on a November 5, 2015 conference call that the Company's nonmonetary revenue in 2014 was "driven by the release of new products in the last year that required acquisition of scarce data sets." ¶462; *see also* ¶494 (statement by Wesley on February 17, 2016 conference call that nonmonetary revenue in 2015 was "driven by the release of new products that required scarce data sets"). These statements were false because, far from acquiring "scarce data sets" that were "required" for developing comScore's own products, the Company admitted in its November 23, 2016 Form 8-

19

K that the data-swapping transactions included "instances where there did not appear to be a clear need for all the data that was being exchanged." ¶161.

All of the statements summarized above about comScore's historical financial results, internal controls, and barter transactions were admittedly, indisputably false when made.

### 2.   Statements of Projected Results

In addition to the admittedly false statements of historical and present fact discussed above, comScore's earnings press releases, its earnings conference calls, and Defendants Tarpey, Matta, and Wesley's presentations to analysts all also included statements about comScore's projections of its revenue, income or loss, and adjusted EBITDA. ¶¶206, 214, 231, 239, 247, 268, 276, 291, 299, 307-08, 323, 331, 339, 365, 373, 388, 396, 404, 420, 423, 451, 459, 462, 484, 491. For example, Defendant Tarpey said on the Company's second-quarter 2014 conference call that "[w]e're now raising our full year 2014 revenue outlook due to the continued momentum of the business. For 2014, we now anticipate revenues in the range of $320.5 million to $329.5 million." ¶276. These projections were materially false and misleading because they relied on recognition of nonmonetary revenue, when the § 10(b) Defendants had actual knowledge that (a) they lacked any reasonable basis for the projected nonmonetary revenue, and (b) recognizing the revenue would violate GAAP. *E.g.*, ¶277.

### D.   Defendants' Knowing or Reckless Misconduct

### 1.   The Company's Admissions of "Misconduct"

The false statements discussed above were the result of knowing or reckless misconduct. comScore has admitted that its false financial statements were the result not only of "errors in accounting determinations" but also of "misconduct." comScore Form 8-K, Nov. 23, 2016 (Browne Decl. Ex. 1) at p.3. The dictionary definition of "misconduct" is "[b]ehavior not conforming to prevailing standards or laws; impropriety"; "[d]ishonest or bad management"; and

"[d]eliberate wrongdoing." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1125 (5th ed. 2011).

The Company has also admitted that the nonmonetary barter transactions included "instances where additional arrangements were entered into and not properly disclosed to the Company's accounting group and instances where there did not appear to be a clear need for all of the data that was being exchanged." ¶131. With respect to improperly recognized monetary revenue, the Company has admitted that there were instances of "over-delivery of data that recurred in multiple periods," "potential undisclosed additional arrangements that required contemporaneous contracts to be accounted for as a single arrangement," and "partially delayed invoicing for delivered data inconsistent with the terms of the contract." ¶132.

Finally, with respect to "internal control deficiencies," the Company has admitted that there were "concerns about tone at the top," "information not having been provided to the Company's accounting group and its external auditors," and "the sufficiency of public disclosures made by the Company about certain performance metrics." ¶133. "Tone at the top" is an accounting concept defined by Deloitte & Touche as "set[ting] an organization's guiding values and ethical climate," an element "missing in *high profile corporate scandals*." ¶189. Thus, the Company's disclosure essentially acknowledges that the § 10(b) Defendants had created an environment to facilitate their accounting fraud. ¶193.

### 2.    The Suspicious Resignations of Abraham, Matta, and Wesley

The Company has also admitted that its steps "addressing these concerns" included "separating certain Company personnel . . . ." ¶133. As discussed above, Defendant Abraham stepped down as comScore's Executive Chairman in July 2016 in the midst of the internal investigation and—contrary to the Company's statement at that time that he would remain on the Board through the expiration of his term in 2018—left the Board in December 2016 shortly after

the investigation was completed. ¶117. In August 2016, during the investigation, Defendants Matta and Wesley stepped down as CEO and CFO, respectively, and became advisors to their successors. ¶119. Both Matta and Wesley resigned from their jobs at the Company in October 2016, and Matta resigned from the Board in December 2016. *Id.* Thus, the Company's three most senior executives lost their positions during the investigation.

### 3. The Officer Defendants' Frequent Comments About comScore's Revenue and Aggressive Defense of Its Accounting

As discussed above, Defendants Abraham, Matta, Wesley, and Tarpey all made frequent statements about the Company's revenue and revenue-related metrics in quarterly press releases, conference calls, and presentations to analysts and investors. *E.g.*, ¶¶202, 210-11, 235, 243-44, 303-04. These Defendants all also signed certifications attesting to the accuracy of the Company's financial statements and the adequacy of its internal controls. *E.g.*, ¶¶195, 226-27, 319. And when questions were publicly raised about comScore's nonmonetary revenue at the end of August 2015, Matta and Wesley aggressively defended the Company's accounting for the revenue in detailed statements about the purported legitimacy of the purported barter transactions. ¶¶80-90. Wesley also signed the Company's false response to the SEC comment letter about the nonmonetary revenue, and a "cc" copy was sent to Matta. ¶¶104-05. Thus, the Officer Defendants held themselves out as knowledgeable about these matters.

### 4. The Officer Defendants' Personal Profiting from comScore's Artificially Inflated Stock Price

Before comScore's fraudulent scheme fell apart, Defendants Abraham, Matta, Wesley, and Tarpey all profited richly from the Company's artificially inflated stock price. All four of them engaged in massive insider selling during the Class Period:

|  | Percent of Shares Sold | Dollar Value of Shares Sold |
|---|---|---|
| Abraham | 92% (direct) | $31.5 million[3] |
|  | 57% (indirect) |  |
| Matta | 68% | $18.1 million |
| Tarpey | 22% | $1.8 million |
| Wesley | 83% | $7.6 million |
| **TOTAL:** |  | **$59 Million** |

¶176. Matta sold $6.7 million worth of stock between March and August 2015, when the stock price was being driven to record heights by the Company's recognition of nonmonetary revenue. ¶177. He also sold $1.1 million of stock on February 18, 2016, one day after another false announcement of "record" revenues, and one day before (as Defendants later disclosed) the Audit Committee received the information about accounting irregularities that triggered the internal investigation. *Id.* Similarly, Wesley sold nearly $5.1 million of stock during the second quarter of 2015, as the price was being driven to record heights by comScore's recognition of nonmonetary revenue. *Id.* And all four of these Defendants made the vast bulk of their sales either not pursuant to any Rule 10b5-1 trading plan or pursuant to trading plans that were entered into at times when the Company has admitted that its financial results were artificially inflated by the improperly recognized nonmonetary revenue. ¶¶178-82.

In addition to their insider selling, Matta and Wesley profited from the artificial inflation of the Company's stock price through the vesting of more than $9 million worth of stock options

---

[3] This number includes both $27.9 million worth of comScore stock directly held by Abraham, and $3.5 million of comScore stock Abraham held indirectly on behalf of related parties, including his wife and children.

and restricted stock units ("RSUs") granted in November 2014 that vested only because the stock price met targets ranging from $48 to $60 between March and August 2015. ¶¶64, 67. Each of these targets was met only as a result of earnings reports that reported strong revenue growth that included large amounts of improperly recognized nonmonetary revenue. ¶¶65-66. In particular, the improper nonmonetary revenue represented 38.6% of comScore's reported revenue growth in 2014, 36.5% in the first quarter of 2015, and an astonishing 85.7% in the second quarter of 2015. ¶73. These earnings reports caused the stock-price pops that allowed Matta and Wesley's options and RSUs to vest:



¶66.

Moreover, during the Class Period, comScore used $144 million in shareholder money to buy back over 3.2 million shares of its stock, which dwarfed its historical buybacks, such as $38.4 million in 2014. ¶¶68-69. The average price paid for the shares repurchased by comScore in the second and third quarters of 2015 was just below the price thresholds for triggering the final two

tiers of Defendants Matta and Wesley's RSU packages and helped push the share price into the range where these Defendants would receive that extra compensation. ¶¶70, 183-87.

### 5. The Rentrak Acquisition

As discussed above, comScore began to negotiate to acquire Rentrak in 2013 and reached an agreement to acquire Rentrak in an $827 million all-stock transaction in late 2015. ¶¶13, 93-97, 188. Thus, the acquisition was made possible by comScore's artificially inflated stock price.

### 6. comScore's Extraordinary Delay in Finalizing Its Still Unissued Restatement

To this day, comScore has still not filed its restated financial statements for the period from 2013 through the first three quarters of 2015 or its late financial statements for the full year 2015 and for 2016—four months after announcing on September 15, 2016 that it would have to restate its previously issued financials since 2013, and ten months after announcing on February 29, 2016 that its 2015 annual financial statements would be late. ¶197. Most restatements are completed in much less time, and restatements that take unusually long to complete—like comScore's—are frequently caused by fraud. *Id.* Huron Consulting Group studied approximately 1,900 restatements announced from August 2004 through December 2006 and found that "[t]he average time between the filing of the initial Form 8-K and the filing of the restated financial statements was seven weeks, while the median was three weeks." *Id.*

Similarly, a study by Brad A. Badertscher and Jeffrey J. Burks, who are professors at the University of Notre Dame, analyzed "a comprehensive sample of error-related restatements announced between 1997 and 2005" and concluded that restatements that take months to complete "are uncommon and concentrated in restatements ***involving suspected or confirmed fraud*** (i.e., intentional manipulations)." ¶198. As Badertscher and Burks explain, "[f]raud perpetrators often go to great lengths to conceal their actions," so it takes longer for a company where fraud occurred

to investigate what happened and for its auditors to agree to render an opinion on the company's reports than in non-fraudulent restatements. ¶199.

comScore's failure to file its restatement for 2013 through the first three quarters of 2015, its 2015 annual report, and its 2016 quarterly and annual reports led to its being suspended from trading on NASDAQ on February 8, 2017. *See* comScore Form 8-K, Mar. 14, 2017 (Browne Decl. Ex. 3) at 3. The Company's most recent public statement about the status of its efforts to restate its previously issued false financial statements and to issue the late statements that were never filed indicates that "the Company is targeting the Summer of 2017 to complete the financial restatement and to be current with all of its SEC filings, although there can be no assurance that the process will be completed by that time." *Id.* Thus, the full impact of Defendants' fraud remains uncertain.

### E.    The comScore and Rentrak Merger

As mentioned above, comScore and Rentrak announced in late September 2015 that the two companies had entered into an Agreement and Plan of Merger and Reorganization (the "Merger Agreement"). ¶559. The Merger Agreement was the culmination of discussions regarding a potential merger between comScore and Rentrak that began in late 2013. ¶550.

