**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**FRESNO COUNTY EMPLOYEES' RETIREMENT ASSOCIATION ET AL., individually and on behalf of all others similarly situated,**

**Plaintiffs,**

**- against –**

**COMSCORE, INC. ET AL,**

**Defendants.**

---

**16-cv-01820 (JGK)**

**OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

This is a consolidated securities fraud action. The defendants are (1) comScore, Inc. ("comScore") and several of its current and former officers and directors, specifically, Kenneth J. Tarpey, Melvin Wesley III, Serge Matta, Magid M. Abraham, William J. Henderson, Russell Fradin, Gian Fulgoni, William Katz, Ronald J. Korn, and Joan Lewis (collectively, the "comScore defendants"); and (2) the Rentrak Corporation, a subsidiary of comScore ("Rentrak"), and several of its former directors, specifically, David Boylan, David I. Chemerow, William Engel, Patricia Gottesman, William Livek, Anne MacDonald, Martin O'Connor, Brent Rosenthal, and Ralph Shaw (collectively, the "Rentrak defendants") (together with the comScore defendants, the "defendants").

The Second Consolidated Amended Class Action Complaint (the "SAC") is divided into two parts and asserts two theories of

liability. First, the Lead Plaintiffs --- the Fresno County Employees' Retirement Association, and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge --- and individual plaintiff William Huff ("Huff") (collectively, the "plaintiffs") assert claims on behalf of a proposed class of investors in comScore who purchased securities of comScore from February 11, 2014 through November 23, 2016 (the "Class Period"). SAC ¶ 662. In Count I, the plaintiffs allege that comScore, Matta, Wesley, Abraham, and Tarpey (collectively, the "10(b) defendants") made material misstatements in connection with comScore's recognition of revenue for nonmonetary barter transactions. The plaintiffs claim that the 10(b) defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5 (the "Section 10(b) claims" or "10(b) claims"). In Count II, the plaintiffs allege control person liability against Matta, Wesley, Abraham, and Tarpey (collectively, the "individual 10(b) defendants") under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Second, the plaintiffs allege that the disclosures and solicitations relevant to the January 29, 2016 merger (the "Merger") between comScore and Rentrak contained material misstatements and omissions also in connection with comScore's

recognition of revenue for nonmonetary barter transactions. In Count III, plaintiff Huff asserts on behalf of a proposed class of investors who held the common stock of Rentrak as of December 10, 2015, and were entitled to vote on the Merger, see SAC ¶ 662, claims pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 79n(a), and Rule 14a-9, promulgated thereunder, 17 C.F.R. § 240.14a-9, against comScore, Matta, Wesley, Abraham, Fulgoni, Fradin, Henderson, Katz, Korn, and Lewis (the "comScore Merger defendants"). In Count IV, plaintiff Huff asserts a similar claim solely against the Rentrak defendants. The comScore Merger defendants sued in Count III and the Rentrak defendants sued in Count IV are referred to collectively as the "Merger defendants." In Count V, plaintiff Huff, on behalf of a proposed class of investors who acquired comScore's common stock pursuant to a registration statement filed with the United States Securities and Exchange Commission (the "SEC") on October 30, 2015, and subsequently amended, asserts a claim pursuant to Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, against the comScore Merger defendants.

Pending before the Court are four motions pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the SAC for failure to state a claim on behalf of (1) all of the comScore defendants collectively; (2) Wesley individually; (3) Tarpey individually; and (4) the Rentrak defendants. This Court has

subject matter jurisdiction pursuant to 15 U.S.C. §§ 77v and 78aa, and 28 U.S.C. § 1331.

For the following reasons, the motions are **denied**.

**I.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff[s] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take

judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773–74 (2d Cir. 1991); see also In re Eletrobras Sec. Litig., No. 15-CV-5754 (JGK), 2017 WL 1157138, at *1-2 (S.D.N.Y. Mar. 27, 2017).

**II.**

The following facts are undisputed or accepted as true for purposes of the defendants' motions to dismiss. The SAC is divided into two parts. The first part relates to Counts I and II, and the second part to Counts III, IV, and V. The facts relevant to one set of Counts will not be repeated except as necessary.

**A.**

The following facts are primarily relevant to Counts I and II.

comScore is a media measurement and digital analytics company that analyzes audience and consumer behavior, including by assessing Internet traffic and usage. SAC ¶ 40. comScore provides its data analysis services to its customers --- such as marketers and advertisers --- regarding the size and demographics of audiences and consumers. SAC ¶ 40.

The individual 10(b) defendants were each high-ranking officers and directors of comScore.

Abraham is the co-founder of comScore and served as the company's CEO from its founding in 1999 until March 1, 2014. SAC ¶ 37. From March 1, 2014 until July 21, 2016, Abraham served as the Executive Chairman of the Board of Directors. SAC ¶ 37.

Matta began working for comScore in 2000, and served as the company's President from June 2013 until August 5, 2016. SAC ¶ 35. Matta replaced Abraham as comScore's CEO, a position he held from March 1, 2014 until August 5, 2016. SAC ¶ 35. Matta became a director in April 2014. See comScore Amended Form 10-K dated Apr. 24, 2015 at 1.

Tarpey was comScore's CFO from April 20, 2009 until August 5, 2014. SAC ¶ 38. Wesley replaced Tarpey as comScore's CFO, a position he held from August 29, 2014 until August 5, 2016. SAC ¶ 36.

During the Class Period, comScore entered into a series of data sharing agreements with other companies. Pursuant to these agreements, substantially no money changed hands; instead, comScore and its counterparties swapped data-for-data, making the data swaps nonmonetary "barter" transactions. SAC ¶¶ 9, 71. The ostensible purpose of the data swaps was to give comScore access to more data to improve its analytics products and services. See SAC ¶¶ 83-84.

Under United States Generally Accepted Accounting Principles ("GAAP"), "a nonmonetary transaction will ordinarily have no effect on a company's operating income [or cash flow], because the [c]ompany will recognize matching revenue and expense from the exchange. In other words, any revenue will be cancelled out by the matching expense." SAC ¶ 166. While nonmonetary transactions should ultimately have no effect on a company's operating income or cash flow, they can have a permanent impact on a company's reported revenues and expenses. Moreover, a company can delay recognizing expenses for nonmonetary transactions due to "timing differences in the delivery and receipt of the respective nonmonetary assets exchanged." SAC ¶ 168.

comScore recognized significant revenues on a periodic basis during the Class Period by accounting for the nonmonetary data assets on a fair value basis, with the amount of revenue recognized in such transactions increasing as the Class Period progressed. SAC ¶ 144. comScore booked tens of millions of dollars in revenue from these nonmonetary transactions based on the determination by the 10(b) defendants of the "fair value" of the data exchanged. SAC ¶ 72.

comScore reported total revenues of $286.9 million for 2013, of which $3.2 million (1.12%) was attributed to nonmonetary transactions; total revenues of $329.1 million for

2014, of which $16.3 million (4.95%) was attributed to nonmonetary transactions; and total revenues of $271.1 million for the first three quarters of 2015, of which $23.7 million (8.74%) was attributed to nonmonetary transactions. SAC ¶ 72. In sum, comScore recognized $43.2 million in nonmonetary revenue during the Class Period, which accounted for a substantial proportion (around 40.3%) of comScore's revenue growth during the period. SAC ¶ 73.

As comScore would later admit, "as a result of certain instances of misconduct and errors in accounting determinations," the company should have recognized *no* revenue from these nonmonetary transactions. Micheletto Decl., Ex. B (comScore Form 8-K dated Nov. 23, 2016). comScore will have to restate its financial results from end-of-year 2013 through end-of-year 2015. SAC ¶ 17. The crux of the allegations in the SAC is that the 10(b) defendants knew at the time that they were misstating nonmonetary revenue in an effort to inflate comScore's reported revenues and revenue related metrics, such as adjusted earnings before interest, taxes, depreciation, and amortization ("Adjusted EBITDA").[1] See, e.g., SAC ¶ 167.

[1] "Adjusted EBITDA" was not calculated in accordance with GAAP. See Hendon Decl., Ex. 1 (comScore 2013 Form 10-K at 65).

comScore's disclosures during the Class Period stated that comScore was accounting for nonmonetary revenue in compliance with ASC 845 of GAAP:

> The Company accounts for nonmonetary transactions under ASC 845, Nonmonetary Transactions. Nonmonetary transactions with commercial substance are recorded at the estimated fair value of assets surrendered including cash, if cash is less than 25% of the fair value of the overall exchange, unless the fair value of the assets received is more clearly evident, in which case the fair value of the asset received is used.

SAC ¶ 144. According to ASC 845, nonmonetary transactions should be accounted for on a fair value basis unless any one of three conditions applies, in which case the transaction should be accounted for on a historical cost basis:

> A nonmonetary exchange shall be measured based on the recorded amount . . . of the nonmonetary asset(s) relinquished, and not on the fair values of the exchanged assets, if any of the following conditions apply:
>
> a. The fair value of neither the asset(s) received nor the asset(s) relinquished is determinable within reasonable limits.
>
> b. The transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange.
>
> c. The transaction lacks commercial substance.

SAC ¶ 147 (quoting ASC 845-10-30-3). ASC 845 defines "commercial substance" to mean that "the entity's future cash

flows are expected to significantly change as a result of the exchange." SAC ¶ 147 (quoting ASC 845-10-30-4).

The plaintiffs point to analyst reports and comScore's filings to show that the market considered revenue and Adjusted EBITDA to be key metrics for evaluating the company's performance. See, e.g., SAC ¶¶ 41-45. With each earnings announcement, at least some of the 10(b) defendants touted comScore's "record" revenue and Adjusted EBITDA numbers, which were consistently ahead of expectations, and prompted comScore to raise its revenue guidance on several occasions. See, e.g., SAC ¶¶ 48, 50, 52, 54, 57-61, 276, 308. Analysts reacted bullishly to the earnings announcements, focusing on revenue and Adjusted EBITDA. See, e.g., SAC ¶¶ 49, 51, 53, 55, 62. So too did the market: comScore's stock price consistently increased in response to comScore's earnings announcements, soaring from approximately $30.97 per share in February 2014 to a Class Period high of $64.64 in August 2015. SAC ¶¶ 47, 63.