On October 30, 2015, comScore filed with the SEC a preliminary version of the registration statement on Form S-4 that comScore intended to use in issuing new common stock in conjunction with the comScore and Rentrak merger (the "Merger"). ¶613. comScore subsequently filed an amendment to the registration statement on Form S-4/A on December 7, 2015 (the "Registration Statement"), and the SEC declared the Registration Statement effective on December 23, 2015. ¶613. The Registration Statement contained a preliminary prospectus, a preliminary joint proxy statement/prospectus, and other documents concerning the proposed Merger. *Id.* The Registration Statement was signed by Defendants Russell Fradin, Gian M. Fulgoni, William J. Henderson, William Katz, Ronald J. Korn, Joan Lewis, Abraham, Matta, and Wesley. ¶¶531-38, 613. The

26

Registration Statement also incorporated by reference the following documents, among others: (i) comScore's 2014 Form 10-K; (ii) comScore's amendment no. 1 to its 2014 Form 10-K filed with the SEC on April 24, 2015; (iii) comScore's quarterly reports on Form 10-Q for the first, second, and third quarters of 2015; and (iv) comScore's current reports on Form 8-K filed with the SEC on May 5, 2015, August 7, 2015, September 29, 2015, and November 6, 2015. ¶¶586, 613.

On December 23, 2015, Rentrak and comScore filed a Rule 424(b)(3) Joint Proxy Statement/Prospectus (the "Joint Proxy") with the SEC. ¶563. The Joint Proxy included a cover letter signed by Matta notifying comScore shareholders of their right to vote on the proposed Rentrak and comScore merger at a special meeting to be held on January 28, 2016. ¶577. In addition, the Joint Proxy included a recommendation from comScore's Board that comScore shareholders vote to approve the issuance of shares of comScore common stock in the Merger. *Id.*

The Joint Proxy also provided a summary of comScore's selected historical consolidated financial data, including comScore's reported revenues and income from operations for 2014 and 2013 and the six months ended June 30, 2015 and June 20, 2014, as well as pro forma condensed financial information for the combined companies. ¶¶581-82. Finally, the Joint Proxy incorporated by reference the following documents, among others: (i) comScore's 2014 Form 10-K; (ii) comScore's amendment no. 1 to its 2014 Form 10-K filed with the SEC on April 24, 2015; (iii) comScore's quarterly reports on Form 10-Q for the first, second, and third quarters of 2015; and (iv) comScore's current reports on Form 8-K filed with the SEC on May 5, 2015, August 7, 2015, September 29, 2015, and November 6, 2015. ¶¶586-604.

comScore's and Rentrak's shareholders approved the merger on January 28, 2016. ¶564. The next day, Rentrak became a wholly owned subsidiary of comScore, and Rentrak's

27

shareholders received 1.15 shares of comScore stock in exchange for each of their Rentrak shares. *Id.*

III.   **ARGUMENT**

   A.   **THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER EXCHANGE ACT §§ 10(b) and 20(a)**

      1.   **The Complaint Alleges Actionable Misstatements and Omissions.**

"The federal securities laws impose an obligation on speakers to be both accurate and complete." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Under Rule 9(b) and the PSLRA, Plaintiffs need only specify the alleged fraudulent statements, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent" by pleading facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003). The Complaint easily satisfies that standard.

      a.   **comScore Has Admitted to Dozens of Misstatements and Omissions by the §10(b) Defendants.**

As described above, the Complaint exhaustively lays out nearly three hundred paragraphs describing the §10(b) Defendants' misstatements and omissions about comScore's historical revenue and revenue-related metrics, GAAP compliance, internal controls, and financial projections. *See* ¶¶200-495. In particular, the Complaint alleges with particularity that the §10(b) Defendants' represented that comScore's financial statements were GAAP compliant and accurate and their quarterly mantra that the Company delivered "another quarter of record revenues . . . demonstrat[ing] the fundamental strength and continued momentum of our business," they were "proud of the strong growth we drove in revenue and adjusted EBITDA," and "revenue and

EBITDA [were] ahead of expectations." ¶¶52, 53, 235; *see* ¶¶201-03, 210-11, 217-24, 234-36, 243-44, 250-56, 262-65, 272-73, 279-85, 291, 294-96, 303-04, 311-17, 326-28, 335-36, 342-48, 369-70, 376-82, 391-93, 400-01, 407-414, 423, 426, 430, 434-35, 438-41, 443, 446-48, 454-56, 464-469, 476-77, 479-81, 487-88. The Company has now admitted—and thus the §10(b) Defendants *cannot* dispute—that these statements were materially false and misleading. In connection with its pending restatement, the Company has stated that it will erase over *$43 million* in nonmonetary revenue throughout the Class Period—every single penny of nonmonetary revenue it reported to investors during the Class Period. Thus, far from exceeding expectations as Defendants reported during the Class Period, the Company's "key financial measures" actually suffered sagging or even *negative* growth. *See* ¶¶171-72. Moreover, the Company has also admitted serious internal controls deficiencies throughout the Class Period, including "concerns about tone at the top; errors in judgment identified with respect to issues reviewed; information not having been provided to the Company's accounting group and its external auditors; and the sufficiency of public disclosures made by the Company about certain performance metrics." ¶133. This confirms the falsity of the §10(b) Defendants' multiple certifications that comScore maintained adequate internal controls. *See* ¶¶224-27, 256-58, 285-87, 317-19, 348-50, 382-84, 414-16, 469-71.

In short, there is no reasonable dispute that, the Complaint pleads the falsity of the §10(b) Defendants' statements. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made[.]"); *In re Nortel Network Sec. Litig.*, 238 F. Supp. 2d 613, 627-28 (S.D.N.Y. 2003) (revenue projections actionable where defendants had no reasonable basis to believe the company's continued growth based on known facts). The

majority of Defendants' arguments against falsity do not contest the core of the misstatements and omissions at issue—the §10(b) Defendants' misrepresentations of the Company's revenue—but instead concern only narrow subcategories of the alleged statements. *See*, *e.g.*, comScore Br. at 12 (limiting arguments on falsity to only "a number of statements").

> **b.** **The "Safe Harbor" Provides No Shelter, and the §10(b) Defendants' False Statements Regarding comScore's "Key Financial Measures" Is Not "Corporate Optimism"**

Certain Defendants attempt to invoke the PSLRA "safe harbor" to escape liability for the subset of their allegedly false statements contained in the "financial outlook" section of comScore's SEC filings, and which Defendants refer to as projections. *See* comScore Br. at 12-15; Tarpey Br. at 19-20. These Defendants argue that "18 pages of risk factors" scattered in comScore's SEC filings adequately warned investors that comScore's revenue numbers were false. comScore Br. at 14. This is absurd. The risk factors Defendants cite are conditional and imprecise. They consist of statements such as (i) "interpretations of accounting rules and regulations *could* result in unfavorable accounting charges," and "changes to, or interpretations of, accounting methods or policies in the future *may* require us to . . . restate . . . our financial statements," or that comScore's "stock price *may* be adversely affected *if* our internal control over financial reporting is found" to be inadequate. comScore Br. at 14.

These types of non-specific boilerplate warnings are meaningless and Courts routinely reject arguments that they somehow insulate Defendants from liability for fraud. *See In re Salix Pharma., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("To be eligible for the safe harbor, 'the relevant cautionary language must be prominent and specific, and must directly address exactly the risk that plaintiffs claim was not disclosed.'" (quoting *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013))); *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006) ("To be meaningful,

cautionary language must precisely address the substance of the specific statement or omission that is challenged." (internal quotations omitted)).

Moreover, none of these "risk factors" actually warned investors of the then-existing facts that comScore's revenue was overstated, its internal controls were deficient, and the Company was not complying with GAAP. It is well established that "cautionary language cannot be 'meaningful' if it is misleading in light of historical fact[s] that were established at the time the statement was made." *In re Harman Int'l, Indus. Inc. Sec. Litig.,* 791 F.3d 90, 102 (D.C. Cir. 2015); *In re FirstEnergy Corp. Sec. Litig.,* 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004) (no safe harbor protection where "general" language gave no "meaningful caution" and failed to disclose "the 'actual risks' known by the Company."). The Second Circuit has held that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Or, as one court famously stated:

> Bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

In any event, the §10(b) Defendants' argument fails to recognize that that (i) their projections were built on present revenue amounts that themselves, in increasing part, relied on the recognition of nonmonetary revenue in violation of GAAP, and (ii) the §10(b) Defendants knowingly manipulated related party transactions and accounting for nonmonetary revenue in order to attain those projections.

Relying on *Ross v. Lloyds Banking Group*, 546 Fed. App'x. 5 (2d Cir. 2013), the comScore Defendants argue that the Complaint insufficiently alleges "*who* specifically had actual knowledge" of their false statements. comScore Br. at 15 (emphasis in original). The comScore

Defendants are wrong. In *Ross*, the plaintiff acknowledged that his allegations were "technically deficient" because his complaint failed to identify clearly the speaker of the purportedly misleading statement. 546 Fed. App'x at 9 n.1. In contrast the Complaint's allegations here carefully identify the particular speaker(s) of each of the allegedly forward-looking statements (*see, e.g.*, ¶215 (referring to "Defendant Tarpey's statements")), and the Complaint is replete with allegations demonstrating that *each* of the §10(b) Defendants had knowledge of the nonmonetary-revenue scheme. *See, e.g.*, ¶¶148-61, 175-99.

Finally, the argument advanced by certain of the §10(b) Defendants that the Complaint relies on "vague expressions" of puffery and corporate optimism (*see* comScore Br. at 15-16) is contradicted by the Complaint. Far from being vague, Defendant' statements explicitly called investors' attention to the Company's revenue and revenue growth, as well as §10(b) Defendants' *knowing* that bogus nonmonetary-transaction accounting drove that revenue. The comScore Defendants' reference to *Harborview Master Fund, LP v. Lightpath Technologies, Inc.* 601 F. Supp. 2d 537 (S.D.N.Y. 2009) makes plain this difference. There, the court rejected claims concerning general statements that the company "was performing well, and that sales and profitability were on the rise" despite alleged knowledge of "financial and operational difficulties." *Id.* at 549. In contrast, the Complaint here asserts claims concerning the *specific* statements by the §10(b) Defendants that, *e.g.*, "comScore delivered . . . strong revenues," despite their knowledge that those revenues were overstated through improper revenue recognition. *See, e.g.*, ¶¶361, 363-64.

### c.   Wesley's Disagreement with comScore's Decision to Restate Provides No Basis to Dismiss the Complaint

During the Class Period, Defendant Wesley reassured investors that "the value [of comScore's nonmonetary revenue] is based on our historic sales. The value that we record in

revenue is consistent with our historic sales for the same products." ¶90. Wesley further insisted

that "*these are legitimate transactions* with customers of the company that do cash transactions

that would have been cash transactions had the company not decide[d] they wanted to do a

nonmonetary transaction." ¶88. Thus, Wesley presented comScore's revenue—including its

nonmonetary revenue—as a matter of observable fact, not opinion. Wesley's statements were

consistent with courts who commonly hold that the false recognition of revenue is an actionable

factual misrepresentation. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 179–80

(S.D.N.Y. 2003) (company "violated U.S. GAAP because it 'recognized and reported the entire

dollar amount of long-term, fixed priced contracts as revenue upon the signing of the contract,'

resulting 'in improperly recognized anticipated revenue from multi-year public service contracts'

and yielding materially overstated operating results during the class period"); *Clark v. TRO*

*Learning, Inc.*, 1998 WL 292382, at *2 (N.D. Ill. May 20, 1998) ("company's overstatement of

revenues in violation of GAAP can constitute a false or misleading statement of material fact

necessary to establish securities fraud under Section 10(b)").