The SAC alleges that the individual 10(b) defendants were financially motivated to inflate nonmonetary revenue. In particular, on November 7, 2014, Matta and Wesley received grants of Restricted Stock Units ("RSUs") that would trigger if comScore's stock attained predetermined price points ($48, $50, $55, and $60 per share) during any consecutive 30-day period. SAC ¶¶ 7, 64. At the time, comScore's stock was trading at

around $43 per share. The RSUs met each successive price point following successive earnings reports, which were bolstered by large amounts of nonmonetary revenue. The RSUs completely vested on August 23, 2015 on the heels of comScore’s second quarter 2015 earnings announcement. SAC ¶¶ 65-67. Matta received $7.4 million and Wesley $1.64 million in comScore shares. SAC ¶ 67. On the investor call for that quarter, Matta and Wesley trumpeted comScore’s second quarter 2015 revenue growth as compared to the second quarter of 2014. SAC ¶¶ 60-61. For the second quarter of 2015, comScore recognized $10.8 million in nonmonetary revenue alone, which constituted 85.7% of the revenue growth for that quarter. SAC ¶ 74.

The plaintiffs allege that the 10(b) defendants’ scheme to inflate revenues threatened to unravel soon thereafter. On August 31, 2015, the Wall Street Journal published an article entitled “Is comScore’s Revenue Growth as Good as it Seems?” in which --- as the title suggests --- the newspaper questioned comScore’s recognition of nonmonetary revenue on a fair value basis, noting that nonmonetary revenue was driving much of comScore’s revenue growth. SAC ¶¶ 75-78.

On September 2, 2015, comScore’s stock price fell from $52.21 to $44.3. SAC ¶ 79. The plaintiffs allege that the 10(b) defendants immediately engaged in damage control to maintain comScore’s artificially inflated stock price.

On September 3, 2015, the plaintiffs allege that Matta and Wesley participated in a private conference call arranged by SunTrust Robinson Humphrey (the "SunTrust Call") for a limited group of institutional investors in which Matta and Wesley "vigorously defended" comScore's accounting of nonmonetary revenue. SAC ¶¶ 82-85.

Wesley explained the rationale for the barter data swaps (as opposed to paying cash for the data). Wesley stated that counterparties were more willing to engage in barter transactions with respect to data because it can be "difficult" to quantify the cash value of such data. SAC ¶¶ 84-85. Wesley also stated that comScore considered the data to be more valuable than did its counterparties, insisting that comScore acquired its barter counterparties' data more cheaply in the nonmonetary deals than comScore would by paying cash, and that the data comScore received in the barter deals was more valuable than the data it delivered. SAC ¶¶ 85-86. Wesley asserted that comScore properly accounted for its nonmonetary transactions based on comparable historic cash sales for the same data that it had bartered. SAC ¶ 87. Wesley added that comScore understood that it could not recognize revenue in connection with nonmonetary data swaps unless it had "historic cash transactions" for comparison, but assured the investors that the barter counterparties were in fact "cash customers" for the data

that would have been willing to pay cash if necessary. SAC ¶¶ 87-89.

Nevertheless, investors questioned whether comScore's accounting for nonmonetary transactions could "overstate . . . revenue and understate . . . expense." SAC ¶ 90. Wesley avowed that comScore's accounting was based on "historic sales for the same product," with Matta stating that "the guidelines are very, very strict and we follow them to the 't.'" SAC ¶ 90. However, Matta stated that comScore would going forward "avoid these [barter] transactions whenever possible." SAC ¶ 91.

According to the SAC, Matta and Wesley's efforts worked. In a report dated September 3, 2015, Bream Capital wrote that it had met with comScore's management regarding the nonmonetary revenue issue, and that management expected nonmonetary revenue to drop in 2016, which led Bream Capital to reiterate its "buy" rating and $67 price target. SAC ¶ 81.

The plaintiffs also allege that Matta and Wesley had a lunch meeting with Cantor Fitzgerald in which they reassured Cantor Fitzgerald that comScore's accounting for nonmonetary transactions was proper. SAC ¶ 80. In a September 4, 2015 report, Cantor Fitzgerald stated: "While we're not big fans of barter transactions, we believe management has adequately addressed the logic behind pursuing them and their benefits to

the business. . . . We remain positive on [comScore] and maintain our BUY rating and $64 [target price].” SAC ¶ 80.

Meanwhile, comScore was engaged in serious negotiations to acquire Rentrak, another media-measurement company that focused on television and video data analysis. SAC ¶ 13. The SAC alleges that comScore had considered acquiring Rentrak since around December 2013, two months before the beginning of the Class Period. Browne Decl., Ex. 4 (comScore and Rentrak Form 424(b)(3) Joint Proxy) at 37; SAC ¶ 188. Discussions heated up in April 2015, which coincided with escalating amounts of reported nonmonetary revenue. SAC ¶ 188. On September 29, 2015, comScore agreed to acquire Rentrak in an all-stock transaction that valued Rentrak at $827 million. SAC ¶¶ 13, 93, 95. The SAC alleges that the Merger was made possible by the misstated nonmonetary revenues, which had inflated comScore’s stock price. SAC ¶¶ 95, 188.

Following the disclosure that comScore intended to acquire Rentrak, comScore announced “another quarter of record revenues” for the third quarter of 2015. SAC ¶ 99. During an earnings call on November 5, 2015, Wesley addressed the nonmonetary revenue issue, noting that he expected barter revenue to decline in the future. SAC ¶ 100.

The market was placated. Cantor Fitzgerald wrote in a November 5, 2015 report that it “believe[d] [nonmonetary

revenue] concerns should now be put to rest," raised its stock price target from $60 to $64, and "maintain[ed] a BUY rating on [comScore] after virtually in-line 3Q:15 results, which show that organic growth remains very healthy even as nonmonetary revenue (a hot topic throughout the quarter) drops below 10% of total revenue." SAC ¶ 102. On November 6, 2015, comScore's stock price increased more than 5%, from $44.31 to $46.57. SAC ¶ 103.

On November 25, 2015, the SEC issued a nonpublic comment letter to comScore regarding the company's accounting for nonmonetary revenue. SAC ¶¶ 14, 104. In a response signed by Wesley (with a cc to Matta) published on the SEC's website on or around December 3, 2015, comScore "supplementally advise[d] the Staff that all of its monetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized. . . . The Company concluded that such transactions were consistent with its accounting policies and with the terms of similar transactions with other ordinary course transactions but for the nonmonetary element." SAC ¶¶ 104-05.

On January 28, 2016, the shareholders of comScore and Rentrak approved the Merger. Rentrak became a wholly owned subsidiary of comScore. SAC ¶ 97.

On February 17, 2016, comScore filed a Form 8-K and accompanying press release to preannounce its annual results for 2016. SAC ¶ 106. The press release stated: "comScore achieved record annual GAAP revenue of $368.8 million, an increase of 12% compared to 2014." SAC ¶ 106. On the same day, Matta and Wesley participated in an investor conference call during which Matta touted comScore's "record revenues" and Wesley emphasized the decreasing importance of nonmonetary revenue to comScore's revenue growth. SAC ¶ 107.

On February 29, 2016, the plaintiffs allege that the 10(b) defendants' scheme finally began to fall apart when comScore filed a Form 12b-25 Notification of Late Filing to disclose that it would be unable to file its 2015 Form 10-K because:

> On February 19, 2016, the Audit Committee of the Company's Board of Directors (the "Audit Committee") received a message regarding certain potential accounting matters. In response, the Audit Committee immediately commenced a review of the matters with the assistance of independent counsel and advisors. As a result, the Company has not finalized its financial statements pending completion of the review, and the Company is not in a position to file its Form 10-K until after the completion of the Audit Committee's review. The Company expects to file the Form 10-K by March 15, 2016, which is within the permitted 15-day extension of the prescribed due date of February 29, 2016.

SAC ¶ 109. On March 1, 2016, comScore's stock price fell by 2.8% from $41.15 to $40.00. Several analysts cautioned investors not to overreact because the company expected to file its end-

of-year results by March 15, 2015. SAC ¶ 110. On March 7, 2016, comScore announced that it was unlikely to meet that filing date due to the internal review. SAC ¶ 111. comScore also disclosed that it had "proactively" contacted the SEC. SAC ¶ 112.

Analysts reacted negatively, with the Wall Street Journal querying whether "comScore pushed the envelope with its accounting . . . too far." SAC ¶ 113. On March 7, 2016, comScore's stock price plummeted by 33.5%, from $40.71 to $27.04. SAC ¶ 113.

Over the next few months, in several filings, comScore announced that it would have to postpone its earnings announcements due to what had become an internal investigation. SAC ¶¶ 114-16. The NASDAQ threatened to delist comScore for failure to comply with the Exchange's periodic reporting requirements. SAC ¶¶ 114, 120-21, 127-29.

On July 22, 2016, comScore announced that Abraham had stepped down as Executive Chairman of comScore's Board of Directors, but stated that he would remain a director through the expiration of his term in 2018. SAC ¶ 117.

On August 10, 2016, comScore announced that it still could not release any earnings information, but disclosed:

> The internal investigation is substantially complete, and the Audit Committee has identified certain areas of potential concern, including with respect to certain accounting and disclosure practices and controls that the Company, with input from its

> consultants and counsel, is further analyzing. The accounting transactions at issue mainly relate to certain non-monetary transactions. The Company has not yet concluded whether any of these or other transactions of concern were incorrectly recorded at the time of the transactions.

SAC ¶ 118. On the same day, comScore announced that Matta and Wesley would no longer serve as the company's CEO and CFO, respectively. SAC ¶ 119. However, both Matta and Wesley were to remain with the company. Matta was to remain on the Board of Directors and serve as an Executive Vice Chairman and an advisor to comScore's new CEO, Fulgoni, who had co-founded comScore along with Abraham. SAC ¶ 119. Wesley was to serve as an Executive Vice President and an advisor to comScore's new CFO, Chemerow, the company's former Chief Revenue Officer. SAC ¶ 119.