Nonetheless, Wesley attempts to invoke the Supreme Court's decision in *Omnicare, Inc.*

*v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015), by

misleadingly characterizing "Plaintiffs' claim [as] boil[ing] down to a disagreement with the

historical *opinions* of comScore, its officers, and its external auditor that nonmonetary transactions

should have been valued by fair value and not historical cost basis under ASC 845." Wesley Br.

at 11; *see also id.* at 14 ("Plaintiffs merely disagree that fair value should have been used under

ASC 845"). Wesley is wrong.

In reality, the disagreement Wesley alludes to is not between him and Plaintiffs, but rather

between him and comScore. After a nearly year-long investigation, costing (so far) $39 million,

comScore has admitted that (1) the revenue statements that Wesley made to the investing public were wrong *at the time he made them*; and (2) the Company suffered from internal controls deficiencies under Wesley's stewardship as CFO, including a failure of "tone at the top." *Compare* ¶¶122-36 *with*, *e.g.*, Wesley Br. at 13 ("[T]o be clear, Mr. Wesley still has no reason to believe his opinion was wrong[.]"), 15 (The Complaint "highlights Mr. Wesley's statements about why the nonmonetary transactions *did* meet the requirement of ASC 845 . . . but cannot allege why it disagrees with those explanations except to assert that they must have been wrong if the Company intends to restate its financial statements sometime in the next year.") (emphasis in original, citations omitted).

Wesley attempts to mischaracterize the dozens of factual representations he made to investors about the Company's revenue as "opinions" by bootstrapping them to his purported disagreement with the damning conclusions of the Audit Committee investigation. Notably, however, during calls with investors during the Class Period Wesley did not claim that his statements were "judgment calls" or "opinions." To the contrary, he explicitly said that comScore's reported nonmonetary revenue was "100% GAAP revenue . . . . ***[T]he guidelines are very, very strict and we follow them to the t.***" ¶¶12, 82-92. Indeed, while "[t]here are indeed numerous occasions for judgment calls in the application of GAAP[,] GAAP are intended to provide a reliable degree of predictability," and "[t]he fact that the application of GAAP tolerates a range of reasonable treatments does not . . . vindicate [a defendant] so easily." *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147–48 (D. Mass. 2001).

Wesley's own authorities reveal the flaw in his argument: in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011), the Second Circuit ruled that "subjective statements regarding value of goodwill and adequacy of loan loss reserves" are opinions, not "objective facts," after the

"[p]laintiff [did] not point to any objective standard such as market price that he claims [the defendant] should have but failed to use in determining the value . . . ." *Id.* at 110. In contrast, in this case, the Complaint alleges that Wesley himself claimed that the nonmonetary transactions "would have been cash transactions had the company not decide[d] they wanted to do a nonmonetary transaction" and that "[t]he value that we record in revenue is consistent with our historic sales for the same products." ¶¶88, 90.[4] Thus, far from being a subjective opinion, Wesley himself represented that comScore's nonmonetary revenue relied on an objective measurement—market price. *See Fait*, 655 F.3d at 110.[5]

---

[4]   *City of Omaha v. CBS Corp.*, 679 F.3d 64 (2d. Cir. 2012) (cited at Wesley Br. 11-12) supports Plaintiffs for the same reasons. *See id.* at 68. *Harris v. AmTrust Financial Services, Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015) (cited at Wesley Br. 11-12), is similarly inapposite. In that case, the court ruled that the plaintiffs were simply "carping about Defendants' application of GAAP." *Id.* at 171. In contrast, here comScore itself has stated that Wesley incorrectly applied GAAP and Plaintiffs have pleaded the nature of the GAAP violation—and its contradiction with Wesley's prior statements—in meticulous detail. Finally, Wesley conflates the elements of falsity and scienter in citing *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) (cited at Wesley Br. 12), where the court rejected "vague claims of GAAP violations . . . absent 'evidence of corresponding fraudulent intent.'" *Id.* at 302.

[5]   While Wesley observes that "comScore's SEC filings did not make any other factual claim about the nonmonetary transactions" beyond their amount, his statements quoted here also reveal

Ultimately, "the GAAP rules . . . violated in this case are not complex, as they reduce, in essence, to the simple principle that" recognizing revenue from a nonmonetary transaction requires that the transaction itself **be valid**. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-38 (E.D. Va. 2000) ("To be sure, the application of accounting principles often involves details and minutiae, but the accounting principle violated here boils down to the well-worn adage, 'Don't count your chickens before they hatch.'"). "Certainly, prematurely recognizing millions of dollars in revenue is not minor or technical in nature," and the Court should not indulge Wesley's attempt to disguise as an opinion his fraudulent assertions of comScore's revenue. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005); *see also In re GE Sec. Litig.*, 856 F. Supp. 2d 645, 658 n.2 (S.D.N.Y. 2012) ("[Plaintiff] claims not that GE estimated the value of its assets incorrectly, but that its valuation *must* be false because the company engaged in improper accounting practices. Thus, the truth or falsity of this statement is not a matter of opinion, it is an objective fact and plaintiffs need not plead subjective falsity." (emphasis in original)); *In re Global Crossing, Ltd. Sec. Litig.* 322 F. Supp. 2d 319, 341–42 (S.D.N.Y. 2004) (sustaining even claims based on exchange transactions that "conformed to specific GAAP rules" where "[t]he gravamen of plaintiffs' Complaint is that these exchanges were essentially unnecessary . . . transactions created with the specific intention of inflating the Companies' revenues and . . . were structured with the specific goal of increasing quarterly revenue and meeting 'the street's expectations'")

In any event, even if the Court finds that Wesley's statements about the Company's revenues were "opinions," the Complaint more than sufficiently alleges that Wesley did not hold

---

that the rest of his sentence—"and there were no untrue supporting facts alleged in the Complaint"—is incorrect. Wesley Br. at 14.

the belief he professed, supplied untrue supporting facts, and omitted information whose omission made the opinions misleading. In *Omnicare*, the Supreme Court held that liability with respect to a statement of opinion may be pleaded either by alleging that the speaker did not subjectively believe the statement, or by alleging that the speaker lacked a reasonable basis for the opinion expressed, even if he or she *did* subjectively hold it. *See* 135 S. Ct. at 1328-29. *Omnicare* holds that falsity of a statement of opinion may be alleged by pleading that the statement "omits material facts about the issuer's inquiry into or knowledge concerning [the] statement" and that the omitted facts show issuer "lacked the basis for making those statements that a reasonable investor would expect," even if the opinion was sincerely held. *Id.* Here, the Complaint alleges (and comScore has *admitted*) that comScore recorded revenue for swaps of useless data and falsely claimed to base the value of the revenue on past sales of the same kinds of data when no such sales had occurred. ¶131. Therefore, even if the revenue statements were opinions, they lacked any reasonable basis and are actionable.

### d. The Complaint Adequately Alleges that Tarpey Made Material Misstatements and Omissions

Tarpey tries to take refuge in the fact that the November 2016 8-K did not specifically identify the vast internal-controls failures as occurring in years when he worked at the Company. Tarpey Br. at 20. This fails because the Company uncovered the internal-controls failures as part of its investigation into periods during which Tarpey was CFO, and the Company has announced that it will restate those periods. The Company has thus admitted that the accounting did not comply with GAAP *at the time it was made, i.e.*, when Tarpey oversaw it. ¶¶149-51. This link

between the restatement and the uncovering and disclosure of the internal-controls failures more than satisfies the standards for defeating a motion to dismiss.

Tarpey also incorrectly argues that Plaintiffs have alleged no material misstatements by him, relying principally on the fact that the nonmonetary revenue comScore recognized during those portions of the Class Period in which he served as CFO constituted less than 5% of comScore's total revenue. *See* Tarpey Br. at 22. Tarpey ignores, however, that during those periods nonmonetary revenue amounted to *10.1%* of the Company's reported growth in revenue for fiscal year 2013, *27.2%* of the growth for the first quarter of 2014, and *17.8%* of the growth for the second quarter of 2014 (¶73). Given the central importance that both the Company and the market placed on comScore's revenue growth (*see* ¶¶40-46), the substantial role that this nonmonetary revenue played in that growth cannot be found at the pleading stage to be "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015) (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y.2012)) (also noting that "[m]ateriality is 'a mixed question of law and fact and is rarely a basis for dismissal on the pleadings'").

Moreover, "the Second Circuit Court of Appeals has explained that courts must fully analyze 'all relevant considerations' when assessing materiality," and that "sufficiently strong qualitative evidence of materiality can establish materiality as a matter of law." *In re Eletrobras Sec. Litig.*, 2017 WL 1157138, at *7 (S.D.N.Y. March 25, 2017) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011)). As Tarpey acknowledges, one such qualitative factor is "[w]hether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise." *See* Tarpey Br. at 22. But Tarpey conspicuously ignores that Grant Thornton's finding

in its report to the Rentrak Board of Directors that comScore's "consensus revenue for virtually all periods would not have been achievable without [the nonmonetary transactions]." ¶94.

Tarpey's arguments against the other qualitative factors also fail. His argument that nonmonetary revenue is not subject to "precise measurement" disregards his successor's plain statement that comScore purportedly valued its nonmonetary transactions "based on our historic sales. The value that we record in revenue is consistent with our historic sales for the same products." ¶90.

Tarpey also argues that comScore would have reported a net loss even without recognizing nonmonetary revenue. *See* Tarpey Br. at 23-24. Tarpey is wrong again. This argument ignores the reality that (as alleged in the Complaint) comScore had "a history of net losses" and relied on fraudulently recognized nonmonetary revenue to maintain an illusion of constant growth and boost its stock price. *See Eletrobras*, 2017 WL 1157138, at *8 (finding materiality alleged where "prior annual reports understated expenses and overstated earnings, thereby implicating whether such misstatements in the previous annual reports 'mask[ed] a change in earnings or other trends'" (quoting SAB 99, 64 Fed. Reg. at 45,152)).[6] Thus, Tarpey's argument runs afoul of SAB 99's

---

[6]   Relying on *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Financial Holdings Ltd.*, 886 F. Supp. 2d 328 (S.D.N.Y. 2012), Tarpey contends that the misstatements are not material because comScore's second-quarter 2014 net income increases after reversing the nonmonetary revenue or expenses (but is still negative). *See* Tarpey Br. at 24. Tarpey is wrong. In *Fairfax,* the court—mindful that materiality should not be decided on a motion to dismiss—ruled in highly unusual circumstances that the restatement in that case was immaterial because it gave "shareholders . . . a bargain for a stock that was ultimately *more* valuable than they

criterion that misstatements or omissions may be material when "the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability." SAB 99, 64 Fed. Reg. at 45, 152. Here, Tarpey and the other §10(b) Defendants consistently emphasized comScore's revenue and EBITDA as the "key financial measures" for the Company, making material their manipulation of those metrics. ¶¶40-46.