One month later, on September 8 and 12, 2016, respectively, comScore announced that Wesley and Matta had tendered their resignations effective October 10, 2016. comScore Form 8-K dated Sept. 8, 2016; comScore Form 8-K dated Sept. 12, 2016; see also SAC ¶ 36. Matta would, however, remain on the Board of Directors.

On September 15, 2016, comScore filed a Form 8-K announcing the partial results of the internal investigation: the Audit Committee had concluded that comScore would have to restate its financial results for the years ended December 31, 2013 and 2014 and for the quarters ended September 30, 2015, June 30, 2015,

and March 31, 2015, as well as its preliminary financial statements for the quarter and year ended December 31, 2015. SAC ¶ 122. comScore disclosed that,

> "[it had] concluded that revenue and expenses associated with all nonmonetary transactions during [these] periods . . . should be reversed and accounted for at historical cost rather than at fair value. *There is no historical cost basis associated with the assets that [comScore] exchanged and therefore there should be no revenue recognized or expenses incurred for those transactions.* While a nonmonetary transaction inherently has no effect on operating income or cash flow over the life of the relevant agreement governing such transaction, the timing of revenue recognized relative to the related expense recognized may have an effect on a periodic basis. As previously disclosed, the Company does not expect in the future to enter into any nonmonetary transactions that would result in the recognition of revenue.

Hendon Decl., Ex. 7 (comScore Form 8-K dated Sept. 23, 2016) (emphasis added); see also SAC ¶ 123. At that point, comScore attributed the misstatements to "certain activities that reflect errors in judgment with respect to certain accounting practices and resulting disclosures as well as deficiencies in the Company's internal control system." Hendon Decl., Ex. 7. comScore also disclosed: "Based on the results of the investigation to date, certain remediation actions have been recommended by the Audit Committee, with a view toward improved accounting and internal control practices." Hendon Decl., Ex. 7.

In a Form 8-K dated November 23, 2016, comScore disclosed the results of the completed internal investigation. comScore

reaffirmed that it would have to restate the aforementioned financial statements because it could not “support” its previous accounting for nonmonetary transactions. SAC ¶ 130. However, in what the Wall Street Journal described as “a pre-Thanksgiving turkey . . . buried after the market closed ahead of the holiday,” SAC ¶ 130, the company disclosed that it no longer attributed the misstatements to mere “errors in judgment”; rather, “The Audit Committee’s investigation concluded that, as a result of *certain instances of misconduct and errors in accounting determinations*, adjustments to the Company’s accounting for certain nonmonetary and monetary transactions were required.” Micheletto Decl., Ex. B (emphasis added). According to the disclosure:

> Based on its investigation, the Audit Committee also found that, for the nonmonetary transactions under review, facts collected during the investigation called aspects of the transactions into question, including instances where additional arrangements were entered into and not properly disclosed to the Company’s accounting group and instances where there did not appear to be a clear need for all of the data that was being exchanged. . . .
>
> The Audit Committee also determined that the accounting treatment for certain monetary transactions will need to be adjusted, principally relating to the timing of revenue recognition. One of these transactions involved over-delivery of data that recurred in multiple periods, two others included potential undisclosed additional arrangements that required contemporaneous contracts to be accounted for as a single arrangement, and one related to partially delayed invoicing for delivered data inconsistent with the terms of the contract. The Company is in the

> process of reviewing the adjustments for these transactions as well as several journal entries identified during the investigation.

Micheletto Decl., Ex. B. The disclosure announced that "[t]he Audit Committee's investigation also identified concerns regarding internal control deficiencies, including concerns about tone at the top; errors in judgment identified with respect to issues reviewed; information not having been provided to the Company's accounting group and its external auditors; and the sufficiency of public disclosures made by the Company about certain performance metrics." Micheletto Decl., Ex. B. In contrast to the remedial plans previously announced, comScore disclosed that it would consider and implement stronger remedial measures to improve accounting and internal controls, including, "*separating certain Company personnel*; enhancing communications to support a robust control environment; strengthening the Company's disclosure controls, including through disclosure committee enhancements; strengthening controls around the Company's revenue recognition practices, including controls related to contract administration and delivery of data; and enhancing the Company's internal audit and compliance functions." Micheletto Decl., Ex. B (emphasis added). Finally, comScore announced that it would be reviewing transactions outside the scope of the original investigation, which could

require additional, material accounting adjustments to monetary transactions. Micheletto Decl., Ex. B.

Within a month, in December 2016, Abraham and Matta each resigned from the Board of Directors. SAC ¶¶ 35, 37.

On February 8, 2017, NASDAQ suspended trading of comScore common stock. Brown Decl., Ex. 3 (comScore Form 8-K dated Mar. 9, 2017).

During the Class Period, Abraham sold 92% of the shares that he directly owned, while related parties sold 57% of their shares, for a total value of $31.5 million. SAC ¶¶ 176 & n.1, 181. Matta sold 68% of his shares for a value of $18.1 million. SAC ¶¶ 176, 179. Wesley sold 83% of his comScore shares for a value of $3.4 million.[2] See Micheletto Decl., Exs. G, J; see also SAC ¶¶ 176, 180. Tarpey sold 22% of his shares for a value of $1.8 million. SAC ¶¶ 176, 182.

The SAC alleges that each individual 10(b) defendant made numerous materially false and misleading statements during the Class Period, primarily in comScore's filings and on investor calls. See SAC ¶¶ SAC 200-494. Each of the individual 10(b) defendants signed at least one earnings disclosure that misstated comScore's revenue and revenue related metrics, see,

[2] As the 10(b) defendants correctly note, the SAC overstated Wesley's sales because it failed to factor the cost of certain options that Wesley exercised (a fact the plaintiffs do not contest).

e.g., SAC ¶¶ 217, 311, and at least one Sarbanes–Oxley Act ("SOX") Certification affirming the truth and completeness of the reports, and attesting to comScore's internal controls over financial reporting and disclosure systems. See, e.g., SAC ¶¶ 226, 258. The SAC alleges that the 10(b) defendants knew that any statement regarding revenue or related revenue metrics (including projections), or compliance with GAAP, was false and misleading at the time the statement was made.

**B.**

The following facts are primarily relevant to Counts III, IV, and V.

In the midst of Merger negotiations between comScore and Rentrak during the summer of 2015, Rentrak retained the accounting firm Grant Thornton LLP ("Grant Thornton") to perform financial due diligence on comScore. SAC ¶¶ 552-53. In a report dated September 4, 2015 (the "Grant Thornton Report"), Grant Thornton warned Rentrak's Board of Directors that:

- comScore's use of nonmonetary, i.e., barter, transactions for the sharing of data or exchange of services that comScore had accounted for as revenue "may have provided opportunities for [comScore] Management to 'manage' revenues to meet targets."
- comScore's use of nonmonetary transactions "may not be fully understood by analysts and investors. It was unclear how much comScore's stock price may be impacted if comScore's nonmonetary transactions are better understood."

- It was unclear how much analysts had incorporated non-monetary transactions into their forecasts for comScore. And it was unclear if analysts understood how non-monetary transactions affected revenue and earnings.

- comScore’s consensus revenue for virtually all periods would not have been achievable without the nonmonetary revenue.

SAC ¶ 557.[3] Despite the “red flags,” Rentrak ultimately agreed to the Merger with comScore, which was announced on September 29, 2015 in a Form 8-K with the merger agreement attached as an exhibit. SAC ¶ 559. On December 23, 2015, the companies filed a Joint Proxy recommending that their respective shareholders vote in favor of the Merger. SAC ¶ 563. While the Joint Proxy disclosed the fact of Grant Thornton’s due diligence, SAC ¶ 579, the Joint Proxy and other proxy solicitation materials did not discuss any red flags identified by Grant Thornton. See, e.g., SAC ¶¶ 563-64. Moreover, plaintiff Huff alleges that the Joint Proxy (including documents incorporated by reference) and other proxy solicitation materials misstated comScore’s revenue and other items, such as comScore’s compliance with GAAP. See SAC ¶¶ 566-616.

In addition, in connection with the Merger, comScore filed a registration statement (the “Registration Statement”) that was declared effective, as amended, on December 23, 2015. SAC ¶ 613.

[3] There is no allegation that any of the comScore defendants learned about the contents of the Grant Thornton Report during the Class Period.

The Registration Statement was signed by Matta, Wesley, Abraham, Fulgoni, Fradin, Henderson, Katz, Korn, and Lewis (the “comScore individual Merger defendants”). The Registration Statement included a preliminary prospectus and other documents related to the Merger that contained, among other things, allegedly untrue statements related to reported revenues and revenue related metrics. SAC ¶¶ 613-616.

**III.**

The 10(b) defendants have moved to dismiss the 10(b) claims in Count I for failure to plead an actionable misrepresentation or omission, and for failure to plead scienter. Tarpey has separately moved to dismiss the 10(b) claims for failure to plead materiality.

Section 10(b), as effectuated by Rule 10b-5, makes it “unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.” 17 C.F.R. § 240.10b–5(b). To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs. Ganino v. Citizens

Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 10 (S.D.N.Y. 2016).

**A.**

In light of comScore's admission that it must restate its financial statements, there can be no dispute that the SAC pleads numerous false and misleading misstatements with respect to revenue, revenue related metrics, and comScore's compliance with GAAP. See Varghese v. China Shenghuo Pharm. Holdings, Inc., 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) ("Misreported financial information clearly amounts to a false statement of fact."). Under GAAP, "previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) (citations omitted). "Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." S.E.C. v. Espuelas, 908 F. Supp. 2d 402, 410 n.5 (S.D.N.Y. 2012) (quoting Atlas Air, 324 F. Supp. 2d at 486). The plaintiffs have sufficiently alleged

that the revenue numbers that comScore reported during the Class Period were improperly inflated by $43.2 million.[4]

Rather than challenge the falsity of the vast majority of the statements, the 10(b) defendants argue that the statements are not actionable. The majority of the 10(b) defendants' arguments rest on the same proposition, namely, that the SAC does not establish mendacity on the part of the speaker. The 10(b) defendants argue that the SAC alleges, at best, that the restatement was the result of innocent "human" accounting errors, and thus that the misstatements are not actionable because they were subjective opinions, forward-looking statements, and puffery.