Finally, Tarpey fails to address that he fraudulently certified the effectiveness of comScore's internal controls, which courts routinely find to be materially misleading. *See*, *e.g.*, *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381; *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 232 (S.D.N.Y. 2008).

## 2.   The Complaint Adequately Pleads Scienter

Scienter allegations must be viewed holistically:  the issue is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis added). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324. Instead, a scienter inference is "strong" when it is as likely as any other inference. *Id.*;

---

initially thought." 886 F. Supp. 2d at 336. In contrast, here, the market focused (at the §10(b) Defendants' direction) on comScore's growth in revenue—not its history of net losses—and Tarpey's argument ignores that 17.8% of comScore's critical *growth* in revenue that quarter came from improperly recognized nonmonetary revenue. ¶73.

*see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) ("[T]he plaintiff does not need a smoking gun to allege sufficient facts to support a strong inference of scienter.").

A complaint sufficiently pleads scienter through alleging facts (a) showing "that the defendants had both motive and opportunity to commit the fraud" or (b) constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Allegations that establish a strong inference of scienter include that the defendants "benefitted in a concrete and personal way from the purported fraud," "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor." *Id*. at 311. Here, the Complaint sufficiently alleges scienter under both the "motive and opportunity" theory and the "strong circumstantial evidence of conscious misbehavior or recklessness" theory. Moreover, because scienter must be assessed holistically, the Court should reject the §10(b) Defendants' countless requests to view each theory in isolation.[7]

---

[7] *See, e.g.*, comScore Br. at 19 (arguing that GAAP violations "standing alone" are insufficient); 33 (arguing that executive compensation plans "without more" are insufficient), Wesley Br. at 12 (arguing that GAAP violations "standing alone" are insufficient), 19 (arguing that large proceeds from insider sales "alone are not suspicious per se"), 19-20 n. 5 (arguing that resignation of officer "standing alone" are insufficient) Tarpey Br. at 17 (arguing that GAAP violations "standing alone" are insufficient).

### a.   The §10(b) Defendants Had Motive and Opportunity to Commit Fraud

The §10(b) Defendants apparently do not dispute that they had the opportunity to commit fraud, nor could they:  as the top executives of the Company throughout the Class Period, the §10(b) Defendants both maintained ultimate control over the Company's accounting functions and also set the "tone at the top"—each of which, comScore has now disclosed, was wholly deficient throughout the Class Period. ¶¶133, 189-96. Moreover, related-party transactions—which supplied the bulk of the nonmonetary revenue now admitted to be inappropriate—provided yet another opportunity for the §10(b) Defendants deliberately to misuse nonmonetary accounting. ¶¶161-64.

The Complaint also alleges specific, concrete motivations for the §10(b) Defendants to act on the opportunities afforded them by their positions, as discussed below.

### i.   The Market Agreed that comScore's Revenue and EBITDA Were the Company's "Key Financial Measures"

As discussed above, the market—at comScore's urging—understood that revenue and EBITDA were the "key financial measures" for valuing the Company. ¶¶41-46. The central importance of these topics supports a strong inference that Defendants' misrepresentations concerning these topics were made with scienter. *See New Orleans Employees Retirement System v. Celestica, Inc.*, 455 Fed. App'x. 10, 14 & n.3 (2d Cir. 2011) (scienter adequately pled where "inventory levels" were "key to measuring Celestica's financial performance and . . . a subject about which investors and analysts often inquired"); *In re Salix*, 2016 WL 1629341, at *16 ("The magnitude of Defendants' alleged fraud and the fact that it involved the core operations of Salix's business also support a strong inference of scienter."); *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148, at *3 (C.D. Cal. May 12, 2011) (holding that inventory backlog for "flagship product" supported inference of scienter).

### ii. The §10(b) Defendants Sold Nearly $60 Million in Stock

"The Court of Appeals for the Second Circuit has held that motive is adequately pleaded where plaintiffs allege that a defendant sold its own shares while at the same time misrepresenting corporate performance in order to inflate stock prices." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 420-21 (S.D.N.Y. 2011). The Complaint details that the §10(b) Defendants collectively sold nearly *$60 million* in stock throughout the Class Period— the same time that all of the §10(b) Defendants indisputably were making materially false and misleading statements regarding comScore's "key financial measures," revenue and EBITDA, pushing comScore's stock price to record highs. ¶¶175-82. Accordingly, there is no question that each sale improperly benefitted from the §10(b) Defendants' misrepresentations, and these allegations sufficiently plead motive. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001) (holding that relevant considerations includes the number of insiders who sold and percentage of holdings); *Roseville*, 814 F. Supp. 2d at 420-21.

The §10(b) Defendants respond to the astounding volume of insider sales by quibbling about the amounts, asserting that "[a]fter backing out in-kind transactions and shares sold pursuant to a 10b5-1 plan, Plaintiffs do not allege that a single Defendant sold more than approximately $2 million . . . within the entire Class Period." comScore Br. at 27; *see also* Wesley Br. at 18 ("The Complaint can therefore only allege that Mr. Wesley made $2 million of profit from stock sales during the putative Class Period."). As an initial matter, the suggestion implicit in the §10(b) Defendants' argument—that this Court should ignore *$2 million in admitted profits at highly suspicious times*—defies common sense. Regardless, and to be clear, both of the premises on which the §10(b) Defendants' base their alternative figures—that "only for-profit sales are relevant to scienter" and that "trades made pursuant to Rule 10b5-1 plans do not give rise to a strong inference of scienter" (comScore Br. at 26-27)—fail as a matter of law.

43

First, as explained by the Second Circuit, the Rule 10b5-1 plans do not provide any shield for the §10(b) Defendants' stock sales because, "[w]hen executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations." *Emps.' Ret. Sys. of Gov't. of Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015).[8] Here, over $13 million in stock sales by Matta and Abraham occurred under Rule 10b5-1 plans entered into *after* they began their fraudulent scheme to prop up comScore's revenue with phony nonmonetary revenue, "ma[king] positive public statements about [comScore's] growth that drove up its stock price immediately before the scheduled sales." *Id.*; *see* ¶¶175-182. Further, under the logic of *Blanford*, the Court should credit the remaining sales made under Rule 10b5-1 plans, as those plans were all entered into in October 2013 and thus during the period of time for which the Company has now ***admitted*** it must restate its financial statements due to the §10(b) Defendants' fraudulent behavior.[9]

Second, the §10(b) Defendants assert that this Court must discount to zero "in-kind" transactions, but provide no basis for this Court to do so. Defendants do not even explain what

---

[8] The Second Circuit's decision in *Blanford* came after the decision in *In re Lululemon Securities Litigation*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015), the comScore Defendants' sole support for its assertion that the Court categorically ignore sales made to a Rule 10b5-1 plan. *See* comScore Br. at 27.

[9] Indeed, the fact that the §10(b) Defendants sold nearly $15 million in stock through a trading plan entered into at or near the start of their fraudulent scheme raises the plausible inference that entry into the plan may have motivated the fraud to begin with.

they are referring to as "in-kind" transactions. "In-kind" apparently refers to a designation by the §10(b) Defendants referring to their use of comScore shares to pay tax liability or exercise price related to their receipt, exercise, or vesting of comScore shares. *See* SEC Instructions on Form 4, *available at* https://www.sec.gov/files/form4data%2C0.pdf. In other words, the §10(b) Defendants want this Court to rule that the §10(b) Defendants' sale of comScore shares at artificially inflated prices to pay millions of dollars in taxes does not constitute a *benefit*. This is absurd. In the real world, paying millions of dollars of taxes for a person is ***certainly*** a benefit to that person!

Unsurprisingly, even those authorities cited by Defendants do not follow Defendants' approach in assessing insider sales. Courts instead analyze whether the sales were "unusual because they were extensive, and the amount of profit . . . [is] also relevant to this inquiry." *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 442 (S.D.N.Y. 2005) (citing *In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 412 (S.D.N.Y. 2003). *See also Roseville*, 814 F. Supp. 2d at 422 (The court must consider "*all* of the facts and circumstances of the sales.")

Importantly, as "each case [is] decided on its own facts . . . whether plaintiffs can prove their allegations is not to be resolved on a Rule 12(b)(6) motion," even where—as here—defendants contest the motive or significance of stock sales. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001). Indeed, relying on *In re Scholastic*, the court in *In re SLM Corp. Securities Litigation*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010), rejected the defendant's near-identical "explanations for his stock sales—that the August sales were necessary to pay the exercise price of expiring options and associated taxes, and that the December sale was necessary to satisfy a

margin call—[because] those facts remain in dispute." *Id.* at 558 & n.6 (citing *In re Scholastic Corp.*, 252 F.3d at 75).[10]

Accordingly, the §10(b) Defendants provide no reason for the Court to ignore the *entirety* of each Defendants' insider sales in assessing scienter regardless of whether such sales occurred pursuant to a Rule 10b5-1 plan or were purported by the §10(b) Defendants to be "in-kind" transactions.

In a tortured effort to convince the Court that there is nothing suspicious about their massive stock sales, the Defendants also proffer a host of individual excuses. None of them have merit.

**Matta:** The Complaint alleges that Matta sold $18.1 million in stock during the Class Period, with $10.9 million being sold *not* pursuant to any Rule 10b5-1 trading plan, and $6.4 million being sold pursuant to plans entered into during the height of the fraud. ¶179. *See Tellabs,* 551 U.S. at 310 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference[.]") Here, the comScore Defendants' try to negate the obvious inference from these massive sales in two ways. First, they argue that "nearly 70%" of Matta's $6.7 million in stock sales between March

---

[10] The authorities referenced by the §10(b) Defendants do not state otherwise. *See* comScore Br. at 27; *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 241–42 (S.D.N.Y. 2012) (noting that the plaintiff did "not earnestly contest . . . defendants' proffered explanation" for the sales and "failed adequately to allege that [the sales] resulted in profits"—unlike here, where the §10(b) Defendants have even conceded profits from these sales); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (holding that the alleged trades were not "unusual" but rather part of "a consistent pattern of trading")).

and August 2015—when the inappropriate nonmonetary revenue recognized by the Company amounted to ***over 80%*** of the Company's reported growth in revenue—were made under Rule 10b5-1 plans. *See* comScore Br. at 28-29. These plans, however, were entered into in June 2014 and May 2015, well after the fraud began. *See* comScore Ex. G; ¶179. *See George v. China Auto. Sys., Inc.,* 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (the creation of a Rule 10b5-1 plan during the class period enables defendants "to take advantage of an inflated stock price or insider information").