But comScore has admitted to wrongdoing. The 10(b) defendants seriously understate comScore's stated rationale for the restatement: "The Audit Committee's investigation concluded that, as a result of *certain instances of misconduct and errors in accounting determinations*, adjustments to [comScore's] accounting for certain nonmonetary and monetary transactions were required." Micheletto Decl., Ex. B (emphasis added). Read in the light most favorable to the plaintiffs, the accounting for nonmonetary transactions cannot be supported because of misconduct. Based on other portions of the disclosure, it is a

[4] The plaintiffs do not rely on the disclosure that comScore's revenues from monetary transactions will have to be adjusted to support their claims.

reasonable inference that comScore entered into unnecessary nonmonetary transactions that were intentionally and erroneously assessed on a fair value basis even though there was no legitimate justification for that treatment and instead that the reason for this treatment was to boost revenues. See Micheletto Decl., Ex. B (noting the lack of a "clear need" for the nonmonetary transactions). Based on the disclosure, it is also plausible that comScore's accounting group and auditor (Ernst & Young) were not given pertinent information about the transactions so that they would not detect the fraud. See Micheletto Decl., Ex. B.

Contrary to the 10(b) defendants' arguments, this is not a case where a restatement can plausibly be attributed to mere errors in accounting judgment. The 10(b) defendants quibble over the dictionary definition of "misconduct," arguing that misconduct can be consistent with wholly innocent or accidental behavior. The meaning of misconduct cannot be parsed in the way the 10(b) defendants propose nor can its import be minimized at the pleading stage. While the disclosure does not single out any individual, the SAC plausibly connects each 10(b) defendant to the misconduct. The SAC plausibly pleads that each 10(b) defendant made misrepresentations with "intent to deceive, manipulate, or defraud, or at least knowing *misconduct*." SEC v.

First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (citation omitted) (emphasis added).

At various points, the 10(b) defendants attempt to cordon the disclosure, arguing that it is limited to a specific time period or subset of transactions within the Class Period. The reasonable interpretation of the disclosure is that the misconduct was related to the accounting for the nonmonetary transactions and extended throughout the Class Period.

The individual 10(b) defendants attempt to parse the disclosure in other ways, all of which are without merit. Fairly read in the light most favorable to the plaintiffs, the Audit Committee’s investigation concluded that the primary driver behind the restatement was misconduct. The investigation “also” identified other issues that called “aspects” of the nonmonetary transactions “into question” and additional issues with respect to internal control deficiencies, some of which are more damaging to the 10(b) defendants than others. Micheletto Decl., Ex. B. The addition of additional problems does not dilute the admission of misconduct.

Wesley argues that any statements he made were subjective opinions. Wesley cites In re Gen. Elec. Co. Sec. Litig., 856 F. Supp. 2d 645 (S.D.N.Y. 2012), for the proposition that “[s]tatements estimating the fair market value of assets are opinions, not matters of objective fact.” Id. at 653 (citing

Fait v. Regions Financial Corp., 655 F.3d 105, 110 (2d Cir. 2011)). That case does not help Wesley because the court noted that allegations of misstated asset valuations attributable to "improper accounting practices" raise issues of objective fact that are not protected as opinion statements. Id. at 657-58 & n.2; see also Underland v. Alter, No. CIV.A. 10-3621, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("Unlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact.").

This case is not about complex accounting judgments over which reasonable minds can differ. The plaintiffs allege that GAAP was irrelevant to the accounting calculus except to the extent that the 10(b) defendants used the accounting standards as a cover to inflate revenues. See In re Glob. Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 341 (S.D.N.Y. 2004) ("The gravamen of plaintiffs' Complaint is that these exchanges were essentially unnecessary mirror-image transactions created with the specific intention of inflating the Companies' revenues and deceiving investors into thinking the company was financially sound when it was, in fact, in increasingly perilous straits."). The allegations --- including the disclosure of misconduct; the plausible inference from the disclosure that the 10(b) defendants were entering into gratuitous data swaps and avoiding

disclosing pertinent information to comScore's accounting group and auditor to evade detection; the assurances by Matta and Wesley on the SunTrust Call that historic cash comparators existed for the nonmonetary transactions (when they did not), see SAC ¶ 87 (Wesley stating: "[I]f you don't have historic cash transactions for the products or services that you are selling in a nonmonetary transaction, you cannot under the guidance recognize revenue in connection with that transaction."); the Audit Committee's determination that none of the revenues from the nonmonetary transactions could be recognized; and the alacrity with which the company disclaimed future reliance on nonmonetary transactions after the Wall Street Journal questioned comScore's accounting --- plausibly establish that the inclusion of nonmonetary transactions as revenue in the financial statements, and the statements that nonmonetary transactions were evaluated using ASC 845, were false and misleading statements of objective fact.

In re Hertz Glob. Holdings, Inc. Sec. Litig., No. CV 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017), like the other cases cited by Wesley, is distinguishable. In that case, the plaintiff did "not allege that [the defendant-company] bypassed a methodology or metric, but that [the defendant-company] applied its methodologies incorrectly," which raised issues of subjective opinion. Id. at *12; see also Harris v. AmTrust Fin.

Servs., Inc., 135 F. Supp. 3d 155, 162 n.9, 172 (S.D.N.Y. 2015) (declining to intuit a GAAP violation in the absence of a restatement), aff'd, 649 F. App'x 7 (2d Cir. 2016) (summary order); In re MF Glob. Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 313 (S.D.N.Y. 2013) ("[T]his case is not one in which the complaint alleges that a company 'engaged in improper accounting practices.'" (citation and internal quotation marks omitted)). Here, the plaintiffs have sufficiently alleged that the 10(b) defendants bypassed the asserted accounting methodology in perpetrating the alleged fraud, an allegation supported by the Audit Committee's determination that no revenue from any nonmonetary transaction could be included in the financial statements.

Moreover, treating any of the alleged misstatements as subjective opinions pursuant to Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1327 (2015), would not aid Wesley (or the other 10(b) defendants). Assuming Omnicare applies in the 10(b) context,[5] "[f]or a

---

[5] The parties assume that Omnicare applies to Section 10(b) claims. Although there has been some indication that Omnicare applies outside of the Section 11 context in which it arose, see City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 616 (9th Cir. 2017), the Court of Appeals for the Second Circuit has not "directly held that Omnicare applies to Section 10(b) [and] Rule 10b–5 . . . claims." Sec. & Exch. Comm'n v. Thompson, No. 14-CV-9126 (KBF), 2017 WL 874973, at *17 (S.D.N.Y. Mar. 2, 2017). It is

statement of belief or opinion to be actionable under Section 10(b), a plaintiff must allege that (1) ‘the speaker did not hold the belief she professed,’ (2) ‘the supporting fact[s] she supplied were untrue,’ or (3) the stated opinion, ‘though sincerely held and otherwise true as a matter of fact,’ ‘omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor.’” N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc., No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016) (quoting Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016)).

The allegations meet all three Omnicare tests for alleging falsity.[6] The allegations plausibly and specifically claim that Wesley (and the other 10(b) defendants) did not honestly hold any opinions professed. See In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015). Moreover, there are sufficient allegations that any opinions were predicated on untrue statements of fact and “omit[ed] material facts about [each] speaker's inquiry into or knowledge of facts that would support the stated opinion.” In re Salix Pharm., Ltd., No. 14-

---

unnecessary to address the precise reach of Omnicare because its application would not affect the outcome of this case.

[6] For this reason, it is unnecessary to parse which statements could be fairly characterized as opinion statements.

CV-8925 (KMW), 2016 WL 1629341, at *12 n.10 (S.D.N.Y. Apr. 22, 2016).[7]

The 10(b) defendants argue that any statements regarding revenue projections --- such as instances where Tarpey and Wesley stated that comScore was increasing its revenue guidance, see, e.g., SAC ¶¶ 276, 308, or where Matta stated, "[B]ased on the revenue growth and the flow through to the bottom line, we feel like over the next three to five years, this should be a mid-20%s EBITDA margin," SAC ¶ 291 --- are protected under the PSLRA's safe harbor as forward-looking statements. See 15 U.S.C. § 78u–5(c)(1)(A-B). Pursuant to the safe harbor, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010).

The safe harbor is inapplicable. The 10(b) defendants do not contest materiality, with the exception of Tarpey (his argument, which is without merit, is addressed below), and the SAC sufficiently alleges that each 10(b) defendant made the projections knowing that they were based on a false premise:

[7] Wesley's papers state that he does not believe that any accounting determinations he made were erroneous. See Wesley Reply Mem. at 3. That type of assertion is not properly considered on a motion to dismiss.

nonexistent revenue. The 10(b) defendants point to cautionary language accompanying their statements that, among other things, warned investors that changes to accounting interpretations or methods could result in a restatement of financial results. See, e.g., Micheletto Ex. C (Excerpts from comScore 2013 and 2014 Form 10-Ks). The risk factors plainly did not warn investors about the relevant risk that led to the restatement: misconduct. See Salix, 2016 WL 1629341, at *11 ("To be eligible for the safe harbor, 'the relevant cautionary language must be prominent and specific, and must directly address exactly the risk that plaintiffs claim was not disclosed.'" (citation and internal quotation marks omitted)). Moreover, resort to cautionary language cannot aid the 10(b) defendants in light of the plausible allegations that the 10(b) defendants knew at the time that a significant portion of the revenue undergirding their revenue projections was fictitious. See In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 102 (D.C. Cir. 2015) ("[C]autionary language cannot be 'meaningful' if it is 'misleading in light of historical fact[s]' . . . 'that were established at the time the statement was made.'" (quoting Slayton, 604 F.3d at 769-70)).