Second, Defendants argue that there was nothing suspicious about these sales because Matta's percentage of sales did not "significantly increase" from before the Class Period, and relatedly that he "forwent profits of up to $19 million" by failing to exercise options vested in 2015. *See* comScore Br. at 28-29. Defendants are wrong. Courts recognize that "vested but unexercised options are not shareholdings." *EVCI Colleges,* 469 F. Supp. 2d at 100. And there is no requirement under law that a defendant must sell all (or even most) of their holdings before large stock sales can raise an inference of scienter. *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("[R]etention of a large position in [the company] . . . [does not] vitiate insider trading liability . . . [where the defendant] realized a profit."); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 731 (S.D. Ohio 2006) ("[A]n insider may not always trade all his shares in the company. . . . [T]he trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC."); *In re MicroStrategy,* 115 F. Supp. 2d at 646-67 (fact that defendants did not sell all their holdings does not negate an inference of scienter). This is particularly true here given the enormous size of Matta's sales and the undisputed fact that Matta did not spend a single penny of his own money to purchase stock during the Class Period.

***Wesley***: The Complaint alleges that none of Wesley's $7.6 million in insider sales were made pursuant to a Rule 10b5-1 plan. ¶180. Wesley responds by arguing that $4.2 million worth of his sales supposedly involved stock options and he "only" sold $3.4 million when those options are excluded. comScore Br. at 30. This response is meaningless.  Wesley fails to explain why the stock option sales should be excluded from a Judicial scienter analysis. Those sales provided Wesley with $4.2 million in value immediately following Wesley's involvement in yet another announcement of false revenue and EBITDA by comScore, and they indisputably provided a real world benefit to him and a concomitant motive to defraud. *See* comScore Br. at 30; Wesley Br. at 18. *See also In re Enron Corp. Sec. Derivative & ERISA Litig.,* 235 F. Supp. 2d 549, 686 (S.D. Tex. 2002) ("Lining one's pockets with gold, at the expense of investors, employees and the public, appears too often to be a dominating ambition[.]").[11]

Wesley also contends that he ceased his insider selling immediately after the August 2015 *Wall Street Journal*'s article. Wesley Br. at 19.  But there is no requirement that sales must continue throughout the Class Period to be suspicious. Nor can the Court accept Wesley's unsupported factual assertion that his "concentrated sales during the second quarter of 2015" occurred because that was his first opportunity to sell (*see* comScore Br. at 30; Wesley Br. at 18-19). Moreover, Wesley's retention of stock during a period in which he was perpetrating a fraud that would *boost*

---

[11] Illustrating the intensely factual nature of these issues, Defendants themselves do not even agree about how much stocks Wesley sold.  While the comScore Defendants claim that Wesley engaged in "the *sale"* of stock options (comScore Br. at 30), Wesley asserts conversely that "the Complaint erroneously included $4.1 million that Mr. Wesley *paid* to comScore to purchase comScore options. Wesley Br. at 18.

the value of that stock logically provides a valid motive. *Cf. Tellabs*, 513 F.3d at 710 (The "fact that a gamble . . . concealing bad news in the hope that it will be overtaken by good news . . . fails is not inconsistent with it having been considered . . . a reckless[] gamble" and therefore consistent with a strong inference of scienter.). At most these arguments raise a question of fact that does nothing to undercut the scienter inferences to be drawn at the pleading stage. *West Palm Beach Firefighters' Pension Fund v. Startek, Inc.,* 2008 WL 879023, at *13 (D. Colo. Mar. 28, 2008) ("It may well be that the trading by Defendants . . . will be found by a jury to be innocent of deception. But at this stage of the case I will not remove the resolution of the conflicting inferences from the province of the jury.").

*Abraham*: The complaint alleges that Abraham sold $31.5 million in stock during the Class Period, and $13.1 million of those sales were not pursuant to any Rule 10b5-1 Plan. The remaining $18.4 million were made pursuant to plans entered in May 2013 ($11.5 million) and December 2014 ($6.9 million). ¶181. Abraham attempts to normalize his astonishing sale of 92% of his directly held shares (and 57% of his indirectly held shares) by contending that "[i]t is hardly unusual for a co-founder of a technology company to sell shares" and "Abraham has a long history of receiving and selling a substantial amount of comScore shares." comScore Br. at 31. Whatever. As an initial matter, the sole support the comScore Defendants offer for this bold assertion—a reference to a single prior period in which Abraham purportedly liquidated 30% of his holdings— cannot possibly support their far-reaching and implausible proposition. In any event this argument plainly constitutes an issue of fact inappropriate for determination on a motion to dismiss.

*Tarpey*: The complaint alleges that Tarpey sold $1.8 million in insider sales, with $1.2 million not pursuant to any Rule 10b5-1 trading plan. Similar to Wesley, Tarpey argues that "it defies logic to argue . . . that Mr. Tarpey would acquire and retain comScore stock at a time he

knew comScore was misstating its revenue to inflate its stock price" (Tarpey Br. at 14-5), and the argument fails for the same reasons just discussed. But Tarpey provides no support for his argument that his insider transactions do not provide a motive because his final sales occurred "more than a year and a half before" the Audit Committee investigation was announced (Tarpey Br. at 14), and this proposition defies logic: ill-gotten gains do not become ill-gotten only when realized near the end of the fraud.

### iii.    Matta and Wesley's Compensation Packages Uniquely Incentivized and Rewarded the Fraud

Matta and Wesley's compensation packages richly rewarded them for the artificial inflation of comScore's stock price throughout the Class Period. *See* Miriam Gottfried, "Beware the Squishy Math of comScore's Pay Plan," *Wall St. J.*, July 12, 2016; ¶¶64-67. During that time, the §10(b) Defendants stated to the market that revenue and EBITDA were comScore's "key financial measures," and the market agreed:  the §10(b) Defendants' announcements of "record revenue" drove comScore's stock higher and higher. ¶¶40-46. Matta and Wesley's compensation packages thus made them both fearful of the market's reaction when the market learned that the Company's revenue sagged, and eager to benefit from the market's reaction should revenue continue to grow.

Where a plaintiff alleges unique compensation triggers based on an issuer's stock price like those here, courts find that the allegations support a strong inference of scienter. For example, in *In re SLM Corp. Securities Litigation*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010), the court found that the plaintiffs' adequately pleaded an officer defendant's scienter because, among other things, he stood to receive a multimillion-dollar payment and the right to exercise stock options tied to exercise prices above the stock's current market price upon completion of a merger that depended on his company's stock not falling below certain trigger prices, "an event that would have torpedoed the merger and [the officer]'s payout." *Id.* at 557-58. This "possibility of reaping a

windfall payout . . . contribute[d] to an inference of scienter." *Id.* Similarly, in *Darquea v. Jarden Corp.*, 2007 WL 1610146 (S.D.N.Y. May 31, 2007), the court held that "Plaintiffs adequately alleged scienter" because, among other things, "the Individual Defendants gained millions of dollars in incentive payments keyed to Jarden's stock price performance." *Id.* at *10.

Accordingly, the uniqueness and specificity of the compensation program as it relates to Defendants' fraud differentiates this case from those cases Defendants cite involving run-of-the-mill "executive compensation." comScore Br. at 33-34. Indeed, the cases cited by the comScore Defendants acknowledge that the Second Circuit has not categorically rejected an inference of scienter as a result of compensation plans dependent upon stock value, they actually hold that such allegations do not give rise to scienter "***without more***." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 64 (2d Cir. 1995) (emphasis added) (quoted at comScore Br. at 33); *see also ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (rejecting pleading scienter through compensation plan "on that basis *alone*" (emphasis added)) (cited at comScore Br. at 33);[12] *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y.

---

[12] In fact, in *ECA* the Second Circuit acknowledged a "particularized showing" involving a "direct link between the compensation package and the fraudulent statements because of the magnitude of the compensation and the defendants' motive to sweep problems under the rug." 553 F.3d at 201 (discussing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661-62 (8th Cir. 2001).) Nowhere is this more obvious than in second-quarter 2015, when Matta and Wesley pushed the stock just high enough to trigger their final compensation tier by announcing "record" revenue growth, ***nearly 90%*** of which has now been revealed to be bogus nonmonetary revenue. *See* ¶¶ 64-67; 73.

2004), *aff'd sub. nom. Albert Fadem Trust v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) (rejecting as too "generalized" allegations of "higher annual compensation" for defendant stock analyst) (cited at comScore Br. at 33); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 160-61 (S.D.N.Y. 2015) (finding allegations concerning compensation plans provided insufficient motive in part because bonuses were paid in stock despite the fact that alleged fraud would subject shares to invalidation) (quoted at comScore Br. at 33-34).

Finally, relying on *Pennsylvania Public School Employees' Retirement System v. Bank of America Corporation*, 874 F. Supp. 2d 341 (S.D.N.Y. 2012), Matta and Wesley argue that any inference of scienter from the compensation plans is "not plausible" because Matta and Wesley entered into the plans after Defendants' fraud began, and therefore "fraudulent conduct predates motive." comScore Br. at 32 (quoting *Bank of America*, 874 F. Supp. 2d at 358). Defendants' argument reads the Complaint piecemeal rather than holistically. In reality, the compensation packages do not provide the only basis for scienter. As noted, the Complaint details *several* ways in which all of the §10(b) Defendants stood to profit from Defendants' scheme even before the compensation packages, including the negotiation of the Rentrak acquisition and the Individual Defendants' stock sales.

Regardless, *Bank of America* does not support the comScore Defendants. In *Bank of America*, the plaintiff alleged that the defendant concealed its "exposure to **billions** of dollars of loan repurchase claims arising from the sale of mortgage-backed securities" so as to "facilitate the repayment of funds it borrowed" from the federal government. *Id.* at 347 (emphasis added). The court ruled that the plaintiff sufficiently alleged material misstatements and omissions, and further sufficiently pleaded scienter as against the defendant corporation. It nonetheless found the scienter allegations insufficient against the individual executive defendants in part because the *Bank of*

*America* plaintiff alleged that the executive defendants began concealing the exposure well before the sole particular motive alleged (the Bank's receipt of government funds). *Id.* Here, however, the Complaint details *several* motives that *predate* the fraud. *See*, *e.g.*, ¶¶175-82 (insider sales); ¶188 (Rentrak acquisition negotiated since before start of Class Period). Thus, entry into the lucrative compensation packages after the fraud began is consistent with the §10(b) Defendants' scheme: having already inflated the value of comScore's stock in part through phony transactions with related party Acxiom, Matta and Wesley may have even suggested this rigged compensation scheme to §14(a) Defendant Henderson, who both sat on the board of directors for Acxiom and approved the compensation plan as comScore's Compensation Committee chair. ¶¶64-70.

### iv.     Rentrak Transaction

The Second Circuit "has ruled that, in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993), and *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 & n.2 (2d Cir. 1982)). These circumstances exist here, where the fraudulent inflation of comScore's stock price directly relates to the Rentrak transaction as it gave comScore both a strong bargaining position in its attempt to acquire Rentrak and a more valuable currency with which to pay for the acquisition. ¶188.

The §10(b) Defendants (except Tarpey) principally argue in response that "the timing of the alleged fraud and the acquisition of Rentrak does not add up" because Defendants supposedly did not start 'active' negotiations with Rentrak until April 2015, while the fraud began in 2014. comScore Br. at 34. Defendants, however, omit to mention that comScore's *own filing* confirms that the merger discussions began in 2013, just before the Class Period begins. *See* Browne Decl. Ex. 4, at 37 (comScore and Rentrak engaged in "preliminary diligence and discussions" in December 2013.).