The 10(b) defendants also move to dismiss the same statements regarding projections as inactionable expressions of puffery and corporate optimism. However, the alleged

misstatements were more than mere puffery because they were grounded in historical facts (false revenue numbers) that the 10(b) defendants allegedly knew to be false and because they were plausibly designed to mislead investors into believing that comScore's present (as well as its future) was rosier than reality. See, e.g., Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 485 (S.D.N.Y. 2010), as corrected (Sept. 30, 2010); In re Symbol Techs., Inc. Sec. Litig., No. 05-CV-3923 (DRH), 2013 WL 6330665, at *7 (E.D.N.Y. Dec. 5, 2013); compare SAC ¶ 276 (Tarpey stating: "We're now raising our full year 2014 revenue outlook due to the continued momentum of the business. For 2014, we now anticipate revenues in the range of $320.5 million to $329.5 million."), SAC ¶ 291 (similar statement by Matta), SAC ¶ 373 (similar statement by Wesley), with In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) (statement that "Based on the momentum we have experienced during the first nine months and the strong order backlog, we continue to expect our percentage growth in 2000 over 1999 will be in the low 40's" was not a "simply 'soft' prediction" because "there was no such momentum").

Finally, Tarpey argues that the SAC fails to plead with particularity the falsity of any statements he made with respect to the sufficiency of comScore's internal controls because he

only made statements toward the beginning of the Class Period. It is a reasonable inference that the internal controls deficiencies identified in the November 23, 2016 Form 8-K extended through the Class Period, including the filings that Tarpey signed, which will have to be restated. There are sufficient allegations that the statements regarding the internal controls were false and misleading throughout the Class Period, and that each of the 10(b) defendants "disbelieved the alleged statements [including with respect to internal controls] at the time they were made." Petrobras, 116 F. Supp. 3d at 381.

Accordingly, the motions to dismiss the 10(b) claims in Count I based on the lack of falsity of the alleged misrepresentations and omissions are **denied.**

**B.**

Tarpey has moved to dismiss the 10(b) claim in Count I against him for failure to allege materiality. Tarpey argues that, for the period he was CFO, nonmonetary revenue to be restated represented approximately 1%, 3%, and 2%, respectively, of comScore's total revenues for end-of-year 2013 and the first and second quarters of 2014, meaning that any misstatements he made during this period were presumptively quantitatively immaterial. See Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 487 (2d Cir. 2011) (quantitative materiality typically rests on a numerical threshold of 5%).

"A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 389 (2d Cir. 2015) (citation omitted). A complaint may not be dismissed "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (citation omitted).

The Court of Appeals for the Second Circuit has explained that courts must fully analyze "all relevant considerations" when assessing materiality. Litwin v. Blackstone Group, L.P., 634 F.3d 706, 717 (2d Cir. 2011); Hutchison, 647 F.3d at 485. Under the holistic analysis endorsed by the Court of Appeals, sufficiently strong qualitative evidence of materiality can establish materiality as a matter of law. Litwin, 634 F.3d at 717–18. The qualitative inquiry is guided by SEC Staff Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45,150 (1999). Id. at 717; see also Eletrobras, 2017 WL 1157138, at *7.

SAB 99 provides a non-exhaustive list of the relevant qualitative factors that could render material a quantitatively small misstatement of a financial statement item. See SAB 99, 64

Fed. Reg. at 45,152. Among these factors is management's expectations regarding whether a known misstatement may result in a significant negative market reaction. SAB 99, 64 Fed. Reg. at 45,152. The very fact of the restatement and thus comScore's conclusion that the financials were materially misstated at the time Tarpey made alleged misrepresentations "belies any suggestion that any misstatement or omission was not material." S.E.C. v. Kelly, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009); accord Warchol v. Green Mountain Coffee Roasters, Inc., No. 10-CV-227, 2012 WL 256099, at *5 (D. Vt. Jan. 27, 2012).

The alleged misstatements plausibly implicate other SAB factors. The alleged misstatements by Tarpey plausibly affected comScore's "compliance with regulatory requirements," SAB 99, 64 Fed. Reg. at 45,152, because the misstated earnings and false promises of compliance with GAAP plausibly contributed to comScore's inability to comply with its periodic reporting requirements and subsequent suspension from NASDAQ. The misstatements also plausibly "mask[ed] a change in earnings or other trends" and "hid[] a failure to meet analysts' consensus expectations for the enterprise," SAB 99, 64 Fed. Reg. at 45,152, because the misstatements enabled Tarpey to give more robust (and false) guidance about comScore's financial health. See Eletrobras, 2017 WL 1157138, at *8; In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 291 (S.D.N.Y.

2008) (categorization of company as "a growth company" contributed to finding of materiality where earnings were misstated). It is plausible that comScore's revenue growth --- overstated by approximately 10.1%, 27.2%, and 17.8% for the end-of-year 2013 and first two quarters of 2014, respectively --- was material to investors: analysts highlighted comScore's revenue growth as an important metric, see, e.g., SAC ¶ 3, 44, as did Tarpey, repeatedly, see, e.g., SAC ¶¶ 211, 214, 231, 244, 247, 273, 276. The Grant Thornton Report specifically identified comScore's disclosures with respect to nonmonetary revenue as something that "may not be fully understood by analysts and investors" and warned that a "better under[standing]" could adversely affect comScore's stock price. SAC ¶ 94.

A better understanding did affect comScore's stock price. comScore's significant stock drop further supports an inference of materiality. See Eletrobras, 2017 WL 1157138, at *9 ("While market volatility alone is too blunt an instrument to be depended on in considering whether a fact is material, the significant volatility of [the company's securities], considered in aggregate with other SAB 99 factors, preclude the conclusion that the alleged misstatements and omissions . . . were so obviously unimportant to a reasonable investor to be immaterial." (citations, internal quotations marks, and footnote omitted)).

As he did in connection with his arguments regarding the falsity of his statements on internal controls, Tarpey argues that the statements he made earlier in the Class Period (though plausibly false and misleading, and determined to be materially so by comScore) were categorically immaterial to investors. Although Tarpey would attribute comScore's restatement, stock drop and regulatory woes to misstatements made later in the Class Period by the other 10(b) defendants, that inference could not be drawn on a motion to dismiss.

Accordingly, Tarpey's motion to dismiss the 10(b) claim in Count I for failure to plead materiality is **denied.**

**C.**

The 10(b) defendants argue that the SAC has failed to plead scienter.

The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." First Jersey, 101 F.3d at 1467 (citations omitted). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that

constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99.

In order to plead scienter adequately, the plaintiff must allege facts supporting a strong inference with respect to each defendant. See Arbitron, 741 F. Supp. 2d at 488. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton, 604 F.3d at 766.

To raise a strong inference of scienter through motive and opportunity to defraud, a plaintiff must allege that the defendants "'benefitted in some concrete and personal way from the purported fraud.'" ECA, 553 F.3d at 198 (quoting Novak v. Kasaks, 216 F.3d 300, 307–08 (2d Cir. 2000)). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id. Motive is generally shown by alleging that corporate insiders made the

misrepresentation in order to sell their own shares at a profit. Id.

Where the defendants' motive to commit fraud is not apparent, "the strength of the circumstantial allegations [that a defendant consciously or recklessly misbehaved] must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (citation and internal quotation marks omitted). Plaintiffs typically allege conscious or reckless misbehavior by pleading with specificity that the defendants had "knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308. As the Court of Appeals for the Second Circuit has explained, "[r]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (citation and internal quotation marks omitted); see also Lions Gate, 165 F. Supp. 3d at 22–23.

Considering the allegations holistically, the SAC plausibly alleges circumstantial facts from which to conclude conscious misbehavior on the part of each individual 10(b) defendant, and moreover plausibly alleges that the individual 10(b) defendants had the motive and opportunity to overstate comScore's revenues.

The November 23, 2016 Form 8-K's admission that the restatement of nonmonetary revenue was attributable to misconduct, see Micheletto Decl., Ex. B, provides the starting point. Based on comScore's disclosure, it is plausible that the misconduct stretched through the Class Period to when Tarpey and Abraham were CFO and CEO, respectively. It is plausible that the misconduct began under their regime, and continued under Wesley and Matta.

The individual 10(b) defendants each seek to distance themselves from the disclosure, arguing that it does not link them to the misconduct with specificity. However, inferences of misconduct that might be borderline in the absence of the disclosure are magnified and must be viewed with increased suspicion. See Eletrobras, 2017 WL 1157138, at *12 n.12 (finding that the "clear implication of the disclosure" was that the individual defendant was complicit in the alleged scheme). Considered holistically, the SAC sufficiently connects each individual 10(b) defendant to misconduct.

The internal control deficiencies identified in the November 28, 2016 Form 8-K contribute to an inference of scienter for Tarpey, Wesley, Matta, and Abraham. See id. at *11 (collecting cases). The deficiencies included "concerns about tone at the top," "information not having been provided to the Company's accounting group and its external auditors," and "the

sufficiency of public disclosures made by the Company about certain performance metrics.” Micheletto Decl., Ex. B. Unlike cases in which misrepresentations plausibly result from issues flowing from the bottom-up (for example, where subordinates fail to give executives pertinent information), it is more plausible based on the disclosure that the fraud flowed from the top-down. It is plausible that when the company refers to deficiencies surrounding public disclosures about performance metrics, it is implicating the speakers about those subjects during the period: Tarpey, Abraham, Wesley, and Matta. It is plausible that the individual 10(b) defendants did not give relevant information to the accounting group and auditors who could have caught the fraud. Wesley notes that comScore’s auditor signed off on comScore’s financial statements, but that is not a mitigating circumstance in light of the plausible inference that the individual 10(b) defendants did not disclose information to the auditor to avoid detection.