53

The comScore Defendants also challenge the inference raised by the Rentrak transaction by relying on the Second Circuit's decision in *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d 187 (2d Cir. 2009). comScore Br. at 35. But in that case, the Court of Appeals explicitly "acknowledge[d] that the artificial inflation of stock prices in order to acquire another company may, 'in some circumstances,' be sufficient for scienter." *ECA*, 553 F.3d at 201 n.6 (quoting *Rothman*, 220 F.3d at 92-94). Further, the court held that determinations of this kind require "an 'extremely contextual [inquiry].'" *Id.* The court there found insufficient claims that "[a]t most . . . allege a generalized desire to achieve a lucrative acquisition proposal" in light of the "dubious at best" connection to "alleged misstatements [that] began *eight years before the acquisition and ended years afterward.*" *Id.* at 201 (emphasis added).

In contrast, the Complaint here makes plain the direct connection between the §10(b) Defendants' fraud and the Rentrak transaction. comScore first began negotiating to acquire Rentrak in 2013—not coincidentally, the first year for which the Company has now admitted it must remove entirely its previously reported nonmonetary revenue and thus *just before* the start of the §10(b) Defendants' fraudulent statements. ¶188. Moreover, the Class Period ends—and the §10(b) Defendants' scheme began to come unraveled—just *one month* after the completion of the Rentrak acquisition. ¶564.

Finally, while the comScore Defendants attempt to suggest that the inference of scienter from the all-stock transaction is not compelling, they fail to provide any purportedly innocent inference of their own. This Court and others have found similar allegations sufficient to survive a motion to dismiss. *See In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557–58 (S.D.N.Y. 2010) (finding scienter adequately pleaded based in part on desire to use inflated stock as acquisition currency); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("Scienter may

be imputed . . . to defendants when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices"); *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002) (finding "specific goal . . . to acquire companies" sufficient motive to support "strong inference of scienter"); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 207 F. Supp. 2d 292, 298 (S.D.N.Y. 2002) (finding scienter adequately pleaded where "defendants had a motive to inflate artificially the value of Sloan's stock in order to use the stock to acquire other companies"); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) ("Plaintiffs' charge—that defendants sought to maintain the artificially high stock price so that CMI might use that stock as currency for acquisitions that would leverage what the defendants knew were ultimately uncollectible receivables—is an extremely contextual one. Given that we evaluate the allegations under the standard governing a motion to dismiss, this is a sufficiently concrete motive to support a strong inference of scienter.").

### b. The Complaint Alleges Strong Circumstantial Evidence of Conscious Misbehavior by the §10(b) Defendants

The Complaint provides not just strong, but *overwhelming*, circumstantial evidence of the §10(b) Defendants' conscious misbehavior, including:

***comScore's Admissions***: comScore's own statements concerning the Audit Committee investigation alone establish a strong inference of scienter. Indeed, the extraordinary steps announced alongside the Company's very first disclosures on the subject on February 29 and March 7, 2016 suggests that this is a case of fraud, not mere mistakes. After only an initial review into a message about "certain potential accounting matters," comScore "proactively contacted" the SEC and announced it would not timely file its Form 10-K, postponed its Investor Day, and halted its stock buyback. ¶¶109-13. The *Wall Street Journal* commented that comScore's "aggressive

accounting practices may have caught up with it" (¶16) and that comScore had "pushed the envelope with its accounting . . . too far." ¶113.

Ultimately, the Company made the suggestion of conscious misbehavior unambiguous when it confirmed in its November 23, 2016 Form 8-K that the §10(b) Defendants' misrepresentations throughout the Class Period concerning comScore's "key financial measures"—revenue and EBITDA—stemmed from "***misconduct***." ¶22; Browne Decl. Ex. 1, at p.3. This is not a word used lightly:  "misconduct" refers to "[b]ehavior not conforming to prevailing standards or laws; impropriety," or "[d]ishonest or bad management." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1125 (5th ed. 2011). Nor is the context ambiguous:  comScore disclosed its discovery of "misconduct" in the same filing that explicitly linked comScore's previously announced restatement to remove more than $43 million in nonmonetary revenue—and thus erase three years of "record" revenue growth relied upon by investors—to the failure to "properly disclose[]" arrangements to the Company's accounting group and "instances where there did not appear to be a clear need for all of the data that was being exchanged." ¶131.[13] Moreover, that same filing identified numerous internal-controls deficiencies, one of which—"concerns about tone at the top"—is associated with corporate fraud. *See* ¶189; *see also* Statement of Facts, *supra*, at 16. The other internal-controls deficiencies are no less

---

[13] In suggesting that the November 2016 Form 8-K disclosed simply that there are "questions" concerning "instances where additional arrangements were entered into and not properly disclosed," the comScore Defendants misrepresent the phrasing of their own Form 8-K. comScore Br. at 20. The disclosure makes clear that the investigation uncovered such instances, which themselves called the *transactions* into question. *See* Browne Decl. Ex. 1, at p.3.

suspicious, including "information not having been provided to the Company's accounting group and its external auditors" and "the sufficiency of public disclosures made by the Company about certain performance metrics." ¶133.

Thus, comScore has now admitted that it "cannot support" over three years of nonmonetary revenue that the §10(b) Defendants approved.[14] ¶23. It has also admitted that some monetary transactions will also require "adjustment." *Id*. Further, it has linked both of these admissions to internal-controls deficiencies for which the §10(b) Defendants maintained responsibility throughout the Class Period. *Compare* ¶133 (remedial measures include "strengthening controls around the Company's revenue recognition practices, including controls related to contract administration and delivery of data") *with* ¶131 (investigation uncovered "instances where additional [nonmonetary] arrangements were entered into and not properly disclosed to the Company's accounting group and instances where there did not appear to be a clear need for all of the data that was being exchanged") *and* ¶132 (adjusted monetary transactions included "partially delayed invoicing for delivered data inconsistent with the terms of the contract").

In response, the §10(b) Defendants all advance—with slight variations—an argument that the November 2016 Form 8-K does not raise an inference of scienter against them because it did not *explicitly* partition its damning conclusions to any particular act, time period, or Defendant.

---

[14] Accordingly, Tarpey's argument that the November 2016 Form 8-K "does not provide any basis [to] single out Mr. Tarpey or his tenure as CFO—which comprised only six months of the class period" (Tarpey Br. at 18) misses the mark by a factor of three:  in fact, the Company has admitted that a year-and-a-half of nonmonetary accounting that he oversaw was wrong at the time the statements were made.

*See* comScore Br. at 20-22; Tarpey Br. at 18. That is not the standard required on a motion to dismiss. Instead, the clear implication of, and *only* plausible inference from, comScore's admission to "misconduct" in the November 2016 Form 8-K directly alongside the Company's descriptions of obviously suspicious behavior in connection with its admitted misstatements of at least $43 million in nonmonetary revenue is the suggestion of behavior so plainly deceptive that one analyst commented that the Company "will face challenges in . . . re-building **trust/credibility**." ¶26. *See*, *e.g.*, *In re Eletrobras Sec. Litig.*, 2017 WL 1157138, at *12 (S.D.N.Y. 2017) (ruling that "clear implication of the disclosure" raises inference of scienter); *Orthofix*, 89 F. Supp. 3d at 615 (after considering the "full picture of wrongdoing presented by the plaintiff" and the company's "later admission in the Restatement that there were failures in revenue recognition practices," finding scienter sufficiently alleged concerning defendants' "deliberate[] or reckless[]" participation in program "to boost revenue artificially at the end of quarters in order to present a false and misleading picture of [the] actual revenue").

Moreover, neither the comScore Defendants nor Wesley cites a single case in attempting to rebut the clear implications of the November 2016 Form 8-K, and neither of the cases cited by Tarpey supports his position. *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 615 F. App'x 44 (2d Cir. 2015) is inapposite, as Plaintiffs do not "rely[] soley" on Tarpey's "failure to identify defects in the company's internal controls," but rather base their allegations on the affirmative connections made by comScore's own filings; moreover, there is no indication that Tarpey made any "affirmative efforts to uncover fraud." *Id.* at 46 (cited at Tarpey Br. at 18). Likewise irrelevant is *International Association of Heat & Frost Insulators & Asbestos Workers Local #6 Pension Fund v. International Business Machines Corporation*, 2016 WL 4688862 (S.D.N.Y. Sept. 7, 2016), in which the court declined to infer scienter following a write-down simply because the

defendants had signed internal controls certifications—in contrast, here, the Company has *concluded* that deficiencies *implicating* Tarpey—i.e., the "tone at the top"—existed even while Tarpey attested otherwise. *Id.* at *7 (cited at Tarpey Br. at 18). *See Orthofix*, 89 F. Supp. 3d at 616-17 (finding scienter sufficiently alleged where, "among its concessions regarding material misstatements and weaknesses in internal controls, [the] Restatement noted 'extra-contractual terms or arrangements at the onset of sale,' and that such terms 'were not evaluated, or not evaluated correctly'. . . [R]ead most favorably to the plaintiff and accepting the Complaint's allegations as true, the above allegations raise an inference that [the defendant] either knew or had access to information about [improper revenue recognition], and thus possessed information contrary to her public statements in the SOX Certifications regarding the adequacy of . . . revenue recognition practices.").

Finally, only Wesley offers a competing inference from the November 2016 Form 8-K, that he is "an honest executive," and suggesting in passing that the disclosure's reference to information not having "been provided to the Company's accounting group" refers to him. Wesley Br. at 17-8. This bare possibility, however, is plainly undercut by the totality of other scienter allegations raised against him, as discussed above and further below.

**_The Obvious Nature of comScore's Improper Revenue Recognition_**: Violations of GAAP involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue improperly, and may therefore support a stronger inference of scienter. *See*, *e.g.*, *Orthofix*, 89 F. Supp. 3d at 618 ("As shown by Orthofix's Restatement, Orthofix undisputedly has made material misstatements and admitted to violations of GAAP . . . . The GAAP regarding revenue recognition that were admittedly violated by the defendants are basic accounting principles . . . [and] when 'coupled with evidence of corresponding fraudulent intent,' restatement

or accounting violations[,] may provide some evidence of scienter."). *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21–22 (D.D.C. 2000) (finding scienter adequately alleged based on allegations of defendants' knowledge of buyers' rights of return and failure to resell products); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 234 (D. Mass. 1999) ("[S]ignificant overstatements of revenue 'tend to support the conclusion that defendants acted with scienter.'") (quoting *Marksman Partners v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 (C.D. Cal.1996)); *In re Ancor Comm'n, Inc.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) (finding scienter adequately alleged based on allegation that defendants recognized revenue despite awareness of product's incompatibility with buyer's components and of buyer's right of return); *Bell v. Fore Sys., Inc.*, 17 F. Supp. 2d 433, 439 (W.D. Pa. 1998) (allegation that defendants knowingly engaged in "inventory parking scheme" and improper accounting practices in order to recognize revenue in violation of GAAP sufficed to show scienter); *Marksman Partners*, 927 F. Supp. at 1315 (finding that recognition of revenue from sales of goods where defendants were aware of buyer's right of return supported inference of scienter).