It is undisputed that Tarpey, Abraham, Matta, and Wesley were aware of and made statements about comScore’s revenue recognition practices, including with respect to nonmonetary revenue. Each of the individual 10(b) defendants spoke extensively about comScore’s revenues during the Class Period. The fictitious nonmonetary revenue plausibly allowed comScore to raise revenue guidance and to meet analyst and market

expectations. Crediting the allegations, it is plausible that the individual 10(b) defendants were aware that the revenues were artificially inflated, or at the very least consciously or recklessly disregarded the evidence that the revenues were overstated. Eletrobras, 2017 WL 1157138, at *11.

The 10(b) defendants argue that executive turnover undercuts an inference of scienter. But the improper assessment of nonmonetary transactions on a fair value basis, even though "there [was] no historical cost basis associated with the assets that [comScore] exchanged," Micheletto Decl., Ex. B, was first made under Tarpey and Abraham. Similarly, the entrance into unnecessary nonmonetary transactions and the failure to disclose pertinent information about the nonmonetary transactions to comScore's accounting group plausibly occurred under both regimes. The 10(b) defendants also overstate the degree of turnover at the company. Matta became the President of comScore in June 2013 while Tarpey and Abraham were still CFO and CEO, respectively. Matta replaced Abraham as CEO while Tarpey was still CFO. Abraham stayed at the company as the Executive Chairman of the Board of Directors.

The campaign by Matta and Wesley to placate the market in reaction to the inquires by the media, analysts, investors and the SEC regarding comScore's accounting practices provides cogent support for the inference of scienter. Matta and Wesley

vociferously defended comScore's treatment of nonmonetary revenue (which had begun under Tarpey and Abraham). It is a plausible and cogent inference that Matta and Wesley knew or consciously disregarded the possibility that their protestations of accurate accounting treatment for nonmonetary transactions were false. When the Audit Committee examined the same transactions, it found that none of the revenue could be properly recognized, despite the detailed defenses by Matta and Wesley. The false assurances that cash comparators for the transactions existed and that "the guidelines" for barter transactions "are very, very strict and we follow them to the 't,'" SAC ¶ 90, likewise contribute to the inference of scienter. See Salix, 2016 WL 1629341, at *14; In re Marsh & Mclennan Companies, Inc. Sec. Litig., 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (finding that "aggressive[] support[] [for] the Company's business practices" after they had been questioned supported scienter).

The fact that revenues and other related metrics were "key to measuring [comScore's] financial performance and [were] a subject about which investors and analysts often inquired" further reinforces the inference of scienter. Dobina v. Weatherford Int'l Ltd., 909 F. Supp. 2d 228, 247 (S.D.N.Y. 2012) (quoting New Orleans Emps. Ret. Sys. v. Celestica, Inc., 455 F. Appx. 10, 14 (2d Cir. 2011) (summary order)).

The timing and circumstances surrounding the resignations of Abraham, Wesley, and Matta also contribute to the inference of scienter with respect to those defendants. See In re OSG Sec. Litig., 12 F. Supp. 3d 622, 633 n.84 (S.D.N.Y. 2014) (collecting cases). In the November 28, 2016 Form 8-K, comScore disclosed that one of its remedial measures for improving "accounting and internal control practice . . . included . . . separating certain personnel." Micheletto Decl., Ex. B. It is plausible that the targets of this remedial measure were Wesley, who left the company toward the conclusion of the Audit Committee investigation, and Matta and Abraham, who both resigned from the Board of Directors within a month of the disclosure before their terms expired. See Eletrobras, 2017 WL 1157138, at *12 n.6. The resignations were contrary to comScore's previous disclosures, which had implied that Wesley and Matta would remain with the company for longer periods, and expressly contradicted the representation that Abraham would remain on the Board of Directors through 2018. The individual 10(b) defendants contend that the resignations were nonevents in the sense that companies routinely clean house in the aftermath of negative news, but that explanation lacks force in light of the disclosed remedial measure.

The Court of Appeals for the Second Circuit has held that the size of the purported fraud may contribute to an inference

of scienter. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001) (holding that a total of $24 million in charges "undermines, at the pleading stage, the argument that the defendants were unaware" of any increase in returns); Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (deeming significant the "magnitude" of a defendant's write-off in determining scienter); see also Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015). Here, the plausible allegations that the individual 10(b) defendants failed to evaluate the nonmonetary transactions using GAAP and affirmatively misrepresented that the recognition of the revenue complied with GAAP when it did not, the lack of any historical cost basis to evaluate any of the nonmonetary transactions over the Class Period (despite the assurances that such comparators existed), the need for a restatement, and the 100% write-off of comScore's nonmonetary revenue of $43.2 million, all contribute to the inference of scienter. See Salix, 2016 WL 1629341, at *13.

Accordingly, the circumstantial allegations are sufficient to allege a strong inference of scienter with respect to each individual 10(b) defendant that is more plausible than any competing innocent inference.

The SAC also establishes motive and opportunity on the part of each individual defendant. There is no dispute that the

individual defendants, as high-ranking officers who made alleged misrepresentations with respect to comScore's revenues, had the opportunity to mislead the market with respect to revenues.

The SAC plausibly alleges that the individual 10(b) defendants had the motive to inflate comScore's stock price to acquire Rentrak. See ECA, 553 F.3d at 201 n.6 (observing that whether the artificial inflation of stock prices to acquire a company can suffice for scienter purposes is extremely contextual). The SAC establishes a direct line between the Merger and the fraud. The plaintiffs allege that comScore and Rentrak engaged in preliminary discussions regarding a merger in December 2013. Browne Decl., Ex. 4 at 37. The scheme to inflate revenues allegedly began two months later. The amount of fictitious revenue escalated as Merger negotiations heated up, culminating in the all-stock acquisition of Rentrak with comScore's artificially inflated stock. The acquisition occurred shortly after Wesley and Matta defended their revenue recognition practices to analysts and the market, which was plausibly designed in part to keep the share price afloat so that comScore could acquire Rentrak. The scheme fell apart less than a month after the Merger was consummated.

The 10(b) defendants argue that the delay in the acquisition and the fact that the intensity of negotiations may have simmered at points renders the alleged motive implausible.

The argument that Merger discussions may not have been linear does not eliminate the culpable inference that the purpose of the fraud from the perspective of the individual 10(b) defendants was, in part, to accomplish the acquisition. The form of the all-stock acquisition, the timeline of events, and the disclosure that the restatement is attributable to misconduct, when combined with the other allegations, plausibly establishes a culpable motive with respect to each individual 10(b) defendant that is more cogent and compelling than any alternative inference. See, e.g., Rothman v. Gregor, 220 F.3d 81, 92-94 (2d Cir. 2000); In re SLM Corp. Sec. Litig., 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010); In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003); Burstyn v. Worldwide Xceed Grp., Inc., No. 01 CIV. 1125 (GEL), 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002) (citing In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001)).[8]

The insider trading by Matta, Abraham, and Wesley provides additional support for an inference of motive as to those

[8] The 10(b) defendants argue that pre-Tellabs cases should not be relied upon. In noting that artificially inflating stock prices for acquisitions can support an inference of scienter, the Court of Appeals in ECA, 553 F.3d at 201 & n.6, cited pre-Tellabs cases approvingly. Pre-Tellabs cases are accorded the appropriate weight with the understanding that they predate the consideration of competing nonculpable inferences required by Tellabs.

defendants. A complaint that seeks to base scienter on a corporate insider's sale of the insider’s own stock must show “unusual” insider sales. See Scholastic Corp., 252 F.3d at 74; Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995). “Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling.” Scholastic, 252 F.3d at 74–75; see also City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 420 (S.D.N.Y. 2011).

With respect to Abraham, Matta, and Wesley, the allegations of stock sales are very potent. During the Class Period, Abraham sold 92% of his shares directly, while related parties sold 57% of their shares indirectly, for a total of $31.5 million; Wesley sold 83% of his shares for $3.4 million; and Matta sold 68% of his shares for $18.1 million. The sheer magnitude of these sales by three of the individual 10(b) defendants during the Class Period, combined with the circumstances surrounding the sales, including comScore’s admission of misconduct, strongly supports an inference of scienter. See Stevelman v. Alias Research Inc., 174 F.3d 79, 82, 85–86 (2d Cir. 1999) (sale of 40% of shares indicative of motive).

The 10(b) defendants raise a number of unsuccessful arguments in an effort to dilute the significance of the sales. The 10(b) defendants argue that a portion of the sales by Abraham and Matta were made pursuant to Rule 10b5-1 trading plans. But "[w]hen executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 309 (2d Cir. 2015). While a small portion of the sales were pursuant to trading plans entered into outside the Class Period, the vast bulk of the sales were not made pursuant to any Rule 10b5-1 trading plan or pursuant to trading plans that were entered into at times that were plausibly designed to take advantage of comScore's allegedly inflated share price. SAC ¶¶ 178-82.

Abraham and Matta argue that the allegations fail to show that their trades were out-of-line with their previous trading practices, but the magnitude of their divestments during the Class Period even when compared to previous periods is plausibly unusual.

Wesley argues that he joined comScore as CFO during the middle of the Class Period and that he sold his shares at the first opportunity when restrictions on his stock awards expired,

which he contends creates an opposing nonculpable inference that his sales were designed to diversify his portfolio. Considering the allegations as a whole, it is more plausible that Wesley joined the scheme and unloaded his shares at the first opportunity while the stock price was artificially elevated.

The 10(b) defendants argue that what they label “in-kind” sales (for example, sales to cover tax liabilities) should be discounted from the analysis because only sales that result in “take-home cash” are indicative of fraudulent intent. The difference would not vitiate the inference of motive because the take-home cash sales were substantial. Omitting trades pursuant to trading plans entered into before the Class Period, and such purported in-kind sales, Abraham took home in cash approximately $12.5 million, Matta $8.5 million, and Wesley $2 million. See Micheletto Decl., Ex. G.

Moreover, there is little principled reason to exclude in-kind sales as a categorical matter. Money is fungible; in-kind and take-home cash sales affect the seller’s bottom line equally. See SLM Corp., 740 F. Supp. 2d at 558 n.6 (finding that the explanation that sales “were necessary to pay the exercise price of expiring options and associated taxes for stock sales” was a disputed issue that could not be resolved on a motion to dismiss).