"The inference invited by the large magnitude of the misstated financials and the repetitiveness of the GAAP violations takes on added significance if, as the Complaint alleges, the violated GAAP rules and Company accounting policies are, in fact, relatively simple." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636–38 (E.D. Va. 2000). Here, the rules for revenue recognition are straightforward, and Defendants violated them in obvious ways by improperly booking revenue for exchanges of useless, worthless data and by citing fictitious prior sales of the same types of data as pricing benchmarks. ¶¶144-61. Thus, these GAAP violations support a strong inference of scienter "because violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious. Put another

way, if the GAAP rules and [Defendants'] accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard." *Id.* "[T]he accounting principle violated here boils down to the well-worn adage, 'Don't count your chickens before they hatch.' These common-sense observations compel the conclusion that the alleged simplicity of the GAAP rules violated here are relevant and contribute probative weight to an inference of scienter." *Id.*

The §10(b) Defendants assert that their admitted violations of GAAP do not support an inference of scienter because GAAP involves judgment. comScore Br. at 18-19; Wesley Br. at 17-18. But during the Class Period, Wesley and Matta contended just the opposite, telling investors "the guidelines are very, very strict and we follow them to the t." ¶¶5, 82-92. Defendants also contended that GAAP-compliant accounting for nonmonetary revenue was susceptible to objective verification, stating, "if you don't have historic cash transactions . . . you cannot under the guidance recognize revenue in connection with the transaction." ¶87; *see also* ¶90 ("[T]he revenue we are taking on here is based on revenues that we have sold before of similar transaction for cash."). *See In re Salix*, 2016 WL 1629341, at *14 (finding inference of scienter where plaintiffs "allege[d] that Defendants claimed they had accurate knowledge" related to the accounting at issue).

In any event, as the court held in *Raytheon*, however, "[t]he fact that the application of GAAP tolerates a range of reasonable treatments does not . . . vindicate the defendants so easily." 157 F. Supp. 2d at 147–48. Rather, "GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred." *Id.* Likewise in *Microstrategy*, the court rejected the defendants' argument "that a misapplication of accounting principles or a

restatement of financials can never take on significant inferential weight in the scienter calculus," instead holding that "to the contrary, when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter . . . ." 115 F. Supp. 2d at 636–38.

Put differently, "[w]hile alleging a misapplication of Generally Accepted Accounting Principles standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter . . . [and] the totality and magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *Carley Capital Grp. v. Deloitte & Touche*, 27 F. Supp. 2d 1324, 1339–40 (N.D. Ga. 1998). Indeed, common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that the restatement or violation was made consciously or recklessly:  this axiom rings especially true here, where the restatement will not only wipe out **over $43 million** in nonmonetary revenue and as yet-undisclosed amounts of monetary revenue, but also undoes years of purported "record" growth in comScore's "key financial measures."

Finally, Defendants' argument about the "robust disclosures" comScore made throughout the Class Period (comScore Br. at 23-24; *see also* Wesley Br. at 16) misses the point: nowhere did comScore disclose that its nonmonetary-revenue accounting violated GAAP or that—consequentially—its purportedly "record" "key financial measures" of revenue and EBITDA were actually increasingly sagging and even negative. *See*, *e.g.*, ¶¶163-64, 169-73. This contrasts markedly with *Kuriakose v. Federal Home Loan Mortgage Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed Home Loan Mortg. Corp.*,

543 F. App'x 72 (2d Cir. 2013), in which the court ruled that the "bevy of truthful disclosures," including "the credit characteristics of the loans in [defendant's] guarantee portfolio, . . . the specific credit scores of borrowers in its guarantee portfolio, and . . . loan-to-value ratios," negated scienter on claims that the defendant misrepresented its exposure to subprime mortgage products. *Id.* at 185 (cited at comScore Br. at 24).

**_Matta and Wesley's Private Phone Call for Select Institutional Investors:_** After the *Wall Street Journal* published an article on August 31, 2015 stating that comScore's nonmonetary revenue "warrants scrutiny," Matta and Wesley rushed to further conceal their fraud by participating in a private phone call to select institutional investors and analysts (in violation of comScore's obligations of fair disclosure under Regulation FD).[15] Defendants' failure to disclose publicly the information discussed on this call hardly corresponds with "an honest executive working in the interests of comScore and its shareholders." Wesley Br. at 17. comScore never published this phone call, an audio tape of which Plaintiffs obtained in the course of their investigation. ¶¶10-12.

**_The §10(b) Defendant Executives Have All Left the Company_**: In the midst of the Audit Committee's investigation, Matta, Abraham, and Wesley all unexpectedly "resigned" from their executive roles and have since left the Company altogether. The timing of their resignations is suspicious: Matta and Wesley resigned as CEO and CFO, respectively, within weeks of the *Wall Street Journal* article drawing a connection between Matta and Wesley's compensation targets and

---

[15] Wesley argues that "[t]he Complaint does not allege that Mr. Wesley denied the nature of the transactions or minimized their effect on the financial statements" during this call, ignoring that the Complaint alleges that Wesley falsely described the nonmonetary transactions. *See* ¶¶144-61.

Defendants' fraudulent nonmonetary-accounting practices. ¶¶64-67. Abraham resigned as director (thus altogether leaving the Company he co-founded) just weeks after the Company announced its findings of "misconduct" and concerns about "tone at the top"—even though the Company had previously stated that he would continue to serve as a director until 2018. Courts including this one consistently hold that "the timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter." *In re Eletrobras Sec. Litig.*, 2017 WL 1157138, at *12 (quoting *Orthofix*, 89 F. Supp. 3d at 615); *see also In re Salix*, 2016 WL 1629341, at *15 (resignations occurring proximate to audit committee investigation and restatement "provide[d] additional evidence of scienter"); *Orthofix*, 89 F. Supp. 3d at 615 (noting that resignations surrounding restatement "lend further weight to an inference of scienter").

Defendants, again relying on *Bank of America*, argue that the turnover in the Executive Defendants requires that the Court rule the fraud "implausible." *See* 874 F. Supp. 2d at 358. That is absurd. First, the motive alleged in *Bank of America* did not correspond to a direct personal benefit for the individual defendants, leading the court to rule that the executive turnover also supported an opposing inference that the executives "acted in good faith." *Id.* at 358. In contrast, the Complaint here alleges motives that benefitted the §10(b) Defendants directly, including lucrative stock sales, which would provide a basis to continue the scheme. ¶¶175-82.

Second, unlike in *Bank of America*, the executive turnover has been consecutive between the §10(b) Defendants without gaps, and both Matta and Abraham presided in powerful positions within the Company throughout the Class Period as President and then CEO, and as CEO and then Executive Chairman, respectively, only to lose their prestigious titles after the Audit Committee investigation began, and then leave comScore completely following the disclosure of "misconduct" and problems with "tone at the top." *See* ¶¶23-25, 35, 37, 196. This unbroken,

consecutive leadership makes plausible the continuation of the scheme throughout the Class Period. Moreover, though the comScore Defendants suggest that "there are a number of other, more plausible reasons" for the departure of *all* of the §10(b) Defendants, they fail to provide even a single one. comScore Br. at 25.[16] *See In re Salix*, 2016 WL 1629341, at *16 ("Defendants fail to provide the Court with any cogent non-fraudulent inference that is *more* compelling than the inferences of fraud alleged by Plaintiffs." (emphasis in original)).

**_The §10(b) Defendants' Nearly $60 Million in Stock Sales_**: As discussed above, the §10(b) Defendants made nearly $60 million in insider sales throughout the Class Period. Moreover, the suspicious timing of these sales further supports a strong inference of scienter. Indeed, much of Matta's and Wesley's sales occurred following reported explosive growth in comScore's revenue, consisting in overwhelming part of wholly fictitious nonmonetary revenue. Most suspiciously, $6.7 million of sales by Matta and $5.1 million by Wesley occurred surrounding comScore's second quarter 2015 financial results, which reported now known to have included baseless nonmonetary revenue amounting to over **_85%_** of the reported revenue growth, and which pushed comScore's stock to new highs, triggering the final tier of Matta and Wesley's compensation package. ¶¶64-70.[17]

---

[16] Likewise, Wesley's suggestion that his departure related to "honest disagreements about the best way to run a business" (Wesley Br. at 19 n. 5) does not outweigh the overwhelming inferences of fraud in the totality.

[17] Discussing the insider sales, the comScore Defendants again rely on *Bank of America* for the proposition that the scheme is "implausible." comScore Br. at 23. For the reasons discussed elsewhere, this reliance is misplaced. *Infra.* at 61.

The Company's repurchase of over 3.2 million of its shares with $144 million in shareholder money during the Class Period at artificially inflated prices further heightens the circumstantial evidence of conscious misbehavior provided by the §10(b) Defendants' insider sales. ¶183. The Company's repurchases during 2015 rose to unprecedented levels, exceeding in each quarter of 2015 the Company's total repurchases for the entire year in both 2013 and 2014. ¶185. The Company even announced an additional $125 million repurchase program on February 17, 2016, the same day as its last false announcement of "record" revenue that included improperly recognized nonmonetary revenue, and only two weeks before the Company was forced to announce the Audit Committee's investigation and suspend the buyback program. ¶187. The use of shareholder money to engage in these buybacks further inflated the price of comScore's stock and the profits from the §10(b) Defendants' insider sales during the Class Period, and therefore further contributes to the strong inference of scienter from these sales.[18]

**_The Use of a Related Party_**: The primary source of nonmonetary revenue was from related party transactions with Acxiom. At least one court in this district has noted that, "while related-party transactions are not per se unlawful, we view them with 'extreme skepticism[.]'" *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014) (quoting *McCurdy v. SEC*, 396 F.3d 1258, 1261 (D.C. Cir. 2005)). The District of Columbia Circuit observed in *McCurdy* that "related-party transactions . . . are viewed with extreme skepticism in

---

[18] The comScore Defendants' suggestion that the §10(b) Defendants played no role in the Board of Directors' decision to undertake the buybacks both misses the obvious—that Abraham was Executive Chairman of the Board and Matta a director—but also raises an issue of fact inappropriate at this juncture. comScore Br. at 33.

all areas of finance" and are "inherently suspicious," because, "[a]lthough in an ordinary arms-length transaction, one may assume that parties will act in their own economic self-interest, this assumption breaks down when the parties are related." 396 F.3d at 1261.