However, the SAC fails to allege unusual trading on behalf of Tarpey. Tarpey sold 22% of his shares for a value of $1.8 million, of which $650,000 worth was sold pursuant to Rule 10b5-1 trading plans entered into before the Class Period. See Hendon Decl., Ex. 6 (Tarpey Form 4s); SAC ¶¶ 176, 182. The trades were not unusually timed. Tarpey argues that his retention of stock raises a compelling nonculpable inference that he was not complicit in the alleged fraud. While Tarpey presents a closer case than the other individual 10(b) defendants, the culpable inference of scienter that Tarpey was complicit despite his failure to unload his stock before the scheme unraveled is at least as powerful as any nonculpable inference.

Similarly, the culpable inference of scienter dwarfs any nonculpable inference that the remaining individual 10(b) defendants were not involved in the alleged fraud. The individual 10(b) defendants argue that comScore's disclosures about nonmonetary transactions were exhaustive, which they contend undercuts the inference of scienter. The individual 10(b) defendants exaggerate the content of the disclosures, which were neither illuminating nor truthful.

The SAC thus plausibly alleges scienter against each individual defendant. Because the SAC alleges scienter against four key officers of comScore, it necessarily alleges scienter against comScore itself. See Teamsters Local 445 Freight Div.

Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant."); Arbitron, 741 F. Supp. 2d at 491 ("Because the plaintiffs have successfully pleaded scienter as to . . . [the company's] then-president, CEO, and chairman, they have also pleaded corporate scienter as to [the company]."); see also Orthofix, 89 F. Supp. 3d at 619–20.

Accordingly, the motions to dismiss the Section 10(b) claims in Count I for failure to plead scienter are **denied.**

**IV.**

In Count II, the plaintiffs allege that the individual 10(b) defendants are liable under Section 20(a) of the Exchange Act, which provides:

> Every person who, directly, or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud." ATSI, 493 F.3d at 108; see also In re New Oriental Educ. & Tech. Grp. Sec. Litig., 988 F. Supp. 2d 406, 428–29 (S.D.N.Y. 2013). The 10(b) defendants' only argument for dismissal of the Section 20(a) claims is that the plaintiffs have not adequately alleged a primary violation. Because this argument is without merit, the motions to dismiss Count II are **denied.**

## V.

The Merger defendants have moved to dismiss the claims pursuant to Section 14(a) of the Exchange Act in Counts III and IV, and the comScore Merger defendants have moved to dismiss the claims pursuant to Section 11 of the Securities Act in Count V.

Section 11(a) of the Securities Act provides that any signatory to a registration statement, director of the issuer of securities, or underwriter with respect to such securities, among others, may be held liable to purchasers of registered securities if the registration statement contains "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

Section 11 imposes "a stringent standard of liability on the parties who play a direct role in a registered offering." In re Flag Telecom Holdings, Ltd. Secs. Litig., 618 F. Supp. 2d 311, 321 (S.D.N.Y. 2009) (quoting Herman & MacLean v.

Huddleston, 459 U.S. 375, (1983)). To establish a prima facie claim under Section 11, "[a] plaintiff need only plead a material misstatement or omission in the registration statement." In re Flag Telecom Holdings, Ltd. Secs. Litig., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), abrogated on other grounds, 574 F.3d 29 (2d Cir. 2009). Under Section 11, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements," while "[o]ther defendants bear the burden of demonstrating due diligence." Herman & MacLean, 459 U.S. at 382; see also EnergySolutions, 814 F. Supp. 2d at 424.

Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person . . . to solicit or permit the use of his name to solicit any proxy" in violation of an SEC regulation. 15 U.S.C. § 78n(a)(1). Rule 14a–9 in turn prohibits both the inclusion of "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact," and the omission of "any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a–9(a).

"To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must allege that: '(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself,

rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd., 866 F. Supp. 2d 223, 238 (S.D.N.Y. 2012) (quoting Police and Fire Retirement System of City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009)). While the Court of Appeals has not directly addressed the issue, courts have generally concluded that Section 14(a) allegations must identify with precision any misleading statements or omitted material facts pursuant to the PSLRA, 15 U.S.C. § 78u–4(b)(1). See In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig., 757 F. Supp. 2d 260, 286 (S.D.N.Y. 2010) (collecting cases).

Neither Section 11 nor Section 14(a) requires pleading that a defendant acted with intent to defraud. Dekalb Cty. Pension Fund v. Transocean Ltd., 817 F.3d 393, 409 & n.95 (2d Cir. 2016), as amended (Apr. 29, 2016) (Section 14(a)); Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (Section 11). While loss causation is an element of a Section 14(a) claim, see Witchko v. Schorsch, No. 15 CIV. 6043 (AKH), 2016 WL 3887289, at *7 (S.D.N.Y. June 9, 2016), "[l]oss causation is not an element of a Section 11 . . . claim and need not be pleaded to sufficiently state a claim." EnergySolutions, 814 F. Supp. 2d at

424 (collecting cases). Instead, Section 11 provides for a loss causation affirmative defense to liability. Id.

### A.

If Section 11 and Section 14(a) claims plead at most negligence, they need only satisfy the notice pleading requirements of Federal Rule of Civil Procedure 8(a). See Litwin, 634 F.3d at 718 (Section 11); Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 995 (2d Cir. 1988) (Section 14(a)); Bank of Am. Corp., 757 F. Supp. 2d at 322 (Section 14(a)). However, when claims under Sections 11 and 14(a) "are premised on allegations of fraud," they must also satisfy Rule 9(b) of the Federal Rules of Civil Procedure. Rombach, 355 F.3d at 171 (Section 11); In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) ("The reasoning of [Rombach], that extends Rule 9(b) particularity requirements to Section 11 claims, applies with equal force to claims brought pursuant to Section 14(a).").

Relying on Rombach, the Merger defendants argue that all of the claims must sound in fraud because some of the claims against some of the defendants sound in fraud. The Merger defendants misread Rombach. Unlike the plaintiffs in Rombach --- whose Section 11 claims incorporated by reference the allegations supporting their Section 10(b) fraud claims --- the plaintiffs here went beyond "nominal efforts" to distinguish

their fraud allegations from their strict liability and negligence allegations under Section 11 and Section 14(a). Rombach, 355 F.3d at 171, 175 (citation omitted).

The SAC specifies that the Section 14(a) and Section 11 claims "are based solely on negligence or strict liability" and "disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims . . . ." SAC ¶ 528. "On their own, such disclaimers are insufficient to subject a complaint to Rule 8, because '[p]laintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness.'" EnergySolutions, 814 F. Supp. 2d at 424 (quoting JP Morgan Chase, 363 F. Supp. 2d at 635). However, the SAC is segregated into two parts, the first for the allegations supporting Counts I and II, which sound in fraud, and the second for the allegations supporting Counts III, IV, and V, which plead at most negligence. Counts III, IV, and V are only pleaded by plaintiff Huff. Plaintiff Huff is allowed to "plead claims in the alternative" and the careful structure of the SAC "draw[s] a clear distinction between [the at most] negligence and fraud claims." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007); accord In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011). In similar circumstances, courts have consistently held that Section 11 and Section 14(a) are subject to notice pleading where, as here, the division

between the claims is clear. E.g., In re Jumei Int'l Holding Ltd. Sec. Litig., No. 14-CV-9826, 2017 WL 95176, at *3 (S.D.N.Y. Jan. 10, 2017) (Section 11); EnergySolutions, 814 F. Supp. 2d at 424 (Section 11); Bank of Am. Corp., 757 F. Supp. 2d at 321–22 (Section 14(a)).

The Rentrak defendants' characterization of the SAC as telling a "single fraud story," Rentrak Mem. Op. at 8, is without merit. Part of the rationale animating Rombach, 355 F.3d at 171, was the salutary purposes underlying Federal of Civil Procedure Rule 9: claims that sound in fraud, by their nature, can harm a defendant's reputation and may be used as strike suits. Those concerns are not present here in light of the different theories underlying the fraud and the (at most) negligence claims, and they are not remotely present for the majority of the Merger defendants, who are not implicated by any fraud claims. In particular, a fair reading of the SAC does not reveal any allegations that could lead to an inference that the Rentrak defendants were complicit in the fraud alleged against the 10(b) defendants.

Nevertheless, the Merger defendants argue that the division of the SAC is irrelevant because the allegations supporting the Section 11 and Section 14(a) claims are couched in the language of fraud because they refer to the allegedly problematic proxy solicitation and Registration Statement as "materially false and

misleading and omit[ing] material facts." See, e.g., SAC ¶ 533. The majority of well-reasoned cases have rightly rejected this argument. See Bank of Am. Corp., 757 F. Supp. 2d at 321 (Section 14(a)); Refco, 503 F. Supp. 2d at 632 (Section 11). Plaintiff Huff's allegations simply track the language of Section 11, see 15 U.S.C. § 77k(a), and Rule 14a-9, see 17 C.F.R. § 240.14a–9(a); they do not sound in fraud. To hold that bare recitations of the elements of the causes of action triggered Rule 9(b) would be contrary to the holding of the Court of Appeals in Rombach, 355 F.3d at 178, that claims under Section 11 need not sound in fraud, and the recent statement by the Court of Appeals in Dekalb that "[l]iability can be imposed [under Section 14(a)] for negligently drafting a proxy statement." 817 F.3d at 409 & n.95 (quoting Wilson, 855 F.2d at 995) (collecting cases). A contrary rule also "would create a perverse incentive to file separate actions." Lewy v. SkyPeople Fruit Juice, Inc., No. 11 CIV. 2700 (PKC), 2012 WL 3957916, at *8 (S.D.N.Y. Sept. 10, 2012).