**_The Length of Time to Complete the Still-Unfinished Restatement_**: The restatement has taken an exceptionally long time. After having first announced the Audit Committee's investigation in late February 2016, the Company then announced its intent to restate in September 2016, but even now has yet to announce when it expects to file its restated financials. Further, this delay has resulted in comScore being suspended from NASDAQ, and the Company has revealed consequent costs of nearly $40 million and climbing. *See* Browne Decl. Ex. 2, at Ex. 99.9 p.7. As at least one other court has held, circumstances this dire support a strong inference of scienter:

> In the present case, the magnitude of the restatement is evinced by the fact that after almost one year since it was announced, the restatement is still not complete. The magnitude is also emphasized by Avid's recently filed Form 8–K, where it informs that, 'given the scope of the review,' the Company will probably fail to regain compliance with its SEC filing requirements for continued listing of its common stock on NASDAQ before the deadline set by the NASDAQ Listing Qualifications Panel. Accordingly, it is as yet unknown what the impact of such a restatement will be, but that cannot impair the Plaintiffs' claim. The length and magnitude of the restatement here leads to a strong inference of scienter, indeed suggesting a conscious choice by the Defendants, or at least an extreme departure from the standards of ordinary care.

*Washtenaw Cty. Emps.' Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 113–14 (D. Mass. 2014). As noted above, academic studies have drawn a correlation between the length of time to restate and the presence of fraud. *See* Statement of Facts, *supra*, 25-26; ¶¶197-99.

### 3. The Complaint Adequately Alleges Control-Person Liability Against the Executive Defendants Under §20(a)

To establish control-person liability under §20(a), a plaintiff must show control of a primary violator, and that the controlling person was "in some meaningful sense a culpable participant in the fraud." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). None

of the Executive Defendants contest their control over comScore, and for the reasons stated above, the Complaint adequately alleges a primary violation. Because Abraham, Matta, and Tarpey do not dispute that the Complaint sufficiently alleges their culpable participation, Plaintiffs have adequately stated a claim for their control-person liability. *See* comScore Br. at 35-36; Tarpey Br. at 25 (only challenging §20(a) claim on basis of failure to state a primary violation). Finally, Wesley's minimalist argument that his "role as a chief financial officer is not a sufficient reason to allege culpable participation in misconduct" simply ignores the overwhelming totality of allegations establishing his—along with all the Executive Defendants'—scienter, as discussed in Section III.A.2. above.

### B. THE COMPLAINT ADEQUATELY ALLEGES CLAIMS UNDER EXCHANGE ACT §14(a) AND SECURITIES ACT §11 AGAINST THE COMSCORE MERGER INDIVIDUAL DEFENDANTS

"To state a claim under Section 14(a), a plaintiff must allege that: (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 238 (S.D.N.Y. 2012). comScore and the comScore Merger Individual Defendants (the "comScore 14(a) Defendants") challenge only the first element. As discussed below, these challenges fail.

### 1. Plaintiffs' §14(a) Claim Does Not Sound in Fraud

As an initial matter, Plaintiffs plead no fraud-based claims against Defendants Fradin, Fulgoni, Henderson, Katz, Korn, and Lewis. Therefore, Defendants cannot credibly assert that Plaintiffs' claims against these Defendants are subject to the heightened standard of Rule 9(b) of the Federal Rules of Civil Procedure rather than the Rule 8 notice-pleading standard. The fact that the Complaint asserts fraud claims based on some of these same statements (when made by

different Defendants) does not preclude Plaintiffs from concurrently asserting negligence claims against these six Defendants. *See, e.g.*, *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 513 (S.D.N.Y. 2010) (noting that while the complaint "is replete with allegations of fraud against the iStar defendants . . . it does not levy such charges at the underwriters" and concluding "that the allegations against the underwriters sound in negligence and are not governed by Rule 9(b)").

Furthermore, Plaintiffs' assertion of fraud-based claims against comScore, Matta, and Abraham does not preclude Plaintiffs from simultaneously asserting negligence-based claims against these Defendants, and does not import the heighted Rule 9(b) pleading standard to these negligence-based claims. *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (applying Rule 8 standard and recognizing that plaintiffs' allegation that "most, if not all, of the defendants, were engaged in a massive fraud . . . does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 375 (S.D.N.Y. 2011) (same).

In arguing that Plaintiffs' §14(a) claim "unmistakably sounds in fraud," the comScore 14(a) Defendants seize upon Plaintiffs' use of the phrase "materially false and misleading" in describing the misstatements in the Joint Proxy, arguing that these words "are classically associated with fraud." comScore Br. at 37-38 (quoting *Rombach*, 355 F.3d at 172). However, this argument ignores that "the text of Rule 14a-9 itself prohibits the speaker from uttering 'false or misleading' statements 'with respect to any material fact . . . .'" *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 321 (S.D.N.Y. 2010) (quoting 17 C.F.R. § 240.14a–9(a) and rejecting argument that plaintiffs' "characterization of the Joint Proxy as 'false and misleading' assert[s] [sic] claims that sound in fraud"); *see also In re Refco*, 503 F.

Supp. 2d at 632 ("the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent"). Thus, Plaintiffs' recitation of the applicable statutory language in pleading their §14(a) claim does not invoke the heightened pleading standard for fraud under Rule 9(b). *See In re Bank of Am.*, 757 F. Supp. 2d at 321.

The comScore 14(a) Defendants also assert that "Plaintiffs' disclaimer of a basis in fraud is of no consequence." comScore Br. at 38. This assertion is unfounded, as similar disclaimers have been deemed adequate by courts in this District to preclude application of the Rule 9(b) pleading standard. *See, e.g.*, *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) (applying Rule 8 standard to non-fraud Securities Act claims and concluding: "Because plaintiffs have specifically disclaimed any component of fraud in their Sections 11 and 12(a)(2) claims, there are no 'averments of fraud' . . . [Thus,] these allegations clearly 'sound in negligence,' do not rely on fraudulent acts, and allege no fraudulent intent.").

Further undermining the comScore 14(a) Defendants' assertion that Plaintiffs' §14(a) claim sounds in fraud is the fact that Plaintiffs have structured the Complaint to carefully separate fraud and non-fraud theories of liability into wholly independent sections of the Complaint, making it "easy to distinguish between the two, and the substance of the allegations keeps the distinction as clear as does the [C]omplaint's structure." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 425 (S.D.N.Y. 2011). The allegations supporting Plaintiffs' negligence claims against the comScore 14(a) Defendants are thus completely independent from any fraud-based allegations contained in the Complaint. *See generally* ¶¶527-38, 550-638.

Plaintiffs' §14(a) claim against the comScore 14(a) Defendants does not sound in fraud, and therefore is governed by Rule 8, not the heightened Rule 9(b) standard. Even if Plaintiffs' §14(a) claim were subject to the heightened pleading standard, Plaintiffs would only be required to plead their allegations of negligence with particularity, as "negligence is not a state of mind." *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009). Plaintiffs have clearly met this particularity standard, as discussed below. Thus, the comScore 14(a) Defendants' contention that Plaintiffs must plead a strong inference of scienter to prevail on this claim under a 9(b) standard is baseless. *Cf.* comScore Br. at 38-39.

### 2.    Plaintiff Has Adequately Pleaded a Section 14(a) Claim

The comScore 14(a) Defendants' assertion that Plaintiffs fail to plead negligence is misplaced. As an initial matter, "a proxy solicitation that contains a misleading misrepresentation or omission violates [Section 14(a)] even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials." *Beck*, 559 F.3d 680 at 682. Indeed, Rule 14a-9 imposes a duty to "fully and fairly furnish[] all the objective material facts" related to a transaction in a proxy statement so that shareholders can "make an informed investment decision." *Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1990); *see also In re Bank of Am.*, 757 F. Supp. 2d at 290 ("Section 14(a) is satisfied '[o]nly when the proxy statement fully and fairly furnishes all the objective material facts' to allow a reasonably prudent investor to make an informed investment decision.").[19] Because the Joint Proxy contained materially misleading statements and omissions, Plaintiffs have stated a Section 14(a) claim against the comScore 14(a) Defendants. *See Wilson v.*

---

[19] The comScore Defendants do not challenge the materiality of the false and misleading statements and omissions in the Joint Proxy. *See generally* comScore Br.

*Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the [*Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973)] negligence standard."); *see also* ¶¶625, 634 (alleging the comScore 14(a) Defendants' negligence).

### 3. Plaintiffs Adequately Plead a §11 Claim Against the comScore 14(A) Defendants

The comScore 14(a) Defendants repeat the same arguments regarding Plaintiffs' §11 claim that they made regarding Plaintiffs' Section 14(a) claims. *See* comScore Br. at 40. For the reasons stated in Section III.B.2. above, these arguments should be rejected. In addition, these arguments should be rejected out of hand with respect to comScore, as the Company is strictly liable under §11. *See, e.g., Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("Section 11 imposes strict liability on issuers").[20]

### 4. Plaintiffs State Section 14(A) and Section 11 Claims Against Wesley

To the extent that Wesley contends that Plaintiffs have failed to adequately pleaded a misstatement under §§14(a) and 11 because the accounting treatment applied to comScore's nonmonetary transactions was a statement of opinion, this contention is unfounded, as discussed in Section III.A.1.c. above. Thus, because the Joint Proxy contained materially misleading statements and omissions, Plaintiffs have stated a §14(a) claim against Wesley. *See Wilson*, 855 F.2d at 995 ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to

---

[20] Notably, Defendants do not challenge Plaintiffs' allegation that the Registration Statement failed to comply with Item 503. ¶¶614-16. *See generally* comScore Br.

satisfy the [*Gerstle*] negligence standard.").[21] Similarly, because Plaintiffs have sufficiently pleaded that the Registration Statement contained untrue statements of material fact and material omissions, they have stated a §11 claim against Wesley. *See, e.g., Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* [§11] case.").

## IV.    <u>CONCLUSION</u>

For all of these reasons, Plaintiffs respectfully request that the Court deny the Motions to Dismiss of the comScore Defendants, Tarpey, and Wesley. If any claims are dismissed, Plaintiffs respectfully request the opportunity to replead.

Dated: April 13, 2017

 /s/ John C. Browne
John C. Browne
Jai K. Chandrasekhar
Jesse L. Jensen
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
jai@blbglaw.com
jesse.jensen@blbglaw.com

-       and       -

---

[21]  Wesley's arguments with respect to the Joint Proxy's failure to disclose the findings of Grant Thornton's due diligence (Def. Br. at 22) are wholly misplaced—Plaintiffs are not asserting that Wesley and the comScore Defendants violated Section 14(a) by failing to disclose the red flags identified in the Grant Thornton report. *See generally* Compl. Section XV.

Blair A. Nicholas
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323
Blair@blbglaw.com

*Counsel for Lead Plaintiffs the Fresno
County Employees' Retirement Association
and the Employees' Retirement System of
the City of Baton Rouge and Parish of East
Baton Rouge and Proposed Lead Counsel
for the Class*

Sharan Nirmul
Daniel C. Mulveny (*pro hac vice* to be filed)
Margaret E. Onasch (*pro hac vice* to be
filed)
KESSLER TOPAZ MELTZER
& CHECK LLP
280 King of Prussia Road
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056
Radnor, PA 19087
snirmul@ktmc.com
dmulveny@ktmc.com
monasch@ktmc.com

*Counsel for Named Plaintiff William Huff*

Douglas McKeige
The McKeige Law Firm
1337 Flagler Drive
Mamaroneck, NY 10543
*Additional Plaintiffs' Counsel*