Citing Bond Opportunity Fund v. Unilab Corp., No. 99 CIV. 11074 (JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003), aff'd, 87 F. App'x 772 (2d Cir. 2004) (summary order), the Merger defendants argue that claims of negligence pursuant to Section 14(a) are subject to the elevated pleading standard of the PSLRA, 15 U.S.C. § 78u–4(b)(2), meaning that plaintiff Huff

must plead a strong inference of negligence. 15 U.S.C. § 78u–4(b)(2) provides: "[I]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

The better reasoned cases have followed the decision of the Court of Appeals for the Seventh Circuit in Beck v. Dobrowski, 559 F.3d 680 (7th Cir. 2009) (Posner, J.), which held that the elevated pleading standard does not apply to Section 14(a) claims that sound in negligence because "negligence is not a state of mind; it is a failure, whether conscious or even unavoidable (by the particular defendant, who may be below average in his ability to exercise due care), to come up to the specified standard of care."[9] Id. at 682; accord Transocean, 866 F. Supp. 2d at 240; Bank of Am. Corp., 757 F. Supp. 2d at 321.

The Court of Appeals for the Second Circuit recently cited Beck's articulation of the law with approval in Dekalb, 817 F.3d at 408 n.90. The articulation is consistent with what it takes

[9] Section 11 imposes a standard of strict liability on issuers and the signatories of registration statements. See Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012). There can thus be no argument by the comScore Merger defendants that the PSLRA imposes a heightened pleading standard on Section 11 claims against issuers and signatories --- there is nothing to heighten.

to plead a Section 14(a) claim: "Under Rule 14a-9, plaintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive. Liability can be imposed for negligently drafting a proxy statement." Wilson, 855 F.2d at 995 (citation omitted); accord Dekalb, 817 F.3d at 408 & n.90.

Accordingly, plaintiff Huff's Section 11 and 14(a) claims in Counts III, IV, and V need only meet Rule 8(a)'s notice pleading requirement.

**B.**

The comScore Merger defendants have moved to dismiss the Section 14(a) claims in Count III and the Section 11 claims in Count V. Plaintiff Huff alleges that the Registration Statement and proxy solicitation materials related to the Merger contained a variety of false and misleading statements substantially identical to or of the same nature as those discussed in connection with the 10(b) claims, namely, related to comScore's reported revenues and revenue related metrics, which were inflated by nonmonetary revenue.[10] SAC ¶¶ 566-613.

The comScore Merger defendants do not offer a basis to distinguish the alleged misstatements and omissions in Counts

[10] Plaintiff Huff has clarified that his omission claims related to the Grant Thornton Report are directed solely against the Rentrak defendants. See Dkt. 204 (Pls.' 10(b) Mem. Op.) at 73 n.21.

III and V from the substantially identical misrepresentations and omissions already addressed in connection with Counts I and II. The SAC pleads that there were actionable misrepresentations and omissions in the proxy solicitation and the Registration Statement. See EnergySolutions, 814 F. Supp. at 425 ("Under Rule 8, all allegations that survive Rule 9(b) necessarily survive as well.").

The comScore Merger defendants principally argue that the SAC fails to plead negligence.

That argument is inapplicable to Count V because "Section 11 imposes strict liability on issuers and signatories, . . . '[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012) (quoting 15 U.S.C. § 77k(a)). Because plaintiff Huff has pleaded actionable misrepresentations in the Registration Statement, he has pleaded Section 11 claims against the comScore Merger defendants.

With respect to the Section 14(a) claims in Count III, "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy

the . . . negligence standard." Wilson, 855 F.2d at 995; see also Brown v. Brewer, No. CV06-3731 (GHK), 2010 WL 2472182, at *24-25 (C.D. Cal. June 17, 2010). The allegations are sufficient to meet that low bar.

Accordingly, the motion by the comScore Merger defendants to dismiss Counts III and V is **denied**.

**C.**

The Rentrak defendants have moved to dismiss the Section 14(a) claims in Count IV for failure to plead a material misstatement or omission. Plaintiff Huff's claims relate to the red flags identified in the Grant Thornton Report to the effect that comScore's accounting for nonmonetary transactions "may have provided opportunities for [comScore] Management to 'manage' revenues to meet targets." SAC ¶ 557. Plaintiff Huff claims that the Rentrak defendants breached a duty to Rentrak's shareholders by failing to disclose (in some form) the red flags in their proxy solicitation materials. Plaintiff Huff also faults the Rentrak defendants for negligently preparing proxy solicitation materials.

A "proxy statement should honestly, openly and candidly state all the material facts, making no concealment of the purposes for the proposals it advocates." Mendell v. Greenberg, 927 F.2d 667, 670 (2d Cir.), amended, 938 F.2d 1528 (2d Cir. 1990). Section 14(a) is satisfied "[o]nly when the proxy

statement fully and fairly furnishes all the objective material facts as to enable a reasonably prudent stockholder to make an informed investment decision is the federal purpose in the securities laws served." Id. at 674; see also Bank of Am. Corp., 757 F. Supp. 2d at 290 ("Even 'indefinite and unverifiable' terms, such as observations that an offer was 'fair' or of a 'high' value, can be actionable under Section 14(a) and Rule 14a–9, because they are based on 'provable facts.'" (quoting Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093–94, (1991))).

"A[n] omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008).

Plaintiff Huff primarily challenges the following representation in the Joint Proxy as false and misleading:

> On September 8, 2015, the Rentrak Board met to review the status of the discussions with comScore, with a focus on results of the due diligence process. Mr.

> Chemerow reviewed materials that had been prepared by Grant Thornton regarding the results of Grant Thornton's accounting due diligence.

SAC ¶¶ 579-80. Plaintiff Huff plausibly claims that the Rentrak defendants did not fairly and fully apprise investors of the risks associated with the Merger, as required under Section 14(a). The statement, while factually correct, plausibly does not go far enough to satisfy Rentrak's duty of fair and full disclosure. The statement creates the false impression that Grant Thornton identified no material concerns in their review of comScore's financial data. The representation omits information suggesting that comScore's revenue numbers could be inflated, and the reason for the inflation, which was plausibly grounded in provable facts: the financial information reviewed by Grant Thornton. That undisclosed information plausibly would have been material to a reasonable investor in deciding how to vote on the Merger. The Rentrak defendants were plausibly under a duty to disclose more under Section 14(a).

The Rentrak defendants argue that the Grant Thornton Report did not specifically alert them to the fact that comScore's revenue numbers were overstated, and that there was thus no additional risk factor to disclose. Read in the light most favorable to plaintiff Huff, the Report communicated the risk that, based on Grant Thornton's financial due diligence, comScore's revenue numbers could be overstated because

management was manipulating revenues to meet market expectations.

The Rentrak defendants also argue that they were under no duty to disclose the Grant Thornton Report's observations. The Rentrak defendants point to the Report's "may" language, arguing that it insulates them from liability because the observations were not expressed in the language of certainty. Few disclosed risk factors are expressed in such language. The Rentrak defendants were "certainly require[d]" to disclose "information that would permit an investor to appreciate the risk[s]" associated with the Merger. In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 760 (S.D.N.Y. 2001). This was plausibly one such risk.

The Rentrak defendants argue that a reasonable investor would not have found the Grant Thornton Report's red flags material.

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). Such a determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." Id. at 450. Because

materiality is a mixed question of law and fact, the Court of Appeals had indicated that its resolution often implicates a jury question. Mendell, 927 F.2d at 673; see also Bank of Am. Corp., 757 F. Supp. 2d at 290.

In this case, it is plausible that a reasonable investor would find it material that an accounting firm, upon reviewing comScore’s financial information, had identified concrete reasons to believe that comScore’s revenues could be overstated.

The Rentrak defendants also argue that the Grant Thornton Report’s red flags were not material because the market already knew that there could be issues with comScore’s accounting for nonmonetary transaction based on the questions raised by the Wall Street Journal and other media outlets. This raises a so-called “truth-on-the-market defense” that “a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.” Ganino, 228 F.3d at 167. To be successful, “the corrective information must be conveyed to the public ‘with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by’ the alleged misstatements.” Id. (citation and internal quotation marks omitted). The Court of Appeals has instructed that “[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for

failure to plead materiality.” Id. While the truth-on-the-market defense typically arises in the context of Section 10(b) claims, there is no reason to craft a different rule for a claim based on Section 14(a). Bank of Am. Corp., 757 F. Supp. 2d at 301-03; see also Kronfeld v. Trans World Airlines, Inc., 832 F.2d 726, 736 (2d Cir. 1987) (“There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them.”).

This is not an appropriate case for a “truth-on-the-market” defense. The Joint Proxy instructed: “**Stockholders of comScore and shareholders of Rentrak should rely only on the information contained in this joint proxy statement/prospectus and in the documents that comScore and Rentrak have incorporated by reference into this joint proxy statement/prospectus**.” Browne Decl., Ex. 4 at 136. Because Rentrak “itself warned investors not to rely on the media, it would be unreasonable for a shareholder to consider the media pronouncements to be part of the relevant mix of information.” S.E.C. v. Bank of Am. Corp., 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010); accord In re Facebook, Inc. IPO Sec. & Derivative Litig., 986 F. Supp. 2d 487, 522 (S.D.N.Y. 2013).

Moreover, regardless of the instruction, the force of any corrective information had been undermined by comScore's vigorous defense of its accounting practices to analysts, investors, and the SEC. The fact that the Rentrak defendants had exclusive access to the Grant Thornton Report --- which was based on comScore's financial data --- distinguishes this case from cases like Bettis v. Aixtron SE, No. 16 CIV. 00025 (CM), 2016 WL 7468194, at *12-13 (S.D.N.Y. Dec. 20, 2016), where investors and corporate insiders alike had equal access to the same public information that was allegedly omitted.

Finally, the Rentrak defendants contend that the allegations do not plausibly allege negligence, but the allegations are sufficient to meet the low bar for pleading negligence in the Section 14(a) context. See Wilson, 855 F.2d at 995. While the Rentrak defendants point to a number of efforts they took to assure themselves that comScore's financials were sound, those efforts raise issues of fact that cannot be resolved at the pleading stage.

Accordingly, the motion by the Rentrak defendants to dismiss Count IV is **denied**.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the

motions to dismiss are **denied**. The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated: New York, New York**
**July 28, 2017**

_____________/s/_________________
**John G. Koeltl**
**United States District Judge**